

# EXHIBIT 1

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.<br>☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| **DIVISION**<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ FAMILY<br>☐ OTHER | **CIVIL COVER SHEET** | **CASE NUMBER**<br><br>12-17427CA 10 |
| **PLAINTIFF**<br><br>GHM (SOUTH BEACH) LLC,<br>a Delaware limited liability company | **VS. DEFENDANT**<br><br>SETAI OWNERS LLC,<br>a Delaware limited liability company,<br>and TREVI LUXURY HOSPITALITY<br>GROUP, INC., a Texas corporation,<br>and SMB Management LLC,<br>a Florida limited liability company | **CLOCK IN** |

The civil cover sheet and the information contained here does not replace the filing and service of pleadings or other papers as required by law. This form is required by the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075. See instructions and definitions on reverse of this form.

**TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x in both the main category and subcategory boxes.

☐ 001 - Eminent Domain
☒ 003 - Contracts and Indebtedness
☐ 010 - Auto Negligence
☐ 022 - Products Liability
☐ 023 - Condominium
☐ **Negligence - Other**
  ☐ 097 - Business Governance
  ☐ 098 - Business Torts
  ☐ 099 - Environmental/Toxin Tort
  ☐ 100 - Third Party Indemnification
  ☐ 101 - Construction Defect
  ☐ 102 - Mass Tort
  ☐ 103 - Negligent Security
  ☐ 104 - Nursing Home Negligence
  ☐ 105 - Premises Liability - Commercial
  ☐ 106 - Premises Liability - Residential
  ☐ 107 - Negligence - Other
☐ **Real Property/Mortgage Foreclosure**
  ☐ 108 - Commercial Foreclosure $0 - $50,000
  ☐ 109 - Commercial Foreclosure $50,001 - $249,999
  ☐ 110 - Commercial Foreclosure $250,000 - or more
  ☐ 111 - Homestead Residential Foreclosure $0 - $50,000
  ☐ 112 - Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 113 - Homestead Residential Foreclosure $250,000 or more
  ☐ 114 - Non-Homestead Residential Foreclosure $0 - $50,000
  ☐ 115 - Non-Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 116 - Non-Homestead Residential Foreclosure $250,000 or more
  ☐ 117 - Other Real Property Actions $0 - $50,000
  ☐ 118 - Other Real Property Actions $50,001 - $249,999

☐ 119 - Other Real Property Actions $250,000 or more
☐ **Professional Malpractice**
  ☐ 094 - Malpractice - Business
  ☐ 095 - Malpractice - Medical
  ☐ 096 - Malpractice - Other professional
☐ **Other**
  ☐ 120 - Antitrust/Trade Regulation
  ☐ 121 - Business Transactions
  ☐ 122 - Constitutional Challenge - Statute or Ordinance
  ☐ 123 - Constitutional Challenge - Proposed amendment
  ☐ 124 - Corporate Trust
  ☐ 125 - Discrimination - Employment or Other
  ☐ 126 - Insurance Claims
  ☐ 127 - Intellectual Property
  ☐ 128 - Libel/Slander
  ☐ 129 - Shareholder Derivative Action
  ☐ 130 - Securities Litigation
  ☐ 131 - Trade Secrets
  ☐ 132 - Trust Litigation
☐ **133 - Other Civil Complaint**
  ☐ 009 - Bond Estreature
  ☐ 014 - Replevin
  ☐ 024 - Witness Protection
  ☐ 060 - Declaratory Judgment
  ☒ 081 - Injunctive Relief
  ☐ 082 - Equitable Relief
  ☐ 083 - Construction Lien
  ☐ 084 - Petition for Adversary Preliminary Hearing
  ☐ 085 - Civil Forfeiture
  ☐ 086 - Voluntary Binding Arbitration
  ☐ 087 - Personal Injury Protection (PIP)

SHAWNEE EMANUEL

Clerk's web address: www.miami-dadeclerk.com

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

REMEDIES SOUGHT (check all that apply):

☒      monetary;

☒      non-monetary declaratory or injunctive relief;

☐      punitive

NUMBER OF CAUSES OF ACTION: [12 <u>(i) Breach of Contract (Owner); (ii) Breach of Duty of Good Faith and</u>

(specify) <u>Fair Dealing (Owner); (iii) Declaratory Relief (Owner); (iv) Tortious Interference with Business Relationships</u> <u>(All Defendants); (v) Tortious Intereference with Business Relationships (All Defendants); (vi) Tortious Interference</u> <u>with Business Relationships (Trevi); (vii) Violation of Florida Trade Secrets Act (All Defendants); (viii) Defamation (Owner);</u> <u>(ix) Conversion (All Defendants); (x) Conversion of Business Interest (Trevi and SMB); (xi) Conspiracy</u>

IS THIS CASE A CLASS ACTION LAWSUIT?    <u>(All Defendants);</u>

☐ Yes                  <u>(xii ) Willful and Wanton Termination (Owner).</u>

☒ No

HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?

☒ No

☐ Yes   If "Yes", list all related cases by name, case number, and court.

IS JURY TRIAL DEMANDED IN COMPLAINT?

☒ Yes

☐ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature _____    Florida Bar # ___664286_____
               Attorney or party                                     (Bar # if attorney)

__Kenneth R. Hartmann_____          ____5/2/12_____
(type or print name)                                      Date



| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |

| DIVISION | SUMMONS 20 DAY CORPORATE SERVICE | CASE NUMBER |
|---|---|---|
| ☒ CIVIL | (a) GENERAL FORMS | |
| ☐ DISTRICTS . | | 12 - 17427 CA 10 |
| ☐ OTHER | | |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| GHM (SOUTH BEACH) LLC, a Delaware limited liability company | SETAI OWNERS LLC, a Delaware limited liability company, and TREVI LUXURY HOSPITALITY GROUP, INC., a Texas corporation, and SMB MANAGEMENT LLC, a Florida limited liability company | |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on defendant(s): SETAI OWNERS LLC, a Delaware limited liability company

By serving, Corporation Service Company, as Registered Agent

2711 Centerville Road, Suite 400

Wilmington, DE 19808

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Kenneth R. Hartmann, Esq.

whose address is: Kozyak Tropin & Throckmorton, P.A.

2525 Ponce de Leon, Coral Gables, Fl 33134

Tel. 305/372-1800

CLOCK IN

within 20 days"\* Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| HARVEY RUVIN CLERK OF COURTS | BY: _____ | MAY - 2 2012  DATE |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
### ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

CLK/CT. 314 Rev. 01/11                                      Clerk's web address: www.miami-dadeclerk.com

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-17427 CA 10

GHM (SOUTH BEACH) LLC,
a Delaware limited liability company,

     Plaintiff,

v.

SETAI OWNERS LLC,
a Delaware limited liability company,
TREVI LUXURY HOSPITALITY GROUP,
INC., a Texas corporation, and SMB MANAGEMENT
LLC, a Florida limited liability company,

     Defendants.

_____/

## COMPLAINT

Plaintiff, GHM (SOUTH BEACH) LLC ("GHM"), sues Defendants, SETAI OWNERS LLC ("Owner"), TREVI LUXURY HOSPITALITY GROUP, INC. ("Trevi"), and SMB MANAGEMENT LLC ("SMB" and together with Owner and Trevi, collectively, the "Defendants"), and alleges:

### INTRODUCTION

1.    Despite the fact that GHM and Owner have a fifteen-year management contract which grants GHM the exclusive right to operate the Setai Resort & Residences (the "Hotel" or "Setai"), Owner took the law into its own hands and terminated the contract, forcibly removing GHM as manager in the most destructive and demeaning manner possible.

2.    No notice of any default or opportunity to cure was given to GHM, contrary to the requirements of the management contract. No notice of termination was given, contrary to the

requirements of the management contract. No attempt was made to eject GHM as operator of the Hotel through any legal means or with any court authorization whatsoever. Instead, Owner elected to evade legal process, and under cover of darkness early on a Saturday morning, Owner and Trevi stormed the Hotel, supported by dozens of armed security personnel. These actions are lawless, reckless and set a dangerous precedent.

3.     Established in 1992, GHM and its affiliates have created and manage some of the world's most highly regarded boutique luxury resorts and hotels from its home base in Singapore including the The Chedi, Chiang Mai, Thailand; The Legian, Bali, Indonesia; The Strand, Yangon, Myanmar; The Chedi, Muscat, Oman; The Nam Hai, Hoi An, Vietnam, The Chedi, Andermatt, Switzerland, and The Ananti Club Seoul, South Korea. The Setai is the only GHM-managed property in the United States and its flagship property. GHM's relationship with guests, employees, owners, developers, and other business partners have been severely damaged. Owner's breach is devastating to GHM's reputation as a hotel manager and, indeed, the survival of its business.

4.     In addition to breaching the management contract, Owner has misappropriated GHM's property. GHM's proprietary, privileged and confidential information is housed at the Hotel, as the parties' contract expressly recognizes. Because Owner willfully ignored the termination provisions of the management contract, and instead evaded legal process and brought in a new manager in the middle of the night, both Owner and its new manager, who assisted in the breach of the management contract, now possess this information, which includes GHM's proprietary, privileged and confidential information. Owner's actions are theft, plain and simple, and they too entitle GHM to money damages as well as an injunction requiring Owner, Trevi and their representatives and agents to immediately return GHM's property.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action because the amount in controversy is in excess of $15,000, and because GHM seeks injunctive relief.

6.     This Court has jurisdiction over the Defendants because they own or have an interest in property located in Miami-Dade County, Florida, are doing business in Miami-Dade County, Florida, and/or because GHM's claims arise from the Defendants' activities in Miami-Dade County, Florida.

7.     Venue lies in Miami-Dade County, Florida in that the contract at issue is performed and was breached here and the Hotel which is the subject of this action is located in Miami-Dade County.

## PARTIES

8.     GHM is a Delaware limited liability company with its registered principal place of business at 2001 Collins Avenue, Miami Beach, Florida 33139, the same address as the Hotel. Founded in 1992 by legendary hotelier Adrian Zecha, General Hotel Management and its affiliates have created some of the world's most highly regarded intimate luxury resorts and hotels. Their primary assets are (a) their long-term management agreements and (b) their reputation and goodwill which has become associated worldwide with GHM management, including impeccable and distinctive physical, operational and service standards.

9.     Owner is a Delaware limited liability company with its principal place of business located at 1271 Avenue of the Americas, 39th Floor, New York, New York 10020. Owner is an affiliate or subsidiary of Lehman Brothers, the failed financial institution.

10.    Trevi is a Texas corporation with its principal place of business at 2708 Fairmount St., Suite 101, Dallas, Texas 75201. Trevi is an unknown, start-up hotel management company with no other properties under management.

11.    SMB is a Florida limited liability company with its principal place of business at 1271 Avenue of the Americas, 39th Floor, New York, New York 10020. SMB is an affiliate of Owner formed shortly before the raid of the Hotel.

FACTS

The Setai by GHM

12.    Opened in December 2004, the Setai is an intimate, serene oceanfront resort in the heart of South Beach. Infused with natural materials, space and light, the Setai's Asian-inspired design bears the unmistakable imprint of GHM and its legendary founder and principal, Adrian Zecha. GHM's signature physical, operational and service standards are exhibited throughout the Setai and in its operations.  Indeed, the management contract with GHM included a license to the Owner of the GHM marks ("GHM", "GHM Resorts" and "GHM Hotels") for use in connection with the marketing of the project and the operation of the hotel, which illustrates the value of the GHM brand to the success of the hotel operations and the sale of the Setai residences. The management contract also required payment to GHM of a 1% fee upon the sale of each Residence, another example of the value of the branding of the Setai with the GHM marks.

13.    GHM was the Setai's original and only operator, and it was at Owner's request that GHM licensed its marks in connection with the Setai.  Throughout every phase of the design, pre-opening, and ongoing operation of the Hotel and residences, GHM brought its industry-leading reputation to bear, creating the "Setai" as a luxury hotel brand synonymous with GHM. Because of GHM's stellar reputation, the Setai achieved the rare honor of being admitted among

the "Leading Hotels of the World" (LHW), Virtuoso, and "Fine Hotels and Resorts" (FHR) even before opening.

14.  As a direct result of GHM's management, experience, and reputation, the Setai by GHM has become one of the most highly regarded hotels in North America. The following are a few of the accolades received by the Setai by GHM in 2011 alone:

a.  Conde Nast Johansens Awards, "Most Excellent Hotel in the USA & Canada"

b.  U.S. News, "#1 hotel in Florida"

c.  Conde Nast Traveler "The Platinum Circle" Award, recognizing five consecutive years of being on "The Gold List"

d.  Smith Travel Reseach, "Best Performing Hotel, Independent Segment" (Award for RevPar Index)

e.  The Gallivanter's Guide 2011 Award for Excellence – second on list "Best Resort in North America"

f.  Wine Spectator, "The Best of Award of Excellence"

g.  Hotels Magazine, "10 Great Restaurants of the World"

h.  The Miami New Times, Best of Award, "Best Hotel Restaurant"

i.  Organic Spa Magazine, "Top 10 Green Spa Awards"

j.  Conde Nast Traveler, "Top 50 Hotel Spas in the U.S."

15.  In addition to the many accolades, under GHM's management, the Setai has become very financially successful, achieving revenues per available room far surpassing all other hotels in the region and generating record-breaking property values for its private residences. In December 2011, one of the penthouses at the Setai sold for an astonishing $21.5 million, shattering several Miami Beach real estate records.

16.   GHM's extraordinary achievements came notwithstanding Owner's constant attempts to sabotage GHM's operation of the Hotel and to manufacture "cause" to terminate GHM, at the expense of the well-being of the Hotel.

17.   On countless occasions and to the detriment of GHM and the Setai, Owner deliberately and/or unnecessarily delayed or refused simple requests by GHM to sign permits, approve critical maintenance and renovation projects for the Setai, or comply with its other obligations related to Hotel operations, all  as required under the Management Agreement in order to insure compliance with the GHM standards. For example:

a.   As a result of Owner's unwillingness to provide competent assistance, a critical balcony renovation project was unnecessarily delayed for over 5 years. Owner further insisted that the renovations be completed during the busy high season. The result was that many homeowners/residents and Hotel guests were unable to access their balconies, resulting in guest/resident complaints and significant lost revenues and reputational damage to GHM and the Hotel.

b.   Although the Hotel opened in December 2004, a certificate of occupancy for the Hotel was not obtained until 2010, when GHM finally obtained the certificate of occupancy notwithstanding Owner's attempts to delay the process.

c.   Owner deliberately delayed approving a critical painting and exterior repairs project sought by GHM for over one year. Upon information and belief, the painting and exterior repairs project was commenced the day after the improper termination.

d.   Despite repeated requests by GHM, Owner refused to provide GHM with a proper engineering workshop at the Hotel. Instead, GHM was forced to maintain "temporary engineering workspaces" outside the Hotel. To date, the engineering workshop for the Hotel is located off-site, which is both inefficient and dangerous.

e.   Owner failed to provide GHM with adequate "back of house" facilities. Astonishingly, the Hotel's back of house is located approximately one block from the Hotel, in a very old, cramped building. This greatly reduced the efficiency of Hotel operations and resulted in increased labor costs and lost profits for GHM.

f.   Owner refused GHM's repeated requests to sign a permit application to serve hot food at the Beach Bar & Restaurant, notwithstanding the fact that the City of

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

6

Miami Beach threatened to close the Beach Bar & Restaurant and impose daily fines.

g. For over two years, Owner refused to sign documents necessary to give signing authority to the GHM's Director of Finance over the Hotel's accounts and checks, creating payment and contractual problems between the Hotel and its vendors.

18. In addition, GHM was frequently pulled away from operating the Hotel to attend meetings with Lehman Brothers/Owner's asset managers and on-site representative, John Duggan, who were woefully unprepared for meetings and unwilling to resolve even the most basic Hotel-related issues. The correspondence between the parties, which Owner improperly seized and has refused to turn over to GHM, logs GHM's frustration with the lack of preparation and efficiency of Richard Siu, Lehman/Owners' asset manager, who often arrived late to scheduled meetings and/or lost or was "too busy with other important meetings" to bring the meeting agenda and financial documents for discussion.

19. Owner also deliberately attempted to sabotage the relationship between GHM and the condominium owners' association. In December 2011, Richard Siu and Lori Geisler, Lehman/Owner's asset managers, in order to increase Owner's profits, agreed and encouraged GHM to shift more expenses from Owner to the condominium owners' association on the 2012 budget. The shift was intended to benefit Owner, not GHM. In mid-January, 2012, Owner suddenly and in complete contradiction of its previous decision, asked GHM to allocate expenses based on the 2011 budget until further notice. Owner then refused to send the association a simple letter advising the association of its decision and the possibility that outstanding fees may be due when the 2012 budget is finalized, demanding instead that the letter be signed and sent by GHM. The purpose behind Owner's strange behavior became clear following the termination, when it was revealed that Owner was misleading the association to believe that GHM was unilaterally attempting to increase condominium fees in order to boost its own profits.

20.   Moreover, despite the economic downturn, Owner has not contributed <u>a single penny</u> to the operation of the Setai since its opening. Nevertheless, GHM, through careful budgeting and excellent management and marketing, was able to successfully fund all hotel operations with hotel revenues and even yield a substantial profit to Owner.

21.   The Setai is the only property managed by GHM in the United States, and the company's flagship property worldwide. Management of the Setai is a critical component of the global business of GHM and its affiliates, including GHM's plans for expansion world wide.

### The Management Agreement

22.   The Management Agreement ("Management Agreement") was entered into on March 20, 2000 between General Hotel Management Ltd. and Dempsey Vanderbilt Owners LLC. A copy of the Management Agreement is attached hereto as **Exhibit A**. Approximately 8 years remain on the original term of Management Agreement, with an option for GHM to extend for an additional 5 years.

23.   The Management Agreement is governed by Florida law.

24.   On June 27, 2000, Dempsey Vanderbilt Owners LLC changed its name to Setai Owners LLC with the Secretary of State of Delaware. On January 13, 2005, the Management Agreement was assigned by General Hotel Management Ltd. to GHM. Accordingly, the current parties to the Management Agreement are Owner, as owner of the Hotel, and GHM, as manager of the Hotel.

25.   The Management Agreement vests GHM with exclusive and substantial operational and managerial authority over the Hotel — e.g., unfettered authority over employment; pricing; publicity and advertising; administrative policies; operating licenses and permits.

26. For example, under Article VII of the Management Agreement, captioned "Operation of the Hotel," GHM has "the exclusive right and obligation to direct, supervise and control the management and operation of the Hotel." Likewise, under the same section, Owner agreed that GHM "shall, in directing, supervising, and controlling the management and operation of the Hotel, be free and maintained by the Owner from interruption or disturbance and the Owner shall, at its own cost and expense, undertake and prosecute any appropriate action, judicial or otherwise, to assure such freedom to [GHM]..."

27. The parties further agreed that "nothing in [the Management Agreement] shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties." Accordingly <u>no relationship</u>, other than a contractual relationship, was created between the parties, including a fiduciary or agency relationship. Although GHM may have acted as Owner's representative for discreet tasks related to some aspects of Hotel operations, the Management Agreement and the actions of the parties made clear that the sole authority to operate and manage the Hotel rested with GHM.

28. The Management Agreement makes clear that Owner cannot terminate for GHM's failure to perform without providing advance written notice and an opportunity to cure. Absent the destruction or condemnation of the Hotel or the bankruptcy of GHM, Owner may terminate the Management Agreement during the operating term <u>only</u> "[b]y giving 60 days notice in writing to [GHM], in the event that [GHM] shall fail to observe or perform any of the provisions of this Agreement that are [GHM]'s responsibility to be observed or performed, including the obligation to operate the Hotel in accordance with the Standards, <u>despite owner having given written notice of such default to [GHM] and such default shall not have been remedied within thirty (30) days after such notice.</u>" <i>See</i> Article XIX (1.1.2).

29. The Management Agreement also contains specific provisions that further channel the method by which to resolve any disputes between the parties without resort to courts or arbitration. In the event of a disagreement over any accounting matter, including budgeted management fees and hotel operating expenses, the Management Agreement expressly calls for a binding audit by an independent Certified Public Accountant. *See* Article XI (3). In fact, prior to the raid described below, PricewaterhouseCoopers was in the process of conducting an audit of the Hotel's accounting records.

30. Moreover, pursuant to Article XXVI of the Management Agreement, the parties agreed to attempt to settle any differences or disputes in "good faith" before a dispute may be referred to arbitration. At a minimum, "good faith" requires that the parties follow the protocols expressly called for in the Management Agreement. As discussed below, Owner did not even attempt to follow these protocols.

31. Subsequent to termination by either party, the Management Agreement guarantees certain rights to GHM. It expressly provides that the Owner's "license to the use of the 'GHM marks' shall be terminated and the words 'GHM,' GHM Resorts and GHM Hotels shall not be used for the Hotel in its name or in any other way." Article XX (1.4); *see also* Article XVII(2) ("GHMarks shall be the exclusive property" of GHM). Article XVII(2) further provides that "this covenant shall be enforceable, by injunction or otherwise, by the Operator, . . . and shall in case of conflict prevail over all other provisions of this Agreement." Finally, to the extent that GHM had created any books, records, statements or reports as defined by Article XI of the Management Agreement, GHM had the right to examine, audit, inspect, and copy such information for a period of two years after termination at "reasonable times and intervals."

### Owner's Reckless and Lawless Raid of the Hotel

32. At approximately 2:00 a.m. in the pre-dawn hours of Saturday, March 31, 2012, and without any notice, Owner and Trevi raided the Hotel with dozens of armed security personnel. The Owner advised GHM's manager on duty that it was purporting to terminate the parties' Management Agreement "effective immediately." A copy of the letter is attached hereto as **Exhibit B**. Owner's termination letter does not identify any basis for the termination and raid.

33. No notice or opportunity to cure any purported mismanagement was given to GHM prior to the raid, contrary to the express requirements in the Management Agreement. Owner did not even bother to feign a "good faith" attempt to settle any differences amicably. Instead, Owner took the law into its own hands, and unlawfully and forcefully removed GHM as manager in the most demeaning and damaging manner possible. Owner subsequently filed an action against GHM to have an arbitration panel bless the actions it had already taken.

34. Once in the Hotel, the Owner, SMB, and Trevi seized and began accessing GHM's proprietary and confidential information, including standard operating procedure manuals, employee files, and attorney-client privileged communications. Owner, SMB, and Trevi also seized control of GHM's "GHM Americas" mail server, which was located at the Hotel. The result was to block GHM's personnel access to the "GHM Americas" domain, which was property of and used by GHM's parent company for all of its email correspondence, not just correspondence related to the Hotel.

35. As GHM's employees arrived to work amidst the chaos that ensued as a result of the raid, they were handed an "announcement" advising them of the termination of GHM and soliciting them to work for Owner, SMB, and Trevi or face termination. A copy of the announcement to employees is attached as **Exhibit C**. Upon information and belief, GHM's

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

11

former employees also have been forced to sign loyalty oaths to Trevi, SMB, and/or Owner and confidentiality agreements.

36.. Consistent with its "shoot first and ask questions later" strategy, Owner completely disregarded the fact that, as it was aware, approximately 100 of these GHM employees were in the United States on immigration visas, and faced deportation as a result of Owner's actions. Owner did not consult an immigration attorney until after the raid, and no immigration assistance was given to the employees until five days after the raid. Moreover, some of GHM's employees lived in the so-called "Abbey Hotel," which serves as the back-of-house for the Hotel. These employees were afraid of losing not only their jobs, but also their homes.

37.   Owner also abruptly fired many of GHM's managerial employees, escorting them off of the property with armed personnel and/or preventing them from accessing the property, even to retrieve their personal belongings. The Owner provided GHM with no prior notice of any of these actions so that it could make arrangements for its employees and their families, instead electing a sneak attack under cover of darkness.

38.   It is clear that Owner, SMB, and Trevi had been planning this takeover for many weeks or even months. Upon information and belief, Trevi representatives secretly stayed at the Hotel in the days leading up to the termination to observe operations and familiarize themselves with the property. SMB was created by Owner for the sole purpose of assisting with the raid and subsequent operation of the Hotel.

39.   Moreover, Owner's counsel, based in the same state as Trevi, is apparently attempting to create a specialization in these illegal hotel raids. Following the raid, the same attorneys boasted to the press that, in 2011, they orchestrated an identical nighttime raid of a property in Hawaii managed by Marriott. Owner's counsel did not bother to inform the press,

however, that a court had granted an injunction against his clients in connection with the Hawaii raid.

## Substantial Harm to GHM Resulting from Defendants' Lawless Actions

40.  Miraculously, there were no physical injuries as a result of Owner, SMB and Trevi's lawless night-time raid by armed personnel. However, the deliberately demeaning and damaging manner in which the Management Agreement was terminated, which went well beyond a simple breach of contract, and the post-termination actions of the Defendants, have caused and continue to cause substantial harm to GHM and its business.

41.  On the day of the takeover, Owner embarked on a libelous marketing and public relations campaign to attempt to justify its actions at the expense of GHM's name and reputation. For example, on the day of the takeover, *USA Today* reported based on information provided by Owner that "[i]n 2010-2011 alone, the Hotel's Rooms Department incurred excessive expenses of over $2 million, its Administrative and General Department incurred excessive expenses of approximately $2.3 million, and its Marketing Department incurred excessive expense of approximately $3.3 million. Had GHM not negligently expended those amounts – and, instead, operated more efficiently – Owner would have realized an additional $7.6 million in incremental profit." In the same article, it was reported that Anthony Barsanti, vice president of Lehman Brothers Holdings, said in a public statement to the press: "we believe that under the right management, this property has limitless potential."

42.  At a meeting with GHM's former and current employees following the raid (and on other occasions), John Duggan, Owner's on-site representative, and Martin Scasserra, the manager of the condominium association, also made false and defamatory statements regarding GHM, including that GHM (i) could not be trusted, (ii) had maintained two separate accounting

budgets for the condominium owners association and Owner, (iii) intentionally had not been transparent with the condominium owners association and Owner, and (iv) had mismanaged and/or misappropriated the Hotel's assets and funds.

43.   GHM generally earns money by entering into long term management contracts and license agreements with hotel owners and condominium owners or associations. Indeed, the economic value of GHM as a company is calculated based on the revenue stream from its management agreements with owners. GHM's goodwill and solid reputation are critical to its relationships with its owners and with prospective clients. As a direct result of the raid and the post-termination defamatory statements made by Owner, prospective developers and hotel/resort owners have indicated a reluctance to invest in the GHM brand. Consequently, GHM's business has been severely impaired.

44.   The Defendants' actions also have damaged GHM's goodwill and reputation in the hospitality industry, and among its guests. Following the raid, guests who expected to stay at the Hotel managed by GHM unexpectedly found themselves in a hotel managed by Trevi, which is an inexperienced, unknown, start-up hotel management company with no other properties under management. Many guests are still unaware that Trevi is managing the property. For weeks following the raid, guest reservation responses were sent from "ghmamericas.com" email addresses and contained the "GHM" logos on the email signature blocks. To date, many of the guest room amenities, signs on the walls, and even the room keys still contain the "GHM" marks. Even though GHM is no longer managing the Hotel, GHM is being blamed for the poor service and accommodations being offered by Trevi, which is causing substantial reputational damage to the brand.

45.   What is true of individual guests is even truer of the GHM's loyal travel agents and group travel managers who generate much of the business for the Hotel and GHM's other properties worldwide. One of GHM's most valuable contributions to the Hotel and most valuable assets is its significant relationships with travel agencies and group accounts, developed by GHM's sales teams. These relationships are built on trust and travel agencies, which depend on customer satisfaction to sustain their business, are highly risk-averse. As a result of the raid, travel agents and managers who booked groups into what they believed was a GHM-managed hotel unexpectedly had to explain to the group members, who had invested significant resources in making arrangements for their meetings and conference, that they would not in fact be staying at a GHM-managed property or receiving the experience they expected. Accordingly, GHM's premature eviction, which the Owner is falsely holding out to the public is the result of GHM's faulty management, has caused these agencies to look at GHM differently in determining whether to book clientele at other GHM properties.

46.   GHM also is suffering substantial damages as a result of Owner and Trevi's seizure of its proprietary, confidential, and privileged materials and the exposure of GHM's trade secrets to a competitor. Trevi, a start-up company and new competitor of GHM, is currently in possession of voluminous written information and other materials relating to GHM's proprietary methods for operation of hotels including its employee files, training manuals, and operating procedure manuals. Trevi and Owner also are in possession of documents relating to GHM's global business operations, which are completely unrelated to the Hotel. Perhaps most egregiously, Setai Owners and Trevi are in possession and refuse to return GHM's privileged and confidential communications with counsel.

47.   These confidential materials and trade secrets, especially when taken as a whole, represent an extremely valuable asset — GHM's knowledge of how to manage ultra-luxury hotels effectively and efficiently. This is confidential and proprietary information that required considerable time and expense to create and which GHM goes to great lengths to protect. Because Trevi is a competitor of GHM and a start-up entity, Owner's actions have essentially handed to a competitor, at no cost, the blueprints for how to operate a hotel according to GHM's carefully developed, proprietary methods.

48.   By threat of termination, deportation, and even eviction, Owner and Trevi also forcibly poached GHM's employees, many of whom were brought to work at the Hotel from other GHM properties. GHM spent considerable time and money training these employees, all of which is now lost. The loss of these key employees also severely impacts GHM's ability to take on other management projects.

49.   Of course, in addition to the aforementioned damages and other actual and consequential damages incurred as a result of Defendants' actions, GHM also has lost its anticipated profits for the approximately thirteen years remaining under the Management Agreement, as well as incurred costs and fees in connection with the termination, and is owed certain pre-termination fees and costs by Owner.

50.   All conditions precedent to the filing of the action, if any, have occurred or have been waived by Defendants' egregious actions.

## COUNT I

## BREACH OF CONTRACT
### (Owner)

51.   Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

52.   GHM and Owner are parties to the valid and binding Management Agreement.

53. GHM has fulfilled all conditions precedent to the assertion of its claims against Owner, including the performance of all of its obligations under the Management Agreement. Alternatively, GHM's performance has been excused by the wrongful acts and material breaches of the Management Agreement by Owner.

54. Owner has breached the Management Agreement, *inter alia,* by (i) terminating GHM without cause, and without any notice or an opportunity to cure, as required by Article XIX of the Management Agreement, (ii) prior to termination, intentionally refusing or delaying approval for items critical Hotel operations and maintenance, and (iii) failing to comply with the procedure upon termination set forth in Article XX of the Management Agreement, which requires Owner to pays all amounts and debts due to Operator, to cease use of the GHM marks in connection with the Hotel, and to allow GHM to access and copy all materials used in operation of the Hotel.

55. As a result of Owner's breach of the Management Agreement, GHM has sustained economic injury for which it seeks actual and consequential damages, including compensation for attorneys fees as provided in the Management Agreement, in an amount to be determined by the trier of fact.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM any and all actual damages, costs and expenses, pre- and post-judgment interest, costs, attorneys fees as set forth in the Management Agreement, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by GHM arising from the above-described wrongful acts of Owner.

## COUNT II

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (Owner)

56.  Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

57.  Implied in the Management Agreement, as a matter of law, is a covenant of good faith, fair dealing and commercial reasonableness.

58.  Owner has acted in bad faith, *inter alia*, by intentionally failing to comply with the termination provisions of the Management Agreement which require Owner to (i) advise GHM of any alleged material deficiencies in GHM's management and operation of the Hotel, (ii) give GHM an opportunity to cure any such deficiencies, and (iii) attempt to settle any differences in good faith.

59.  Owner has breached its duty of fair dealing by purposely engaging in a pattern to exclude and evict GHM from the Hotel despite Owner agreeing to a 15-year term.

60.  Owner's breach of its duty of good faith, fair dealing and commercial reasonableness has damaged GHM.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees as set forth in the Management Agreement, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by GHM arising from the above-described wrongful acts of Owner.

## COUNT III

## DECLARATORY RELIEF
### (Owner)

61.  Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

62.  This is an action for declaratory and injunctive relief.

63. On March 31, 2012, Owner filed a request for arbitration before the International Court of Arbitration of the International Chamber of Commerce. The arbitration request seeks damages resulting from (i) the alleged over-payment of management fees to GHM, (ii) mismanagement of the Hotel, (iii) "gross insubordination." Again, consistent with its unlawful "shoot first, ask questions later" strategy, the arbitration request also seeks a declaration that Owners was allowed to take the actions it already took.

64. Pursuant to Article XXVI of the Management Agreement, the parties agreed to attempt to settle any differences or disputes in "good faith" before a dispute may be referred to arbitration. At a minimum, "good faith" requires that the parties at least attempt to follow the protocols expressly called for in the Management Agreement. Specifically, Management Agreement requires notice and an opportunity to cure perceived mismanagement of the Hotel, and it calls for an independent audit in the event of any disputes over management fees.

65. Owner did not even feign a "good faith" attempt to settle any differences amicably. No notice of any mismanagement was sent to GHM prior to termination. Owners did not even wait for the completion of the independent audit by PricewaterhouseCoopers which Owner itself initiated and which was expected at any time. Instead, Owner took the law into its own hands, and unlawfully and forcefully removed GHM as manager in the most demeaning and damaging manner possible.

66. The result of sudden and improper manner in which Owner terminated the Management Agreement is that it is now no longer possible to conduct a "good faith" attempt to settle the dispute amicably. GHM is no longer managing the Hotel and, therefore, can no longer make any efforts to cure any alleged mismanagement, over-payment, or "gross insubordination." Moreover, GHM has lost its only source of revenue to defend the costly arbitration requested by

Owner. As a result of Owner's unreasonably large and inflated $70 million actual and punitive damages claim, GHM's estimated arbitration fees alone (not including attorneys fees and costs) are expected to be approximately $350,000.

67.   Because Owner irreparably failed to comply with the express prerequisites of the arbitration provision of the Management Agreement to the detriment of GHM, Owner has waived its rights to arbitration, and the requested arbitration should not be allowed to go forward.

68.   There is a bona fide, actual, present practical need for a declaration resolving whether and to what extent arbitration of this case should be allowed. Therefore, GHM is entitled to seek declaratory relief.

WHEREFORE, GHM requests that the Court declare that GHM is not required to submit to arbitration and prohibit Owner from proceeding with the arbitration.

## COUNT IV

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (All Defendants)

69.   Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

70.   The Defendants knew that the employees at the Hotel were GHM employees.

71.   The Defendants further knew or should have known that GHM spends a large amount of time and money recruiting and training its employees to work at GHM-managed properties. The Defendants further knew or should have known that GHM's employees are a valuable asset of GHM and its affiliates.

72.   As GHM's employees arrived at work following the raid, those GHM employees that were not improperly terminated by Owner were forced by threat of termination, deportation, and/or eviction to end their business relationship with GHM and work for the Hotel for the benefit of the Defendants.

73.  Upon information and belief, all of the Defendants intentionally participated in orchestrating the improper raid of the Hotel, the ouster of GHM from the Hotel, and the recruitment of GHM's employees to work for the Hotel post-termination. By their actions, the Defendants induced GHM's employees to end their business relationship with GHM.

74.  The Defendants acted without proper justification.

75.  As a direct and proximate result of the wrongful conduct of the Defendants, GHM has suffered and continues to suffer substantial money damages.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by GHM arising from the above-described wrongful acts of the Defendants.

## COUNT V

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (All Defendants)

76.  Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

77.  The Defendants knew that GHM had entered into separate contracts to manage certain private residences at the Setai participating in a "rental program."

78.  Upon information and belief, all of the Defendants intentionally participated in orchestrating the improper raid of the Hotel and ouster of GHM from the Hotel. By their actions, the Defendants interfered with GHM's ability to maintain and continue these separate contracts with the private residence owners.

79.  The Defendants acted without proper justification.

80.   As a direct and proximate result of the wrongful conduct of the Defendants, GHM

has suffered and continues to suffer substantial money damages.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM

any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation

for attorneys fees, and consequential damages, including lost profits, damage to goodwill and

business reputation, lost business value, and lost business opportunities sustained by GHM

arising from the above-described wrongful acts of the Defendants.

**COUNT VI**

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**
**(Trevi)**

81.   Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

82.   Trevi knew that the Management Agreement existed between Owner and GHM.

83.   Upon information and belief, Trevi intentionally participated in orchestrating the

improper raid of the Hotel and the ouster of GHM from the Hotel. By its actions, Trevi

knowingly interfered with the Management Agreement.

84.   Trevi acted without proper justification.

85.   As a direct and proximate result of the wrongful conduct of Trevi, GHM has

suffered and continues to suffer substantial money damages.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM

any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation

for attorneys fees, and consequential damages, including lost profits, damage to goodwill and

business reputation, lost business value, and lost business opportunities sustained by GHM

arising from the above-described wrongful acts of Trevi.

**COUNT VII**

## VIOLATION OF FLORIDA TRADE SECRETS ACT
### (All Defendants)

86.   Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

87.   While operating the Hotel in its capacity as manager, GHM brought its confidential and proprietary information and materials, including standard operating procedure manuals, training manuals, and employee files, to the Hotel.

88.   GHM uses its confidential and proprietary information and materials to operate, manage, and market the hotels it manages, including not only the Hotel but also other GHM-managed properties.

89.   The confidential and proprietary information and materials consist of unique and specific information with significant actual and potential economic value to others in the hotel industry, including the Defendants.

90.   GHM has taken strict measures to protect the confidentiality of the above-described confidential and proprietary information and materials.

91.   Upon being improperly terminated without any notice on March 31, 2012, GHM was unable to remove its confidential and proprietary information and materials from the Hotel. Accordingly, the confidential and proprietary information and materials are currently in the possession of the Defendants and/or their agents.

92.   Pursuant to the Management Agreement, the above-described confidential and proprietary information and materials are owned by GHM and not the Defendants.

93.   The Defendants' failure to return GHM's confidential and proprietary information and materials constitutes misappropriation, in violation of Florida Statutes Section 688.001, et seq.

94.   The Defendants' misappropriation is willful and malicious.

95.   GHM has retained undersigned counsel and agreed to pay its counsel a reasonable fee.

WHEREFORE, GHM respectfully requests that this Court enter an order (i) awarding compensatory and statutory damages, and/or a reasonable royalty, pursuant to F.S. § 688.004; (ii) enjoining the Defendants from using GHM's confidential and proprietary information and materials pursuant to F.S. § 688.003; (iii) requiring the Defendants to return the confidential and proprietary information and materials to GHM pursuant to F.S. § 688.003; (iv) awarding attorney's fees pursuant to F.S. § 688.005; and (v) awarding GHM any other relief this Court deems just and proper.

## COUNT VIII

### DEFAMATION
(Owner)

96.   Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

97.   Owner published false statements about GHM to third parties including, without limitation, the press and GHM's current and former employees.

98.   The falsity of these statements has caused substantial injury to GHM's reputation and business.

99.   Owner acted without proper justification.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by GHM arising from the above-described wrongful acts of Owner.

## COUNT IX

## CONVERSION
### (All Defendants)

100. Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

101. The Defendants' conduct during and after the unlawful raid permanently and indefinitely deprived the GHM of a vast amount of its property, which was located at the Hotel and Abbey Hotel. This property includes, but is not limited to GHM operating procedure manuals, employee files, training manual, attorney-client privileged communications, global operations documentation, style guides, guest profile databases, GHM P&P files, supplier lists and contracts, accounting books and records, personal belongings and effects of GHM employees.

102. GHM has been severely damaged by the Defendants' wrongful depravation of GHM's property and has incurred great cost and expense in attempting to replace, restore, and repair the wrongfully deprived property. In addition, GHM incurred and will continue to incur substantial consequential damage including lost profits as a direct and proximate result of Defendants' wrongful depravation of GHM's property.

103. Additionally, the wrongfully deprived property is unique, irreplaceable, and was procured by GHM through great effort, cost, and expense, such that monetary damages will not adequately compensate GHM for the Defendants' wrongful deprivation of this property.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by GHM arising from the above-described wrongful acts of the Defendants.

### COUNT X

### CONVERSION OF BUSINESS INTEREST
**(Trevi and SMB)**

104. Plaintiff realleges paragraphs 1 through 46 above as if fully set forth herein.

105. Trevi's and SMB's participation in the unlawful raid, termination of the Management Agreement, and post-raid management of the Hotel wrongfully deprived GHM of a valuable intangible property interest, namely GHM's business venture at the Hotel.

106. As a direct and proximate result of the wrongful conduct of Trevi and SMB, GHM has suffered and continues to suffer irreparable injury, substantial money damages, and damages to its reputation and good will.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by GHM arising from the above-described wrongful acts of Trevi and SMB.

### COUNT XI

### CONSPIRACY
**(All Defendants)**

107. Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

108. The Defendants agreed to participate in a scheme to unlawfully deprive GHM of it business interest as manager of the Hotel, steal the employees it recruited and trained, and misappropriate its trade secrets and proprietary information. The conspirators' scheme was consummated during and after the unlawful raid on March 31, 2012.

109. The Defendants each committed an overt act in furtherance of the conspiracy. Owner, as ring leader of the conspiracy, orchestrated the scheme, recruited the participants, and

hired armed security personnel to forcibly remove GHM from the Hotel. Trevi and SMB perpetuated the scheme by taking over management of the hotel, stealing GHM's employees, and misappropriating GHM's trade secrets and proprietary information that was located at the hotel. Trevi representatives secretly stayed at the Hotel in the days leading up to the termination to observe operations and familiarize themselves with the property in advance of the raid and unlawful termination.

110. As a direct and proximate result of the wrongful conduct of the Defendants, GHM has suffered and continues to suffer irreparable injury, substantial money damages, and damages to its reputation and good will.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by GHM arising from the above-described wrongful acts of the Defendants.

## COUNT XII

### WILLFUL AND WANTON TERMINATION
### (Owner)

111. Plaintiff realleges paragraphs 1 through 50 above as if fully set forth herein.

112. Pursuant to Articles XIX and XX of the Management Agreement, if ground for termination existed under those Articles, Owner had a duty of care to terminate the contract in a safe and orderly manner, with notice to GHM, and to give GHM an opportunity to wind up its business. Specifically, in addition to the notice and cure requirement, the Management Agreement required 60 days notice of termination.

113. Owner breached this duty of care by terminating the Management Agreement in an unlawful raid, without notice to GHM, at 2:00 a.m. a Saturday night, with armed security personnel.

114. Owner intentionally engaged in a surprise raid of the Hotel, which harmed GHM, *inter alia,* in the following ways:

      a.  GHM had no time to retain its employees who were poached by the new management company;

      b.  GHM's competitor, Trevi, was given access to its trade secrets and proprietary information, including without limitation operating procedure manuals, employee files, training manual, attorney-client privileged communications, global operations documentation, style guides, guest profile databases, GHM P&P files, supplier lists and contracts, accounting books and records;

      c.  The bank accounts used by GHM to pay its vendors and employees were frozen as a result of the raid and no advance notice was provided to GHM to make accommodations for payment of outstanding obligations including payments to employees and vendors; and

      d.  GHM was denied the opportunity to provide notice to its guests, travel agents, and group travel managers that future management would be provided not by GHM, but by another management company so that guests, travel agents, and group travel managers would not be misled into believing that GHM was managing the Hotel when it was not.

115. As part of the unlawful raid and termination process, Owner engaged in a negative public relations campaign by making false and misleading press release.

116. Owners' intentional breach of its contractual termination duties are willful, wanton, malicious, and in reckless disregard for the rights of GHM.

117. As a direct and proximate result of the willful and wanton misconduct of Owner, GHM's business has suffered significant injury to its goodwill and reputation, which has resulted in and will continue to result in irreparable injury and substantial monetary damages.

WHEREFORE, GHM respectfully requests that this Court enter an order awarding GHM any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by GHM arising from the above-described wrongful acts of Owner.

## JURY DEMAND

GHM hereby requests a trial by jury on all issues so triable.

Dated May 2, 2012

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Attorneys for Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800

By _____
Kenneth R. Hartmann
Florida Bar No. 664286
Daniel F. Benavides
Florida Bar No. 81675
Douglas A. Wolfe
Florida Bar No. 28671

# EXHIBIT A

Dated the 20th day of March ,2000

# MANAGEMENT AGREEMENT

Between

## GENERAL HOTEL MANAGEMENT LTD.

AND

## DEMPSEY VANDERBILT HOTEL

**EXHIBIT**

A

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE I | Nomination | 3 |
| ARTICLE II | Construction, Furnishing and Equipping of the Hotel | 4 |
| ARTICLE III | Operating Term and Extension thereof | 4 |
| ARTICLE IV | Working Capital | 5 |
| ARTICLE V | Training and Pre-opening Program: Advertising and Promotion | 5 |
| ARTICLE VI | Official Opening of the Hotel | 6 |
| ARTICLE VII | Operation of the Hotel | 6 |
| ARTICLE VIII | Insurance | 9 |
| ARTICLE IX | Assessments, Property Tax and Other Similar Payments | 10 |
| ARTICLE X | Bank Accounts and Disbursements | 10 |
| ARTICLE XI | Books, Records, Statements and Reports | 11 |
| ARTICLE XII | Management Fees and Reimbursement | 12 |
| ARTICLE XIII | Additional Payments by the Owner | 13 |
| ARTICLE XIV | Set-off, Counterclaims, etc. | 13 |
| ARTICLE XV | Repairs and Maintenance and Capital Improvements | 13 |
| ARTICLE XVI | Reserve for Capital Replacement | 14 |
| ARTICLE XVII | Name of the Hotel | 14 |
| ARTICLE XVIII | Indemnification | 15 |
| ARTICLE XIX | Termination | 15 |
| ARTICLE XX | Procedure upon Termination | 17 |

811312.4                               -i-

ARTICLE XXI      Partial Invalidity ............................... 17

ARTICLE XXII     Force Majeure ................................. 18

ARTICLE XXIII    Damage, Destruction, Compulsory Taking .................. 18

ARTICLE XXIV     Successors and Assigns ........................... 19

ARTICLE XXV      Notices ..................................... 20

ARTICLE XXVI     Applicable Law ................................ 21

ARTICLE XXVII    Leasing and Property Management Services for Guest Unit
                 Owners and Residential Tower Unit Owners ................ 21

ARTICLE XXVIII   Definitions .................................. 23

ARTICLE XXIX     Special Conditions .............................. 28

ARTICLE XXX      Miscellaneous ................................. 28

## MANAGEMENT AGREEMENT

THIS AGREEMENT made this 9th day of March, 2000 by and between GENERAL HOTEL MANAGEMENT LTD., a company incorporated in the British Virgin Islands with limited liability and having its registered office situated at P.O. Box 71, Craigmur Chambers, Road Town, Tortola, British Virgin Islands ("GHM"), and DEMPSEY VANDERBILT OWNERS LLC, a Delaware limited liability company ("OWNER").

WHEREAS:

(A)    The Owner is in the course of developing and constructing, at its own cost and expense, a mixed-use project (the "Project") consisting of a residential condominium tower (the "Residential Tower") and a hotel condominium (the "Hotel") to be known as the "Dempsey Vanderbilt Hotel." The Hotel will consist of about 91 guest rooms, retail space, food and beverage operations, garage, health club and spa, and other facilities. The Project will be located at Collins Avenue between 20th and 21st Streets in Miami Beach, Florida. The Residential Tower and the Hotel will be governed by separate condominium regimes with appropriate cross-easement agreements.

(B)    The Hotel will be structured as a condominium with three principal components: (i) the 91 or so guest rooms will each be a separate residential condominium unit (collectively, the "Guest Units"), (ii) the restaurants, lounges, bars, retail space, garage, health club and spa and other income-generating areas, to the extent included in the Hotel, shall constitute one or more commercial condominium units (collectively, the "Commercial Units"), and (iii) the lobby, front desk, hallways, building systems and other public areas, administrative areas and "back of house" shall constitute a separate condominium unit (the "Hotel Unit"; the Guest Units, Commercial Units and Hotel Unit being hereinafter sometimes collectively referred to as the "Units").

(C)    As structured, neither the Guest Units nor the Commercial Units will contain any of the structural or mechanical components of the building, but instead will consist almost solely of the air-space within the interiors of the applicable Units. Specifically, the following components of the Hotel building (which shall be referred to in the Project Offering Documents as the "Shared Essential Components") are made part of the Hotel Unit: any and all structural components of the improvements, including, without limitation, all exterior block walls and all finishes (paint, stucco, etc.) and balconies, terraces and/or facades attached or affixed thereto; the roof; all roof trusses, roof support elements and roofing insulation; all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems, including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility,

911312.4



mechanical, telephonic, telecommunications, electrical, plumbing and/or other services; all heating, ventilating and air conditioning systems, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services; all elevator shafts, elevator cabs, elevator cables and/or systems and/or equipment used in the operation of the elevators; and all trash rooms, trash chutes and any and all trash collection and/or disposal systems. The exterior grounds and the hallways connecting the Guest Units are also part of the Hotel Unit.

(D)    In addition, certain non-income-producing areas of the recreational facilities to be constructed on the site will be part of the Hotel Unit. It is contemplated that the Hotel condominium will have very little "common areas", as most of the traditional common areas will be included within the Hotel Unit, and thus controlled by the Hotel Unit owner and, pursuant to this Agreement, the Operator. Although the owners of Guest Units will have the right to use certain of these facilities, including the pool and pool deck, the maintenance and operation of them will be the sole responsibility of the Hotel Unit owner. In consideration for the rights of use to certain portions of the Hotel Unit granted to the Guest Unit and Commercial Unit owners, the Guest Unit and Commercial Unit owners are obligated to reimburse the Hotel Unit owner for the portion of the expenses related to the Shared Essential Components and all of the other shared facilities. As no revenues will be generated from the Hotel Unit, no Management Fees will be due or payable under this Agreement. All Management Fees will be paid to Operator pursuant to separate agreements between Operator and the owners of the Guest Units and/or Commercial Unit(s) generating the revenues.

(E)    The costs and expenses of owning and operating the Hotel Unit will be allocated among the various Units pursuant to separate agreements. The revenues derived from the operation of the Hotel will be allocated to the owners of the Units from which such revenues were derived. It is Owner's intention to sell the Guest Units to third party purchasers, who will then determine whether they want their particular Guest Unit to be included in the "Rental Program" (described below). Management of the individual Guest Units shall only be provided by Operator if separately arranged by contract between the Operator and the applicable Guest Unit owner who has elected to participate in the Rental Program (the "Guest Unit Operating Agreements"). The Guest Unit Operating Agreements shall contain terms consistent with the provisions of this Agreement and such other commercially reasonable terms as to which Owner and Operator shall mutually agree.

(F)    It is the intention of the parties that separate agreements are to be entered into between Owner and Operator covering the operation or leasing of the various facilities included in the Commercial Units (the "Commercial Unit Operating Agreements"), exclusive of any retail units (other than a Hotel store). The parties shall negotiate in good faith to arrive at mutually acceptable agreements for the Commercial Units on customary, commercially-reasonable terms with respect to these facilities.



(G)   The Operator has experience in the management and operation of hotels, and is willing to render assistance in its construction, its preparation for operation and its eventual management and operation.

(H)   The Operator, being a member of the General Hotel Management Ltd. Group of companies, is able to procure for the Hotel a license to use the GHMarks, which is included in this Agreement.

(I)   The Owner desires to avail itself of the hotel management experience and know-how of the Operator, and the Operator is willing to render its expertise and assistance in the management and operation of hotels upon the terms and conditions hereinafter appearing.

NOW THEREFORE the parties hereto AGREE AND COVENANT as follows:

ARTICLE I

Nomination

1.   Nomination

The Owner hereby appoints and engages the Operator as the exclusive and sole manager and operator of the Hotel, to perform the services provided for in this Agreement. The Operator, as the sole agent of the Owner, will act in accordance with the terms and conditions hereinafter set forth and hereby accepts the said nomination. The Operator agrees to operate the Hotel as a world class five star international hotel comparable to the Mandarin, Four Seasons and Ritz-Carlton hotels in Miami (the "Standards").

2.   No Covenants or Restrictions

The Owner warrants that to the best of its knowledge, information and belief having made all reasonable inquiries that there are, and on the date when the Hotel is available for the use by guests, no covenants or restrictions which would prohibit or unreasonably restrict the Operator from carrying on upon the Hotel the businesses and services customarily associated with a world class five star international hotel. The Owner agrees upon request by the Operator to sign promptly and without charge any applications for Licenses, which the Operator may reasonably request be signed, and which Operator shall be obligated to obtain.



## ARTICLE II

### Construction, Furnishing and Equipping of the Hotel

1.  The Owner shall construct with reasonable diligence, at the Owner's own expense and in accordance with a development budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment), a building designed as a world class five star international hotel in accordance with the Standards. Operator agrees that if the building is constructed in accordance with the approved development budget, subject to its reasonable approval of plans and specifications, the Hotel will satisfy the foregoing criteria.

2.  The building shall consist of the Building & Appurtenances in which the Owner shall provide and install:

    2.1   Furnishings & Equipment;

    2.2   Operating Equipment; and

    2.3   Operating Supplies.

## ARTICLE III

### Operating Term and Extension thereof

1.  The term "Operating Term" shall mean a period during which the Operator shall manage and operate the Hotel commencing on the date hereof, and (unless sooner terminated as provided in Article XIX), expiring on the last day of the fifteenth (15th) full calendar year following the official opening of the Hotel, subject to any extension thereof as provided in Section 2.

2.  The Operator shall be entitled to extend the Operating Term for a further period of five (5) years from the date of its expiration upon the same terms and conditions as are contained in this Agreement but without the inclusion of this Section PROVIDED ALWAYS THAT the Operator shall have given notice to the Owner at least one year prior to the expiration of the initial Operating Term of its intention so to extend the same.

911312.4                                    -4-



## ARTICLE IV

### Working Capital

1.  The Owner shall provide sufficient Working Capital for the payment of all of the Operating Expenses throughout the Operating Term, pursuant to a budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment), to be paid in such installment(s) and at such time(s) as the Operator reasonably requires.

## ARTICLE V

### Training and Pre-opening Program: Advertising and Promotion

1.  The Operator agrees to recruit, hire and train the initial staff of the Hotel through such training programs as it shall consider appropriate, such training to take place only in the Country. The Operator further agrees to use its best efforts to advertise and promote the business of the Hotel through its existing facilities.

2.  The Owner shall provide all monies as may be reasonably required to pay for the cost and expense of providing the training and pre-opening programs referred to in Section 1, as well as the cost and expense of providing or procuring for the Hotel pre-operational staff, organization, advertising, promotion, travel and business entertainment including pre-opening operations, opening celebrations and ceremonies, whether incurred prior to or concurrently with the beginning of full management and operation of the Hotel. The cost of the training and pre-opening programs will be set forth in a pre-opening budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment). Owner agrees to pay into the Hotel account(s) to be operated by the Operator under Article X, the mutually approved training and pre-opening expenses in such installment(s) and at such time(s) as the Operator shall reasonably require.

3.  The cost and expenses of providing training and pre-opening programs and the pre-opening and opening costs and expenses of the Hotel shall be treated as Operating Expenses and amortized equally over a period of five (5) years, commencing with the first full Fiscal Year in which a charge may be made therefor.

911312.4                                  -5-



## ARTICLE VI

### Official Opening of the Hotel

1. The Hotel shall be considered ready to be opened for full management and operation when it is substantially completed and the Furnishings & Equipment, Operating Equipment and Operating Supplies shall have been substantially installed therein, all Licenses shall have been obtained, full and adequate inventories of food and beverage have been provided and the Hotel shall be ready to receive and render services to guests in accordance with the Standards.

2. The official opening of the Hotel shall be on a date which the Owner and the Operator shall reasonably agree subject to the Hotel being considered ready to be opened for full management and operation as provided in Section 1. Agreement by the Operator of the said date and the official opening of the Hotel shall not relieve the Owner of its obligation to cure any deficiency regarding the Hotel as to which notices shall have been or shall be given by the Operator before or after opening.

3. It is agreed that prior to the date for the official opening of the Hotel, the Operator may conduct partial management and operations of the Hotel for the purposes of further staff training and operational and promotional development the cost and expense of which shall be a pre-opening operational expense, as provided for in Article V.

4. Within six (6) months after the official opening of the Hotel, the Owner shall deliver to Operator an inventory of all Furnishings & Equipment and Operating Equipment.

## ARTICLE VII

### Operation of the Hotel

1. Commencing from the date hereof and during the Operating Term, the Operator shall have the exclusive right and obligation to direct, supervise and control the management and operation of the Hotel generally and in accordance or in keeping with the Standards and objectives of each Annual Plan and to determine the programs and policies to be followed in connection therewith. Subject as may otherwise be provided in this Agreement, the Operator shall, in directing, supervising and controlling the management and operation of the Hotel, be free and maintained by the Owner from interruption or disturbance and the Owner shall, at its own cost and expenses, undertake and prosecute any appropriate action, judicial or otherwise, to assure such freedom to the Operator, subject always as may otherwise be provided by law. In taking any action pursuant to this Agreement, the Operator will be acting only as the appointed representative of the Owner, and nothing in

911312.4                                    -6-



this Agreement shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties hereto.

2.   Without limiting the generality of the foregoing, and unless otherwise expressly provided, the Operator shall, during the Operating Term, in accordance with the Standards, for and on behalf of the Hotel undertake the following:

2.1   At least two (2) months before the beginning of each Fiscal Year of the Hotel, submit to the Owner for review, recommendations and approval an Annual Plan for the ensuing Fiscal Year which shall consist of:

2.1.1   An estimated profit and loss statement for the ensuing Fiscal Year including a schedule of hotel room rates and all other sources of the Hotel's revenue;

2.1.2   A budget estimate for all Operating Expenses;

2.1.3   A schedule showing proposed replacement of furniture, fixtures, fittings, furnishings and equipment and any other expenditures proposed to be capitalized;

2.1.4   A schedule showing the proposed cash reserve for replacement of furniture, fixtures, fittings, furnishings and equipment;

2.1.5   An estimated cash flow statement for such year; and

2.1.6   A marketing plan.

The Owner shall indicate to the Operator its recommendations and objections, if any, to the Annual Plan before the commencement of the period covered by the Annual Plan. As and when necessary and from time to time in any Fiscal Year, the Operator may submit to the Owner, for its further review and approval, supplementary budgets to the Annual Plan. In the event that the Owner and the Operator cannot agree on any or all of the items in the Annual Plan or any supplement thereto, the dispute shall be resolved by the Expert. Pending such resolution, the Hotel shall be operated in accordance with the prior Fiscal Year's Annual Plan.

2.2   Use its best efforts and diligence in the renting of Guest Units participating in the Rental Program.

2.3   Hire, promote, discharge and supervise the work of the executive staff, including the manager, assistant managers and departmental heads. Through such executive staff, the Operator shall supervise the hiring, training, promotion, discharge and

911312.4                                    -7-

work of all other operating and service employees performing services in or about the Hotel. The Operator shall consult with the Owner in handling collective bargaining negotiations and similar important matters of a particularly local nature. The Operator shall be permitted from time to time to provide a reasonable number of hotel guest rooms for the temporary use of the manager and other management employees, if Operator reasonably considers it necessary or expedient. (In addition, Owner shall have the right to use up to two guest rooms per night at no cost to Owner, subject to availability and other commercially reasonable limitations to be agreed upon.) All staff and other operating and service employees employed at the Hotel shall be or be deemed to be for all purposes the employees of the Operator.

2.4    Establish and supervise an accounting department, with appropriate hotel accounting and cost control systems and personnel, to be maintained by the Operator at the Hotel. The Operator shall establish and supervise all bookkeeping, accounting and clerical services, including the maintenance of payroll records incident to the efficient operation and maintenance of the Hotel. All accounts shall be maintained in conformity with the Uniform System. If requested by Owner, an Independent Certified Accountant nominated by the Owner and reasonably approved by the Operator shall be appointed by the Hotel as its auditor.

2.5    Make available to the Hotel in the Country the expertise of the Operator and the services of the Operator's specialized home-office facilities located in the Country and employed in the performance of its hotel operation and management activities, including, without limitation, its engineering, maintenance, accounting, cost control, taxation, food and beverage control, reservations, sales publicity, advertising, convention, labor relations and safety departments.

2.6    Receive, consider and handle with due decorum and courtesy the complaints of all tenants, guests or users of any of the services or facilities of the Hotel.

2.7    Enter into arms-length contracts in the name of the Owner for the furnishing to the Hotel of electricity, gas, water, steam, telephone, cleaning (including window cleaning), vermin extermination, boiler maintenance, air-conditioning maintenance and other necessary utilities or services and purchase all Operating Equipment, Operating Supplies, and other items and enter into any other contract as may be necessary in the efficient management and operation of the Hotel, all at competitive prices.

2.8    Arrange for compliance with the Law affecting or issued in connection with the Hotel.

911312.4                                   -8-



2.9   Institute any necessary legal actions or proceedings to collect charges, rent or other income due to the Hotel or to oust or dispossess guests, tenants or other persons in possession, or to cancel or terminate any tenancy for the breach thereof or default thereunder by the tenant.

## ARTICLE VIII

### Insurance

1.   During the construction of the Project, the Owner shall procure and maintain the insurance described in Section 1.1 below.  Thereafter, the Operator shall procure and maintain all fire, public liability, indemnity, fidelity, property and other types of insurance which are necessary or appropriate for the operation of the Hotel, including (but without limiting the generality of the foregoing):

   1.1   During the period of construction, furnishing and equipping of the Hotel, full and adequate public liability and indemnity and property damage insurance (if available) protecting the Owner and the Operator against loss or damage arising by reason of all activities in connection with the development, construction, furnishing, equipping, management, operation and maintenance of the Hotel.

   1.2   Upon commencement of the operation and management of the Hotel, general liability and casualty insurance against loss or damage by fire and other hazards included in an extended coverage endorsement (including business interruption insurance), in such amounts as Owner and Operator shall agree upon.

   1.3   If the Owner and the Operator shall consider it appropriate, insurance against loss of income for the Hotel due to riot, civil commotion and insurrections.

   1.4   Such other insurance as Owner, Operator or any mortgagee may require and which is customary in the operation of similar hotels.

2.   Concurrently with the submission of the first Annual Plan and continuing annually thereafter, the Operator shall furnish the Owner with a schedule setting forth the kinds and amounts of insurance proposed to be obtained or continued, including the insurance required in the foregoing sections, and such other kinds and amounts of insurance as the Operator shall deem necessary or advisable for the protection of the interest of the Owner and the Operator.  Promptly thereafter, except as to the insurance required in the foregoing sections, the parties shall agree as to the kind, amount and form of additional insurance to be obtained.  The Operator shall thereupon forthwith apply for and obtain on the Owner's behalf, if obtainable, all such insurance.

911312.4                              -9-



3.   All policies of insurance shall name the Owner, and where appropriate, jointly with the Operator and such other parties in accordance with their respective interests. The original of all policies of insurance and certificates of insurance shall be kept and maintained by the Operator, and certificates of insurances shall be forwarded to the Owner.   The premiums for and costs and expenses associated with obtaining such insurance policies shall be Operating Expenses.

4.   Neither the Owner nor the Operator shall assert against the other and each of them do hereby waive with respect to one another any claims for any losses, damages, liability or expenses (including legal fees) incurred or sustained by either of them to the extent that the same are covered by insurances as aforesaid, on account of damage or injury to person or property arising out of the ownership, management, operation or maintenance of the Hotel.

## ARTICLE IX

### Assessments, Property Tax and Other Similar Payments

1.   All assessments, property taxes and other similar payments in respect of any particular Unit shall be paid by the Operator on behalf of the owner thereof promptly as and when the same shall become due; provided the owner has delivered to Operator the funds necessary to pay the same.

2.   The Operator shall furnish to the applicable owner copies of the official bills and receipts relating to any such payments.

## ARTICLE X

### Bank Accounts and Disbursements

1.   All Working Capital received by the Operator from the Owner shall be deposited in a special account or accounts in the name of the Hotel in a bank or other depository selected by the Owner and approved by the Operator. Such account or accounts shall be operated solely by the Operator's designees.

2.   Out of such account or accounts the Operator shall pay all Operating Expenses.

911312.4                         -10-



ARTICLE XI

Books, Records, Statements and Reports

1.  The Operator shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel on an accrual basis. The books of account and all other records relating to, or reflecting, the operation of the Hotel shall be kept at the Hotel and shall be available to the Owner and its duly authorized representatives for examination, audit, inspection and copying. Such books of account and records shall reflect, for each Unit managed by Operator, the Gross Revenues generated from each such Unit and the Operating Expenses allocable thereto. All of such books and records shall be the property of the Owner and shall not be removed from the Hotel without the written consent of the Owner and the Operator. Upon the termination of this Agreement, all of such books and records up to the date of termination shall forthwith be delivered up to the Owner so as to ensure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be made available to the Operator at reasonable times and intervals for examination, audit, inspection and copying for a period of two (2) years following such termination. Without prejudice or limitation to the foregoing, the Operator's right of examination, audit, inspection and transcription as provided for in this case shall extend to books and records or parts thereof related to transactions or events taking place or occurring before the date of termination of this Agreement.

2.  The Operator shall deliver to the Owner within thirty (30) days after the end of each calendar month a profit and loss statement showing the results of the operation of the Hotel for the immediately preceding calendar month and the Fiscal Year-to-date and as compared to the Annual Plan, and covering such other matters as are customarily covered in such monthly reports for comparable hotels.

3.  Within ninety (90) days after the end of each Fiscal Year, the Operator shall deliver to the Owner a profit and loss statement, balance sheet, sources and application of funds statement, and which, if requested by Owner, shall all be audited and certified by the Independent Certified Public Accountant of the Hotel. Any disputes between the Owner and the Operator as to the contents or correctness of any such statement or any accounting matter thereunder shall be decided by the Independent Certified Public Accountant, whose decision shall be final and binding. The cost and expense of audits pursuant to this section shall be Operating Expenses.

4.  If no objection shall be made by either the Owner or the Operator to the said certified profit and loss statement and to the Net Profit for any Fiscal Year within forty-five (45) days after delivery of the same, such certified profit and loss statement shall be deemed to be correct and conclusive for all purposes. The Owner and the Operator shall endeavor to resolve any objections or differences which may be made prior to the time fixed herein

911312.4                               -11-

for payment of the next succeeding installment to the Owner of its entitlement to the Net Profit, as provided for in Article XIII.

5.   Separate or additional statements may be required to be prepared and delivered to the owners of the Commercial Units and the Guest Units managed by Operator, as may be set forth in the Commercial Unit Operating Agreements and the Guest Unit Operating Agreements.

## ARTICLE XII

### Management Fees and Reimbursement

1.   Under the Guest Unit Operating Agreements, (i) a Base Management Fee shall be payable monthly with respect to the Gross Revenues derived from such Guest Unit, and (ii) an Incentive Management Fee shall be payable monthly with respect to estimated Gross Operating Profit for such Unit, to be adjusted at the end of each Fiscal Year.

2.   For the purpose of calculating the amount of the Base Management Fee, payments for any given calendar month shall be the Base Management Fee percentage of the cumulative Fiscal Year-to-date Gross Revenue, less the amount of any payments on account of the Base Management Fee previously paid to the Operator during such Fiscal Year.   Monthly payments of the Incentive Management Fee shall be calculated on the cumulative Fiscal Year-to-date Gross Operating Profit, less the amount of any payments on account of the Incentive Management Fee previously paid to the Operator during such Fiscal Year.

3.   At the end of each Fiscal Year and following the receipt of the annual statements for Units managed by Operator, an adjustment shall be made on the basis of the said statements, if necessary, so that the Operator shall receive its proper Management Fee for the said Fiscal Year.

4.   The Owner shall reimburse the Operator for all Operating Costs which were paid by the Operator and not out of the Hotel account(s).

5.   The Operator may also charge to the Hotel its reasonable travel and other out-of-pocket head office expenses incurred pursuant and in the course of and directly related to the management and operation of the Hotel, and in accordance with the approved Annual Plan.   The Operator may offer complimentary rooms, food and beverages and other services to any person if, in the reasonable judgement of the Operator, such action will promote the Hotel and increase the overall profitability of its operations.   All such costs and expenses charged pursuant to this Section 5 shall be Operating Expenses.



6.    Notwithstanding any of the foregoing, it is understood and agreed by Owner and Operator that no Management Fees are due from Owner hereunder. The only Management Fees payable to Operator are pursuant to the Commercial Units Operating Agreements and/or the Guest Unit Operating Agreements.

## ARTICLE XIII

### Additional Payments by the Owner

1.    In the event that for any Fiscal Year a Net Loss shall be sustained for the Hotel, the Owner shall forthwith upon demand by the Operator after the end of such Fiscal Year pay into the Hotel account(s) operated by the Operator under Article X such amounts as may be required to provide sufficient Working Capital to cover anticipated Operating Expenses, as reasonably determined by Operator.

## ARTICLE XIV

### Set-off, Counterclaims, etc.

1.    The Commercial Unit Operating Agreements and Guest Unit Operating Agreements shall contain customary exclusions for set-offs and counterclaims.

## ARTICLE XV

### Repairs and Maintenance and Capital Improvements

1.    Subject to the performance by the Owner of its obligations under this Agreement the Operator agrees to maintain the Hotel in good repair and condition.

2.    Subject to the Owner's prior approval, the Operator is authorized to make such alterations, additions or improvements in or to the Hotel as are customarily made in the operation of deluxe international hotels. The cost of such customary additions, alterations and improvements shall either be treated as Operating Expenses or shall be capitalized in the books of account in accordance with sound accounting practices. Such capitalized expenditure shall be amortized by treating such expenditure as Operating Expenses over their estimated useful life.

911312.4                                    -13-

## ARTICLE XVI

### Reserve for Capital Replacement

1.  During the Operating Term there shall be deducted monthly from the Gross Operating Profit such sum as shall be equal, in the aggregate for each Fiscal Year, to 2.5 percent of the Gross Revenue for that Fiscal Year. A cash fund in the above sum shall be created for the purpose of making replacements of, renewals of and additions to said furniture, fixtures, furnishings and equipment. Such fund shall be recorded on the books of account maintained for the Hotel as "Reserve for Capital Replacements". The fund shall be used solely for such purposes. Any expenditure for replacements of, renewals of and additions to, furniture, fixtures, furnishings and equipment during each Fiscal Year may be made by the Operator without the consent of the Owner up to the amount of such fund (including unused accumulations thereof from earlier Fiscal Years), and any such expenditures shall be paid from such fund. To the extent that such expenditures in any Fiscal Year shall be less than the fund for such year, the excess shall be carried forward and added to the next or any subsequent fund until fully used. Any expenditure in excess of the fund shall be subject to the Owner's approval and shall be deducted from Gross Operating Profit in arriving at the Net Profit.

## ARTICLE XVII

### Name of the Hotel

1.  The Operator and the Owner agree that during the Operating Term the Hotel shall at all times be known and designated as the "Dempsey Vanderbilt Hotel", or by such other name as the parties may from time to time agree in writing.

2.  This Agreement includes a license to the Owner of the terms "GHM", "GHM Resorts" and "GHM Hotels" (collectively, the "GHMarks") for use in connection with the marketing of the Project and the operation of the Hotel, to be used in such manner as Operator shall reasonably determine. It is expressly acknowledged and agreed by the parties hereto that the GHMarks shall be the exclusive property of General Hotel Management Ltd. and no legal right or remedy of the Owner of any kind or nature whatsoever, nor any provision of this Agreement or any other agreement shall confer upon the Owner or any of the successor or successors the right to use the "GHMarks" either alone or in conjunction with some word or words, except in accordance with the provisions of this Agreement. Without prejudice to any other legal right or remedy of the Operator, this covenant shall be enforceable, by injunction or otherwise, by the Operator, shall be deemed to survive any termination of this Agreement, and shall in case of conflict prevail over all other provisions of this Agreement.

011312.4

-14-

3.  All costs and expenses relating to any registration of the businesses of the Hotel as are required by law (including legal fees) and renewals of such registration shall be Operating Expenses.

ARTICLE XVIII

Indemnification

1.  The Operator shall not in the performance of this Agreement be liable to the Owner or any other person or entity for any act or omission, negligent, tortious or otherwise, of any officer, agent or employee of Operator, except, however, for the gross negligence or willful misconduct of any such officer, agent or employee of Operator.

2.  The Owner hereby agrees to indemnify and save harmless the Operator and officers, agents and employees of the Operator from and against any and all loss, damage, cost or expense (including lawyer's fees) which Operator or any of the officers, agents or employees of the Operator may sustain or incur by reason of any claim or assertion of wrong doing, error, commission, omission or negligence made by any person or entity involving or arising out of the performance by the Operator or any officer, agent or employee of the Operator of the various services contemplated by this Agreement, whether or not such claim or assertion involves any allegation based on the alleged sole negligence of two or more such entities or individuals (one or more of which may be the Operator or any of its officers, agents or employees) or any other theory, exclusive, however, of any gross negligence or willful misconduct of Operator or of any of its officers, agents or employees. Moreover, the Owner will, at the Operator's request, assume the defense of any proceeding brought by any third party to establish any such liability.

3.  The provisions of this article shall survive any expiration or termination of this Agreement and shall remain enforceable by the Operator notwithstanding such expiration or termination.

ARTICLE XIX

Termination

1.  This Agreement may at any time during the Operating Term be terminated in accordance with the following provisions:

    1.1  At the option of the Owner:

911312.4                                    -15-



1.1.1   By giving sixty (60) days notice in writing to the Operator in the event that, despite the fact that the Owner shall have carried adequate insurance in accordance with the provisions of Article VIII, there has been damage to and destruction of the Hotel of such magnitude that the cost of repairing, restoring, rebuilding or replacing the hotel is in excess of one hundred and twenty per cent (120%) of the proceeds of the insurance;

1.1.2   By giving 60 days notice in writing to the Operator, in the event that the Operator shall fail to observe or perform any of the provisions of this Agreement that are the Operator's responsibility to be observed or performed, including the obligation to operate the Hotel in accordance with the Standards, despite the Owner having given written notice of such default to the Operator and such default shall not have been remedied within thirty (30) days after such notice;

1.1.3   By notice in writing to the Operator, in the event of the entire or a substantial portion of the Hotel or its services being acquired, condemned, or closed in accordance with Law;

1.1.4   By notice in writing to the Operator, in the event the Operator enters into liquidation whether voluntarily or compulsorily or compounds with its creditors generally or has a receiver appointed of all or any substantial portion of its assets or takes or suffers any similar action in consequence of its debts.

1.2   At the option of the Operator:

1.2.1   By giving sixty (60) days notice in writing to the Owner, in the event that the Owner shall fail to observe or perform any of the provisions of this Agreement that are the Owner's responsibility to be observed or performed, despite the Operator having given written notice of such default to the Owner and such default shall not have been remedied within thirty (30) days after such notice;

1.2.2   By notice in writing to the Owner, in the event of the entire or a substantial portion of the Hotel or its services being acquired, condemned, or closed by Law;

1.2.3   By giving notice in writing to the Owner, in the event the Owner enters into liquidation whether voluntarily or compulsorily or by law or compounds with its creditors generally or has a receiver appointed over all or any substantial portion of its assets or takes or suffers any similar action in consequence of its debts.

911312.4

-16-



ARTICLE XX

Procedure upon Termination

1.   In the event of termination of this Agreement, whether by effluxion of time or otherwise, the following steps shall be taken, in the following order:

1.1   If requested by Owner, the Independent Certified Accountant shall conduct a final accounting and audit of the books and records of the Hotel and shall produce and deliver to the Owner and the Operator final audited accounts to the date of the termination (otherwise, such final statements shall be prepared and delivered by Operator);

1.2   There shall be paid from the Hotel account(s) all amounts and debts due to the Operator, and if the monies in the Hotel account(s) are insufficient for such purposes by the Owner; and

1.3   All other amounts and the remaining assets of the Hotel shall be paid to or retained by the Owner.

1.4   The license to the use of the "GHMarks" shall be terminated and the words "GHM", GHM Resorts and GHM Hotels shall not be used for the Hotel in its name or in any other way.

ARTICLE XXI

Partial Invalidity

1.   In the event that one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgement of a court of competent jurisdiction, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted in this Agreement.

911312.4

-17-



## ARTICLE XXII

### Force Majeure

1.   In the event that the performance by any party to this Agreement of its obligations hereunder is prevented by force majeure, including, but not limited to, acts of God, flood, hurricane, earthquake, tidal wave, landslide, fire, plague, epidemic, quarantine restriction, perils of the sea; war or serious threat of the same, civil commotion, blockade, arrest or restraint of government, rulers or people; strike, lockout, sabotage, other labor dispute; or any other causes or circumstances whatsoever beyond the party's reasonable control, then, such party shall not be liable for loss or damage, or failure or delay in performing its obligations under this Agreement.

## ARTICLE XXIII

### Damage, Destruction, Compulsory Taking

1.   If the Hotel or any portion thereof shall be damaged or destroyed at any time during the Operating Term by fire, casualty or any other case, the Owner shall, at its own expense and with due diligence, repair or replace the Hotel so that the Hotel shall be substantially the same as that prior to such damage or destruction.  If the Owner shall fail:

   1.1   To commence such work within sixty (60) days of receipt of insurance proceeds or confirmation by the insurance carrier that such proceeds will be made available to cover actual costs of repair or replacement, whichever is earlier; or

   1.2   To complete such work diligently, then the Operator may, at its option, either:

      1.2.1   Terminate this Agreement by written notice to the Owner, effective as of the date of dispatch; or

      1.2.2   Undertake or complete such work for the account of the Owner to the extent of such available insurance proceeds, in which case the Operator shall be entitled to be repaid thereof from such insurance proceeds.

2.   If the Hotel is damaged or destroyed by fire or other insurable cause to such an extent that the cost of repair or replacement as estimated by the Operator exceeds one third of the original cost of the Hotel, then the Owner may, if it determines not to repair or replace the Hotel, provisionally terminate this Agreement by notice to the Operator.

3.   If thereafter at any time within three (3) years after the termination of this Agreement pursuant to Section 2 above the Owner repairs, rebuilds or replaces the Hotel, the Operator



may, within sixty (60) days of the commencement of such repair or replacement or on receipt of written notice from the Owner of its intention to repair or replace the Hotel, reinstate such services by written notice to the Owner.

4.  If the whole of the Hotel shall be taken by any expropriation, condemnation or similar proceedings, or, if a portion thereof shall be taken, any award (compensation), for such taking shall be equitably apportioned between the Owner and the Operator after recoupment by the Owner or its constituent partners of their investments in the Hotel.

5.  If only a part of the Hotel shall be so taken and the taking of such part does not make it unreasonable, in the Operator's opinion, to operate the remainder of the Hotel as a hotel of the type and class preceding such taking, so much of any award (compensation) to the Owner shall be made available as shall be reasonably necessary for making alterations or modifications to the Hotel as to make it a satisfactory architectural unit as a hotel of similar type and class a prior to the taking. The balance of the award (compensation) shall be equitably apportioned between the Owner and Operator.

## ARTICLE XXIV

### Successors and Assigns

1.  The Owner may sell, assign, transfer, lease, mortgage or otherwise alienate its interest in the Hotel, including any or all of the Units, without the prior written consent of the Operator. The Operator shall not have the right to assign or transfer to any third party any of its obligations or rights under this Agreement, save with the prior written consent or approval of the Owner; provided, however, that (a) the Operator may assign or transfer this Agreement at any time to any other member of the General Hotel Management Ltd. Group upon notice to the Owner and (b) after the earlier to occur of (i) one year after the opening of the Hotel or (ii) the sale of all the Guest Units to third parties, the Operator may assign or transfer this Agreement in connection with a sale or merger of the General Hotel Management Ltd. Group or a sale of substantially all of the assets thereof. It is understood and agreed that any consent or approval granted by the Owner to any such assignment shall not be deemed a waiver of the provisions herein contained against assignment, transfer or alienation in relation to any subsequent sale, assignment, transfer or alienation or purporting so to do.

2.  Subject to the provisions of Section 1, the provisions of this Agreement shall be binding upon and shall enure to the benefit of the successors in title and the assigns of the Owner and of the Operator.

911312.4                                      -19-



ARTICLE XXV

Notices

1.  Any notice required to be given under this Agreement shall be in writing and shall be deemed to have been effectively given (1) when personally delivered, (2) seven (7) working days after being sent by registered or certified airmail, postage prepaid and return receipt requested, or (3) when sent by facsimile, in each such case addressed as follows, or (4) to such other address as either OPERATOR or OWNER may subsequently designate by notice to the other party:

   1.1   To OWNER:

        Metropolitan Development Group
        1411 Broadway
        New York, New York 10018
        Attention:    Jonathan Breene
        Fax. No.:    (212) 704-0546

   1.2   To OPERATOR, at both:

        General Hotel Management Ltd.
        P.O. Box 71
        Craigmur Chambers, Road Town
        Tortola
        British Virgin Islands

        AND

        General Hotel Management Ltd.
        70B Pagoda Street
        Singapore 059229
        Attention:    Hans R. Jenni
        Fax No.:    (65) 221 1535

*[Handwritten annotation:]*

copies To:

Zakay Sasson
16495 N.E. 39nd Avenue
Eastern shores, FL. 33180
    and

Enrique Fefer
19333 Collins Avenue, apT 1708
Sunny Isles Beach, Fl, 33160



## ARTICLE XXVI

### Applicable Law

1.    This Agreement shall be governed and interpreted in accordance with the laws of the State of Florida and the United States of America. The parties agree that in all matters relating to this Agreement, whether during its substance or after its termination, and also in all matters concerning the provisions of this Agreement where any question or dispute or difference shall be settled in mutual good faith. In case of failure by the parties to reach an amicable settlement, such difference or dispute shall be finally settled through a Board of Arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce. The venue of the arbitration shall be Dade County, Florida.

## ARTICLE XXVII

### Leasing and Property Management Services for
### Guest Unit Owners and Residential Tower Unit Owners

1.    The Operator shall offer a "Rental Program" (i.e., rental services and property management services) to Guest Unit owners (if desired by them) on the following terms or such other terms to be reasonably agreed upon between Owner and Operator (subject to requirements of applicable laws).

(a)    The Rental Program shall be completely voluntary;

(b)    The Rental Program shall give Guest Unit owners the option to use their units for a maximum number of days and subject to such restrictions as Owner and Operator shall reasonably agree upon in good faith;

(c)    The Rental Program shall contain a rotation system intended to cause similar quality units to be rented for approximately the same amount of times;

(d)    The Rental Program will not involve any pooling of revenues;

(e)    Operator will offer room service, maid service and turndown service to Guest Unit owners participating in the Rental Program;

(f)    The Rental Program will provide each participating Guest Unit owner 100% of the revenue derived from the rental of the owner's unit not less frequently than quarterly, after first deducting travel agent commissions, credit card service charges, applicable taxes and Management Fees; and

-21-



(g)    Participants in the Rental Program will receive activity statements from Operator not less frequently than quarterly.

Any and all revenue generated from the leasing of a Guest Unit under the Rental Program shall be deemed its Gross Revenues, and any and all costs incurred thereunder shall be deemed part of its Operating Expenses.

2.    The Operator shall offer a similar Rental Program to the Residential Tower unit owners (if desired by them) on the following terms or such other terms to be reasonably agreed upon between the Owner and the Operator:

(a)    The Rental Program shall be completely voluntary;

(b)    The Rental Program shall give Residential Tower unit owners the option to use their units for as many days of the year as they desire;

(c)    The Rental Program shall contain a rotation system intended to cause similar quality units to be rented for approximately the same amount of times;

(d)    The Rental Program will not involve any pooling of revenues;

(e)    Operator will offer room service, maid service and turndown service to Residential Tower unit owners participating in the Rental Program;

(f)    The Rental Program will provide the Residential Condominium unit owners 50% of the net revenues derived from the rental of the owner's unit, after first deducting travel agent commissions, credit card service charges and applicable taxes, with the remaining 50% paid to the Operator as a fee;

(g)    Participants in the Rental Program will receive activity statements from Operator not less frequently than quarterly; and

(h)    Each unit participating in the Rental Program shall contain Furnishings and Equipment approved by Operator.

Any and all revenue generated from the leasing of Residential Tower units under the Rental Program shall be deemed its Gross Revenues, and any and all costs incurred thereunder shall be deemed part of its Operating Expenses.

3.    Operator shall also make available to all Guest Unit and Residential Tower unit owners, whether or not they are enrolled in any Rental Program, other services (whether on an a la carte, or bulk basis, to be agreed to by Operator and Owner subsequent to the execution

911312.4                                -22-

of this Operating Agreement), which shall include, without limitation, the following: room service, food and beverage charging privileges, daily maid service, routine maintenance assistance. Operator shall be entitled to its standard charges for providing any of these services.

4.  Owner and Operator agree to reasonably cooperate with each other to promptly finalize the terms of the Rental Programs and to otherwise establish reasonable rules and regulations and procedures for the operation of the Hotel.

ARTICLE XXVIII

Definitions

As used in this Agreement:

1.  The term "Fiscal Year" shall mean the twelve-month period commencing on January 1 and ending on December 31.

2.  The term "Annual Plan" means such statements, estimates and schedules as are mentioned in Section 2 of Article VII as amended from time to time.

3.  The term "the Country" shall mean the United States of America.

4.  The term "Building and Appurtenances" shall mean a building(s) containing about 91 guest rooms, restaurants, lobbies, bars and lounges, retail space, elevators, back-of-the-house and parking areas, recreational facilities and other related facilities.

5.  The term "Furnishings & Equipment" shall mean all furniture, furnishings, fixtures, life safety and fire equipment on or required for the management and operation of the Building and Appurtenances.

6.  The term "Gross Operating Profit" shall mean, for any particular Unit, the excess during each Fiscal Year (and proportionately, for any period less than a Fiscal Year) of Gross Revenues derived from such Unit over Operating Expenses allocated thereto during the same period, calculated in accordance with the Uniform System.

7.  The term "Gross Revenues" shall mean all income and proceeds of every kind (whether in cash or on credit) generated from Units managed by Operator, including the proceeds of business interruption insurance actually received by Operator or Owner or the owner of any such Unit (after deduction of said insurance proceeds of all necessary expenses incurred in the adjustment or collection thereof) less Turnover Taxes which have been

911312.4                                   -23-



added onto the customer's bills and actually received by the Hotel as part of the Hotel's revenue.

8.      The term "Hotel" shall have the meaning ascribed to it in the Preamble to this Agreement.

9.      The term "Independent Certified Accountant" shall mean the accountant or firm of accountants referred to in Section 2.4 of Article VII.

10.     The term "Law" shall mean all laws, acts, ordinances, rules, regulations, orders, enactment or determinations by any governmental municipal or other authority having jurisdiction.

11.     The term "Licenses" shall mean all licenses, permits, consents, approvals and authorizations (governmental, municipal or otherwise) required for the management and operation of the Hotel in accordance with this Agreement including, but not limited to: liquor licenses for the sale of alcoholic beverages at all restaurants and bars in the Hotel and to all guest rooms; restaurant and hotel licenses; all licenses, permits, consents, approvals and authorizations (governmental, municipal or otherwise) required for the procurement and import of Furnishings & Equipment, Operating Equipment and Operating Supplies, for the Hotel to operate as a world class five star international hotel meeting the Standards, and all visas and work permits for staff who require them.

12.     The term "Net Loss" shall mean any negative balance which may result after the deductions set out in Section 13 of this Article have been made to the Gross Operating Profit of the Hotel for any Fiscal Year.

13.     The term "Net Profit" shall mean, with respect to any particular Unit managed by Operator, the resulting balance after deductions from the Gross Operating Profit for such Unit for a Fiscal Year (and proportionately, for any period less than a Fiscal Year) of all or any allocable portion (as appropriate) of the following charges as they occur in accordance with the Uniform System:

     13.1    Real estate and personal property taxes;

     13.2    The cost and expense of any matter or thing to be done at Owner's cost and expense under this Agreement or otherwise done at the request of the Owner or of the owner of the Unit;

     13.3    The 6% Base Management Fee payable to the Operator; and

     13.4    Technical service fees payable for services rendered to the Hotel.

911312.4.                -24-



14. The term "Management Fee" shall mean, with respect to the Guest Units participating in the Rental Program, (i) a "Base Management Fee" equal to five percent (5%) of Gross Revenue, payable monthly, and (ii) an "Incentive Management Fee" equal to ten percent (10%) of the Gross Operating Profit, payable quarterly. The Management Fees payable with respect to any Commercial Unit managed by Operator shall be as set forth in the applicable Commercial Unit Operating Agreement.

15. The term "Operating Equipment" shall mean all chinaware, glassware, linens, silverware, uniforms, utensils and other items of a similar nature.

16. The term "Operating Expenses" shall mean, with respect to any particular Unit managed by Operator, all or the allocable portion (as appropriate) of the entire costs and expenses of maintaining, conducting, and supervising the operation of the Hotel (but shall not include, except as otherwise provided in this Agreement (a) principal or interest on Owner's indebtedness and any rent payable by Owner; (b) any taxes payable by the Owner; (c) the Management Fees, and (d) the costs of any other things specified in this Agreement to be done or provided at Owner's expense and not otherwise denominated as an Operating Expense) incurred by Operator directly or at its request or as otherwise provided in this Agreement, or under the applicable Commercial Unit or Guest Unit Operating Agreement, which Operating Expenses are properly attributable to the period under consideration under Operator's system of accounting, including without limitation:

   16.1 The cost of all food and beverages sold or consumed and of all Operating Equipment and Operating Supplies, other than initial inventories of Operating Equipment and Operating Supplies furnished by Owner.

   16.2 Salaries and wages and employee benefits of Hotel personnel, including, without limitation, pension plans, medical insurance, life insurance, travel accident insurance and bonuses, including cost of payroll taxes and employee benefits, severance or other termination benefits and accruals therefor; the cost of moving Hotel personnel (including expatriates), their families and personal belongings to the Hotel and their return, and all other expenses not specified or referred to herein which are referred to as "Administrative and General Expenses" in the Uniform System. Subject to prior consultation with the Owner and conformity with the approved Annual Plan, Operating Expenses may include the cost of visas, work permits, residence documentation, salaries, bonuses, payroll taxes and employee benefits (including family home leave airfares and allowances) for Hotel personnel from other countries. Except as herein otherwise expressly provided, the salary or wages of other employees or executives of Operator, or any member of the Operator's group of companies, shall in no event be Operating Expenses, but reasonable and customary traveling expenses incurred by them in connection with the management of the Hotel, including reasonable and customary living expenses incurred during travel, shall be Operating Expenses.

Notwithstanding the foregoing, if it becomes necessary for an employee or executive of any member of the Operator's group of companies to perform temporary services at the Hotel of a nature normally performed by Hotel personnel, his salary (including payroll taxes and employee benefits) as well as his reasonable and customary traveling expenses (including living expenses) shall be Operating Expenses.

16.3  The cost of all other goods and services obtained by Operator in connection with its operation of the Hotel including, without limitation, heat and utilities, office supplies and services performed by third parties.

16.4  The cost of repair and maintenance of the Hotel.

16.5  Insurance premiums and losses incurred from any self-insured risks of the foregoing types provided that Owner and Operator have approved in advance such self-insurance or have agreed in advance to the unavailability of insurance to cover such risks. Premiums on policies for more than one (1) year and/or not for a period within the fiscal year in question will be pro-rated over the period of insurance, and premiums under blanket policies will be fairly allocated among properties covered.

16.6  All taxes (other than income taxes and, unless otherwise included in Gross Revenues, Turnover Taxes), with respect to the operation of the Hotel, and water and sewage charges but excluding all taxes levied or imposed against the Hotel or its contents, such as real and personal property taxes.

16.7  Legal costs and fees, and fees of any Independent Certified Accountant, for services relating to the obtaining of all necessary approvals of this Management Agreement and of matters relating thereto, including any requisite registration of Operator (as a branch, an office or otherwise), and the operation of the Hotel and its facilities.

16.8  The reasonable costs and expenses (including salaries) incurred after the Hotel has opened of technical consultants and specialized operational experts for specialized services in connection with non-recurring work on operation, functional, decorating, design or construction problems and activities, including the reasonable fees of any member of the operator's group of companies in connection therewith.

16.9  All expenses for advertising the Hotel and all expenses of sales promotion and public relations activities incurred after the Hotel has opened.

911312.4                                    -26-

16.10    All out-of-pocket expenses and disbursements reasonably, properly and specifically incurred by any member of the Operator's group of companies pursuant to, in the course of or directly related to, the management and operation of the Hotel. Without limiting the generality of the foregoing, such charges may include all reasonable travel, telephone, facsimile, telex, telegram, cablegram, radiogram, air express, courier service and other incidental expenses, but except as herein otherwise expressly provided, shall not include any of the regular expenses of the offices maintained by any member of the Operator's group of companies other than offices maintained at the Hotel for the management of the Hotel.

16.11    Bad debts and allowances for uncollectible accounts receivable.

16.12    Reserve for Capital Replacements.

16.13    Those items not included above described as Operating Expenses in this Agreement and any other payments made by Owner hereunder which are to be amortized over a period of years.

17.    The term "Operating Supplies" shall mean all inventories of paper supplies, cleaning materials and similar consumable items.

18.    The term "Standards" shall mean the highest quality of facilities or operations and services generally consistent with, and expected by, guests at comparable world class five star international hotels, such as those operated under the trade names Mandarin, Four Seasons and Ritz-Carlton.

19.    The term "taxes" includes, without limitation, all present or future taxes (of any nature and howsoever termed), levies, fiscal charges, imposts, duties, fees, assessments, surcharges, or other charges of whatever nature and however arising, imposed, assessed, charged, levied or demanded by any person at any time, together with all interest thereon and penalties or similar liabilities with respect thereto but does not include any stamp, registration or documentary taxes, duties or similar charges of any kind and Turnover Taxes.

20.    The term "Turnover Taxes" shall mean sales taxes, hotel occupancy taxes, gross receipts or value added tax or similar turnover taxes and any other direct room or room sales related taxes.

21.    The term "Uniform System" shall mean the latest edition of the "Uniform System of Accounts for Hotels", as published by the Hotel Association of New York City, Inc., or any later or revised edition thereof, and as modified by the mutual agreement of the Owner and the Operator.



22. The term "Working Capital" shall mean amounts sufficient to cover anticipated Operating Expenses.

23. The term "Expert" shall mean an independent, nationally-recognized hotel consulting firm or individual qualified to resolve the issue in question and who is appointed in each instance by agreement of the parties or, failing agreement, by each party selecting one Expert and the two chosen experts selecting a third.

### ARTICLE XXIX

#### Special Conditions

1. Owner and Operator agree to make such revisions to this Agreement as may be required by the Owner's mortgage lender or to better market the Guest Units, provided that such changes do not materially adversely affect the economic benefits to either party.

### ARTICLE XXX

#### Miscellaneous

1. Any consent and approval required of the Owner or the Operator shall be ineffective unless in writing and signed by a duly authorized officer or agent of the respective parties.

2. No modification, alteration or amendment of this Agreement nor any waiver of any provision hereof shall be effective unless in writing and signed by the party sought to be charged therewith or by its duly authorized agent.

3. The headings of the Articles and Sections of this Agreement and all of its Appendices are inserted for convenience only and are not intended to affect the meaning of any of the provisions.

4. All Appendices to this Agreement are an integral part of this Agreement and all terms defined in this Agreement and the Appendices shall have the same meaning throughout this Agreement and its Appendices.

5. References in this Agreement to Articles, Sections, subsections and Appendices are to the Articles, Sections, subsections and the Appendices to this Agreement. References to Articles or Sections, except where the context otherwise requires, are references to the relevant Article or Section in this Agreement or Article in which the reference appears. References to subsections are references to the relevant subsection in the Section in which the reference appears.

911312.4                                            -28-





6.    The Owner hereby represents that in entering into this Agreement the Owner has not relied on any projections of earnings, statements as to the possibility of future success or other similar matter which may have been prepared by the Operator or any member of the General Hotel Management Ltd. group of companies, and understands that no guarantee is made or implied by the Operator or any member of the General Hotel Management Ltd. group of companies as to the cost or future financial success of the Hotel.

7.    This agreement constitutes the entire agreement between the Owner and the Operator relating to the subject matter hereof, superceding all prior agreements, oral or written.

911312.4                                    -29-

IN WITNESS WHEREOF GENERAL HOTEL MANAGEMENT and OWNER have duly executed this Agreement on the date first above written.

SIGNED by the OWNER
Dempsey Vanderbilt Owners, LLC

By

Metropolitan Development Group LLC
and SK10 Properties N.V. members
in the presence of: _____

AND

SIGNED by GENERAL HOTEL MANAGEMENT LTD.

By Hans R. Jenni, its Director

in the presence of: _____



# EXHIBIT B

**SETAI OWNERS LLC**
**1271 Avenue of the Americas**
**39th Floor**
**New York, New York 10020**

March 31, 2012

**VIA FACSIMILE, CERTIFIED**
**AIR MAIL, RETURN RECEIPT**
**REQUESTED, AND REGULAR AIR MAIL**

General Hotel Management Ltd.
GHM (South Beach) LLC
1 Orchard Spring Lane
#04-02 Tourism Court
Singapore 247729
Attn: Mr. Hans R. Jenni
     Mr. Adrian Zecha
     Facsimile No.: (65) 6221 1535

General Hotel Management Ltd.
70B Pagoda Street
Singapore 059229
Attn: Mr. Hans R. Jenni
     Facsimile No.: (65) 221 1535
              (65) 6221-1535

GHM (South Beach) LLC
c/o CorpDirect Agents, Inc.
515 East Park Avenue
Tallahassee, Florida 32301

GHM (South Beach) LLC
c/o CorpDirect Agents, Inc.
160 Greentree Drive, Suite 101
Dover, Delaware 19904

General Hotel Management Ltd.
P.O. Box 71
Craigmur Chambers, Road Town
Tortola, British Virgin Islands

Re:    Management Agreement dated March 20, 2000, between Setai Owners LLC, as
        Owner, and General Hotel Management Ltd., as Operator, as amended (the
        "Management Agreement"), relating to the management and operation of the
        Setai Resort & Residences (the "Hotel") located in Miami Beach, Florida

Dear Messrs. Jenni and Zecha:

Please be advised that, effective immediately, Setai Owners LLC (the "Owner") hereby
terminates the above-referenced Management Agreement and its principal-agent relationship
with General Hotel Management Ltd. and GHM (South Beach) LLC (together, "GHM") –
including any authority that GHM may have with respect to the Hotel, the Abbey Building, and
the rental program for participating hotel-condominium and residential-condominium units.

Owner has assumed exclusive control of the Hotel and has installed Trevi Luxury
Hospitality Group, Inc. as its new agent-manager of the Hotel. In connection therewith, Owner
expects GHM to: (1) cooperate fully with Owner to effectuate a smooth transition and turnover



EXHIBIT
B

March 31, 2012
Page 2

of Hotel operations to new management and provide all necessary assistance to accomplish that objective as expeditiously as possible; and (2) comply with and fulfill all of GHM's post-termination obligations, as set forth in the Management Agreement and as provided by the common law of Florida governing agency and fiduciary relationships.

Please also be advised that Owner is initiating an arbitration proceeding against GHM in the International Court of Arbitration of the International Chamber of Commerce, pursuant to Section 1 of Article XXVI of the Management Agreement. A copy of Owner's Request for Arbitration is being delivered to you by separate letter. Pursuant to that Request, Owner seeks, among other relief: (a) monetary damages sufficient to fully compensate Owner for the injuries that it has sustained as a result of GHM's breaches of its contractual and common law obligations to Owner; (b) an order of disgorgement, forfeiture, and restitution requiring GHM to return or otherwise turn over to Owner all fees, profits, monies, payments, and other things of value which GHM wrongfully or unjustly received, retained, took, or paid itself in breach of its obligations to Owner; and (c) a declaration that Owner properly exercised its right and power to terminate the Management Agreement and revoke GHM's authority thereunder, without liability to Owner, due to GHM's material breaches of contract and violations of fiduciary duty.

Owner has no intention to take or use any GHM property including, but not limited to, any GHM intellectual property or confidential and proprietary information. Therefore, GHM should contact Owner to arrange for the removal of such property from the Hotel in a reasonable manner so as not to interfere with the provision of services to the Hotel's guests or otherwise detrimentally affect Hotel operations. Furthermore, it is Owner's intent to pay to GHM any outstanding fees or other amounts owed to GHM pursuant to the Management Agreement as of the date of termination thereof. However, we remind GHM of its termination-related obligations: (i) pursuant to Section 1 of Article XI of the Management Agreement, to deliver to Owner, and not to remove from the Hotel, Owner's books and records, "so as to ensure the orderly continuance of the operation of the Hotel;" and (ii) pursuant to Section 1 of Article XX, to pay or otherwise deliver to Owner all the assets of the Hotel, including any accounts related thereto. In addition, GHM must immediately cease any use of, or affiliation with, the "Setai" name and brand, just as Owner intends to disassociate the Hotel from GHM. Finally, Owner demands that neither GHM nor any of its agents, representatives, or affiliated parties destroy, or otherwise impair the accessibility or availability of, any documents, data, or other materials that relate, directly or indirectly, to the Hotel or GHM's activities under the Management Agreement.

Please immediately inform us in writing of the earliest date and time when authorized representatives of GHM will be available to meet with Owner to discuss any remaining issues with respect to the orderly transition of Hotel operations to new management and other termination-related matters, including, but not limited to, arrangements regarding the Hotel employees.

We thank you for your anticipated cooperation and courtesy with respect to this important matter.

March 31, 2012
Page 3

Sincerely,

**SETAI OWNERS LLC,**
**a Delaware Limited Liability Company**

By:    Setai Mezzanine LLC,
a Delaware Limited Liability Company,
its Sole Member

        By:    LB South Beach LLC,
a Delaware Limited Liability Company,
its Managing Member

            By:

                Jeffrey Fitts
                Vice President

cc:    Mr. Hansjoerg Meier
General Manager
(via e-mail: hmeier@ghmamericas.com)

Mr. Moustapha Guimei
Director of Finance
(via e-mail: mguimei@ghmamericas.com)

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-17427 CA 10

GHM (SOUTH BEACH) LLC,
a Delaware limited liability company,

      Plaintiff,

v.

SETAI OWNERS LLC,
a Delaware limited liability company,
TREVI LUXURY HOSPITALITY GROUP,
INC., a Texas corporation, and SMB MANAGEMENT
LLC, a Florida limited liability company,

      Defendants.

_____/

THE ORIGINAL FILED
IN THE OFFICE OF THE CLERK

MAY 0 7 2012

CIRCUIT & COUNTY COURTS
MIAMI-DADE COUNTY FLORIDA

## MOTION TO ENJOIN USE AND COMPEL RETURN OF GHM'S PRIVILEGED DOCUMENTS AND CONFIDENTIAL TRADE SECRET MATERIALS AND TO ENJOIN FURTHER USE OF GHM'S TRADEMARKS

      Plaintiff, GHM (South Beach) LLC ("GHM") hereby moves for entry of an Order against

Defendants, Setai Owners LLC ("Owner"), Trevi Luxury Hospitality Group ("Trevi") and SMB

Management LLC ("SMB"), enjoining the use and compelling the return of GHM's privileged

documents and communications and valuable and confidential trade secret materials, and

enjoining further use of GHM's trademarks and intellectual property located at the Setai Resort

& Residences, 2001 Collins Avenue, Miami Beach, FL 33139 (the "Hotel"). In support, GHM

states:

## RELEVANT FACTS

**A.    Owner Unlawfully Raids the Hotel and Seizes GHM's Privileged, Proprietary and Confidential Materials and Trade Secrets[1]**

1.      Since its opening in 2005, GHM has operated and managed the Hotel, and maintained its offices there. GHM's records, intra-company emails, proprietary materials, and files containing attorney-client privileged communications relating to both the Hotel and its other business dealings are located on Hotel property in both hard copy and electronic form.

2.      At approximately 2:00 a.m. on Saturday, March 31, 2012, and without any notice, Owner, assisted by Trevi and SMB, raided the Hotel with dozens of security personnel. Owner advised GHM's manager on duty that it was purporting to terminate the parties' Management Agreement "effective immediately." Mar. 31, 2012 Letter from J. Fitts (the "Termination Letter"), attached hereto as **Exhibit A**. Owner's termination letter does not identify any basis for the termination and raid. *Id.*

3.      No notice or opportunity to cure any purported mismanagement was given to GHM prior to the raid, contrary to the express requirements in the Management Agreement between the parties. *Compare* Affidavit of Hansjoerg Meier ¶¶ 3-4, attached hereto as **Exhibit B**, *and* Management Agreement Article XIX (1.1.2), attached hereto as **Exhibit C**. No "good faith" attempt was made to settle any differences amicably, as required by the Management Agreement. H. Meier Aff. ¶ 4.   Instead, Owner took the law into its own hands, and unlawfully and forcibly removed GHM as manager in the most demeaning and damaging manner possible. Owner subsequently filed an arbitration action before the International Chamber of Commerce (the "ICC") against GHM to have a tribunal bless the actions it had already taken.

---

[1] For further details regarding the raid and the wrongful termination of GHM as manager of the Hotel, GHM respectfully refers this Court to the Complaint filed in this case.

4.      Once in the Hotel, the Defendants unlawfully seized, inspected and/or began to use GHM's attorney-client privileged documents and correspondence (the "Privileged Documents"), GHM's trademarks (the "GHM Marks"), and materials containing GHM's trade secrets, including,  (i) GHM standard operating procedures manuals, style guides, manager handover materials, and other such materials; (ii) GHM employee files and training manuals; (iii) guest, group and travel agent files; (iv) sales and marketing materials prepared by GHM for the Hotel and other GHM-managed properties; (v) confidential information and materials belonging to GHM's affiliates; and (vi) GHM management committee meeting notes and minutes (collectively, the "Trade Secret Materials").

5.      At the time of the raid, hard copies of GHM's Privileged Documents and Trade Secret Materials were located throughout the Hotel for use and reference by GHM employees in their workspaces and offices. H. Meier Aff. ¶¶ 5-13. GHM's Privileged Documents and Trade Secret Materials were also located on electronic servers and computer terminals located at the Hotel. *Id*. The GHM Marks were being used throughout the Hotel as authorized by the Management Agreement. H. Meier Aff. ¶ 14.

6.      GHM's Trade Secret Materials, especially when taken as a whole, represent an extremely valuable asset with significant actual and potential economic value to others in the hotel industry — GHM's unique and specialized knowledge of how to manage and market ultra-luxury hotels. GHM has invested substantial resources in developing the Trade Secret Materials and has taken strict measures to protect the confidentiality of its Trade Secret Materials. For a detailed description of each of the GHM Trade Secret Materials, the value of such materials to GHM and to potential competitors, and the measures taken by GHM to protect such materials,

3

GHM respectfully refers this Court to the Affidavit of Hansjoerg Meier.   *See* H. Meier Aff. ¶¶ 5-13.

7.    By their actions, the Defendants have misappropriated GHM's trade secrets, by taking, at no cost and through improper means, the blueprints for how to operate and market a hotel according to GHM's carefully developed, time-tested, proprietary methods.

**B.    Owner Openly and Defiantly Refuses to Cease Use of GHM's Privileged Documents and Trade Secret Materials**

8.    Owner's counsel purports to specialize in assisting hotel owners in orchestrating illegal hotel raids. Following the raid, the same attorneys boasted to the press that, in 2011, they orchestrated an identical nighttime raid of a property in Hawaii managed by Marriott. *See* Barbara De Lollis, *Unusual Management Takeover at Exclusive Miami Hotel,* USA Today, March 31, 2012, attached hereto as **Exhibit D.** In that case, the court granted a temporary injunction reinstating Marriott as the manager of the hotel, *inter alia,* because the owner of the hotel had improperly seized Marriott's proprietary and confidential property. *See* Order to Show Cause, Temporary Restraining Order, and Preliminary Injunction, *M Waikiki LLC v. Marriott Hotel Services, Inc.,* Case No. 651557/2011, (Supreme Court of New York Aug. 31, 2011), attached hereto as **Exhibit E.**

9.    Perhaps learning from its mistakes in the Hawaii case, Owner's counsel apparently advised Owner to include the following statement in the termination letter that was delivered to GHM on the night of the raid:

> "Owner has no intention to take or use any GHM property including, but not limited to, any GHM intellectual property or confidential and proprietary information. Therefore, GHM should contact Owner to arrange for the removal of such property from the Hotel in a reasonable manner so as not to interfere with the provision of services to the Hotel's guests or otherwise detrimentally affect Hotel operations."

Termination Letter at 2.

4

10.     As it turns out, this was an empty statement. In the weeks following the raid, GHM has repeatedly demanded the return of its Privileged Documents and Trade Secret Materials located at the Hotel. *See, e.g.*, Apr. 2, 2012 Letter from D. Benavides at 1-2, attached hereto as **Exhibit F**. GHM also has made clear that its Privileged Documents and Trade Secret Materials should not be accessed, reviewed, used, or otherwise disturbed without the express written consent of GHM or a court order. *Id.* at 1-2. To the extent Owner chose to ignore this admonition, GHM demanded that Owner provide a list of all such materials to be used, accessed or reviewed and the purpose therefor. *See, e.g.*, Apr. 13, 2012 Letter from D. Benavides at 2-3, attached hereto as **Exhibit G**. Owner has brazenly refused to comply with any of these demands.

11.     With respect to numerous categories of documents, <u>including some privileged documents</u>, Owner has taken the position that it has the right to keep such documents. For example, Owner claims the authority to secure "potentially privileged" documents identified by GHM's counsel in "specially-marked boxes" in a locked room at the Hotel. Apr.18, 2012 Letter from J. Renard at 4, attached hereto as **Exhibit H**. Owner also has asserted ownership of other categories of documents that clearly belong to GHM. *Id.* at 4-9. Finally, Owner has expressly reserved its right to an "inspection" of financial and other information belonging to GHM's affiliates, GHM USA and GHM Americas, so that *Owner* can determine what will be returned to GHM as its confidential and proprietary property. *Id.* at 7.

12.     Owner also continues to exercise dominion over categories of Trade Secret Materials it admits belong to GHM. Although Owner did eventually "allow" GHM's representatives access to certain areas of the Hotel to retrieve whatever hard copies of these documents they could find, the electronic servers and certain computers located at the Hotel also contain electronic copies of the same Privileged Documents and Trade Secret Materials. H.

Meier Aff. ¶¶ 5-13. GHM's counsel has made this clear to Owner's counsel on countless occasions and has made repeated attempts to amicably obtain access to the servers and/or copies of the servers to retrieve the Privileged Documents and Trade Secret Materials located thereon. *See, e.g.,* Apr. 18 Letter at 8; Apr. 24,2012 Letter from D. Benavides at 2, attached as **Exhibit I.**

13. Owner's counsel, now pretending that he was never informed of these serious issues, stubbornly continues to stonewall these efforts. *See* May 4, 2012 Letter from J. Renard at 2, ¶6. Owner's counsel has also made the bizarre demand that GHM "specifically identify such materials" before they can be returned. *See* Apr. 18 Letter at 4-7. GHM would need to be able to access the materials in order to determine which materials represent GHM's trade secrets that should be removed from the Hotel.

## C. GHM Discovers Disturbing Evidence of Defendants' Tampering with GHM's Privileged Documents and Trade Secret Materials

14. On April 6, 2012, Owner's counsel finally permitted GHM's personnel and counsel on Hotel property to retrieve the personal belongings of those GHM employees that were forcibly removed from the property on the night of the raid, and purportedly to retrieve the hard copies of GHM's Confidential Materials which were scattered throughout the Hotel. Consistent with its intention to treat GHM in the most demeaning manner possible and apparently to create the impression among Hotel employees and residents that GHM was terminated for cause, Owner insisted that GHM's personnel and even its counsel be paraded around Hotel property, in front of employees and residents, by security. Affidavit of Xavier Vazquez ¶¶ 4-5, attached hereto as **Exhibit J.**

15. Upon entering the Hotel, GHM's counsel and personnel immediately noted several disturbing instances of improper tampering with GHM's proprietary and privileged materials. For example, there were several privileged communications between GHM's counsel and senior

6

management, some of which go to the heart of issues currently in dispute between the parties, on the desk of the Hotel's former Director of Finance. Affidavit of Moustapha Guimei ¶2, attached hereto as **Exhibit K.** Astonishingly, some of those privileged communications contained highlighting marks which were not made before the termination, indicating that they had been reviewed by someone under the control of Owners. *Id.* ¶6. Others were moved into bags or boxes from their original location. *Id.* ¶4. Some documents, including a recent internal audit made by GHM's corporate office in Singapore and a new bank resolution with new signing officers for the Hotel accounts were missing. *Id.* ¶5. GHM's personnel also noted similar tampering with employee files and I-9 immigration forms. X. Vazquez Aff. ¶6.

**D.    Upon Information and Belief, Owner Continues to Use the GHM Marks**

16.    Although Owner had clearly planned its pre-dawn raid, it failed to provide for predictable contingencies, including the ability to replace any materials bearing the GHM Marks. For several weeks following the raid, Owner used the GHM Marks in connection with the Hotel, in breach of its contractual obligations to immediately cease using such intellectual property upon termination of GHM. *See* Apr. 18 Letter from J. Renard at 3(admitting that some of GHM's marks might still be in use as of April 18).

17.    Although Owner's counsel has represented that all GHM marks have been now removed (over a month since the raid), GHM was recently told that certain guest room keys continue to bear the GHM logo. H. Meier Aff. ¶15. Moreover, Trevi employees continued to use GHM's "@ghmamericas.com" email addresses well after counsel for Owner assured GHM that its email addresses were secure. *Compare* J. Renard Letter at 3 (Apr. 4, 2012), attached hereto as **Exhibit L** *and* Email from ffisher@ghmamerics.com (April 12, 2012 3:39 PM EST), attached hereto as **Exhibit M.** Because GHM is barred from the property and because the representations

of Owner's counsel cannot be trusted, it is impossible to confirm whether Owner has finally stopped holding out GHM's trademarks in the operation of the Hotel.

## LEGAL ARGUMENT

### A.  This Court Has Authority To Enter a Temporary Injunction

Although Owner has filed an arbitration action against GHM – the propriety of which is disputed and must be resolved by this Court – that action, even if proper, does not divest this Court of jurisdiction to enter interim injunctive relief. In fact, Article 23 of the Rules governing the International Chamber of Commerce ("ICC Rules"), expressly recognizes this Court's authority to do so:

> Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an Arbitral Tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the Arbitral Tribunal.

ICC Rules, Art. 23, cl. 2; *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dunn,* 191 F.Supp.2d 1346 (M.D. Fla. 2002) ("[T]his Court has the authority to issue injunctive relief despite the parties' agreements to arbitrate their disputes.").

### B.  A Temporary Injunction is Necessary to Protect GHM's Privileged Documents

GHM is entitled to a temporary injunction preventing Defendants from keeping, accessing, and reading GHM's Privileged Documents. By taking possession by force, and ejecting GHM, which had created and kept the documents at the Hotel, Owner has turned the usual rule of protecting privileged information on its head. Owner's actions have left GHM's privileged communications vulnerable to exposure. First, Owner has insisted on keeping possession of some of the hard copy materials that GHM's counsel has identified as privileged in a "locked room" at the Hotel (to which Defendants have access). Second, Owner asserts that

8

*Owner* has the right to and will review any and all of GHM's electronic files and email servers (as well as other hardcopy documents), even though counsel for GHM has expressly stated that those files and emails absolutely contain privileged information belonging to GHM. The harm of exposing GHM's privileged communications – particularly where there is an ongoing legal dispute between the parties – is irreparable. Once seen, those privileged documents and files cannot be unseen.

A party's right to protect privileged communications is embedded in the structure of the adversarial system. *See, e.g.*, Fla. R. Civ. P. 1.280. The material at issue contains precisely such information. Had Owner followed the ordinary course and procedure mandated by the Management Agreement and ordinary principles of legal disputes, the Defendants would not have these documents in the first place. Thus, they cannot complain that a return to black letter rules of conduct somehow prejudices them. Finally, the public has a strong interest in ensuring that parties do not profit from illegal raids and seizure of privileged documents.

**C.       A Temporary Injunction is Necessary to Protect GHM's Trade Secret Materials**

GHM also is entitled to a temporary injunction to enjoin Defendants from accessing and using GHM's Trade Secret Materials. *See* Fla. R. Civ. P. 1.610; *East v. Aqua Gaming, Inc.*, 805 So.2d 932, 934 (Fla. 2d DCA 2001). Courts applying the Florida Trade Secrets Act routinely issue temporary injunctions to protect trade secrets. *E.g.*, *Aqua Gaming*, 805 So. 2d at 934-35; *Four Seasons Hotel & Resorts B.V. v. Consorcia Barr, S.A.*, 267 F. Supp. 2d 1268, at 1276-79; 1325-27 (S.D. Fla. 2003), *aff'd in part, rev'd in part on other grounds*, 138 F. App'x 297 (11th Cir. 2005); *cf. AutoNation, Inc. v. Maki*, No. 03-18896, 2004 WL 1925479, at *3-4, 9 (Fla. Cir. Ct. Aug. 25, 2004), *aff'd*, 895 So. 2d 453 (Fla. 4th DCA 2005). As detailed below, these requirements are easily satisfied here.

9

There is a critical need for this interim relief to prevent Defendants – which have improperly accessed, used, and refused to return GHM's trade secrets – from exposing those trade secrets to GHM's competitors, including Trevi. As described, *supra*, these trade secrets include certain categories of documents that Owners have agreed to return but only at Owner's convenience and on Owner's schedule. With respect to certain other disputed material that Owner seized during its unlawful raid, counsel for Owner takes the position that *Owner* has the right to unilaterally review this material – created and kept by GHM – to determine to whom it belongs. This claim wholly inverts the normal procedure, where the party who created and kept the documents (including privileged and proprietary documents) makes the initial decision so that privileges and proprietary information is protected.

The materials for which GHM seeks protection have been recognized as precisely the kind of trade secrets that require such protection. In *Aqua Gaming*, the Florida District Court of Appeal upheld a preliminary injunction recognizing that a customer list – like GHM's carefully cultivated guest profiles and GHM network – was a valuable trade secret that should be protected from a former employee's "attempt to 'jump start' his business by taking the heart out of [Aqua Gaming's] business." 805 So.2d at 934-35 (quoting the trial court). So too, Florida courts have entered preliminary injunctions to protect items like "Best Practices" policies; detailed breakdowns of dealership operations, and information about employee compensation – like GHM's internal manuals, self-evaluations, and employee incentive summaries – as valuable confidential and proprietary material. *E.g., Maki*, 2004 WL 1925479, at *3-4, 9; *see also AutoNation, Inc. v. Hatfield*, No. 05-02037, 2006 WL 60547, at *2 (Fla. Cir. Ct. Jan. 4, 2006), *aff'd*, 939 So. 2d 155 (Fla. 4th DCA 2006) (issuing a preliminary injunction requiring the return of any trade secrets "including any expansion plans (including existing and entry into new

geographic and/or product markets); operational or management guidelines; corporate or commercial policies; cost, pricing, or other financial data or projections; and any information reflecting the identity and background of any customer, prospect, or supplier"). Moreover, in a dispute between a hotel operator and a hotel owner, the Southern District of Florida entered a permanent injunction of hotel owner's use of hotel operator's confidential and proprietary information, including guest profiles, global corporate accounts, preferred travel agency partners, and internal financial management tools to ensure protection of the operator's valuable trade secrets under Florida law. *See Four Seasons Hotel & Resorts B.V.*, 267 F. Supp. 2d at 1276-79; 1325-27. These are precisely the kinds of trade secrets that GHM seeks to protect here.

Owner's manager, Trevi, is a competitor of GHM's and, given its lack of experience, is in dire need of the proprietary systems, standards, and methods of managing a luxury hotel. And Trevi is now in charge of the Hotel, where GHM's Trade Secret Materials are located in scores of locations. Every day these materials are not returned risks further disclosure of these trade secrets to Trevi, and once disclosed, the bell cannot be unrung. *Cf. Dotolo v. Schouten*, 426 So. 2d 1013, 1015 (Fla. 2d DCA 1983) (applying Florida law and presuming irreparable damage in such circumstances); *see also I.C. Systems, Inc. v. Oliff*, 824 So. 2d 286, 287 (Fla. 2d DCA 2002) (holding that the damages caused by ongoing violations of trade secrets "are, by definition, irreparable"). Although GHM has attempted to mitigate its damages by repeatedly requesting these materials so that GHM can determine what is proprietary and what is not (instead of a self-interested party opponent), it must now ask the Court to intervene to ensure that the growing likelihood of disclosure is finally stopped.

GHM has a substantial likelihood of success on the merits of its claims that Owner's unlawful raid and subsequent review and distribution of these confidential and proprietary

materials was a misappropriation of GHM's trade secrets. First, it is indisputable that Owner obtained possession of this material by breaching its contractual obligation to terminate with a minimum of 60 days notice when it chose to storm the hotel with armed guards in the middle of the night and forcibly eject GHM managers without allowing them the opportunity to retrieve even their personal belongings. Second, as described above, the types of confidential and proprietary materials at issue here have been recognized as valuable trade secrets in similar contexts and have frequently served as the basis for preliminary and permanent injunctive relief. *See supra*; *see also* Florida Stat. 688.001(4) (defining "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process" so long as it has "independent economic value" due to being secret); *Id.* at § 688.003 (providing for injunction to protect trade secrets).

The balance of hardships here strongly favors GHM. As detailed above, every day that those trade secrets remain at the Hotel risks their disclosure and dissemination to a competitor. In contrast, if the injunction is granted, there should be no harm to the Defendants. It was Owner's choice to oust GHM from operations without *any* prior notice in contravention of the procedures mandated by the Management Agreement, and to install Trevi as the manager instead. Presumably, Owner believed that Trevi had the expertise and capability to manage the Hotel without access to GHM's trade secrets. Any burden to Owner resulting from Trevi's inability to do so is entirely Owner's fault and cannot be used to balance the harm to GHM of revealing its trade secrets to a competitor.

The preliminary injunction also would serve the public interest of protecting legitimate business interests and valuable trade secrets, especially in the context of Florida's important hospitality industry.

12

**D.** **A Temporary Injunction is Necessary to Prevent Defendants from Using the GHM Marks**

GHM also is entitled to a preliminary injunction to enjoin Owner from using GHM's marks or to allow Trevi and/or SMB from using those marks at the Hotel in breach of contract. Under longstanding Florida precedent, temporary injunctions are appropriate to enforce contract provisions where, as here, the plaintiff has the clear right to the performance of the contract and would suffer irreparable harm in the absence of such relief. *E.g., Wilson v. Sandstrom*, 317 So. 2d 732, 736 (Fla. 1975). As detailed below, GHM's claim clearly meets this standard.

The Management Agreement clearly establishes GHM's contractual right to prevent Owner from using or authorizing the use of GHM's marks in association with the Hotel or any other property after termination of the contract. *See* Management Agreement at Art. XX (1.4); Art. XVII(2); *see also Wilson*, 317 So. 2d at 736 (holding that temporary injunctions enforcing contracts are appropriate where "plaintiff has a clear right free from reasonable doubt to invoke the remedy"). GHM retains ownership over GHM's marks throughout and beyond the contract, *Id.* at Art. XVII(2), creating a license for Owner to use GHM's marks in association with the Hotel that expires as soon as the contract is terminated, *Id.* at Arts. XVII(2); XX (1.4). Moreover, the contract expressly provides that GHM may seek an injunction to enforce these rights. *See Id.* at Art. XVII(2). This language unambiguously establishes that Owner's license to the marks ended as soon as Owner asserted that the contract was terminated and that GHM has the right to enjoin Owner from continuing to use GHM's marks after that date. Nor can Owner claim that it has a contractual right to use the trademark for some period of time after termination. Having chosen to entirely disregard *all* of its obligations under the termination provision (such as notice, the right to cure, and 60 days written notice of termination, which

13

would have allowed an orderly transition) Owner cannot now seek shelter in the agreements termination provisions relating to an orderly transition.

As described, *supra*, Defendants' use of GHM's marks have undermined GHM's right to protect its trademarks by making it appear to customers as if the Hotel still is being managed by GHM, by using GHM email addresses to correspond with guests and by displaying GHM-branded items throughout the hotel. Every day that Defendants continue to use GHM's marks in operating the Hotel – a property that GHM used to manage – risks increasing customer confusion. Again, GHM has a duty to mitigate its damages, and it therefore seeks this Court's assistance in cutting off the conduct that is continuing to cause damages. Such circumstances support the issuance of a temporary injunction. *E.g.*, *Wilson*, 317 So. 2d at 736.

To the degree the Court finds it necessary to address the other temporary injunction factors, they too favor GHM. GHM has a substantial likelihood of prevailing on the merits because the contract language is clear. GHM will be irreparably harmed by Defendants' use of GHM's marks in violation of the license through continued association with a property that GHM does not manage. Any harm to Defendants, by contrast, in having to remove all GHM marks is entirely the fault of Owner and Trevi in engineering in a hostile takeover of the Hotel, instead of using the orderly termination process required by the Management Agreement and in failing to plan for entirely foreseeable contingencies.

As with the protection of GHM's trade secrets, moreover, a temporary injunction would be in the public interest. The public has an interest in ensuring that unambiguously worded contracts are enforced, particularly where, as here, they correspond to statutory rights that are otherwise recognized by Florida Law. And the public has an interest in discouraging disruptive

14

and potentially dangerous middle-of-the-night raids on Florida's hotels by owners who think they will gain some advantage by using the threat of force to accomplish breaches of contract.

**WHEREFORE,** GHM respectfully requests that the Court enter an order:

    (a)    Enjoining Defendants from reviewing and/or using any and all of GHM's Privileged Documents, Trade Secret Materials and GHM Marks;

    (b)    Compelling Defendants to return any and all hard copies of GHM's Trade Secret Materials, and any copies made by Defendants of such materials, within one (1) week of the Order;

    (c)    Compelling Defendants to immediately turn over all copies of the electronic servers and computer terminals at the Hotel to GHM so that GHM can review that material and remove any of GHMs proprietary, privileged, or confidential property; and

Dated May 7, 2012

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Attorneys for Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800

By_____
    Kenneth R. Hartmann
    Florida Bar No. 664286
    Corali Lopez-Castro
    Florida Bar No. 863830
    Daniel F. Benavides
    Florida Bar No. 81675

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on this 7th day of May, 2012 via Federal Express and/or email to all parties on the attached service list.

By: _____
       Corali Lopez-Castro

15

**EXHIBIT A**

**SETAI OWNERS LLC**
1271 Avenue of the Americas
39th Floor
New York, New York 10020

March 31, 2012

VIA FACSIMILE, CERTIFIED
AIR MAIL, RETURN RECEIPT
REQUESTED, AND REGULAR AIR MAIL

General Hotel Management Ltd.
GHM (South Beach) LLC
1 Orchard Spring Lane
#04-02 Tourism Court
Singapore 247729
Attn: Mr. Hans R. Jenni
Mr. Adrian Zecha
Facsimile No.: (65) 6221 1535

General Hotel Management Ltd.
70B Pagoda Street
Singapore 059229
Attn: Mr. Hans R. Jenni
Facsimile No.: (65) 221 1535
(65) 6221-1535

GHM (South Beach) LLC
c/o CorpDirect Agents, Inc.
515 East Park Avenue
Tallahassee, Florida 32301

GHM (South Beach) LLC
c/o CorpDirect Agents, Inc.
160 Greentree Drive, Suite 101
Dover, Delaware 19904

General Hotel Management Ltd.
P.O. Box 71
Craigmur Chambers, Road Town
Tortola, British Virgin Islands

Re:    Management Agreement dated March 20, 2000, between Setai Owners LLC, as
Owner, and General Hotel Management Ltd., as Operator, as amended (the
"Management Agreement"), relating to the management and operation of the
Setai Resort & Residences (the "Hotel") located in Miami Beach, Florida

Dear Messrs. Jenni and Zecha:

Please be advised that, effective immediately, Setai Owners LLC (the "Owner") hereby
terminates the above-referenced Management Agreement and its principal-agent relationship
with General Hotel Management Ltd. and GHM (South Beach) LLC (together, "GHM") –
including any authority that GHM may have with respect to the Hotel, the Abbey Building, and
the rental program for participating hotel-condominium and residential-condominium units.

Owner has assumed exclusive control of the Hotel and has installed Trevi Luxury
Hospitality Group, Inc. as its new agent-manager of the Hotel. In connection therewith, Owner
expects GHM to: (1) cooperate fully with Owner to effectuate a smooth transition and turnover

March 31, 2012
Page 2

of Hotel operations to new management and provide all necessary assistance to accomplish that objective as expeditiously as possible; and (2) comply with and fulfill all of GHM's post-termination obligations, as set forth in the Management Agreement and as provided by the common law of Florida governing agency and fiduciary relationships.

Please also be advised that Owner is initiating an arbitration proceeding against GHM in the International Court of Arbitration of the International Chamber of Commerce, pursuant to Section 1 of Article XXVI of the Management Agreement. A copy of Owner's Request for Arbitration is being delivered to you by separate letter. Pursuant to that Request, Owner seeks, among other relief: (a) monetary damages sufficient to fully compensate Owner for the injuries that it has sustained as a result of GHM's breaches of its contractual and common law obligations to Owner; (b) an order of disgorgement, forfeiture, and restitution requiring GHM to return or otherwise turn over to Owner all fees, profits, monies, payments, and other things of value which GHM wrongfully or unjustly received, retained, took, or paid itself in breach of its obligations to Owner; and (c) a declaration that Owner properly exercised its right and power to terminate the Management Agreement and revoke GHM's authority thereunder, without liability to Owner, due to GHM's material breaches of contract and violations of fiduciary duty.

Owner has no intention to take or use any GHM property including, but not limited to, any GHM intellectual property or confidential and proprietary information. Therefore, GHM should contact Owner to arrange for the removal of such property from the Hotel in a reasonable manner so as not to interfere with the provision of services to the Hotel's guests or otherwise detrimentally affect Hotel operations. Furthermore, it is Owner's intent to pay to GHM any outstanding fees or other amounts owed to GHM pursuant to the Management Agreement as of the date of termination thereof. However, we remind GHM of its termination-related obligations: (i) pursuant to Section 1 of Article XI of the Management Agreement, to deliver to Owner, and not to remove from the Hotel, Owner's books and records, "so as to ensure the orderly continuance of the operation of the Hotel;" and (ii) pursuant to Section 1 of Article XX, to pay or otherwise deliver to Owner all the assets of the Hotel, including any accounts related thereto. In addition, GHM must immediately cease any use of, or affiliation with, the "Setai" name and brand, just as Owner intends to disassociate the Hotel from GHM. Finally, Owner demands that neither GHM nor any of its agents, representatives, or affiliated parties destroy, or otherwise impair the accessibility or availability of, any documents, data, or other materials that relate, directly or indirectly, to the Hotel or GHM's activities under the Management Agreement.

Please immediately inform us in writing of the earliest date and time when authorized representatives of GHM will be available to meet with Owner to discuss any remaining issues with respect to the orderly transition of Hotel operations to new management and other termination-related matters, including, but not limited to, arrangements regarding the Hotel employees.

We thank you for your anticipated cooperation and courtesy with respect to this important matter.

March 31, 2012
Page 3

Sincerely,

**SETAI OWNERS LLC,**
**a Delaware Limited Liability Company**

By:   Setai Mezzanine LLC,
      a Delaware Limited Liability Company,
      its Sole Member

         By:   LB South Beach LLC,
            a Delaware Limited Liability Company,
            its Managing Member

            By:   _____
                 Jeffrey Fitts
                 Vice President

cc:   Mr. Hansjoerg Meier
      General Manager
      (via e-mail: hmeier@ghmamericas.com)

      Mr. Moustapha Guimei
      Director of Finance
      (via e-mail: mguimei@ghmamericas.com)

**EXHIBIT B**

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-17427 CA 10

GHM (SOUTH BEACH) LLC,
a Delaware limited liability company,

     Plaintiff,

v.

SETAI OWNERS LLC,
a Delaware limited liability company,
TREVI LUXURY HOSPITALITY GROUP,
INC., a Texas corporation, and SMB MANGEMENT
LLC, a Florida limited liability company,

     Defendants.

_____/

## AFFIDAVIT OF HANSJOERG MEIER

I, Hansjoerg Meier, being duly sworn, deposes and says as follows:

1.     My name is Hansjoerg Meier and I was the General Manager of the Setai Resort & Residences (the "Hotel") for approximately six years on behalf of GHM (South Beach) LLC ("GHM"). As General Manager, I was the highest ranking employee of GHM at the Hotel, overseeing all aspects of the Hotel, including the operational, human resources, financial, and sales and marketing departments. In my capacity, I was also the primary GHM employee at the Hotel responsible for executing GHM's responsibilities under the Management Agreement with the Setai Owners LLC ("Owner") and for interacting with Owner and its representatives.

2.     In the early morning of March 31, 2012, Owner came to the Hotel with security personnel and forcibly removed GHM as manager of the Hotel. At that time, Owner provided the night manager on duty with a letter advising of the termination of GHM.

3.     Prior to the raid on March 31, 2012, Owner gave GHM no written notice of any default by GHM under the Management Agreement or its intent to terminate the Management Agreement.

4.     In fact, the first time I was made aware of many of Owner's allegations regarding why the Management Agreement should be terminated was when I read the Arbitration Request filed by Owner. Owner has never tried to discuss or resolve in good faith any of the complaints listed in the Arbitration Request before it evicted GHM from the Hotel.

5.     On March 30, 2012, I left work as usual, leaving my personal belongings and papers belonging to GHM, including communications with counsel, in my office. I frequently corresponded via email with GHM's counsel, as did my Director of Finance, and I printed some of this correspondence. Accordingly, communications with counsel could be found on the electronic servers of the Hotel as well as in hard copy form in my office.

6.     To ensure that GHM's standards and procedures are carried out uniformly at all GHM-managed properties, GHM has invested substantial resources in creating a variety of proprietary guidelines that serve as "How To" manuals to operate ultra-luxury hotels, including training materials for GHM employees. For example, GHM's "Standard Operating Procedures" provide step-by-step procedures that cover every aspect of how to create the GHM experience, including minute details such as how to set a dinner table "GHM style." Another example is what we call "Style Guides," which are standards created for all printed materials at GHM-managed properties, including the manager's business cards and guest letters. These and other such guides and manuals ensure that guests have a consistent experience at all GHM-managed properties. These confidential and proprietary materials were never shared with owners or third parties. Hard copies of these materials would have been located throughout the Hotel in certain

employee workspaces and offices for reference by GHM employees, as well as in electronic form on the electronic servers located at the Hotel.

7.    The Manager Handover Binder was located in my office. It was created for me approximately six years ago by the previous General Manager for GHM at the Hotel. It contains hundreds of pages of advice of how to keep the Hotel in compliance with GHM's proprietary standards. Whenever a new GHM manager takes over the operation of a GHM-managed property, the outgoing manager always creates one of these handover binders. They are never shared with owners or third parties.

8.    GHM kept confidential and proprietary data related to GHM's employees and GHM's compensation system at the Hotel. This information included employee pay sheets, as well as details regarding how GHM structures its employee incentives. Although GHM did give Owner lists of the names of the employees receiving the awards, GHM never shared the details of the methods or criteria used to make these determinations to any owner or third party. The employee files also included photographs of GHM employees. Hard copies of these materials would have been located throughout the Hotel in certain employee workspaces and offices, as well as in electronic form on the electronic servers located at the Hotel.

9.    To maintain GHM's signature brand of service, GHM also has invested substantial resources in creating detailed guest profiles. These profiles are not limited to guest check-in and check-out times. Instead, GHM gathers information about guests' special preferences across GHM-managed properties, including room and dining preferences and personal data, and whether the guests have been referred through GHM's preferred travel agencies or agents. These confidential and proprietary materials, used to enhance guests' stays and encourage long-term relationships with GHM, were never shared with owners or third

parties. Hard copies of these materials would have been located throughout the Hotel in certain employee workspaces and offices for reference by GHM employees, as well as in electronic form on the electronic servers located at the Hotel.

10.     GHM has cultivated special relationships with certain elite travel agencies, and with particular agents within those agencies. These relationships are extremely valuable to GHM. For example, on the strength of GHM's relationship with elite travel agencies, GHM was able to secure the highly unusual honor of a "Leading Hotels of the World" designation for the Hotel before it even opened. GHM has never shared these contacts with owners or third parties. In fact, while managing the Hotel, I  expressly refused to share  the names and information for our contacts within the agencies when Owner requested this information. As of the night of the raid, hard copies of these materials were located at the Hotel, as well as in electronic form on the electronic servers located at the Hotel.

11.     GHM also maintained various financial, marketing and other proprietary files belonging to GHM's affiliates at the Hotel. For example, there were documents regarding GHM's sales and marketing efforts for other GHM properties labeled "GHM Projects."  These materials contained GHM's proprietary and confidential business plans and were never revealed to owner or third parties. As of the night of the raid, hard copies of these materials were located at the Hotel, as well as in electronic form on the electronic servers located at the Hotel.

12.     GHM corporate information and materials were also located at the Hotel. These include, for example, GHM's corporate audit, which is an internal audit completed across all GHM-managed properties every year. It is separate and apart from the audit requirements in the Management Agreement and is never shared with this Owner, other owners, or third parties.

13.     GHM management also has regular internal meetings at which various people have taken minutes or personal notes. Although some of the discussion at the meetings relates directly to GHM's management of the Hotel, GHM's proprietary standards and some contained privileged communications are also discussed at the meetings. Owner was not present at these meetings, and the information was never shared with Owner. As of the night of the raid, hard copies of these materials were located at the Hotel, as well as in electronic form on the electronic servers located at the Hotel.

14.     At the time of the raid, GHM's trademarks were used in connection with the management of the Hotel as provided for in the Management Agreement. For example, communications with guests were always sent from the "ghamamericas.com," and the website and hotel business cards referenced "The Setai by GHM." GHM's trademarks also were visible throughout the Hotel, from the sign at the front of the Hotel to the bathrobes in the rooms.

15.     On or about April 30, 2012, I was informed that, as of that date, room keys containing the GHM marks were still being used at the Hotel.

16.     Since Owner seized the "ghmamericas.com" email server, I and other GHM employees have been unable to access our email accounts at "ghmamericas.com." My ability to remain in communication with GHM's current and prospective business contacts has been damaged because Owner has prevented me from accessing these accounts.

17.     I also have not been able to access various hardcopy and electronic files that Owner has refused to return. These include, for example, material related to GHM's worldwide business, including GHM global, GHM Americas, and GHM USA. The materials contained GHM's proprietary and confidential business plans and were never revealed to Owner or third

parties. My ability to support GHM's global and regional business interests has been damaged because Owner has prevented me from accessing this information.

    I have read and subscribed to the above and swear, under oath, that the information is true and correct. I understand that a false statement in this affidavit will subject me to penalties for perjury.

<br/>

_____
Hansjoerg Meier

<br/>

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

<br/>

Subscribed and sworn to before me this 7th day of May, 2012.



Notary Public, Miami-Dade County

My Commission expires _____

LORENA FERNANDEZ
Notary Public - State of Florida
My Comm. Expires Jun 17, 2014
Commission # EE 2173
Bonded Through National Notary Assn.

**EXHIBIT C**

Dated the 20th day of March ,2000

MANAGEMENT AGREEMENT

Between

GENERAL HOTEL MANAGEMENT LTD,

AND

DEMPSEY VANDERBILT HOTEL

TABLE OF CONTENTS

Page

ARTICLE I        Nomination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE II       Construction, Furnishing and Equipping of the Hotel . . . . . . . . . . . 4

ARTICLE III      Operating Term and Extension thereof . . . . . . . . . . . . . . . . . . . . 4

ARTICLE IV       Working Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE V        Training and Pre-opening Program; Advertising and Promotion . . . . . 5

ARTICLE VI       Official Opening of the Hotel . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE VII      Operation of the Hotel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE VIII     Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE IX       Assessments, Property Tax and Other Similar Payments . . . . . . . . . 10

ARTICLE X        Bank Accounts and Disbursements . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE XI       Books, Records, Statements and Reports . . . . . . . . . . . . . . . . . . 11

ARTICLE XII      Management Fees and Reimbursement . . . . . . . . . . . . . . . . . . . . 12

ARTICLE XIII     Additional Payments by the Owner . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE XIV      Set-off, Counterclaims, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE XV       Repairs and Maintenance and Capital Improvements . . . . . . . . . . . 13

ARTICLE XVI      Reserve for Capital Replacement . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE XVII     Name of the Hotel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE XVIII    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE XIX      Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE XX       Procedure upon Termination . . . . . . . . . . . . . . . . . . . . . . . . . 17

011312.4                              -i-

ARTICLE XXI     Partial Invalidity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE XXII     Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE XXIII     Damage, Destruction, Compulsory Taking . . . . . . . . . . . . . . . . . 18

ARTICLE XXIV     Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE XXV     Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE XXVI     Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARTICLE XXVII     Leasing and Property Management Services for Guest Unit
Owners and Residential Tower Unit Owners . . . . . . . . . . . . . . . . 21

ARTICLE XXVIII     Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARTICLE XXIX     Special Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE XXX     Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## MANAGEMENT AGREEMENT

THIS AGREEMENT made this 20th day of March 2000 by and between GENERAL HOTEL MANAGEMENT LTD., a company incorporated in the British Virgin Islands with limited liability and having its registered office situated at P.O. Box 71, Craigmur Chambers, Road Town, Tortola, British Virgin Islands ("GHM"), and DEMPSEY VANDERBILT OWNERS LLC, a Delaware limited liability company ("OWNER").

WHEREAS:

(A)    The Owner is in the course of developing and constructing, at its own cost and expense, a mixed-use project (the "Project") consisting of a residential condominium tower (the "Residential Tower") and a hotel condominium (the "Hotel") to be known as the "Dempsey Vanderbilt Hotel." The Hotel will consist of about 91 guest rooms, retail space, food and beverage operations, garage, health club and spa, and other facilities. The Project will be located at Collins Avenue between 20th and 21st Streets in Miami Beach, Florida. The Residential Tower and the Hotel will be governed by separate condominium regimes with appropriate cross-easement agreements.

(B)    The Hotel will be structured as a condominium with three principal components: (i) the 91 or so guest rooms will each be a separate residential condominium unit (collectively, the "Guest Units"), (ii) the restaurants, lounges, bars, retail space, garage, health club and spa and other income-generating areas, to the extent included in the Hotel, shall constitute one or more commercial condominium units (collectively, the "Commercial Units"), and (iii) the lobby, front desk, hallways, building systems and other public areas, administrative areas and "back of house" shall constitute a separate condominium unit (the "Hotel Unit"; the Guest Units, Commercial Units and Hotel Unit being hereinafter sometimes collectively referred to as the "Units").

(C)    As structured, neither the Guest Units nor the Commercial Units will contain any of the structural or mechanical components of the building, but instead will consist almost solely of the air-space within the interiors of the applicable Units. Specifically, the following components of the Hotel building (which shall be referred to in the Project Offering Documents as the "Shared Essential Components") are made part of the Hotel Unit: any and all structural components of the improvements, including, without limitation, all exterior block walls and all finishes (paint, stucco, etc.) and balconies, terraces and/or facades attached or affixed thereto; the roof; all roof trusses, roof support elements and roofing insulation; all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems, including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility,

911312.4



mechanical, telephonic, telecommunications, electrical, plumbing and/or other services; all heating, ventilating and air conditioning systems, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services; all elevator shafts, elevator cabs, elevator cables and/or systems and/or equipment used in the operation of the elevators; and all trash rooms, trash chutes and any and all trash collection and/or disposal systems. The exterior grounds and the hallways connecting the Guest Units are also part of the Hotel Unit.

(D)     In addition, certain non-income producing areas of the recreational facilities to be constructed on the site will be part of the Hotel Unit. It is contemplated that the Hotel condominium will have very little "common areas", as most of the traditional common areas will be included within the Hotel Unit, and thus controlled by the Hotel Unit owner and, pursuant to this Agreement, the Operator. Although the owners of Guest Units will have the right to use certain of these facilities, including the pool and pool deck, the maintenance and operation of them will be the sole responsibility of the Hotel Unit owner. In consideration for the rights of use to certain portions of the Hotel Unit granted to the Guest Unit and Commercial Unit owners, the Guest Unit and Commercial Unit owners are obligated to reimburse the Hotel Unit owner for the portion of the expenses related to the Shared Essential Components and all of the other shared facilities. As no revenues will be generated from the Hotel Unit, no Management Fees will be due or payable under this Agreement. All Management Fees will be paid to Operator pursuant to separate agreements between Operator and the owners of the Guest Units and/or Commercial Unit(s) generating the revenues.

(E)     The costs and expenses of owning and operating the Hotel Unit will be allocated among the various Units pursuant to separate agreements. The revenues derived from the operation of the Hotel will be allocated to the owners of the Units from which such revenues were derived. It is Owner's intention to sell the Guest Units to third party purchasers, who will then determine whether they want their particular Guest Unit to be included in the "Rental Program" (described below). Management of the individual Guest Units shall only be provided by Operator if separately arranged by contract between the Operator and the applicable Guest Unit owner who has elected to participate in the Rental Program (the "Guest Unit Operating Agreements"). The Guest Unit Operating Agreements shall contain terms consistent with the provisions of this Agreement and such other commercially reasonable terms as to which Owner and Operator shall mutually agree.

(F)     It is the intention of the parties that separate agreements are to be entered into between Owner and Operator covering the operation or leasing of the various facilities included in the Commercial Units (the "Commercial Unit Operating Agreements"), exclusive of any retail units (other than a Hotel store). The parties shall negotiate in good faith to arrive at mutually acceptable agreements for the Commercial Units on customary, commercially-reasonable terms with respect to these facilities.

911312.4                                -2-



(G)     The Operator has experience in the management and operation of hotels, and is willing to render assistance in its construction, its preparation for operation and its eventual management and operation.

(H)     The Operator, being a member of the General Hotel Management Ltd. Group of companies, is able to procure for the Hotel a license to use the GHMarks, which is included in this Agreement.

(I)     The Owner desires to avail itself of the hotel management experience and know-how of the Operator, and the Operator is willing to render its expertise and assistance in the management and operation of hotels upon the terms and conditions hereinafter appearing.

NOW THEREFORE the parties hereto AGREE AND COVENANT as follows:

ARTICLE I

Nomination

1.     Nomination

The Owner hereby appoints and engages the Operator as the exclusive and sole manager and operator of the Hotel, to perform the services provided for in this Agreement. The Operator, as the sole agent of the Owner, will act in accordance with the terms and conditions hereinafter set forth and hereby accepts the said nomination. The Operator agrees to operate the Hotel as a world class five star international hotel comparable to the Mandarin, Four Seasons and Ritz-Carlton hotels in Miami (the "Standards"):

2.     No Covenants or Restrictions

The Owner warrants that to the best of its knowledge, information and belief having made all reasonable inquiries that there are, and on the date when the Hotel is available for the use by guests, no covenants or restrictions which would prohibit or unreasonably restrict the Operator from carrying on upon the Hotel the businesses and services customarily associated with a world class five star international hotel. The Owner agrees upon request by the Operator to sign promptly and without charge any applications for Licenses, which the Operator may reasonably request be signed, and which Operator shall be obligated to obtain.

811312.4                                        -3-



## ARTICLE II

### Construction, Furnishing and Equipping of the Hotel

1.  The Owner shall construct with reasonable diligence, at the Owner's own expense and in accordance with a development budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment), a building designed as a world class five star international hotel in accordance with the Standards. Operator agrees that if the building is constructed in accordance with the approved development budget, subject to its reasonable approval of plans and specifications, the Hotel will satisfy the foregoing criteria.

2.  The building shall consist of the Building & Appurtenances in which the Owner shall provide and install:

    2.1  Furnishings & Equipment;

    2.2  Operating Equipment; and

    2.3  Operating Supplies.

## ARTICLE III

### Operating Term and Extension thereof

1.  The term "Operating Term" shall mean a period during which the Operator shall manage and operate the Hotel commencing on the date hereof, and (unless sooner terminated as provided in Article XIX), expiring on the last day of the fifteenth (15th) full calendar year following the official opening of the Hotel, subject to any extension thereof as provided in Section 2.

2.  The Operator shall be entitled to extend the Operating Term for a further period of five (5) years from the date of its expiration upon the same terms and conditions as are contained in this Agreement but without the inclusion of this Section PROVIDED ALWAYS THAT the Operator shall have given notice to the Owner at least one year prior to the expiration of the initial Operating Term of its intention so to extend the same.



## ARTICLE IV

### Working Capital

1.     The Owner shall provide sufficient Working Capital for the payment of all of the Operating Expenses throughout the Operating Term, pursuant to a budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment), to be paid in such installment(s) and at such time(s) as the Operator reasonably requires.

## ARTICLE V

### Training and Pre-opening Program; Advertising and Promotion

1.     The Operator agrees to recruit, hire and train the initial staff of the Hotel through such training programs as it shall consider appropriate, such training to take place only in the Country. The Operator further agrees to use its best efforts to advertise and promote the business of the Hotel through its existing facilities.

2.     The Owner shall provide all monies as may be reasonably required to pay for the cost and expense of providing the training and pre-opening programs referred to in Section 1, as well as the cost and expense of providing or procuring for the Hotel pre-operational staff, organization, advertising, promotion, travel and business entertainment including pre-opening operations, opening celebrations and ceremonies, whether incurred prior to or concurrently with the beginning of full management and operation of the Hotel. The costs of the training and pre-opening programs will be set forth in a pre-opening budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment). Owner agrees to pay into the Hotel account(s), to be operated by the Operator under Article X, the mutually approved training and pre-opening expenses in such installment(s) and at such time(s) as the Operator shall reasonably require.

3.     The cost and expenses of providing training and pre-opening programs and the pre-opening and opening costs and expenses of the Hotel shall be treated as Operating Expenses and amortized equally over a period of five (5) years, commencing with the first full Fiscal Year in which a charge may be made therefor.

911312.4                                    -5-



## ARTICLE VI

### Official Opening of the Hotel

1. The Hotel shall be considered ready to be opened for full management and operation when it is substantially completed and the Furnishings & Equipment, Operating Equipment and Operating Supplies shall have been substantially installed therein, all Licenses shall have been obtained, full and adequate inventories of food and beverage have been provided and the Hotel shall be ready to receive and render services to guests in accordance with the Standards.

2. The official opening of the Hotel shall be on a date which the Owner and the Operator shall reasonably agree subject to the Hotel being considered ready to be opened for full management and operation as provided in Section 1. Agreement by the Operator of the said date and the official opening of the Hotel shall not relieve the Owner of its obligation to cure any deficiency regarding the Hotel as to which notices shall have been or shall be given by the Operator before or after opening.

3. It is agreed that prior to the date for the official opening of the Hotel, the Operator may conduct partial management and operations of the Hotel for the purposes of further staff training and operational and promotional development the cost and expense of which shall be a pre-opening operational expense, as provided for in Article V.

4. Within six (6) months after the official opening of the Hotel, the Owner shall deliver to Operator an inventory of all Furnishings & Equipment and Operating Equipment.

## ARTICLE VII

### Operation of the Hotel

1. Commencing from the date hereof and during the Operating Term, the Operator shall have the exclusive right and obligation to direct, supervise and control the management and operation of the Hotel generally and in accordance or in keeping with the Standards and objectives of each Annual Plan and to determine the programs and policies to be followed in connection therewith. Subject as may otherwise be provided in this Agreement, the Operator shall, in directing, supervising and controlling the management and operation of the Hotel, be free and maintained by the Owner from interruption or disturbance and the Owner shall, at its own cost and expenses, undertake and prosecute any appropriate action, judicial or otherwise, to assure such freedom to the Operator, subject always as may otherwise be provided by law. In taking any action pursuant to this Agreement, the Operator will be acting only as the appointed representative of the Owner, and nothing in



this Agreement shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties hereto.

2.   Without limiting the generality of the foregoing, and unless otherwise expressly provided, the Operator shall, during the Operating Term, in accordance with the Standards, for and on behalf of the Hotel undertake the following:

2.1   At least two (2) months before the beginning of each Fiscal Year of the Hotel, submit to the Owner for review, recommendations and approval an Annual Plan for the ensuing Fiscal Year which shall consist of:

2.1.1   An estimated profit and loss statement for the ensuing Fiscal Year including a schedule of hotel room rates and all other sources of the Hotel's revenue;

2.1.2   A budget estimate for all Operating Expenses;

2.1.3   A schedule showing proposed replacement of furniture, fixtures, fittings, furnishings and equipment and any other expenditures proposed to be capitalized;

2.1.4   A schedule showing the proposed cash reserve for replacement of furniture, fixtures, fittings, furnishings and equipment;

2.1.5   An estimated cash flow statement for such year; and

2.1.6   A marketing plan.

The Owner shall indicate to the Operator its recommendations and objections, if any, to the Annual Plan before the commencement of the period covered by the Annual Plan. As and when necessary and from time to time in any Fiscal Year, the Operator may submit to the Owner, for its further review and approval, supplementary budgets to the Annual Plan. In the event that the Owner and the Operator cannot agree on any or all of the items in the Annual Plan or any supplement thereto, the dispute shall be resolved by the Expert. Pending such resolution, the Hotel shall be operated in accordance with the prior Fiscal Year's Annual Plan.

2.2   Use its best efforts and diligence in the renting of Guest Units participating in the Rental Program.

2.3   Hire, promote, discharge and supervise the work of the executive staff, including the manager, assistant managers and departmental heads. Through such executive staff, the Operator shall supervise the hiring, training, promotion, discharge and

work of all other operating and service employees performing services in or about the Hotel. The Operator shall consult with the Owner in handling collective bargaining negotiations and similar important matters of a particularly local nature. The Operator shall be permitted from time to time to provide a reasonable number of hotel guest rooms for the temporary use of the manager and other management employees, if Operator reasonably considers it necessary or expedient. (In addition, Owner shall have the right to use up to two guest rooms per night at no cost to Owner, subject to availability and other commercially reasonable limitations to be agreed upon.) All staff and other operating and service employees employed at the Hotel shall be or be deemed to be for all purposes the employees of the Operator.



2.4   Establish and supervise an accounting department, with appropriate hotel accounting and cost control systems and personnel, to be maintained by the Operator at the Hotel. The Operator shall establish and supervise all bookkeeping, accounting and clerical services, including the maintenance of payroll records incident to the efficient operation and maintenance of the Hotel. All accounts shall be maintained in conformity with the Uniform System. If requested by Owner, an Independent Certified Accountant nominated by the Owner and reasonably approved by the Operator shall be appointed by the Hotel as its auditor.

2.5   Make available to the Hotel in the Country the expertise of the Operator and the services of the Operator's specialized home-office facilities located in the Country and employed in the performance of its hotel operation and management activities, including, without limitation, its engineering, maintenance, accounting, cost control, taxation, food and beverage control, reservations, sales publicity, advertising, convention, labor relations and safety departments.

2.6   Receive, consider and handle with due decorum and courtesy the complaints of all tenants, guests or users of any of the services or facilities of the Hotel.

2.7   Enter into arms-length contracts in the name of the Owner for the furnishing to the Hotel of electricity, gas, water, steam, telephone, cleaning (including window cleaning), vermin extermination, boiler maintenance, air-conditioning maintenance and other necessary utilities or services and purchase all Operating Equipment, Operating Supplies, and other items and enter into any other contract as may be necessary in the efficient management and operation of the Hotel, all at competitive prices.

2.8   Arrange for compliance with the Law affecting or issued in connection with the Hotel.



2.9    Institute any necessary legal actions or proceedings to collect charges, rent or other income due to the Hotel or to oust or dispossess guests, tenants or other persons in possession, or to cancel or terminate any tenancy for the breach thereof or default thereunder by the tenant.

## ARTICLE VIII

### Insurance

1.    During the construction of the Project, the Owner shall procure and maintain the insurance described in Section 1.1 below. Thereafter, the Operator shall procure and maintain all fire, public liability, indemnity, fidelity, property and other types of insurance which are necessary or appropriate for the operation of the Hotel, including (but without limiting the generality of the foregoing):

1.1    During the period of construction, furnishing and equipping of the Hotel, full and adequate public liability and indemnity and property damage insurance (if available) protecting the Owner and the Operator against loss or damage arising by reason of all activities in connection with the development, construction, furnishing, equipping, management, operation and maintenance of the Hotel.

1.2    Upon commencement of the operation and management of the Hotel, general liability and casualty insurance against loss or damage by fire and other hazards included in an extended coverage endorsement (including business interruption insurance), in such amounts as Owner and Operator shall agree upon.

1.3    If the Owner and the Operator shall consider it appropriate, insurance against loss of income for the Hotel due to riot, civil commotion and insurrections.

1.4    Such other insurance as Owner, Operator or any mortgagee may require and which is customary in the operation of similar hotels.

2.    Concurrently with the submission of the first Annual Plan and continuing annually, thereafter, the Operator shall furnish the Owner with a schedule setting forth the kinds and amounts of insurance proposed to be obtained or continued, including the insurance required in the foregoing sections, and such other kinds and amounts of insurance as the Operator shall deem necessary or advisable for the protection of the interest of the Owner and the Operator. Promptly thereafter, except as to the insurance required in the foregoing sections, the parties shall agree as to the kind, amount and form of additional insurance to be obtained. The Operator shall thereupon forthwith apply for and obtain on the Owner's behalf, if obtainable, all such insurance.

911312.4

-9-

3.   All policies of insurance shall name the Owner, and where appropriate, jointly with the Operator and such other parties in accordance with their respective interests. The original of all policies of insurance and certificates of insurance shall be kept and maintained by the Operator, and certificates of insurances shall be forwarded to the Owner. The premiums for and costs and expenses associated with obtaining such insurance policies shall be Operating Expenses.

4.   Neither the Owner nor the Operator shall assert against the other and each of them do hereby waive with respect to one another any claims for any losses, damages, liability or expenses (including legal fees) incurred or sustained by either of them to the extent that the same are covered by insurances as aforesaid, on account of damage or injury to person or property arising out of the ownership, management, operation or maintenance of the Hotel.

## ARTICLE IX

### Assessments, Property Tax and Other Similar Payments

1.   All assessments, property taxes and other similar payments in respect of any particular Unit shall be paid by the Operator on behalf of the owner thereof promptly as and when the same shall become due; provided the owner has delivered to Operator the funds necessary to pay the same.

2.   The Operator shall furnish to the applicable owner copies of the official bills and receipts relating to any such payments.

## ARTICLE X

### Bank Accounts and Disbursements

1.   All Working Capital received by the Operator from the Owner shall be deposited in a special account or accounts in the name of the Hotel in a bank or other depository selected by the Owner and approved by the Operator. Such account or accounts shall be operated solely by the Operator's designees.

2.   Out of such account or accounts the Operator shall pay all Operating Expenses.

911312.4                                   -10-



ARTICLE XI

Books, Records, Statements and Reports

1.    The Operator shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel on an accrual basis. The books of account and all other records relating to, or reflecting, the operation of the Hotel shall be kept at the Hotel and shall be available to the Owner and its duly authorized representatives for examination, audit, inspection and copying. Such books of account and records shall reflect, for each Unit managed by Operator, the Gross Revenues generated from each such Unit and the Operating Expenses allocable thereto. All of such books and records shall be the property of the Owner and shall not be removed from the Hotel without the written consent of the Owner and the Operator. Upon the termination of this Agreement, all of such books and records up to the date of termination shall forthwith be delivered up to the Owner so as to ensure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be made available to the Operator at reasonable times and intervals for examination, audit, inspection and copying for a period of two (2) years following such termination. Without prejudice or limitation to the foregoing, the Operator's right of examination, audit, inspection and transcription as provided for in this case shall extend to books and records or parts thereof related to transactions or events taking place or occurring before the date of termination of this Agreement.

2.    The Operator shall deliver to the Owner within thirty (30) days after the end of each calendar month a profit and loss statement showing the results of the operation of the Hotel for the immediately preceding calendar month and the Fiscal Year-to-date and as compared to the Annual Plan, and covering such other matters as are customarily covered in such monthly reports for comparable hotels.

3.    Within ninety (90) days after the end of each Fiscal Year, the Operator shall deliver to the Owner a profit and loss statement, balance sheet, sources and application of funds statement, and which, if requested by Owner, shall all be audited and certified by the Independent Certified Public Accountant of the Hotel: Any disputes between the Owner and the Operator as to the contents or correctness of any such statement or any accounting matter thereunder shall be decided by the Independent Certified Public Accountant, whose decision shall be final and binding. The cost and expense of audits pursuant to this section shall be Operating Expenses.

4.    If no objection shall be made by either the Owner or the Operator to the said certified profit and loss statement and to the Net Profit for any Fiscal Year within forty-five (45) days after delivery of the same, such certified profit and loss statement shall be deemed to be correct and conclusive for all purposes. The Owner and the Operator shall endeavor to resolve any objections or differences which may be made prior to the time fixed herein

for payment of the next succeeding installment to the Owner of its entitlement to the Net Profit, as provided for in Article XIII.

5.   Separate or additional statements may be required to be prepared and delivered to the owners of the Commercial Units and the Guest Units managed by Operator, as may be set forth in the Commercial Unit Operating Agreements and the Guest Unit Operating Agreements.

## ARTICLE XII

### Management Fees and Reimbursement

1.   Under the Guest Unit Operating Agreements, (i) a Base Management Fee shall be payable monthly with respect to the Gross Revenues derived from such Guest Unit, and (ii) an Incentive Management Fee shall be payable monthly with respect to estimated Gross Operating Profit for such Unit, to be adjusted at the end of each Fiscal Year.

2.   For the purpose of calculating the amount of the Base Management Fee, payments for any given calendar month shall be the Base Management Fee percentage of the cumulative Fiscal Year-to-date Gross Revenue, less the amount of any payments on account of the Base Management Fee previously paid to the Operator during such Fiscal Year.   Monthly payments of the Incentive Management Fee shall be calculated on the cumulative Fiscal Year-to-date Gross Operating Profit, less the amount of any payments on account of the Incentive Management Fee previously paid to the Operator during such Fiscal Year.

3.   At the end of each Fiscal Year and following the receipt of the annual statements for Units managed by Operator, an adjustment shall be made on the basis of the said statements, if necessary, so that the Operator shall receive its proper Management Fee for the said Fiscal Year.

4.   The Owner shall reimburse the Operator for all Operating Costs which were paid by the Operator and not out of the Hotel account(s).

5.   The Operator may also charge to the Hotel its reasonable travel and other out-of-pocket head office expenses incurred pursuant and in the course of and directly related to the management and operation of the Hotel, and in accordance with the approved Annual Plan.   The Operator may offer complimentary rooms, food and beverages and other services to any person if, in the reasonable judgement of the Operator, such action will promote the Hotel and increase the overall profitability of its operations.   All such costs and expenses charged pursuant to this Section 5 shall be Operating Expenses.

911312.4                                    -12-



6. Notwithstanding any of the foregoing, it is understood and agreed by Owner and Operator that no Management Fees are due from Owner hereunder. The only Management Fees payable to Operator are pursuant to the Commercial Units Operating Agreements and/or the Guest Unit Operating Agreements.

## ARTICLE XIII

### Additional Payments by the Owner

1. In the event that for any Fiscal Year a Net Loss shall be sustained for the Hotel, the Owner shall forthwith upon demand by the Operator after the end of such Fiscal Year pay into the Hotel account(s) operated by the Operator under Article X such amounts as may be required to provide sufficient Working Capital to cover anticipated Operating Expenses, as reasonably determined by Operator.

## ARTICLE XIV

### Set-off, Counterclaims, etc.

1. The Commercial Unit Operating Agreements and Guest Unit Operating Agreements shall contain customary exclusions for set-offs and counterclaims.

## ARTICLE XV

### Repairs and Maintenance and Capital Improvements

1. Subject to the performance by the Owner of its obligations under this Agreement the Operator agrees to maintain the Hotel in good repair and condition.

2. Subject to the Owner's prior approval, the Operator is authorized to make such alterations, additions or improvements in or to the Hotel as are customarily made in the operation of deluxe international hotels. The cost of such customary additions, alterations and improvements shall either be treated as Operating Expenses or shall be capitalized in the books of account in accordance with sound accounting practices. Such capitalized expenditure shall be amortized by treating such expenditure as Operating Expenses over their estimated useful life.

911312.4

-13-



## ARTICLE XVI

### Reserve for Capital Replacement

1.   During the Operating Term there shall be deducted monthly from the Gross Operating Profit such sum as shall be equal, in the aggregate for each Fiscal Year, to 2.5 percent of the Gross Revenue for that Fiscal Year. A cash fund in the above sum shall be created for the purpose of making replacements of, renewals of and additions to said furniture, fixtures, furnishings and equipment. Such fund shall be recorded on the books of account maintained for the Hotel as "Reserve for Capital Replacements". The fund shall be used solely for such purposes. Any expenditure for replacements of, renewals of and additions to, furniture, fixtures, furnishings and equipment during each Fiscal Year may be made by the Operator without the consent of the Owner up to the amount of such fund (including unused accumulations thereof from earlier Fiscal Years), and any such expenditures shall be paid from such fund. To the extent that such expenditures in any Fiscal Year shall be less than the fund for such year, the excess shall be carried forward and added to the next or any subsequent fund until fully used. Any expenditure in excess of the fund shall be subject to the Owner's approval, and shall be deducted from Gross Operating Profit in arriving at the Net Profit.

## ARTICLE XVII

### Name of the Hotel

1.   The Operator and the Owner agree that during the Operating Term the Hotel shall at all times be known and designated as the "Dempsey Vanderbilt Hotel", or by such other name as the parties may from time to time agree in writing.

2.   This Agreement includes a license to the Owner of the terms "GHM", "GHM Resorts" and "GHM Hotels" (collectively, the "GHMarks") for use in connection with the marketing of the Project and the operation of the Hotel, to be used in such manner as Operator shall reasonably determine. It is expressly acknowledged and agreed by the parties hereto that the GHMarks shall be the exclusive property of General Hotel Management Ltd. and no legal right or remedy of the Owner of any kind or nature whatsoever, nor any provision of this Agreement or any other agreement shall confer upon the Owner or any of the successor or successors the right to use the "GHMarks" either alone or in conjunction with some word or words, except in accordance with the provisions of this Agreement. Without prejudice to any other legal right or remedy of the Operator, this covenant shall be enforceable, by injunction or otherwise, by the Operator, shall be deemed to survive any termination of this Agreement, and shall in case of conflict prevail over all other provisions of this Agreement.

911312.4

-14-

3. All costs and expenses relating to any registration of the businesses of the Hotel as are required by law (including legal fees) and renewals of such registration shall be Operating Expenses.

## ARTICLE XVIII

### Indemnification

1. The Operator shall not in the performance of this Agreement be liable to the Owner or any other person or entity for any act or omission, negligent, tortious or otherwise, of any officer, agent or employee of Operator, except, however, for the gross negligence or willful misconduct of any such officer, agent or employee of Operator.

2. The Owner hereby agrees to indemnify and save harmless the Operator and officers, agents and employees of the Operator from and against any and all loss, damage, cost or expense (including lawyer's fees) which Operator or any of the officers, agents or employees of the Operator may sustain or incur by reason of any claim or assertion of wrong doing, error, commission, omission or negligence made by any person or entity involving or arising out of the performance by the Operator or any officer, agent or employee of the Operator of the various services contemplated by this Agreement, whether or not such claim or assertion involves any allegation based on the alleged sole negligence of two or more such entities or individuals (one or more of which may be the Operator or any of its officers, agents or employees) or any other theory, exclusive, however, of any gross negligence or willful misconduct of Operator or of any of its officers, agents or employees. Moreover, the Owner will, at the Operator's request, assume the defense of any proceeding brought by any third party to establish any such liability.

3. The provisions of this article shall survive any expiration or termination of this Agreement and shall remain enforceable by the Operator notwithstanding such expiration or termination.

## ARTICLE XIX

### Termination

1. This Agreement may at any time during the Operating Term be terminated in accordance with the following provisions:

    1.1 At the option of the Owner:

1.1.1   By giving sixty (60) days notice in writing to the Operator in the event that, despite the fact that the Owner shall have carried adequate insurance in accordance with the provisions of Article VIII, there has been damage to and destruction of the Hotel of such magnitude that the cost of repairing, restoring, rebuilding or replacing the hotel is in excess of one hundred and twenty per cent (120%) of the proceeds of the insurance;

1.1.2   By giving 60 days notice in writing to the Operator, in the event that the Operator shall fail to observe or perform any of the provisions of this Agreement that are the Operator's responsibility to be observed or performed, including the obligation to operate the Hotel in accordance with the Standards, despite the Owner having given written notice of such default to the Operator and such default shall not have been remedied within thirty (30) days after such notice;

1.1.3   By notice in writing to the Operator, in the event of the entire or a substantial portion of the Hotel or its services being acquired, condemned, or closed in accordance with Law;

1.1.4   By notice in writing to the Operator, in the event the Operator enters into liquidation whether voluntarily or compulsorily or compounds with its creditors generally or has a receiver appointed of all or any substantial portion of its assets or takes or suffers any similar action in consequence of its debts.

1.2     At the option of the Operator:

1.2.1   By giving sixty (60) days notice in writing to the Owner, in the event that the Owner shall fail to observe or perform any of the provisions of this Agreement that are the Owner's responsibility to be observed or performed, despite the Operator having given written notice of such default to the Owner and such default shall not have been remedied within thirty (30) days after such notice;

1.2.2   By notice in writing to the Owner, in the event of the entire or a substantial portion of the Hotel or its services being acquired, condemned, or closed by Law;

1.2.3   By giving notice in writing to the Owner, in the event the Owner enters into liquidation whether voluntarily or compulsorily or by law or compounds with its creditors generally or has a receiver appointed over all or any substantial portion of its assets or takes or suffers any similar action in consequence of its debts.

911312.4                                    -16-




## ARTICLE XX

### Procedure upon Termination

1.    In the event of termination of this Agreement, whether by effluxion of time or otherwise, the following steps shall be taken, in the following order:

    1.1    If requested by Owner, the Independent Certified Accountant shall conduct a final accounting and audit of the books and records of the Hotel and shall produce and deliver to the Owner and the Operator final audited accounts to the date of the termination (otherwise, such final statements shall be prepared and delivered by Operator);

    1.2    There shall be paid from the Hotel account(s) all amounts and debts due to the Operator, and if the monies in the Hotel account(s) are insufficient for such purposes by the Owner; and

    1.3    All other amounts and the remaining assets of the Hotel shall be paid to or retained by the Owner.

    1.4    The license to the use of the "GHMarks" shall be terminated and the words "GHM", GHM Resorts and GHM Hotels shall not be used for the Hotel in its name or in any other way.

## ARTICLE XXI

### Partial Invalidity

1.    In the event that one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgement of a court of competent jurisdiction, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted in this Agreement.

911312.4



}                                                          }

## ARTICLE XXII

### Force Majeure

1.    In the event that the performance by any party to this Agreement of its obligations hereunder is prevented by force majeure, including, but not limited to, acts of God, flood, hurricane, earthquake, tidal wave, landslide, fire, plague, epidemic, quarantine restriction, perils of the sea; war or serious threat of the same, civil commotion, blockade, arrest or restraint of government, rulers or people; strike, lockout, sabotage, other labor dispute; or any other causes or circumstances whatsoever beyond the party's reasonable control, then, such party shall not be liable for loss or damage, or failure or delay in performing its obligations under this Agreement.

## ARTICLE XXIII

### Damage, Destruction, Compulsory Taking

1.    If the Hotel or any portion thereof shall be damaged or destroyed at any time during the Operating Term by fire, casualty or any other case, the Owner shall, at its own expense and with due diligence, repair or replace the Hotel so that the Hotel shall be substantially the same as that prior to such damage or destruction.  If the Owner shall fail:

    1.1    To commence such work within sixty (60) days of receipt of insurance proceeds or confirmation by the insurance carrier that such proceeds will be made available to cover actual costs of repair or replacement, whichever is earlier; or

    1.2    To complete such work diligently, then the Operator may, at its option, either:

        1.2.1   Terminate this Agreement by written notice to the Owner, effective as of the date of dispatch; or

        1.2.2   Undertake or complete such work for the account of the Owner to the extent of such available insurance proceeds, in which case the Operator shall be entitled to be repaid thereof from such insurance proceeds.

2.    If the Hotel is damaged or destroyed by fire or other insurable cause to such an extent that the cost of repair or replacement as estimated by the Operator exceeds one third of the original cost of the Hotel, then the Owner may, if it determines not to repair or replace the Hotel, provisionally terminate this Agreement by notice to the Operator.

3.    If thereafter at any time within three (3) years after the termination of this Agreement pursuant to Section 2 above the Owner repairs, rebuilds or replaces the Hotel, the Operator

011312.4                                    -18-



may, within sixty (60) days of the commencement of such repair or replacement or on receipt of written notice from the Owner of its intention to repair or replace the Hotel, reinstate such services by written notice to the Owner.

4. If the whole of the Hotel shall be taken by any expropriation, condemnation or similar proceedings, or, if a portion thereof shall be taken, any award (compensation), for such taking shall be equitably apportioned between the Owner and the Operator after recoupment by the Owner or its constituent partners of their investments in the Hotel.

5. If only a part of the Hotel shall be so taken and the taking of such part does not make it unreasonable, in the Operator's opinion, to operate the remainder of the Hotel as a hotel of the type and class preceding such taking, so much of any award (compensation) to the Owner shall be made available as shall be reasonably necessary for making alterations or modifications to the Hotel as to make it a satisfactory architectural unit as a hotel of similar type and class a prior to the taking. The balance of the award (compensation) shall be equitably apportioned between the Owner and Operator.

## ARTICLE XXIV

### Successors and Assigns

1. The Owner may sell, assign, transfer, lease, mortgage or otherwise alienate its interest in the Hotel, including any or all of the Units, without the prior written consent of the Operator. The Operator shall not have the right to assign or transfer to any third party any of its obligations or rights under this Agreement, save with the prior written consent or approval of the Owner; provided, however, that (a) the Operator may assign or transfer this Agreement at any time to any other member of the General Hotel Management Ltd. Group upon notice to the Owner and (b) after the earlier to occur of (i) one year after the opening of the Hotel or (ii) the sale of all the Guest Units to third parties, the Operator may assign or transfer this Agreement in connection with a sale or merger of the General Hotel Management Ltd. Group or a sale of substantially all of the assets thereof. It is understood and agreed that any consent or approval granted by the Owner to any such assignment shall not be deemed a waiver of the provisions herein contained against assignment, transfer or alienation in relation to any subsequent sale, assignment, transfer or alienation or purporting so to do.

2. Subject to the provisions of Section 1, the provisions of this Agreement shall be binding upon and shall enure to the benefit of the successors in title and the assigns of the Owner and of the Operator.



ARTICLE XXV

Notices

1. Any notice required to be given under this Agreement shall be in writing and shall be deemed to have been effectively given (1) when personally delivered, (2) seven (7) working days after being sent by registered or certified airmail, postage prepaid and return receipt requested, or (3) when sent by facsimile, in each such case addressed as follows, or (4) to such other address as either OPERATOR or OWNER may subsequently designate by notice to the other party:

1.1  To OWNER:

Metropolitan Development Group
1411 Broadway
New York, New York 10018
Attention:     Jonathan Breene
Fax. No.:      (212) 704-0546

1.2  To OPERATOR, at both:

General Hotel Management Ltd.
P.O. Box 71
Craigmur Chambers, Road Town
Tortola
British Virgin Islands

AND

General Hotel Management Ltd.
70B Pagoda Street
Singapore 059229
Attention:     Hans R. Jenni
Fax No.:       (65) 221 1535

*Copies To:*

*Zakay Sasson*
*16495 N.E. 39ᵗʰ Avenue*
*Eastern Shores, FL. 33180*
*and*

*Enrique Fefer*
*19333 Collins Avenue, apt 1708*
*Sunny Isles Beach, Fl, 33160*



## ARTICLE XXVI

### Applicable Law

1.    This Agreement shall be governed and interpreted in accordance with the laws of the State of Florida and the United States of America.  The parties agree that in all matters relating to this Agreement, whether during its substance or after its termination, and also in all matters concerning the provisions of this Agreement where any question or dispute or difference shall be settled in mutual good faith.  In case of failure by the parties to reach an amicable settlement, such difference or dispute shall be finally settled through a Board of Arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce.  The venue of the arbitration shall be Dade County, Florida.

## ARTICLE XXVII

### Leasing and Property Management Services for
### Guest Unit Owners and Residential Tower Unit Owners

1.    The Operator shall offer a "Rental Program" (i.e., rental services and property management services) to Guest Unit owners (if desired by them) on the following terms or such other terms to be reasonably agreed upon between Owner and Operator (subject to requirements of applicable laws).

   (a)    The Rental Program shall be completely voluntary;

   (b)    The Rental Program shall give Guest Unit owners the option to use their units for a maximum number of days and subject to such restrictions as Owner and Operator shall reasonably agree upon in good faith;

   (c)    The Rental Program shall contain a rotation system intended to cause similar quality units to be rented for approximately the same amount of times;

   (d)    The Rental Program will not involve any pooling of revenues;

   (e)    Operator will offer room service, maid service and turndown service to Guest Unit owners participating in the Rental Program;

   (f)    The Rental Program will provide each participating Guest Unit owner 100% of the revenue derived from the rental of the owner's unit not less frequently than quarterly, after first deducting travel agent commissions, credit card service charges, applicable taxes and Management Fees; and

911312.4                                     -21-



(g)    Participants in the Rental Program will receive activity statements from Operator not less frequently than quarterly.

Any and all revenue generated from the leasing of a Guest Unit under the Rental Program shall be deemed its Gross Revenues, and any and all costs incurred thereunder shall be deemed part of its Operating Expenses.

2.    The Operator shall offer a similar Rental Program to the Residential Tower unit owners (if desired by them) on the following terms or such other terms to be reasonably agreed upon between the Owner and the Operator:

(a)    The Rental Program shall be completely voluntary;

(b)    The Rental Program shall give Residential Tower unit owners the option to use their units for as many days of the year as they desire;

(c)    The Rental Program shall contain a rotation system intended to cause similar quality units to be rented for approximately the same amount of times;

(d)    The Rental Program will not involve any pooling of revenues;

(e)    Operator will offer room service, maid service and turndown service to Residential Tower unit owners participating in the Rental Program;

(f)    The Rental Program will provide the Residential Condominium unit owners 50% of the net revenues derived from the rental of the owner's unit, after first deducting travel agent commissions, credit card service charges and applicable taxes, with the remaining 50% paid to the Operator as a fee;

(g)    Participants in the Rental Program will receive activity statements from Operator not less frequently than quarterly; and

(h)    Each unit participating in the Rental Program shall contain Furnishings and Equipment approved by Operator.

Any and all revenue generated from the leasing of Residential Tower units under the Rental Program shall be deemed its Gross Revenues, and any and all costs incurred thereunder shall be deemed part of its Operating Expenses.

3.    Operator shall also make available to all Guest Unit and Residential Tower unit owners, whether or not they are enrolled in any Rental Program, other services (whether on an a la carte, or bulk basis, to be agreed to by Operator and Owner subsequent to the execution



of this Operating Agreement), which shall include, without limitation, the following: room service, food and beverage charging privileges, daily maid service, routine maintenance assistance. Operator shall be entitled to its standard charges for providing any of these services.

4.   Owner and Operator agree to reasonably cooperate with each other to promptly finalize the terms of the Rental Programs and to otherwise establish reasonable rules and regulations and procedures for the operation of the Hotel.

ARTICLE XXVIII

Definitions

As used in this Agreement:

1.   The term "Fiscal Year" shall mean the twelve-month period commencing on January 1 and ending on December 31. "

2.   The term "Annual Plan" means such statements, estimates and schedules as are mentioned in Section 2 of Article VII as amended from time to time.

3.   The term "the Country" shall mean the United States of America.

4.   The term "Building and Appurtenances" shall mean a building(s) containing about 91 guest rooms, restaurants, lobbies, bars and lounges, retail space, elevators, back-of-the-house and parking areas, recreational facilities and other related facilities.

5.   The term "Furnishings & Equipment" shall mean all furniture, furnishings, fixtures, life safety and fire equipment on or required for the management and operation of the Building and Appurtenances.

6.   The term "Gross Operating Profit" shall mean, for any particular Unit, the excess during each Fiscal Year (and proportionately, for any period less than a Fiscal Year) of Gross Revenues derived from such Unit over Operating Expenses allocated thereto during the same period, calculated in accordance with the Uniform System.

7.   The term "Gross Revenues" shall mean all income and proceeds of every kind (whether in cash or on credit) generated from Units managed by Operator, including the proceeds of business interruption insurance actually received by Operator or Owner or the owner of any such Unit (after deduction of said insurance proceeds of all necessary expenses incurred in the adjustment or collection thereof) less Turnover Taxes which have been

911312.4                                    -23-



added onto the customer's bills and actually received by the Hotel as part of the Hotel's revenue.

8. The term "Hotel" shall have the meaning ascribed to it in the Preamble to this Agreement.

9. The term "Independent Certified Accountant" shall mean the accountant or firm of accountants referred to in Section 2.4 of Article VII.

10. The term "Law" shall mean all laws, acts, ordinances, rules, regulations, orders, enactment or determinations by any governmental municipal or other authority having jurisdiction.

11. The term "Licenses" shall mean all licenses, permits, consents, approvals and authorizations (governmental, municipal or otherwise) required for the management and operation of the Hotel in accordance with this Agreement including, but not limited to: liquor licenses for the sale of alcoholic beverages at all restaurants and bars in the Hotel and to all guest rooms; restaurant and hotel licenses; all licenses, permits, consents, approvals and authorizations (governmental, municipal or otherwise) required for the procurement and import of Furnishings & Equipment, Operating Equipment and Operating Supplies, for the Hotel to operate as a world class five star international hotel meeting the Standards, and all visas and work permits for staff who require them.

12. The term "Net Loss" shall mean any negative balance which may result after the deductions set out in Section 13 of this Article have been made to the Gross Operating Profit of the Hotel for any Fiscal Year.

13. The term "Net Profit" shall mean, with respect to any particular Unit managed by Operator, the resulting balance after deductions from the Gross Operating Profit for such Unit for a Fiscal Year (and proportionately, for any period less than a Fiscal Year) of all or any allocable portion (as appropriate) of the following charges as they occur in accordance with the Uniform System:

  13.1  Real estate and personal property taxes;

  13.2  The cost and expense of any matter or thing to be done at Owner's cost and expense under this Agreement or otherwise done at the request of the Owner or of the owner of the Unit;

  13.3  The 5% Base Management Fee payable to the Operator; and

  13.4  Technical service fees payable for services rendered to the Hotel.

911312.4                                    -24-

14.   The term "Management Fee" shall mean, with respect to the Guest Units participating in the Rental Program, (i) a "Base Management Fee" equal to five percent (5%) of Gross Revenue, payable monthly, and (ii) an "Incentive Management Fee" equal to ten percent (10%) of the Gross Operating Profit, payable quarterly. The Management Fees payable with respect to any Commercial Unit managed by Operator shall be as set forth in the applicable Commercial Unit Operating Agreement.

15.   The term "Operating Equipment" shall mean all chinaware, glassware, linens, silverware, uniforms, utensils and other items of a similar nature.

16.   The term "Operating Expenses" shall mean, with respect to any particular Unit managed by Operator, all or the allocable portion (as appropriate) of the entire costs and expenses of maintaining, conducting, and supervising the operation of the Hotel (but shall not include, except as otherwise provided in this Agreement (a) principal or interest on Owner's indebtedness and any rent payable by Owner, (b) any taxes payable by the Owner, (c) the Management Fees, and (d) the costs of any other things specified in this Agreement to be done or provided at Owner's expense and not otherwise denominated as an Operating Expense) incurred by Operator directly or at its request or as otherwise provided in this Agreement, or under the applicable Commercial Unit or Guest Unit Operating Agreement, which Operating Expenses are properly attributable to the period under consideration under Operator's system of accounting, including without limitation:

16.1   The cost of all food and beverages sold or consumed and of all Operating Equipment and Operating Supplies, other than initial inventories of Operating Equipment and Operating Supplies furnished by Owner.

16.2   Salaries and wages and employee benefits of Hotel personnel, including, without limitation, pension plans, medical insurance, life insurance, travel accident insurance and bonuses, including cost of payroll taxes and employee benefits, severance or other termination benefits and accruals therefor; the cost of moving Hotel personnel (including expatriates), their families and personal belongings to the Hotel and their return, and all other expenses not specified or referred to herein which are referred to as "Administrative and General Expenses" in the Uniform System. Subject to prior consultation with the Owner and conformity with the approved Annual Plan, Operating Expenses may include the cost of visas, work permits, residence documentation, salaries, bonuses, payroll taxes and employee benefits (including family home leave airfares and allowances) for Hotel personnel from other countries. Except as herein otherwise expressly provided, the salary or wages of other employees or executives of Operator, or any member of the Operator's group of companies, shall in no event be Operating Expenses, but reasonable and customary traveling expenses incurred by them in connection with the management of the Hotel, including reasonable and customary living expenses incurred during travel, shall be Operating Expenses.

911312.4                                    -25-



Notwithstanding the foregoing, if it becomes necessary for an employee or executive of any member of the Operator's group of companies to perform temporary services at the Hotel of a nature normally performed by Hotel personnel, his salary (including payroll taxes and employee benefits) as well as his reasonable and customary traveling expenses (including living expenses) shall be Operating Expenses.

16.3    The cost of all other goods and services obtained by Operator in connection with its operation of the Hotel including, without limitation, heat and utilities, office supplies and services performed by third parties.

16.4    The cost of repair and maintenance of the Hotel.

16.5    Insurance premiums and losses incurred from any self-insured risks of the foregoing types provided that Owner and Operator have approved in advance such self-insurance or have agreed in advance to the unavailability of insurance to cover such risks.  Premiums on policies for more than one (1) year and/or not for a period within the fiscal year in question will be pro-rated over the period of insurance, and premiums under blanket policies will be fairly allocated among properties covered.

16.6    All taxes (other than income taxes and, unless otherwise included in Gross Revenues, Turnover Taxes), with respect to the operation of the Hotel, and water and sewage charges but excluding all taxes levied or imposed against the Hotel or its contents, such as real and personal property taxes.

16.7    Legal costs and fees, and fees of any Independent Certified Accountant, for services relating to the obtaining of all necessary approvals of this Management Agreement and of matters relating thereto, including any requisite registration of Operator (as a branch, an office or otherwise), and the operation of the Hotel and its facilities.

16.8    The reasonable costs and expenses (including salaries) incurred after the Hotel has opened of technical consultants and specialized operational experts for specialized services in connection with non-recurring work on operation, functional, decorating, design or construction problems and activities, including the reasonable fees of any member of the operator's group of companies in connection therewith.

16.9    All expenses for advertising the Hotel and all expenses of sales promotion and public relations activities incurred after the Hotel has opened.



16.10   All out-of-pocket expenses and disbursements reasonably, properly and specifically incurred by any member of the Operator's group of companies pursuant to, in the course of or directly related to, the management and operation of the Hotel. Without limiting the generality of the foregoing, such charges may include all reasonable travel, telephone, facsimile, telex, telegram, cablegram, radiogram, air express, courier service and other incidental expenses, but except as herein otherwise expressly provided, shall not include any of the regular expenses of the offices maintained by any member of the Operator's group of companies other than offices maintained at the Hotel for the management of the Hotel.

16.11   Bad debts and allowances for uncollectible accounts receivable.

16.12   Reserve for Capital Replacements.

16.13   Those items not included above described as Operating Expenses in this Agreement and any other payments made by Owner hereunder which are to be amortized over a period of years.

17.     The term "Operating Supplies" shall mean all inventories of paper supplies, cleaning materials and similar consumable items.

18.     The term "Standards" shall mean the highest quality of facilities or operations and services generally consistent with, and expected by, guests at comparable world class five star international hotels, such as those operated under the trade names Mandarin, Four Seasons and Ritz-Carlton.

19.     The term "taxes" includes, without limitation, all present or future taxes (of any nature and howsoever termed), levies, fiscal charges, imposts, duties, fees, assessments, surcharges, or other charges of whatever nature and however arising, imposed, assessed, charged, levied or demanded by any person at any time, together with all interest thereon and penalties or similar liabilities with respect thereto but does not include any stamp, registration or documentary taxes, duties or similar charges of any kind and Turnover Taxes.

20.     The term "Turnover Taxes" shall mean sales taxes, hotel occupancy taxes, gross receipts or value added tax or similar turnover taxes and any other direct room or room sales related taxes.

21.     The term "Uniform System" shall mean the latest edition of the "Uniform System of Accounts for Hotels", as published by the Hotel Association of New York City, Inc., or any later or revised edition thereof, and as modified by the mutual agreement of the Owner and the Operator.

911312.4                                    -27-

22.    The term "Working Capital" shall mean amounts sufficient to cover anticipated Operating Expenses.

23.    The term "Expert" shall mean an independent, nationally-recognized hotel consulting firm or individual qualified to resolve the issue in question and who is appointed in each instance by agreement of the parties or, failing agreement, by each party selecting one Expert and the two chosen experts selecting a third.


ARTICLE XXIX

Special Conditions

1.    Owner and Operator agree to make such revisions to this Agreement as may be required by the Owner's mortgage lender or to better market the Guest Units, provided that such changes do not materially adversely affect the economic benefits to either party.


ARTICLE XXX

Miscellaneous

1.    Any consent and approval required of the Owner or the Operator shall be ineffective unless in writing and signed by a duly authorized officer or agent of the respective parties.

2.    No modification, alteration or amendment of this Agreement nor any waiver of any provision hereof shall be effective unless in writing and signed by the party sought to be charged therewith or by its duly authorized agent.

3.    The headings of the Articles and Sections of this Agreement and all of its Appendices are inserted for convenience only and are not intended to affect the meaning of any of the provisions.

4.    All Appendices to this Agreement are an integral part of this Agreement and all terms defined in this Agreement and the Appendices shall have the same meaning throughout this Agreement and its Appendices.

5.    References in this Agreement to Articles, Sections, subsections and Appendices are to the Articles, Sections, subsections and the Appendices to this Agreement.  References to Articles or Sections, except where the context otherwise requires, are references to the relevant Article or Section in this Agreement or Article in which the reference appears. References to subsections are references to the relevant subsection in the Section in which the reference appears.

911312.4                                    -28-



6.   The Owner hereby represents that in entering into this Agreement the Owner has not relied on any projections of earnings, statements as to the possibility of future success or other similar matter which may have been prepared by the Operator or any member of the General Hotel Management Ltd. group of companies, and understands that no guarantee is made or implied by the Operator or any member of the General Hotel Management Ltd. group of companies as to the cost or future financial success of the Hotel.

7.   This agreement constitutes the entire agreement between the Owner and the Operator relating to the subject matter hereof, superceding all prior agreements, oral or written.

911312.4                              -29-



IN WITNESS WHEREOF GENERAL HOTEL MANAGEMENT and OWNER have duly executed this Agreement on the date first above written.

SIGNED by the OWNER
Dempsey Vanderbilt Owners, LLC

By _____ by
Metropolitan Development Group, LLC
and  SKIP Properties, N.V.  Members
in the presence of: _____



                                    AND

SIGNED by GENERAL HOTEL MANAGEMENT LTD.


By Hans R. Jenni, its Director

In the presence of: ___Kendall. Oy___

**EXHIBIT D**

Save on flights to Europe



How to beat blackout dates



Is flying a plane easy as driving?
Photos
Deals
Search travel news, stori

⦿ Search Travel
○ Search USA TODAY

[ GO ]

Hotel Check-in
A road warrior's guide to the lodging landscape
with Barbara De Lollis
Hotel guests' top 10 Hollywood movies for March
Hotel chains gear up for major international expansion
Unusual management takeover at exclusive Miami hotel

By Barbara De Lollis, USA TODAY                    Updated 3/31/2012 1:30 PM

**Most Popular**
Ask the Captain: Why would landing gear be...
Sheraton NY update fixes No. 1 guest...
Israel's president balks at El Al fee....
Yahoo picks 10 great American road trips
Drag queen bowling lanes open in Las Vegas

Guests at one of Miami's most expensive oceanfront resorts - the Setai South Beach - woke up this morning in a hotel under entirely new



CAPTION                    Courtesy Bickel and Brewer



ADVERTISEMENT
Top Hotel Deals
$129+ San Francisco: Union Square Hotel w/Free Breakfast, Save 50%
$129+ San Francisco Bay Front Hotel on Weekends, 20% Off
$130+ San Diego: Mission Bay Private Island Resort & Spa, 40% Off
$129+ San Diego Resort & Spa in Summer, Save 45%
$105+ Palm Springs Hotel in Summer w/ $60 Credit, Save 75%
☆ SmarterTravel More Deals »
Hotels Forum
Have you ever walked into the wrong hotel room?
Do you try to micromanage your home life from the road?

management.
The owners of the serene hotel staged an unusual, middle-of-the-night takeover, ousting the current management company and installing a new one that specializes in

luxury hotels, lawyer William Brewer III told USA TODAY during a telephone interview this morning.

Brewer, a partner at Bickel & Brewer and counsel for the owner, last year orchestrated a similar takeover on behalf of the owners of Marriott's former Edition Waikiki hotel, capping a long-simmering business dispute.

A unit of Lehman Brothers owns the Setai property.

TWITTER:  Follow Hotel Check-In's BarbDeLollis

PHOTO GALLERY:  A tour of the posh New York Palace

PHOTO GALLERY:  Hotels you've seen in the movies

The Setai takeover - triggered by a business dispute with Singapore-based hotel management firm GHM - has so far gone smoothly so far, as far as guests are concerned, Brewer says.

"It happened without incident. It's been a seamless transition for the guests," he says. The Setai hotel is currently ranked No. 14 out of 204 Miami Beach hotels reviewed on TripAdvisor.

The ousted group is Singapore-based General Hotel Management and GHM (South Beach) LLC, which began in 1992, according to its website. According to its website, it currently operates six other hotels and has seven others under development, all of which are outside the USA.

USA TODAY has sent an email and left a voice mail message with a lawyer who Brewer says appeared at the Setai at 4 a.m. on behalf of the ousted management company, but the messages have immediately been returned. An email was also sent to GHM via its website.

The understated, Asian-inspired Setai features a 40-story tower set amid lushly landscaped tropical gardens and three swimming pools. It also contains a spa and several restaurants and bars. The least expensive rate for night's stay for Sunday night, according to the hotel's current website, is $725.

The hotel will keep its name and most of its employees, Brewer says. It will also keep its affiliation with the luxury hotel marketing organization, Leading Hotels of the World. The Setai's ownership group, Setai Owners LLC, is a unit of Lehman Brothers. It holds ownership interests in significant portions of the Setai, including most of its condominium units. Lehman Brothers' new management team notified guests, condo owners and employees, according to the law firm.

Takeover different from last year's Edition saga

Last summer, there was a dramatic takeover at Marriott's former Edition Waikiki hotel, which was prompted by the hotel's financial losses.

This case is somewhat different, Brewer says. This takeover concerns allegations of inadequate management, according to filings. The owner claims the hotel should be more profitable.

Along with the takeover, Lehman Brothers Holdings also began an international arbitration against GHM, amid charges that the management company violated terms of the March 2000-dated management agreement.

Lehman Brothers filed a "request for arbitration" notice at the International Court of Arbitration of the International Chamber of Commerce in Paris. The filing provides a glimpse as to the hotel's budgets over the past two years and why the owners take issue with it.

"In 2010-2011 alone, the Hotel's Rooms Department incurred excessive expenses of over $2 million, its Administrative and General Department incurred excessive expenses of approximately $2.3 million, and its Marketing Department incurred excessive expense of approximately $3.3 million. Had GHM not negligently expended those amounts – and, instead, operated more efficiently -- Owner would have realized an additional $7.6 million in incremental profit."

In a statement, an executive talks about what prompted this aggressive action.

"We believe that under the right management, this property has limitless potential," Anthony Barsanti, vice president of Lehman Brothers Holdings, said in a statement. Lehman Brothers installed as the new operator Dallas-based Trevi Luxury Hospitality Group, which is led by Atef Mankarios, a former CEO of St. Regis Hotels & Resorts.

Readers: Comments?

Hotel guests' top 10 Hollywood movies for March

Hotel chains gear up for major international expansion

| More from USATODAY | More from the web |
|---|---|
| | All eyes on MGM Grand |
| | *examiner.com* |

Rave about a recent hotel stay
More Hotel Forums »
Connect with Us



USA Today Travel on Facebook



Hotel Check-In on Twitter



Hotel Check-In News Feeds

USA Today e-mail Alerts

**EXHIBIT E**

At a Commercial Division Part ⌇ of the
Supreme Court of the State of New York, held
in and for the County of New York at the
Courthouse, 60 Centre Street, Room ⌇New
York, New York 10007 on the ⌇ day of
August, 2011

PRESENT:

**HON. EILEEN BRANSTEN**
**J.S.C**

HON.

Justice

---

M WAIKIKI LLC,

        Plaintiff,

  - against -

MARRIOTT HOTEL SERVICES, INC., I.S.
INTERNATIONAL, LLC and IAN
SCHRAGER,

        Defendants,

Index No.: 651457/2011
IAS Part 3
Justice Bransten

**ORDER TO SHOW CAUSE,**
**TEMPORARY RESTRAINING ORDER,**
**AND PRELIMINARY INJUNCTION**

---

MARRIOTT HOTEL SERVICES, INC.,

        Counterclaim-Plaintiff,

  - against -

M WAIKIKI LLC,

        Counterclaim-Defendant.

---

Upon the Counterclaim Complaint, dated August 30, 2011, the exhibits annexed thereto,

and the accompanying Memorandum of Law In Support of Marriott Hotel Services, Inc.'s Order

to Show Cause Concerning a Temporary Restraining Order and Preliminary Injunction Against

M Waikiki LLC and its supporting affidavits submitted herewith;

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*
*I.S. International, LLC and Ian Schrager*

Index No. 61457/2011
Page 2 of 3

Now, upon motion of Jenner & Block LLP, attorneys for Defendant and Counterclaim-Plaintiff Marriott Hotel Services, Inc. ("Marriott");

Let the Plaintiff and Counterclaim-Defendant M Waikiki LLC ("Owner"), through its officers or agents show cause before this Court at the Courthouse, 60 Centre Street, Room 442, New York, New York 10007 on the ⊥ day of September 2011, at 9:30 a.m. or as soon thereafter as counsel can be heard, why an order should not be granted:

(1) Restraining and enjoining Owner from unilaterally declaring and installing as the Hotel's manager a party other than Marriott; and

(2) Directing Owner to allow Marriott to, and restraining and enjoining Owner from, taking any actions that in any way interfere with Marriott's ability to: (a) fully perform its role as the Hotel's Manager in accordance with the Management Agreement, and (b) undo the harm and damage that resulted from Owner's purported ouster of Marriott; and

(3) Restraining Owner from using, and directing Owner to return to Marriott, any and all copies of Marriott proprietary or confidential information or data.        *AND SUBJECT TO THE INTERLINEATION PARAGRAPH BELOW*

ORDERED, that pending the hearing of this motion, (1) Owner is restrained and enjoined from unilaterally declaring and installing as the Hotel's manager a party other than Marriott; (2) Owner must allow Marriott to, and is restrained and enjoined from taking any actions that in any way interfere with Marriott's ability to, (a) fully perform its role as the Hotel's Manager in accordance with the Management Agreement, and (b) undo the harm and damage that resulted from Owner's purported ouster of Marriott; and (3) Owner is restrained from using, and must return to Marriott, any and all copies of Marriott proprietary or confidential information or data; and it is further

ORDERED, that a copy of this Order and the papers upon which it is granted shall be served upon counsel for Owner, *handed to counsel in court*, by email on or before the ⊥ day of August 2011, and

*ORDERED THAT MARRIOTT SHALL BE ALLOWED TO RETURN TO ITS MANAGEMENT ROLE AT THE HOTEL BY 2:30 P.M. ON 2WEDNESDAY, ~~THIS~~ AUGUST 31, 2011 (HAWAII TIME; 8:30 P.M. EДТ).*

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*
*I.S. International, LLC and Ian Schrager*

Index No. 61457/2011
Page 3 of 3

that such service shall constitute good and proper service hereunder and shall be deemed due and

sufficient notice of this application; and it is further

ORDERED, that opposition papers, if any, shall be served upon counsel for Marriott such

that they are received no later than the close of business on September 6, 2011

Dated: New York, New York
August 31, 2011

ENTER

Justice of the Supreme Court

**iON. EILEEN BRANSTEN**
**J.S.C**

3

**EXHIBIT F**



KOZYAK · TROPIN
THROCKMORTON
ATTORNEYS AT LAW

Daniel F. Benavides, Esq.
dfb@kttlaw.com | 305.728.2980

April 2, 2012

**VIA EMAIL AND US MAIL**

James S. Renard, Esq.
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201

Re:   **Improper Termination of the Management Agreement dated March 20, 2000,
between Setai Owners LLC and GHM (South Beach) LLC (the "Management
Agreement") for the Setai Resort & Residences (the "Hotel"); HSBC Account
Nos. ▮▮▮▮▮(Operating), ▮▮▮▮▮(Depository)▮▮▮▮▮(Payroll),
▮▮▮▮▮(Travel Agent Commission), ▮▮▮▮▮(FF&E Hotel/Condo),
▮▮▮▮▮(FF&E Suites Escrow)▮▮▮▮▮(FF&E Reserve); ▮▮▮▮▮
(Suite Owners Account)▮▮▮▮▮(Hotel Owners Account)**

Dear Mr. Renard:

We were informed of the lawless, night-time raid on the Hotel this weekend orchestrated
by Setai Owners and Trevi Luxury Hospitality Group, Inc. ("Trevi") and the improper
termination of the Management Agreement by Setai Owners. Without waiving any rights it may
have pursuant to the Management Agreement, at law or in equity, GHM hereby demands that
Setai Owners and Trevi (i) immediately cease any and all use of the "GHM" marks, including
any and all use of the GHM marks on the Hotel property, website, marketing materials, and guest
amenities; (ii) immediately return to GHM all of its confidential and proprietary materials,
including, without limitation, its employee handbooks, employee compensation and benefits
documents, standard operating procedure files, training manuals and files, employee files, global
marketing plan, style guide, guest profile/database, and contracts belonging to other GHM-
managed hotels; and (iii) immediately make arrangements to return all of the personal
belongings of those GHM employees who have been denied access to the Hotel since the night
of the raid.

In addition, we were notified that Setai Owners and Trevi have seized control of GHM's
"GHM Americas" mail server which was located at the Hotel. The result was to block GHM's
personnel access to the "GHM Americas" domain, which was property of and used by GHM's

parent company for all of its email correspondence, not just correspondence related to the Hotel. We demand that Setai Owners and Trevi immediately turn over control to GHM of the "GHM Americas" mail server. We further demand assurances that none of GHM's correspondence was read or accessed while the mail server was in possession of Setai Owners and Trevi.

I am also in receipt of your letter dated April 1, 2012 regarding the HSBC accounts held in the name of Setai (South Beach) LLC. It is not GHM's intention to make any withdrawals or expenditures from the accounts and GHM will cooperate in transferring the accounts. However, please note that GHM is owed approximately $750,000 for February and March management fees and employee compensation, which amounts were due from Setai Owners prior to the improper termination. Setai Owners must make arrangements to pay these amounts immediately. Setai Owners must further agree to indemnify and hold harmless GHM from any and all liability it may have to Setai (South Beach) LLC resulting from the transfer of the accounts as well as any outstanding amounts payable to GHM employees currently working for Trevi at the Hotel.

This letter is sent without prejudice to all rights and remedies of GHM under the Management Agreement and otherwise, all of which are expressly reserved. GHM does not waive any of its rights under the Management Agreement or otherwise.

Thank you in advance for your cooperation.

Sincerely,

Daniel F. Benavides

cc:  Trevi Luxury Hospitality Group, Inc.
     (via fax to 214-220-9151)

     HSBC Bank USA NA
     Legal Department
     (via fax to 716-841-7651)

     HSBC Bank USA NA
     c/o Idi X. Menendez
     (via email to idi.x.menendez@us.hsbc.com)

**EXHIBIT G**



KOZYAK · TROPIN
THROCKMORTON
A T T O R N E Y S   A T   L A W

**Daniel F. Benavides, Esq.**
dfb@kttlaw.com | 305.728.2980

April 13, 2012

**VIA EMAIL AND US MAIL**

James S. Renard, Esq.
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201

> Re:  **Improper Termination of the Management Agreement dated March 20, 2000, between Setai Owners LLC and GHM (South Beach) LLC (the "Management Agreement") for the Setai Resort & Residences (the "Hotel")**

Dear Jim and Jack,

As you know, I was at the Hotel with Jack until yesterday identifying and attempting to retrieve all GHM property and employee personal effects. I am writing to follow up on open transition issues and in response to your letters dated April 4 and April 10, 2012.

### 1.  Employee personal effects

We believe most of the employee personal effects have now been removed from the Hotel. However, Jack refused to allow me to remove the personal rolodexes of Kevin Abramowitz and Hansjoerg Meier, as well as a copy of a rental program agreement for the St. Regis Hotel, which we believe are personal effects and should be returned to the employees. As discussed with Jack and until we are able to resolve this dispute, please send me a scanned copy of all business cards contained in the rolodexes and the St. Regis Hotel rental program agreement. If there are any other personal effects at the Hotel, I will let you know.

### 2.  GHM Marks

We remind you that further use of the GHM marks by Setai Owners and Trevi is strictly prohibited. On April 8, 2012, per your request, I provided you with a list of known items containing the GHM logo. Let me know if you need me to resend the list.

### 3. GHM proprietary information and materials

GHM reiterates its prior demand that Setai Owners and Trevi not review and immediately return all of GHM's confidential and proprietary information. As agreed, all remaining SOP manuals, training manuals, employee files, privileged and confidential communications, and information related to other GHM properties found on Hotel property must immediately be returned to me. GHM further demands the immediate return of the following items, which Jack did not allow me to remove from the property:

    a. Privileged and potentially privileged communications and materials relating to Hotel property inspections, financial audit reports, and rental program agreement negotiations.
    b. Marketing plans
    c. Sales and marketing materials for the Hotel and other GHM properties
    d. All pre-termination guest data, information, and files
    e. Any contracts between GHM and third parties
    f. Hotel reviews and reports made by or for third parties, including press releases and publications
    g. GHM product knowledge materials
    h. Internal meeting minutes and notes
    i. Rental program agreements and related materials and files
    j. Style guides
    k. Materials relating to Jaya Ibrahim
    l. General Manager handover notebook
    m. Pictures of employees
    n. Group, catering and banquet contracts and related event details
    o. Information related to GHM clients and travel agent contacts
    p. Sales reports
    q. GHM corporate audit materials
    r. Employee incentive pay sheets and summary reports
    s. Financial and other information relating to GHM USA and GHM Americas
    t. Documents relating to GHM's funding of Hotel opening expenses

GHM hereby demands that Setai Owners and Trevi not use, review, or otherwise access these materials until a court or tribunal determines their proper owner. If you choose to ignore this admonition, to the extent Setai Owners and Trevi intends to use, access, or review any of these materials for operation of the Hotel or otherwise without GHM's and/or court authorization, GHM hereby demands that Setai Owners and Trevi provide a list of all such materials to be used, accessed or reviewed and the purpose therefor.

GHM reserves the right to supplement this list as additional proprietary items and materials are identified.

## 4. Electronic Data, Records, and Files

GHM reiterates its demand that Setai Owners and Trevi refrain from accessing, searching, or using any electronic data, records, and/or files existing prior to termination. You have represented that (i) your client has retained an independent third party, Huron Consulting Group, to make forensic images of the servers and computer terminals and that Huron will be holding the images in its evidence lockers (ii) Setai Owners, Trevi, and its designees have not accessed, reviewed, searched or used any electronic data, records and/or files existing prior to termination, and (iii) neither GHM nor Setai Owners/Trevi will have access or be allowed to review or search these electronic records, data, and files without the prior written consent of the other party or an order of a court or tribunal.

When the forensic images are completed, we request that you provide us with a complete list of all servers and terminals imaged and obtain our written consent prior to deleting any electronic data, records or files. This task must be prioritized.

In addition to preserving the electronic data, records and files at the Hotel, GHM hereby demands that all security tapes at the Hotel from at least March 1, 2012 going forward be preserved pending resolution of the litigation/arbitration between the parties.

## 5. Outstanding pre-termination obligations

As previously mentioned, Setai Owners must immediately pay to GHM all known outstanding pre-termination amounts owed including, without limitation, employee 401K contributions, reimbursement for professional fees and other expenses incurred in connection with Hotel operations, February management fees in the amount of approximately $273,589.32, and March management fees. Please provide us with a copy of the March financial statement so that we can provide you with an accounting of known amounts owed.

This demand does not waive and is made without prejudice to GHM's right to seek additional damages, costs and expenses from Setai Owners incurred by GHM and its affiliates as a result of the termination of the Management Agreement and Setai Owners' pre- and post-termination actions.

## 6. Email Communications

To date and despite repeated requests, our client informs us that certain individuals are still unable to access their "ghmamericas.com" email accounts. It has further come to our attention that Setai Owners and/or Trevi are continuing to use/access the GHM email system to receive and send email correspondence. We repeat our demand that this must cease immediately, and we will hold Setai Owners and/or Trevi accountable for any damages resulting from this improper use of and interference with the GHM email system.

### 7. Setai Owners' Alleged Property

Per your request, we will provide you with a list of property, if any, in the possession of GHM employees that was either utilized in operation of the Hotel or paid for by Setai Owners.

### 8. GHM employees

We strongly reject any implication of wrongdoing on the part of GHM contained in your statement that GHM has "induced residents of the Abbey Hotel to cease their employment at the Hotel by promising, among other things, alternative housing until they return to their home country." As you are well aware, the Hotel employees were all GHM employees prior to termination. Trevi and Setai Owners, by threat of termination of their employment, have induced some GHM employees to cease their employment with GHM and work for Trevi. However, there are many employees who either did not want to work for Trevi or could not work for Trevi because of immigration visa issues (issues which Setai Owners and Trevi were irresponsibly unprepared to handle). GHM, in accordance with its contractual, legal, and moral obligations, has provided assistance to its employees, including offering a return flight to their home countries and accommodations in the event of an eviction by Setai Owners. It is our understanding that all of the employees living at the Abbey Hotel that do not intend to work for Trevi have either already departed or will be departing by early next week.

### 9. Pending third-party litigation related to Hotel operations

GHM was sued individually, along with Setai Owners, in that certain case styled *American Express v. Marisa Comaianni v. GHM (South Beach), LLC & Setai Owners, LLC*, Case No. 2011-08068T-GC pending before the 41B District Court for the County of Macomb, Michigan (the "Comaianni Case"). The case was brought by a Hotel guest seeking return of her deposit. GHM expects that Setai Owners will defend, indemnify, and hold harmless GHM from all claims made in the Comaianni Case as well as all other pending and future litigation brought against GHM individually as a result of its normal operation of the Hotel.

### 10. Other important issues

While at the Hotel, I noted several alarming instances of improper tampering with GHM's proprietary and privileged materials. For example, there were several privileged communications between myself and GHM senior management, including some relating to the arbitration case brought by your client against GHM, on the desk of the Hotel's former Director of Finance. Some of these communications contained highlighting marks which were not made before the termination, indicating that they had been reviewed by someone under the control of Setai Owners. Others were moved into bags or boxes from their original location. We noted similar tampering with employee files, I-9 immigration forms, and guest files. We also noted that a copy of GHM's most recent internal audit was missing from the Director of Finance's office. **We repeat our demand that GHM's proprietary and privileged information and materials should not be accessed, reviewed, used, or otherwise disturbed without the express written consent of GHM or a court order.**

Finally, we can agree to disagree for now about whether the takeover of the Hotel, made without any notice or an opportunity to cure and without following any of the termination procedures set forth in the Management Agreement, was lawful. However, it is disingenuous to argue that a "raid" does not truthfully describe the sudden, forceful, and deliberately demeaning and damaging manner in which GHM and its employees were removed from the Hotel property on the night of March 31, 2012.

Sincerely,

Daniel F. Benavides

cc:  Trevi Luxury Hospitality Group, Inc.
     (via fax to 214-220-9151)

## EXHIBIT H

BICKEL & BREWER

ATTORNEYS AND COUNSELORS
4800 COMERICA BANK TOWER
1717 MAIN STREET
DALLAS, TEXAS 75201
PHONE: (214) 653-4000
FAX: (214) 663-1015

www.bickelbrewer.com

707 FIFTH AVENUE
50TH FLOOR
NEW YORK, NEW YORK   10153
(212) 489-1400

April 18, 2012

**VIA E-MAIL AND U.S. MAIL**

Daniel F. Benavides, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Miami, FL 33134

      Re:    Termination of Management Agreement dated March 20, 2000, between
                   Setai Owners LLC ("Owner") and General Hotel Management Ltd., as
                   Operator, as amended (the "Management Agreement"), relating to the
                   management and operation of the Setai Resort & Residences (the
                   "Hotel") located in Miami Beach, Florida

Dear Danny:

        This responds to your letter dated April 13, 2012.

## I.

### PRELIMINARY STATEMENT

        As an initial matter, it is important to recognize the legal standards applicable to the
documents, materials, and electronically-stored data relating to the Hotel. Pursuant to Section 1
of Article XI of the above-referenced and now-terminated Management Agreement:

       The books of account and all other records relating to, or reflecting, the operation
       of the Hotel shall be kept at the Hotel . . . All such books and records shall be the
       property of the Owner . . . Upon the termination of the Agreement, all of such
       books and records up to the date of termination shall forthwith be delivered up to
       Owner so as to ensure the orderly continuance of the operation of the Hotel. . . .

Put simply, all records relating to the operation of the Hotel belong to Owner and, consequently,
must remain with Owner. Indeed, if General Hotel Management Ltd. and/or GHM (South
Beach) LLC (together, "GHM") have any documents that either are located within GHM's home
office, GHM-managed hotels, or other facilities or are within the possession of any GHM

Daniel F. Benavides, Esq.
April 18, 2012
Page 2

employees (or ex-employees who are represented by GHM's counsel), and which relate to the operation of the Hotel, those materials must be turned over to Owner at once.[1]

Moreover, the fact that GHM may have created, generated, or maintained those records (or gathered and organized the information contained therein) in the course of operating the Hotel does not affect Owner's rights of ownership or control over those materials. As set forth in Section 1 of Article I of the Management Agreement, GHM's pre-termination operation of the Hotel was undertaken solely in its capacity as "agent of the Owner," and GHM has no right to possession or use of the information it acquired while acting as Owner's agent and operating the Hotel.[2]  Furthermore, GHM was obligated, both before and after the termination of the Management Agreement, not to commingle Owner's property with its own or that of any third-party.[3]

Regrettably, your letter betrays a fundamental misunderstanding of the foregoing principles.  GHM is claiming as its own property numerous categories of records, data, contracts, plans, customer information, marketing materials, and other items relating to the operation of the Hotel that are clearly the property of Owner.  Furthermore, in the few instances in which you have identified information that may belong to GHM, your client improperly commingled it with Owner's information.  Against that background, we address below the points raised in your most recent letter in the order in which you presented them.

---

[1] Such Owner information would include, but not be limited to, data regarding Setai Hotel guests and customers, Hotel financial statements and operating reports (or excerpts thereof), communications with owners of Setai condominium units, notes and minutes of any discussions regarding the Hotel, and any financial or operational audits of the Hotel – whether such information is in hard-copy or electronic form (and whether any such electronic data is stored in servers, hard-drives, personal computers, laptops, or handheld communications devices).

[2] See RESTATEMENT (THIRD) OF AGENCY § 8.05 ("An agent has a duty (1) not to use property of the principal for the agent's own purposes or those of a third party; and (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party."); id. at cmt. b. ("Termination of an agency relationship does not end an agent's duties regarding property of the principal.  A former agent who continues to possess property of a principal has a duty to return it . . .").

[3] See RESTATEMENT (THIRD) OF AGENCY § 8.12 ("An agent has a duty . . . not to mingle the principal's property with anyone else's").

Daniel F. Benavides, Esq.
April 18, 2012
Page 3

## II.

## OWNER'S RESPONSE

### A.  Alleged Personal Effects

You acknowledge that "most of the employee personal effects have now been removed from the Hotel." Nevertheless, you assert a claim to the Rolodexes of Kevin Abramowitz and Hansjoerg Meier as well as a form St. Regis rental program agreement. To the extent that the Rolodexes were used by Messrs. Meier and Abramowitz in connection with the performance of their duties as Owner's sub-agents — and contain names and contact information as to suppliers, sources of business, and other persons or entities important to the operation of the Hotel — they are Owner's property. If that premise is incorrect, please let us know. With respect to the form rental program agreement, we understand that you represented that such document was being used for purposes of evaluating possible modifications to the Setai form agreement. Based upon your representation, that form is not GHM's property. However, if GHM obtained that St. Regis document through improper means, Owner does not want it.

### B.  GHM Marks

As we have repeatedly stated, Owner has no desire to utilize the GHM marks in the operation of the Hotel and is working diligently to complete its removal of all GHM marks from the property. At this time, Owner has removed most, if not all, of the GHM marks from the Hotel. However, because GHM placed the GHM marks on numerous categories of Hotel amenities and promotional materials (which are Owner's property), without the consent and against the wishes of Owner, Owner cannot yet represent to a certainty that all GHM marks have been removed from such property.

### C.  GHM Proprietary Information And Materials

Owner does not intend to utilize GHM's confidential and proprietary information and has returned dozens of boxes of documents to GHM. Without conceding that such materials belong to GHM, Owner has turned over SOP manuals, training manuals prepared by GHM employees, employee files for GHM employees, allegedly-privileged communications between GHM and its counsel, and non-public information about other GHM properties found on the Hotel property, and will return to GHM any such materials remaining at the Hotel as they are located.

You state that "GHM further demands the immediate return of the following items, which Jack [Ternan] did not allow me to remove from the property," and you identify 20 categories of documents. Notably, you neither identify which of those categories of documents GHM claims are its property nor state a basis for any such claim. Given that many of items identified in the letter are clearly not GHM's property, it appears that GHM's demand for the materials is merely

Daniel F. Benavides, Esq.
April 18, 2012
Page 4

an improper attempt to prevent or hinder Owner's lawful operation of its own Hotel. Nonetheless, Owner addresses below each of the 20 categories of documents:

### 1.   Privileged and potentially privileged communications and materials

Mr. Ternan informs me that you personally inspected documents to determine whether they were privileged or potentially privileged, that you were given any documents that you were able to affirmatively state were privileged, and that any documents that you asserted were potentially privileged were separately identified, stored in specially-marked boxes identifying the potentially privileged nature of materials, and placed in a locked room. We have instructed Owner and Trevi not to access or review any of the potentially privileged materials kept in the locked room.

### 2.   Marketing plans

The marketing plans relate to the operation of the Hotel and are, therefore, Owner's property. If there is any legal authority that you believe stands for the contrary proposition, please provide us with such authority and we will consider it.

### 3.   Sales and marketing materials for the Hotel and other GHM properties

As with marketing plans, the sales and marketing materials for the Hotel relate to the operation of the Hotel and are, therefore, Owner's property. Mr. Ternan informs me that he allowed you to remove sales and marketing materials for other GHM properties, unless such materials included the Hotel. If you believe that any other sales and marketing materials specific to existing GHM properties are still located at the Hotel, please identify such materials so that we can return them to you.

### 4.   Pre-termination guest data, information, and files

The pre-termination guest data, information, and files relate to the operation of the Hotel and are, therefore, Owner's property. To the extent that the guest data includes information gathered at other GHM-managed hotels regarding the guest stays there (which is information over which Owner makes no claim of ownership), then we need to explore a way to extract that information for turnover to GHM without detrimentally affecting the integrity and usability of the remaining data. Similarly, GHM must turn over to Owner any Setai guest information located at GHM's corporate headquarters or other GHM-managed hotels.

### 5.   Contracts between GHM and third-parties

Any contracts between GHM and third-parties relating to the operation of the Hotel are Owner's property. Indeed, GHM had no authority to bind the Hotel or Owner to any contractual obligations except as agent of Owner. Furthermore, we are unaware of any contracts located at

Daniel F. Benavides, Esq.
April 18, 2012
Page 5

the Hotel that are between GHM and third-parties that do not involve the Hotel.  If you know of any such contracts, please specifically identify such materials so that we can return them to you.

### 6.   Hotel reviews and reports made by or for third-parties

Any hotel reviews and reports made by or for third-parties relating to or reflecting the operation of the Hotel and stored at the Hotel are Owner's property.  Mr. Ternan does not recall that you identified any reviews or reports made by or for third-parties that you contend are GHM's Property and that do not involve the Hotel.  If you are aware of any such reviews or reports, please specifically identify such materials so that we can return them to you.

### 7.   GHM product knowledge materials

It is not clear what you mean by "GHM product knowledge materials."  Please tell us precisely what materials you contend should be returned to you.

### 8.   Internal meeting minutes and notes

Internal meeting minutes and notes that relate to the operation of the Hotel are Owner's property.  If it is your contention that "internal" meetings took place at the Hotel or during periods in which Hotel employees were being paid for purportedly performing services for the Hotel, but which actually did not relate to the Hotel, please let me know.

### 9.   Rental program agreements and related materials and files

Rental program agreements and related materials and files relate to the operation of the Hotel and are, therefore, Owner's property.  However, if it is your contention that GHM, during the term of the Management Agreement and while acting as Owner's agent in connection with the operation of the Hotel, entered into rental agreements on its own behalf and for its own benefit, please identify those agreements.

### 10.   Style guides

The style guides for the Hotel relate to the operation of the Hotel and are, therefore, Owner's property.  Mr. Ternan informs me that he allowed you to take style guides for other GHM properties, unless such materials included the Hotel.  If you believe that any style guides for other GHM properties were retained, please specifically identify such materials so that we can return them to you.

### 11.   Materials relating to Jaya Ibrahim

As you know, Jaya Ibrahim was involved in the design of the Hotel and, therefore, any materials located at the Hotel that were produced by Jaya Ibrahim likely relate to the Hotel and

Daniel F. Benavides, Esq.
April 18, 2012
Page 6

are Owner's property. If there are such materials that do not relate to the Hotel and were not
paid for by Owner, please let us know.

### 12.   General Manager handover notebook

The General Manager handover notebook is clearly a record that relates to the operation
of the Hotel and, in fact, was presumably prepared for purposes of facilitating a smooth change
from one Hotel general manager to another. It is, therefore, Owner's property.

### 13.   Pictures of employees

As you know, Owner permitted departing employees to take personal pictures with them,
along with their other personal effects. To Mr. Ternan's knowledge, the only photographs of
employees that remained behind were contained on a disc that was made prior to the termination
for the purpose of creating a record of all the individuals working at the Hotel during a certain
time period. Accordingly, the pictures relate to the operation of the Hotel and are, therefore,
Owner's property. However, given that the disc is not necessary to manage the Hotel, Owner
and Trevi have no present plans to use it in connection with operations.

### 14.   Group, catering, and banquet contracts and related event details

Group, catering, and banquet contracts relate to the operation of the Hotel and are,
therefore, Owner's property.

### 15.   Information related to GHM clients and travel agent contacts

On an initial note, your reference to GHM "clients" is unclear. With respect to GHM
hotels that are owned by third-parties, GHM's clients are the owners of the properties that GHM
manages. The guests and customers of those hotels are not GHM's clients — they are the clients
of the respective owners of those properties. In any event, regardless of the definition,
information related to GHM clients and travel agent contacts that also relates to the operation of
the Hotel is Owner's property. Mr. Ternan informs me that he already allowed you to take any
information relating to GHM clients and travel agent contacts if it did not relate to the Hotel. If
you believe that any similar information remains at the Hotel, please specifically identify such
materials so that we can return them to you.

### 16.   Sales reports

Sales reports related to or reflecting the operation of the Hotel belong to Owner. Mr.
Ternan informs me that he allowed you to take sales reports relating to other GHM properties. If
you believe that any sales reports relating to other GHM properties were retained, please identify
such materials so that we can return them to you.

Daniel F. Benavides, Esq.
April 18, 2012
Page 7

### 17. GHM corporate audit materials

GHM corporate audit materials stored at the Hotel that relate to the operation of the Hotel are Owner's property. Such audits were undoubtedly conducted for purposes of determining whether GHM was operating the Hotel, or portions thereof, in accordance with applicable standards. Additionally, GHM corporate audit materials that relate to or reflect the operation of the Hotel, or that constitute books of account for the Hotel, that are stored by GHM at another location are Owner's property and must "forthwith be delivered up to Owner" in accordance with the Management Agreement. Please turn over any such materials to Owner immediately.

### 18. Employee incentive pay sheets and summary reports

Arguably, all employee incentive pay sheets and summary reports are Owner's property because such records relate to the operation of the Hotel and/or constitute books of account. Nonetheless, Mr. Ternan permitted you to retain most employee incentive information as part of the employee files. The only employee incentive pay information retained over your objection was of a broad nature and will be kept solely for the purpose of preserving information relating to a critical component of Hotel payables.

### 19. Financial and other information relating to GHM USA and GHM Americas

Owner was disturbed to learn that GHM was commingling the record-keeping of the Hotel with that of other GHM activities, thus creating a post-termination problem of GHM's own making. The Hotel's files and electronic information systems were never meant to be repositories for GHM documents and data unrelated to the Hotel. Nor were Hotel employees being paid to work with such information. One unfortunate consequence of these inexcusable practices is that, in your words, "financial and other information relating to GHM USA and GHM Americas" was apparently stored at the Hotel. In cooperation with you, Owner has taken steps to segregate information potentially belonging to GHM USA and GHM Americas from the other records at the Hotel. However, without an inspection of those materials, it is impossible to know if they relate to the Hotel and/or constitute books of account for the Hotel. Indeed, at the time of Owner's termination of the Management Agreement, GHM managed no hotels in the U.S., let alone the Americas, other than Owner's Hotel. Accordingly, those materials cannot be turned over to GHM at this time.

### 20. Documents relating to GHM's funding of Hotel opening expenses

Documents relating to GHM's funding, if any, of Hotel opening expenses relate to the operation of the Hotel and/or constitute books of account and, therefore, such documents are Owner's property.

Daniel F. Benavides, Esq.
April 18, 2012
Page 8

**D.**     **Electronic Data, Records, And Files**

    **1.**     **GHM's demand and alleged representations**

        You state in your letter that "GHM reiterates its demand that Setai Owners and Trevi refrain from accessing, searching, or using any electronic data, records, and/or files existing prior to termination." GHM's demand flatly contradicts Article XI, Section 1 of the Management Agreement and evidences your client's continued refusal to abide by that agreement. Owner has the right to use and review, *inter alia*, all records pre-dating the termination that relate to or reflect the operations of the Hotel.

        You also incorrectly recite what we have told you with respect to the electronic data. While Owner has retained Huron Consulting Group to make forensic images of the servers and computers, and Huron will be holding those images in its evidence lockers, Owner has not represented that it will refrain from accessing, reviewing, searching, or using electronic data existing prior to the termination. In fact, Mr. Ternan explicitly informed you and Mr. Hartmann on Thursday, April 12, 2012, that Owner intended to use the electronic data that belongs to Owner.

    **2.**     **List of servers and computers that were imaged**

    The following is a list of the servers that have been imaged by Huron Consulting:

    1. SETAI-FILESVR

    2. SETAI-FIN

    3. SETAI-AB

    4. SETAI-SALES

    5. SETAI-DC

    6. SETAI-9700

    7. SETAI-ENG

    8. SETAI-EXCH

    9. SETAI-ISI

    10. SETAI-GMS

    11. SETAI-SPICE

    12. SETAI-TIMESAVER (A4760 SERVER)

    In addition, set forth below is a list of the computers, identified by custodian, that have been imaged by Huron Consulting:

Daniel F. Benavides, Esq.
April 18, 2012
Page 9

1.  Crain,  Katherine

2.  Meier, Hans

3.  Guimei, Moustapha

4.  Zhao, Jane

5.  Collazo, Jorge

6.  Abramowicz, Kevin

7.  Espinosa, Jose

8.  Vasquez, Xavier

9.  Wendt, Melody

10. Choi, Jung

11. Lui, Meizi

12. Robinson, Paul

13. Randall, Lorraine

14. Werly, David

15. Cavatore, Phillip

16. Martinez, Mario

17. Almeida, Leslie

18. Sibug, Priscila

19. Okeefe, Greg

20. Paalman, Rene

**3.     Security Tapes**

You demand that Owner preserve the security tapes at the Hotel from at least March 1, 2012 "going forward."  In early March 2012, GHM replaced the security camera recording system.  Owner intends to make a copy of the security tapes from the initiation of that system until the date of copying, which will likely be this week, and preserve that copy pending a resolution of the arbitration between the parties.  It is not Owner's intention to indefinitely preserve all data from the security cameras generated while the arbitration is pending, nor do we see any conceivable relevance of such recordings.

Daniel F. Benavides, Esq.
April 18, 2012
Page 10

**E.    Outstanding Pre-Termination Obligations**

You request a copy of the March financial statement in order to provide an accounting of amounts owed by Owner to GHM. Unfortunately, in the short time that Owner has had access the books and records of the Hotel, Owner has uncovered what it believes to be pervasive accounting irregularities that cast serious doubt on the accuracy and reliability of the financial statements previously prepared by GHM. The March financial statement underway at the time of the transition cannot be relied upon to determine any management fees potentially owed by Owner to GHM.

**F.    E-Mail Communications**

GHM's improper commingling of its Hotel-related information with other information is further reflected in the fact that the "ghmamericas.com" e-mail accounts were hosted on one of Owner's computers at the Hotel, and those e-mail accounts were intertwined with user accounts utilized to operate the Hotel. As a result, it was not possible for certain GHM employees to continue accessing their e-mail accounts following the termination of the Management Agreement once their operational accounts at the Hotel were disabled. While this outcome was unfortunate, it could easily have been avoided had GHM complied with its fiduciary duties and segregated the information relating to the operation of the Hotel. Owner remains willing to work with GHM to find a way to allow GHM to utilize its e-mail accounts.

You state that "[i]t has further come to our attention that Setai Owners and/or Trevi are continuing to use/access the GHM email system to receive and send email correspondence." You are misinformed. The "ghmamericas.com" e-mail accounts have been disabled in accordance with your request, and no one can send or receive e-mail messages from those accounts. After Mr. Ternan's conversation with you on this topic last week, he undertook a further investigation and learned that some individuals had configured the version of Microsoft Outlook operating on their work computers to store a duplicate of their "ghmamericas.com" e-mails on their work computer. Accordingly, such individuals had access to their pre-termination e-mail correspondence. It was our intention to delete that duplicate copy and prevent such individuals from accessing their pre-termination e-mail correspondence, but before we were able to do so, we received your letter instructing us not to delete any electronic data. Please advise if you would like us to delete the local copies of the "ghmamericas.com" e-mail data.

However, because the "ghmamericas.com" e-mail system undoubtedly contains information that is the property of Owner (as records relating to the operation of the Hotel) in addition to other information, it is imperative that our respective clients reach agreement on a process for separating those two categories and ensuring that Owner's property is promptly returned to Owner.

Daniel F. Benavides, Esq.
April 18, 2012
Page 11

### G.     Owner's Property

As the foregoing demonstrates, GHM and its employees are likely in possession of multiple categories of Owner's property. In order to ensure that Owner has all information and other property necessary for the continued operation of the Hotel, and that none of that information and property is compromised or misused, we need the list that you undertook to provide us of the property in the possession of GHM employees that was either utilized in the operation of the Hotel or paid for by Owner. That property must be turned over to Owner forthwith.

### H.     GHM Employees

We disagree with your contentions regarding the events and circumstances relating to the employment and cessation of employment of various individuals previously working at the Hotel; however, we believe such issues will be resolved in the arbitration and need not be addressed here. In addition, it is our understanding that all individuals who chose not to be employed with new management have now departed from the Abbey Hotel.

### I.     Pending Third-Party Litigation Related To Hotel Operations

Owner intends to comply with Article XVIII of the Management Agreement, to the extent the terms and provisions thereof apply to any litigation to which GHM is a party and is contractually entitled to a defense and/or indemnification from Owner, and in which GHM is not otherwise guilty of gross negligence or willful misconduct.

### J.     Other Issues

You identify a handful of examples of purportedly "alarming instances of improper tampering with GHM's proprietary and privileged materials." All but one of the examples involve the movement of records relating to the operations of the Hotel (*i.e.*, Owner's property), and there is nothing improper about moving such records from one location within the Hotel to another. With respect to the highlighting of certain documents in the Director of Finance's office purportedly containing privileged communications, I am informed that such office was disorganized when the change in management occurred, and one of the employees (who is not a lawyer and did not recognize the allegedly privileged nature of those documents) attempted to organize that information by highlighting and then alphabetizing the documents. In any event, that employee did not read the documents other than to identify how to organize the information and, further, those documents have now been turned over to you.

Finally, there is little purpose in arguing with you about how to characterize or describe the transition to new management; however, it is inaccurate to state that any employees were removed from the Hotel property in a deliberately demeaning or damaging manner on March 31,

Daniel F. Benavides, Esq.
April 18, 2012
Page 12

2012, or at any other time.  Owner took every step possible to ensure that employees were treated with respect.

## III.

## CONCLUSION

Danny, we should attempt to promptly resolve the issues identified above.  To the extent, however, that your clients agree to disagree over one or more of these property-related questions, we should present the parties' dispute to the arbitration panel as soon as practicable.  To that end, we suggest that GHM nominate its proposed arbitrator on an expedited basis and that, after their qualification and certification, Owner's and GHM's respective arbitrators immediately appoint the third member of the panel (the International Court of Arbitration has informed us that the two party-appointed arbitrators may choose the third).  In that way, we can submit to the full panel any requests for provisional relief at the earliest possible date.

If you have any questions or comments, please do not hesitate to contact us.

Sincerely,

James S. Renard

cc:     Kenneth R. Hartmann, Esq.

5266253.5
2159-02

**EXHIBIT I**



**KOZYAK · TROPIN
THROCKMORTON**
ATTORNEYS AT LAW

Daniel F. Benavides, Esq.
dfb@kttlaw.com | 305.728.2980

April 24, 2012

<u>VIA EMAIL AND US MAIL</u>

James S. Renard, Esq.
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201

> **Re:  Improper Termination of the Management Agreement dated March 20, 2000, between Setai Owners LLC and GHM (South Beach) LLC (the "Management Agreement") for the Setai Resort & Residences (the "Hotel")**

Dear Jim,

I am writing in response to your letter dated April 18, 2012. Unfortunately, based on your actions to date and the tone and substance of your letters, it is clear that you have no intention of cooperating to resolve open transition issues amicably, and that you and your clients are completely unconcerned with the damage you have caused GHM and are continuing to cause GHM as a result of the improper raid and your seizure of GHM's proprietary and privileged information. It is further clear that we have a fundamental disagreement regarding this case and the relationship between our clients which will need to be resolved through litigation. Accordingly, I will not respond to your legal commentary in this letter.

Instead, I will simply reiterate the following demands that GHM has made since the night of the raid and which still remain unsatisfied:

1.  Setai Owners must return all the personal property of GHM employees. This personal property includes the rolodexes of Messrs. Meier and Abramowitz as well as the St. Regis rental program agreement. If Setai Owners would like to make a copy of these items to preserve for litigation, that is fine. However, the property must be returned immediately. Your statement that GHM may have "obtained that St. Regis document through improper means" is ridiculous and insulting.

2.  Setai Owners must immediately cease any and all use of the GHM marks. GHM will hold Setai Owners and its cohorts responsible for any damages resulting from the improper use of the marks. Your excuse that Setai Owners is "working diligently to complete its removal of the GHM marks" is unacceptable, as it was Setai Owners' decision to terminate the Management Agreement without notice and without providing for an orderly transition.

3.  Setai Owners must immediately return all confidential, proprietary, and privileged information which clearly belongs to GHM, including SOP manuals, employee files, and privileged documents. As you well know, these items are scattered all over the Hotel and are on the electronic drives being used by Setai Owners and Trevi. Again, your "we are working on it" excuse is unacceptable, as it was Setai Owners' decision to terminate the Management Agreement without notice and without providing for an orderly transition. GHM will hold Setai Owners and its cohorts responsible for all damages resulting from your seizure and use of these materials. As I mentioned in my previous letter and as you admitted in your response letter, we have found evidence that Setai Owners has already tampered with GHM's proprietary and privileged information.

4.  GHM previously demanded and continues to demand that Setai Owners and Trevi not use, review, or otherwise access the materials listed in my letter dated April 13, 2012 until a court or tribunal determines their proper owner. Your letter indicates that you are choosing to ignore this admonition. Accordingly, to the extent Setai Owners and Trevi intend to use, access, or review any of these materials for operation of the Hotel or otherwise without GHM's and/or court authorization, GHM repeats its demand that Setai Owners and Trevi maintain a list for purposes of litigation of all such materials to be used, accessed or reviewed and the purpose therefor. GHM will hold Setai Owners and its cohorts accountable for all improper use of GHM's proprietary materials as well as the destruction of or failure to maintain evidence relevant to litigation.

5.  Setai Owners and its cohorts must not access, review, search or use electronic data existing prior to termination, as much of the electronic data may be GHM's proprietary, privileged, and confidential information and/or materials. Again, your letter indicates that you are choosing to ignore this admonition. Accordingly, please identify which specific steps you are taking to ensure GHM's electronic materials are protected and that GHM is not further damaged.

6.  Setai Owners must provide GHM with a financial statement for March so that it may determine its management fees for that month. Setai Owners must also provide GHM access to the accounting records so that it can determine all pre-termination amounts owed to GHM. We view your allegation that "accounting irregularities" have been discovered as a delay tactic. As you and your client know, all financial information was shared with Setai Owners throughout the course of the relationship between the parties.

7.  Setai Owners and its cohorts must immediately cease all use of the ghmamericas.com email accounts and refrain from tampering with such accounts. Setai Owners was well aware, prior to the raid, that these accounts were hosted at the Hotel. Again, your "we are

working on it" excuse is unacceptable, as it was Setai Owners' decision to terminate the Management Agreement without notice and without providing for an orderly transition.

Setai Owners has greater financial resources than GHM and Setai Owners had several months to plan for the secret raid of the Hotel and the ensuing legal battle. Furthermore, Setai Owners seized GHM's documents and electronic files containing all evidence pertaining to this case. Nevertheless, rest assured that we are working as quickly as possible to respond to the actions taken by Setai Owners and its cohorts and to protect GHM's rights. To that end, please advise when you intend to provide us with access to the servers listed in your letter or, at a minimum, copies of the servers, so that we may move forward.

Sincerely,

Daniel F. Benavides

cc:  Trevi Luxury Hospitality Group, Inc.
     (via fax to 214-220-9151)



# EXHIBIT J

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-17427 CA 10

GHM (SOUTH BEACH) LLC,
a Delaware limited liability company,

       Plaintiff,

v.

SETAI OWNERS LLC,
a Delaware limited liability company,
TREVI LUXURY HOSPITALITY GROUP,
INC., a Texas corporation, and SMB MANGEMENT
LLC, a Florida limited liability company,

       Defendants.

_____/

## AFFIDAVIT OF XAVIER VAZQUEZ

I, Xavier Vazquez, being duly sworn, deposes and says as follows:

1.     My name is Xavier Vazquez and I was the Director of Human Resources at the Setai Resort & Residences (the "Hotel").

2.     On March 30, 2012, I left my office as I usually do.  I left personal property and confidential property that belonged to GHM in my office.

3.     On April 6, 2012, I arrived at the "Abbey Hotel," which is the back of house for the Hotel, as previously scheduled with Setai Owners' counsel, in order to identify and recover my personal belonging and confidential property that belonged to GHM.

4.     When I arrived at the Abbey Hotel with GHM's counsel, we were immediately greeted by several security personnel and an off-duty state trooper. The security personnel and off-duty trooper were initially hostile and, at one point, demanded that we wait outside in the heat rather than in the air-conditioned waiting area. Setai Owners' counsel also demanded that I

not speak to or even greet any Hotel employees. These demands were demeaning and made in front of several former GHM employees who had been poached to work for the new management company following the raid. As former Director of Human Resources, I knew these employees personally.

5.    Setai Owners' counsel insisted that security personnel escort me and GHM's counsel at all times during our inspection of the Hotel.

6.    Upon entering my office for the first time since the raid on March 31, 2012, I noticed that someone had tampered with and/or moved employee files and I-9 immigration forms for GHM employees.

7.    In addition, there were many documents and categories of documents I identified as being confidential documents belonging to GHM which Owner's representatives did not allow me or GHM's counsel to remove from the Hotel.

I have read and subscribed to the above and swear, under oath, that the information is true and correct. I understand that a false statement in this affidavit will subject me to penalties for perjury.

Xavier Vazquez

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

Subscribed and sworn to before me this 7th day of May, 2012.


LORENA FERNANDEZ
Notary Public - State of Florida
My Comm. Expires Jun 17, 2014
Commission # EE 2173
Bonded Through National Notary Assn.

Notary Public, Miami-Dade County

My Commission expires _____

**EXHIBIT K**

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-17427 CA 10

GHM (SOUTH BEACH) LLC,
a Delaware limited liability company,

      Plaintiff,

v.

SETAI OWNERS LLC,
a Delaware limited liability company,
TREVI LUXURY HOSPITALITY GROUP,
INC., a Texas corporation, and SMB MANGEMENT
LLC, a Florida limited liability company,

      Defendants.

_____/

### AFFIDAVIT OF MOUSTAPHA GUIMEI

I, Moustapha Guimei, being duly sworn, deposes and says as follows:

1. My name is Moustapha Guimei and I was the Director of Finance at the Setai Resort & Residences (the "Hotel").

2. On March 30, 2012, I left my office as I usually do. I left personal property and confidential property that belonged to GHM in my office.

3. On or about April 12, 2012, I was allowed to enter the "Abbey Hotel," which is the back of house for the Hotel, escorted by security personnel and counsel, to collect my personal belongings and to help GHM's counsel collect certain property belonging to GHM that Owner had agreed to return.

4. Upon entering my office for the first time since the raid on March 31, 2012, I noticed that my desk was being used by a representative of Setai Owners and/or the new

management company and that the papers on my desk, which included confidential documents belonging to GHM and communications with counsel, had been sorted and moved.

5.  I also noticed that some documents were missing including a recent corporate audit performed by GHM's corporate offices in Signapore and a new bank resolution with new signing officers for the Hotel accounts.

6.  I was especially shocked to see that somebody had read and highlighted a stack of documents on my desk. The document on the top of the stack was correspondence sent to me by counsel. I had not highlighted any of these communications or documents.

7.  In addition, there were documents I identified as being confidential documents belonging to GHM which Owner's representatives did not allow me or GHM's counsel to remove from the Hotel.

I have read and subscribed to the above and swear, under oath, that the information is true and correct. I understand that a false statement in this affidavit will subject me to penalties for perjury.

_____
Moustapha Guimei

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

Subscribed and sworn to before me this 7th day of May, 2012.

**LORENA FERNANDEZ**
Notary Public - State of Florida
My Comm. Expires Jun 17, 2014
Commission # EE 2173
Bonded Through National Notary Assn.

_____
Notary Public, Miami-Dade County

My Commission expires _____

2

## EXHIBIT L

BICKEL & BREWER

ATTORNEYS AND COUNSELORS
4800 COMERICA BANK TOWER
1717 MAIN STREET
DALLAS, TEXAS 75201
PHONE: (214) 653-4000
FAX: (214) 653-1015

www.bickelbrewer.com

767 FIFTH AVENUE
60TH FLOOR
NEW YORK, NEW YORK   10153
(212) 489-1400

April 4, 2012

**VIA E-MAIL AND FACSIMILE**

Daniel F. Benavides, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Miami, FL 33134

Re:     Management Agreement dated March 20, 2000, between Setai Owners
LLC ("Owner") and General Hotel Management Ltd., as Operator, as
amended (the "Management Agreement"), relating to the management
and operation of the Setai Resort & Residences (the "Hotel") located in
Miami Beach, Florida

Dear Mr. Benavides:

Thank you for your letter dated April 3, 2012. This responds to that letter and requests
some additional information from GHM relating to the transition of Hotel operations to new
management.

A.     **Preliminary Matters**

You have now twice referred to Owner's termination of the above-referenced
Management Agreement and transition of Hotel operations to its new agent-manager as a "raid."
To the contrary, and as you undoubtedly know, a principal's termination of its agent and lawful
exercise of its rights of control over, and possession of, its own property cannot truthfully be
characterized as a "raid" – although you and your clients persist in doing so. With that, I trust
that future communications will dispense with the unnecessary posturing and rhetoric.

You also represent that, at the time of Owner's termination of GHM, "the principal of
GHM was on a flight back from Singapore after a meeting with your clients." There was no
such meeting. This firm's client (singular) is Setai Owners LLC. To the extent that you are
referring to a meeting among Adrian Zecha, Jonathan Breene, and Goldman Sachs, that meeting
did not include or involve Owner. Mr. Breene is neither a member of Setai Owners LLC nor an
officer or authorized representative thereof. To the extent Mr. Breene purported to speak on
behalf of Owner, he had (and has) no authority to do so – a fact of which GHM is well aware.
To eliminate any possibility of confusion in the future, we agree with your proposal "that all

Daniel F. Benavides, Esq.
April 4, 2012
Page 2

further communication between our clients be made exclusively through or in the presence of counsel."

Finally, your accusation that "no effort has been made by Setai Owners to respect any of [its] commitments" relating to the transition is unfounded. Since the termination, Owner has been pursuing those undertakings while simultaneously overseeing the operations of the Hotel. We, like you, are anxious to complete the transition and we are pleased that GHM is willing to cooperate in that endeavor -- which is what we requested and required from the beginning. Now, we will address your five issues in the order in which you presented them.

**B.    Transition Issues**

 **1.    Property**

  **a.    Ex-employee personal effects**

Owner will be pleased to arrange for the return of personal belongings of former Hotel employees who may not have had access to the Hotel's offices or back-of-house areas since the termination. Indeed, we have accommodated several ex-employees in that respect thus far. As to the others, if they will provide us with a list and a description of the location of their property, Owner will retrieve items belonging to those individuals and return them. However, we cannot allow those persons or their counsel access to the Hotel offices unless they are accompanied and supervised by Hotel security and agree, in advance, to act peaceably, to not interfere with Hotel operations or otherwise communicate with Hotel employees while on the premises, and to leave when requested. In the unlikely event that a dispute arises regarding ownership of any particular item, we will endeavor to resolve that dispute as soon as practicable.

  **b.    GHM materials**

As we have previously stated, Owner will return GHM's confidential and proprietary information and materials. However, rather than opening the Hotel to an entourage of GHM representatives and outside counsel to unilaterally "identify and retrieve" any and all items GHM claims as its property (which is what you propose), Owner suggests a more reasonable and orderly process. We ask that GHM provide us with an inventory of the tangible property located at the Hotel in which it claims an ownership interest. Owner will then locate, remove, and turn those items over to GHM. If we need GHM's assistance in accomplishing any of those tasks, we will ask for it. If any of the items GHM requests is the property of Owner (or there is a reasonable dispute regarding ownership), we will so inform you. In that regard, your letter refers to some categories of alleged GHM property to which Owner may take exception. For example, we understand that the e-mail server (*i.e.*, the hardware itself) is Owner's property. Furthermore, to the extent any information in the guest profile database relates to guest stays at the Hotel, such information was obtained and recorded in connection with GHM's duties as Owner's agent-

Daniel F. Benavides, Esq.
April 4, 2012
Page 3

manager – and, thus, belongs to Owner. Of course, these matters are open to discussion, and we will consider any proof or explanations GHM may have with respect to its claims of ownership over that and other property.

### 2.    GHM Marks

Owner is in the process of identifying and removing (or, if possible, modifying) its property within the Hotel that bears the GHM name or mark. If your client has an inventory of such property for Owner's reference, it would be helpful if you would provide us with that list as we complete those tasks. With respect to the timing of completion of Owner's efforts to de-identify the Hotel from the GHM name, we remind you of the provisions of Article XX of the Management Agreement and the fact that Owner has requested a termination-related accounting from GHM. *See* my letter dated April 3, 2012, at 2.

### 3.    Management Fees

As you know, Owner has asserted claims against GHM in the pending arbitration proceeding, pursuant to which it seeks an award of damages and an order of disgorgement and forfeiture relating, among other matters, to the management fees and other amounts that GHM has paid itself as Owner's agent-operator. Against that background, but nevertheless mindful of Owner's post-termination rights and obligations under the Management Agreement, please provide us with an accounting of the sums you demand. Please include in that accounting a detailed description of GHM's methodology for calculating those fees.

### 4.    Payroll

Please inform us of the total amount of pre-termination payroll and benefits that is currently due, and Owner will transfer such sum to ADP for processing those payments. As Owner has previously informed you, and as your client undoubtedly agrees, Hotel employees and ex-employees who are owed money for their pre-termination services must be timely paid.

### 5.    E-Mail Communications

Owner has established a new e-mail system to be used by Hotel employees in connection with the operation of the Hotel. Owner has not accessed the old system, nor did it block Hotel employees to whom GHM had previously given access from continuing to use that system (although Owner has attempted to discourage any such use by setting up its new system). However, in response to your request, Owner will turn off all on-site access to the old system. We are anxious to transfer the contents of the old system to GHM; provided that GHM agrees to make a copy of those contents and preserve it for purposes of the arbitration (and any related legal proceedings) and agrees to permit Owner access to any portion of those contents that

Daniel F. Benavides, Esq.
April 4, 2012
Page 4

constitutes the property of Owner (including, but not limited to, excerpts of books and records, information relating to future bookings, etc.).

**C.     Conclusion**

If possible, please provide us with the lists, assurances, and other information requested above by tomorrow, Thursday, April 5, 2012. Once again, Owner appreciates GHM's expressed interest in cooperating and assisting with the transition.

If you have any questions or comments, please do not hesitate to contact us.

Sincerely,

James S. Renard

5265558.1
2159-02

EXHIBIT M

| | |
|---|---|
| **From:** | Mark Holzberg <Mark.Holzberg@khinternational.com> |
| **To:** | "ffischer@ghmamericas.com" <ffischer@ghmamericas.com> |
| **Date:** | 4/12/2012 3:52 PM |
| **Subject:** | RE: The Setai, South Beach - Your Itinerary |

Florian-

Thanks for the hair appt for my mom.

One thing I noticed, though, on the Itinerary. The cost of the boat apparently doubled. The information you sent me previously was:

May 14th: Boat, 10 am: Daniel one engine, 26 feet, 8 hours, We need to upgrade from 20 foot Searay, $549 for 8 hour rental + tax and fuel. What is the largest boat they rent?

Vendor: Miami Boat Rental

Notes: We need a captain

# People: 3 guests

Destination: 8 hour rental

Cost: $549 + tax and fuel

Special Notes: Includes transportation to and from the marina, lunch at Casablanca

What am I missing? Was the quote above for the 20 foot boat? Is the 26 foot boat double?? Can you check this again?

Thanks
Mark

From: ffischer@ghmamericas.com [mailto:ffischer@ghmamericas.com]
Sent: Thursday, April 12, 2012 3:39 PM
To: Mark Holzberg
Subject: The Setai, South Beach - Your Itinerary

Dear Mr. Holzberg,

As previously discussed, attached please find your revised itinerary including the salon appointment. Please do not hesitate to contact us if you need further assistance.

Warm Regards,

F.

Florian Fischer

Head Concierge
Member, Les Clefs d'Or USA
The Setai, South Beach
2001 Collins Avenue
Miami Beach, Fl 33139
T-(305) 520-6000
D-(305) 520-6360
F -(305) 520-6600
www.setai.com<http://www.setai.com>

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-17427 CA 10

GHM (SOUTH BEACH) LLC,
a Delaware limited liability company,

     Plaintiff,

v.

SETAI OWNERS LLC,
a Delaware limited liability company,
TREVI LUXURY HOSPITALITY GROUP,
INC., a Texas corporation, and SMB MANAGEMENT
LLC, a Florida limited liability company,

     Defendants.
_____/

THE ORIGINAL FILED
IN THE OFFICE OF THE CLERK

MAY 0 7 2012

CIRCUIT & COUNTY COURTS
MIAMI-DADE COUNTY FLORIDA

## MOTION TO PERMANENTLY ENJOIN OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION ENJOINING DEFENDANT SETAI OWNERS LLC FROM PROCEEDING WITH THE ARBITRATION FILED BEFORE THE INTERNATIONAL COURT OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE

Plaintiff, GHM (SOUTH BEACH) LLC ("GHM"), by and through their attorneys, respectfully moves this Court to permanently enjoin or, in the alternative, to issue a temporary injunction pursuant to Fla. R. Civ. P. 1.610 enjoining defendant SETAI OWNERS LLC ("Owner") from proceeding with the arbitration filed by Owner before the International Court of Arbitration.

## SUMMARY AND INTRODUCTION

Up until March 31, 2012, GHM operated the award winning luxury Setai Resort & Residences (the "Hotel") pursuant to a Management Agreement ("Management Agreement" or "Agreement," attached as Exhibit A to the Complaint) entered into between GHM and the

Owner. Notwithstanding the numerous contractual provisions that govern how disputes between the parties shall be resolved, Owner—in complete violation of every one of these dispute resolution methods—staged a pre-dawn raid of the Hotel on March 31, 2012 and forcefully ejected GHM from the Hotel while purporting to terminate the Agreement. Simultaneous with its purported termination in contravention of the Management Agreement, Owner filed a Request for Arbitration ("Arbitration Request") with the International Court of Arbitration of The International Chamber of Commerce, which seeks to hold GHM liable for a laundry list of alleged breaches for which GHM had never received written notice. *See* Arbitration Request, attached as **Exhibit A**. Owner, however, has waived it right to arbitrate its claims by circumventing the dispute resolution methods that are required by the Management Agreement.

While the Agreement contains arbitration language, it does not allow arbitration in these circumstances. Instead, the Agreement requires first that termination can occur only after 60 days' written notice of some default by the Operator and an opportunity to cure, *see* Agreement, Art. XIX 1.1.2; and second that the parties are required to attempt to settle any question or dispute in mutual good faith, *see Id.* Art. XXVI. Thus, the Agreement envisions notice of a problem, an opportunity to cure, good faith negotiation about the issue, and then—*and only then*—arbitration. But here, Owner gave no notice of any default. It gave GHM no opportunity to cure any such alleged default. And it never attempted to resolve whatever issues it had by trying to settle the issue in mutual good faith. Rather, Owner has acted in objectively bad faith by wholly vitiating the dispute resolution provisions in the Agreement in ways that cannot now be remedied because GHM *cannot* now cure and good faith negotiations are impracticable. Because Owner determinedly repudiated the critical conditions precedent to the arbitration clause its conduct makes any cure impossible, Owner is now precluded from initiating

2

arbitration. Accordingly, GHM respectfully moves this Court to permanently enjoin Owner from proceeding with the arbitration filed by Owner on March 31, 2012 before the International Court of Arbitration.

## STATEMENT OF FACTS

### A.    The Management Agreement

As set forth in further detail in GHM's Complaint, GHM and Owner entered into a Management Agreement that governs the relationship between the parties. The Agreement clearly sets forth an escalation of dispute resolution methods, with arbitration as the last resort. First, the Agreement has specific dispute resolution methods for particular disputes, such as those arising from accounting matters relating to the financial statements. Agreement, Art. XI (3) (Any disputes "as to the contents or correctness" of financial statements "or any accounting matter thereunder shall be decided by the Independent Certified Public Accountant, whose decision *shall be final and binding*.").[1]  Second, the Agreement requires notice of a default and an opportunity to cure. *Id.* Art. XIX (1.1.2).    Third, the Agreement envisions that if these provisions do not lead to resolution, the parties will engage in a good faith attempt to settle their difference. Only if all of those attempts fail may arbitration commence.

> The parties agree that in all matters relating to this Agreement, whether during its substance or after its termination, and also in all matters concerning the provisions of this Agreement where any question or dispute or difference *shall be settled in mutual good faith.    In case of failure by the parties to reach an amicable settlement*, such difference or dispute shall be *finally* settled through a Board of Arbitrators . . . .

*Id.* Art. XXVI (1) (emphases added).

---

[1] There are also some built-in provisions designed to prevent disputes. For example, if neither the Owner nor GHM objects within 45 days to a particular year's profits and loss statement or to the Net Profit for any fiscal year, then that "statement shall be deemed to be correct and conclusive for all purposes." Agreement, Art. XI (4).

The Management Agreement is a term agreement, and neither party could terminate at will. Both parties are permitted to terminate only for reasons specified in the Agreement, and only under the procedures specified in the Agreement. Thus, to terminate for performance reasons, the Owner could only do so:

> "[b]y giving 60 days notice in writing to [GHM], in the event that [GHM] shall fail to observe or perform any of the provisions of this Agreement that are [GHM]'s responsibility to be observed or performed, including the obligation to operate the Hotel in accordance with the Standards, despite owner having given written notice of such default to [GHM] and such default shall not have been remedied within thirty (30) days after such notice.

*Id.* Art. XIX (1.1.2). Thus, there can be no termination for default in the absence of notice of default and the opportunity to cure.

**B.    Owner's Conduct Violated Management Agreement Provisions Requiring Engaging In Dispute Resolution As A Precondition to Arbitration.**

Although Owner had begun at least one of the dispute resolution processes in the Agreement, it did not complete any of them before its midnight raid and Arbitration Request. Under Article XI (3), Owner had hired PricewaterhouseCoopers to perform an audit of the Hotel's accounting records. Curiously, however, rather than wait for the results of what the parties agreed would be a "final and binding" audit, Owner decided to engage in what amounted to armed self-help. At approximately 2 a.m. on the early morning of March 31, 2012, Owner's representatives stormed the Hotel with security personnel and forcibly ejected GHM as manager. Affidavit of Hansjoerg Meier ("Meier Aff.") ¶ 2, attached as **Exhibit B**. Owner had given no notice of any default and no opportunity to cure, contrary to the requirements of the management contract. *Id.* ¶¶ 3-4. Owner also gave no notice whatsoever (and certainly not 60 days) of its intent to terminate the agreement, again, contrary to the requirements of the Agreement. *Id.* ¶ 3.

4

And finally, Owner made no effort whatsoever to engage in "good faith" efforts to settle any differences amicably, contrary to the requirements of the Agreements. *Id.* ¶¶ 4, 7.

Concurrent with its unlawful termination, Owner filed an Arbitration Request before the International Court of Arbitration of the International Chamber of Commerce, seeking damages resulting from allegations concerning (i) the overpayment of management fees, (ii) mismanagement of the Hotel including allegations of overspending and failure to control operational expenses, and (iii) "gross insubordination." *See generally* Arbitration Request.

As a result of Owner's sudden, hostile, and improper termination of the Management Agreement and its forcible eviction of GHM from the property, any attempt now to comply with the contractual requirements to resolve disputes in good faith as a precondition to arbitration has been made impracticable. Certainly, because GHM has been ejected, it has no ability to remedy now any of the alleged deficiencies identified by Owners. Likewise, if GHM were still managing the Hotel, one of the topics to be negotiated in any good faith talks would be GHM's continued management of the Hotel. But that topic is now off the table as a consequence of Owner's conduct. In short, the Owner's conduct has made impossible or impracticable the contractual requirement to attempt resolution of differences amicably and in good faith. Moreover, Owner's conduct has deprived GHM of its only source of revenue to defend the costly arbitration requested by Owner. As a result of Owner's unreasonably large and inflated $70 million actual and punitive damages claim, GHM's estimated arbitration advance fees alone (not including attorneys' fees and costs) are expected to approximate $350,000. For all these reasons, Owner's actions have defeated the preconditions to arbitration and therefore, the Owner cannot now rely on the arbitration provision.

## ARGUMENT

### I. THIS COURT SHOULD PERMANENTLY ENJOIN OWNER FROM PROCEEDING WITH THE ARBITRATION

#### A. This Court Should Resolve the Question of Arbitrability and Whether Owner has Waived Its Right to Arbitration.

"The determination of jurisdictional disputes, such as whether a claim is subject to arbitration, must be made by a court of law." *Curtis v. Olson*, 837 So. 2d 1155, 1157 (Fla. 1st DCA 2003); *see also AT&T Technologies, Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986) (question of arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise"); *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999) ("[B]ecause arbitration provisions are contractual in nature, construction of such provisions and the contracts in which they appear remains a matter of contract interpretation" for the court.); *cf. Mercedes Homes, Inc. v. Rosario*, 920 So. 2d 1254, 1256 (Fla. 2d DCA 2006) (trial court must determine whether there is a valid arbitration agreement). Importantly, "[c]ourts are not divested of authority to determine questions of arbitrability simply because an arbitration proceeding is ongoing." *Morton v. Polivchak*, 931 So. 2d 935, 938-39 (Fla. 2d DCA 2006).

"Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider" in determining whether arbitration is mandated: "(1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." *Seifert*, 750 So.2d at 636. Moreover, where the agreement to arbitrate contains a condition precedent before arbitration can be initiated, the court must determine whether the condition precedent has been satisfied before allowing arbitration to proceed. *See Hubbard Constr. Co. v. Jacobs Civil, Inc.*, 969 So.2d 1069, 1072 (Fla. 5th DCA

2007) ("trial court was required to consider" whether party "failed to comply with a condition precedent to seeking arbitration").

Accordingly, the questions of whether Owner has satisfied the preconditions to initiating arbitration as well as whether Owner has waived its rights to arbitration is a determination to be made by this Court.

**B.      Owner Has Waived its Right to Arbitration.**

Notwithstanding the federal policy favoring arbitration as expressed by the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Kemiron Atl., Inc. v. Aguakem Int'l, Inc.*, 290 F.3d 1287 (11th Cir. 2002) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotations omitted)). As arbitration provisions are contractual in nature, the "intent of contracting parties is paramount," and the policy in favor arbitration "does not operate without regard to the wishes of the contracting party." *Kemiron*, 290 F.3d at 1290, 1291.

Where, as here, the parties have contracted for escalating means of dispute resolution, "by placing those conditions in the contract, the parties clearly intended to make arbitration [as] a dispute resolution mechanism of last resort." *Kemiron*, 290 F.3d at 1291. The other methods for resolving the dispute constitute "conditions precedent before arbitration can take place." *Id.* Thus, where the arbitration provision requires parties to resolve disputes through other informal methods before arbitration can be initiated (*e.g.*, notice of mediation, mediation, and notice of request for arbitration), and where the party seeking arbitration failed to "perform the steps necessary, as spelled out in the contract," arbitration cannot proceed. *Id.* at 1290 (affirming denial of motion to stay litigation pending arbitration where conditions precedent to arbitration had not been satisfied). *See also HIM Portland LLC v. Devito Builders Inc.*, 317 F.3d 41, 44 (1st

7

Cir. 2003) ("Where contracting parties condition an arbitration agreement upon the satisfaction of some condition precedent, the failure to satisfy the specified condition will preclude the parties from compelling arbitration . . . .").

Florida courts routinely hold that arbitration cannot proceed where a contractual condition precedent has not been satisfied. *Hubbard Constr.*, 969 So.2d at 1072 (no right to arbitrate where condition precedent of issuing demand for arbitration within certain time period had not been made); *Seaboard Surety Co. v. Cates*, 604 So.2d 570 (Fla. 3d DCA 1992) (same); *3-J Hospitality, LLC v. Big Time Design, Inc.*, No. 09-61077-CIV, 2009 WL 3586830, at *3 (S.D. Fla. Oct. 27, 2009) (dismissing complaint because claim was not subject to litigation or arbitration until parties satisfied condition precedent of mediation).

Here, the parties did not agree to arbitrate all differences. Instead, they set up certain mechanisms for particular issues, and they agreed more generally that, on all disputes, they would try to resolve all differences in mutual good faith. Only if that process failed did the parties agree to arbitrate. In other words, the parties established a framework of escalation under which arbitration would serve as a dispute resolution mechanism of last resort, exercisable only after the required steps had been taken. Especially where the Agreement provided for a lengthy contractual period and required at least 60 days' notice of termination by either side, the Agreement contemplated that disputes should be resolved informally by both parties in their contractual positions, and without resort to litigation or arbitration where possible so as to guarantee the uninterrupted operation of the Hotel.

Because Owner has unilaterally and recklessly removed GHM from its contractual role on the premises, Owner has deprived GHM of the protections for which it bargained—including the very basic requirements of written notice of default and the opportunity to cure, as well as the

crucial "good faith" efforts to resolve any disputes between the parties while GHM was in a position to resolve those issues. Rather than engage in "good faith" discussions as required by the Agreement, Owner's conduct is the epitome of bad faith. Having wholly repudiated these critical components of the Agreement's dispute resolution process, Owner cannot now selectively choose to take shelter in the arbitration provision. *United Contractor's Inc. v. United Constr. Corp.*, 187 So.2d 695, 701-02 (Fla. 2d DCA 1966) ("[T]he law is too well settled to admit of controversy that one may not accept the fruits of a contract and at the same time renounce, or repudiate, the burdens which that contract places upon him."); *Fineberg v. Kline*, 542 So. 2d 1002, 1004 (Fla. 3d DCA 1988) (same).

Owner has therefore waived any contractual right to arbitrate the claims set forth in its Arbitration Request. *Cf. Burton-Dixie Corp. v. Timothy McCarthy Constr. Co.*, 436 F.2d 405, 408 (11th Cir. 1971) (arbitration agreement "may be waived" where "conduct of the parties [is] inconsistent with the notion that they treated the arbitration provision in effect" or where conduct "might be reasonably construed as showing that they did not intend to avail themselves of the arbitration provision").

Nor can the milk be poured back into the broken bottle. Owner's conduct has effectively deprived GHM forever of the benefits of the conditions precedent to arbitration for which it bargained. By refusing to provide written notice and an opportunity to cure, Owner has deprived GHM of the opportunity to cure. By unilaterally removing GHM from the property, Owner has taken GHM out of the position it would have otherwise been in had the parties engaged in the contractually required good faith resolution process.[2]  In that position, GHM and Owner could

---

[2] Not only did Owner evict GHM from the Hotel but by virtue of its hostile takeover of the Hotel, Owner has taken possession of all the documents and other evidence to which GHM is

9

have discussed the issues, both sides would have understood the nature of the dispute, both sides could evaluate evidence, and both sides could have negotiated resolutions, including GHM's continued role as manager. By virtue of Owner's conduct, however, GHM now cannot remedy alleged or perceived deficiencies, nor evaluate Owner's claims in light of documents (which have been seized by Owner, and not made available to GHM). In addition, the central issue of GHM's continued management is now off the table. Owner cannot seize all the cards and then insist that GHM agreed to play in a card game. At this point, Owner has precluded the effective performance of the conditions precedent to arbitration.

Where, as here, Owner has acted with complete disregard of the conditions precedent to arbitration and where those conditions precedent cannot now be effectively exercised, Owner has waived its contractual right to arbitration (or it should be estopped from claiming the right). Because the parties contractually agreed to forfeit the right of trial *but only if certain conditions had been met*, GHM cannot now be deprived of its right to trial by jury where it has not received the benefits of that bargain.

Accordingly, this Court should permanently enjoin Owner from proceeding with the arbitration and permit the parties to resolve their disputes in the present litigation.

## II.   IN THE ALTERNATIVE, GHM IS ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING OWNER FROM PROCEEDING WITH THE ARBTIRATION.

In the alternative, GHM is entitled to a preliminary injunction enjoining Owner from proceeding with the arbitration, which shall be in force until further order, to prevent irreparable injury and with the provision of an appropriate bond. *See* Fla. R. Civ. P. 1.610(a) & (b). A preliminary injunction should be awarded where there is:

---

entitled. Arbitration – with its more limited discovery and less process – would not adequately protect GHM's rights under these circumstances created by Owner's wrongful conduct.

> a showing of (1) the likelihood of irreparable harm and the unavailability of an adequate remedy at law, (2) the substantial likelihood of success on the merits, (3) that the threatened injury to petitioner outweigh[s] any possible harm to respondent, and (4) that the granting of the injunction will not disserve the public interest.

*East v. Aqua Gaming, Inc.*, 805 So.2d 932, 934 (Fla. 2d DCA 2001). As detailed below, each of these requirements is easily satisfied here.

*First,* as to factor one, GHM has demonstrated that it cannot be compelled to arbitrate the disputes between the parties because not only has Owner breached the conditions precedent to arbitration, but Owner's conduct has been wholly contrary to the framework of dispute resolution set forth in the Agreement. Owner has therefore waived its right to arbitration or is estopped from claiming that right. GHM has made a strong showing that it is likely to succeed in its arguments because Owner has never sought to resolve any of its alleged claims in "good faith," nor did Owner employ the other dispute resolution methods applicable to disputes concerning financial statements and the budgetary process.

*Second,* as to factor two, absent a preliminary injunction enjoining Owner from proceeding with the arbitration, GHM undoubtedly will suffer irreparable harm. In denying a motion to enjoin arbitration, a court effectively "compels [movant] to proceed with arbitration," *Curtis,* 837 So. 2d at 1155, and "[b]eing forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm for which there is no adequate remedy at law." *AT&T Mobility LLC v. Bushman,* No. 11–80922–CIV, 2011 WL 5924666, at *3 (S.D. Fla. Sept. 23, 2011) (internal quotations and citation omitted); *see also Chase Manhattan Bank USA, N.A. v. National Arbitration Council, Inc.,* No. 3:04-CV-1205-J-32HTS, 2005 WL 1270504, at *3-4 (M.D. Fla. May 27, 2005). Importantly, "[i]t is not merely expense that underlies the prohibition against forcing a party to arbitrate a dispute that it did not agree to arbitrate," but the fact that "[f]orcing

11

[parties] to arbitrate deprives them of their Constitutional right to a jury trial," and thus causes "irreparable injury." *Duthie v. Matria Healthcare, Inc.*, 535 F. Supp. 2d 909, 924 (N.D. Ill. 2008), *aff'd*, 540 F.3d 533 (7th Cir. 2008); *see also Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 642 (Fla. 1999) ("[T]o require petitioner to submit her tort claim to binding arbitration would deprive her of her rights to a trial by jury, due process and access to the courts."). Here, where GHM has suffered substantial harm and injury to its business and employee relationships as well as its reputation due to Owner's extreme and unwarranted ejection from the Hotel, GHM is entitled to submit its claims to a jury. Forcing GHM to undergo an arbitration that was never rightfully triggered would thus impose irreparable harm on GHM.

*Third*, the issuance of a preliminary injunction will not cause substantial injury to Owner. As discussed above, Owner intentionally thwarted the framework of dispute resolution methods set forth in the Agreement, and has essentially sabotaged the process set up in the Agreement. The arbitration that would have followed the informal dispute resolution established in the Agreement—where both sides had already had full exposure to the nature of the dispute, the facts, and all the evidence, and in which GHM would have had the ability and opportunity to negotiate as manager, with the ability to effect remedies and to discuss its continued management—cannot now occur. Should an arbitration occur now, it would not be the kind envisioned by the Agreement. Instead, no resolution in which GHM manages the Hotel is now possible, and no resolution in which GHM can effectively remedy any alleged deficiencies is possible. Indeed, the arbitration is likely to be characterized largely by the expense GHM will incur in trying to obtain the kinds of information that it should already have had through the informal dispute resolution. Having chosen to blatantly disregard the dispute resolution

12

provisions of the Agreement, Owner can hardly argue that it is harmed by the natural consequences of its choice.

*Fourth*, the public interest favors enjoining Owner from proceeding with the arbitration. There of course is a strong public interest in enforcing conditions precedent in arbitration provisions. There is also a strong public interest in ensuring that parties do not, through gamesmanship, create for themselves favorable climates for arbitration by depriving the other parties to the contract of the clear benefits that would have flowed from the required informal dispute resolution in good faith. And finally, the public interest favors avoiding piecemeal resolution of the parties' claims and permitting all the issues in a case to be adjudicated in a single forum. *See, e.g., Miccosukee Tribe of Indians of Florida v. South Florida Water Management District*, 559 F.3d 1191, 1196 (11th Cir. 2009) (where there are two competing proceedings, "the general principle is to avoid duplicative litigation"); *Belize Telecom, Ltd. v. Government of Belize*, 528 F.3d 1298, 1308 (11th Cir. 2008) (courts must consider the "[e]fficient use of judicial resources," including the "avoidance of piecemeal litigation"). GHM has commenced litigation against Owner, as well as other third parties that would not be subject to arbitration because those third parties are not parties to any agreement to arbitrate. Moreover, GHM has asserted tort claims against Owner that would also not be subject to arbitration. *See Seifert*, 750 So. 2d at 642 (tort claims that "neither relies on the agreement not refers to any provision within the agreement" not subject to arbitration). To conserve judicial resources, the public interest thus weighs in favor of enjoining Owner from proceeding with the arbitration and allowing this litigation to proceed.

For these reasons, and to the extent the Court determines that GHM is not entitled to permanent enjoinment of arbitration proceedings, this Court nevertheless should issue a

preliminary injunction temporarily enjoining Owner from proceeding with the arbitration until it can be conclusively determined that Owner has waived its right to arbitration.

## CONCLUSION

For the foregoing reasons, GHM respectfully moves this Court to permanently enjoin or, in the alternative, to issue a preliminary injunction enjoining Owner from proceeding with the arbitration proceeding initiated by Owner.

**WHEREFORE**, GHM respectfully requests that the Court enter an injunction permanently enjoining Owner from proceeding with the arbitration proceedings before the International Court of Arbitration of the International Chamber of Commerce filed by Owner or, in the alternative, enter a temporary injunction enjoining Owner from proceeding with the above-mentioned arbitration proceedings.

Dated May 7, 2012

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Attorneys for Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800

By_____
        Kenneth R. Hartmann
        Florida Bar No. 664286
        Corali Lopez-Castro
        Florida Bar No. 863830
        Daniel F. Benavides
        Florida Bar No. 81675

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on this 7th day of May, 2012 via Federal Express and/or email to all parties on the attached service list.

By: _____
Corali Lopez-Castro

15

**EXHIBIT A**

**EXHIBIT B**

IN THE INTERNATIONAL COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF COMMERCE

SETAI OWNERS LLC,

    Claimant,

    and

GENERAL HOTEL MANAGEMENT
LTD. and GHM (SOUTH BEACH)
LLC,

    Respondents.

NO. _____

## REQUEST FOR ARBITRATION

TO:   The Secretariat of the Court of Arbitration of the International Chamber of Commerce, 38 cours Albert 1er, 75008 Paris, France

Claimant Setai Owners, LLC ("Owner"), by and through its undersigned counsel, submits this Request for Arbitration against Respondents General Hotel Management Ltd. and GHM (South Beach) LLC (together, "GHM"), as follows:

### I.

### PRELIMINARY STATEMENT

The Setai Resort & Residences (the "Setai") is located in Miami Beach, Florida. It is a luxury mixed-use complex consisting of a hotel operation, residential condominiums, restaurants and bars, a spa, and other commercial facilities and amenities. Pursuant to the Management Agreement between the parties (which is attached hereto as Exhibit "A"), GHM undertook to operate the hotel portion of the Setai (the "Hotel") as Owner's agent and fiduciary. Unfortunately, GHM materially breached its contractual obligations and violated its fiduciary duties to Owner by paying itself millions of dollars to which it was not entitled, engaging in disloyal and self-enriching practices, and failing to comply with the prescribed standards

governing its management, marketing, and care of the Hotel. As a result of GHM's wrongdoing and gross negligence, Owner has sustained substantial injury. Accordingly, on March 31, 2012, Owner exercised its right to terminate the Management Agreement and to revoke GHM's agency powers thereunder. Now, in order to obtain the compensation and other relief to which it is due, Owner initiates this arbitration proceeding and asserts the claims set forth herein.

## II.

## PARTIES

### A.   Claimant

1.   Owner is a limited liability company organized and existing under the laws of the State of Delaware of the United States of America with its principal place of business located at 1271 Avenue of the Americas, 39th Floor, New York, New York 10020. Owner is represented in this arbitration by its legal counsel, William A. Brewer III and James S. Renard of the law firm of Bickel & Brewer, 1717 Main Street, Suite 4800, Dallas, Texas 75201 (Telephone 1-214-653-4000; Facsimile 1-214-653-1015).

### B.   Respondents

2.   General Hotel Management Ltd. is a company incorporated and existing under the laws of the British Virgin Islands with its principal place of business located at 1 Orchard Spring Lane, #04-02 Tourism Court, Singapore 247729 (Telephone (65) 6223 3755; Facsimile (65) 6221 1535).

3.   GHM (South Beach) LLC is a limited liability company organized and existing under the laws of the State of Delaware of the United States of America with its principal address at 2001 Collins Avenue, Miami Beach, Florida 33139. GHM (South Beach) LLC's

2

registered agent for service of process in the State of Florida is CorpDirect Agents, Inc., 515 East Park Avenue, Tallahassee, Florida 32301.

4.     On or about January 13, 2005, General Hotel Management Ltd. and GHM (South Beach) LLC entered into an Assignment and Assumption Agreement (which, together with a cover letter to Owner, is attached hereto as Exhibit "B"), pursuant to which the former purported to transfer and assign the Management Agreement to the latter.   That Assignment and Assumption Agreement (the "Assignment") did not relieve or otherwise excuse General Hotel Management Ltd. from its continuing liability under the Management Agreement or from the performance of Operator's obligations with respect thereto.   In addition, both General Hotel Management Ltd. and GHM (South Beach) LLC acted as Owner's agents under the Management Agreement following their execution of the Assignment.

**III.**

**ARBITRATION JURISDICTION, VENUE,
TRIBUNAL, LANGUAGE, AND FILING FEE**

5.     Until March 31, 2012, Owner and GHM, as "Operator," were parties to a management agreement made on March 20, 2000, and amended by letter dated January 8, 2003 (together, the "Management Agreement").   A copy of the Management Agreement (consisting of the original contract and subsequent letter amendment) is attached hereto as Exhibit "A."

6.     Pursuant to Section 1 of Article XXVI of the Management Agreement, Owner and GHM (together, the "Parties") agreed that in the event of their failure to reach an amicable settlement of any difference or dispute between them "relating to" or "concerning the provisions of" the Management Agreement, "such difference or dispute shall be finally settled through a Board of Arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce" – even if such dispute arises "after termination" of the

3

Management Agreement. Accordingly, the International Court of Arbitration has jurisdiction over this dispute and the Parties hereto, in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules").

7.     Pursuant to Section 1 of Article XXVI of the Management Agreement (which is expressly "governed and interpreted in accordance with the laws of the State of Florida of the United States of America"), "venue of [this] arbitration shall be Dade County, Florida" – where the Hotel is located.

8.     Section 1 of Article XXVI of the Management Agreement provides that this arbitration "shall be settled through a Board of Arbitrators in accordance with the Rules." Therefore, pursuant to Article 12(4) of the Rules, Owner hereby nominates Hon. Richard E. Neville (Ret.) as its party-selected impartial and independent member of the three-member panel of arbitrators (the "Arbitral Tribunal").

9.     Although the Management Agreement does not specify the language in which this arbitration shall be conducted, Owner proposes that the language of the arbitration be English, in light of the fact that: (a) the Management Agreement is in the English language; (b) by its terms, the Management Agreement is governed by the laws of the State of Florida of the United States of America; (c) the Management Agreement provides that the venue of this arbitration shall be Dade County, Florida; and (d) the Parties are organized under the laws of English-speaking jurisdictions.

10.     Pursuant to Article 1(1) of Appendix III of the Rules, entitled "Arbitration Costs and Fees," Owner is wire transferring the requisite $3,000 filing fee to the International Chamber of Commerce, as beneficiary, to the bank of the beneficiary, UBS SA, 35, rue des Noirettes, P.O.

4

Box 2600, 1211 Geneva 2, Switzerland, Account No.: 240-224534.61R, IBAN: CH06 0024 0240 2245 3461 R, Swift Code (BIC): UBSWCHZH80A.

## IV.

## FACTS

**A.  Owner's Interests In The Setai Hotel**

11.   Pursuant to the publicly-filed Declaration of Setai Resort & Residences, a Florida Condominium, established in December 2003, Owner is the Developer of the Setai. Owner also holds ownership interests in significant portions of the Hotel, including most of the Condo-Hotel Units. .

12.   In order to provide for the management, operation, marketing, and care of the Hotel once opened, Owner (under its prior name, Dempsey Vanderbilt Owners LLC) entered into the Management Agreement with GHM in March of 2000. Owner thereafter completed the development and construction of the Hotel, and the Hotel opened for business to the public in December 2004. At all times pertinent hereto, the Hotel was operated by GHM, and the relationship between the Parties was governed by the Management Agreement.

**B.  GHM Made Its Entry Into The United States By Securing The Management Agreement To Operate The Hotel.**

13.   A relative latecomer to the hotel management business, General Hotel Management Ltd. was established in 1992 and is headquartered in Singapore. Most of the hotels it and its affiliates operate are located in Asia (Indonesia, Vietnam, Myanmar, South Korea, and Thailand). GHM manages only one property in the Americas – Owner's Setai Hotel in Miami Beach, Florida.  Regrettably, GHM's lack of experience in operating luxury resorts in competitive markets within the United States ultimately played a role in the demise of the relationship between the Parties. That, coupled with GHM's misappropriation, misuse, and

inappropriate accounting of Owner's monies, proved a toxic mix. Fortunately, the terms and provisions of the Management Agreement provide the measure of GHM's misconduct and entitle Owner to appropriate remedies for GHM's breach.

## C.  GHM Was Owner's Agent And Fiduciary In Connection With The Management Of The Hotel.

14.   Pursuant to Section 1 of Article I of the Management Agreement, Owner "appoint[ed] and engage[d] the Operator as the exclusive and sole manager and operator of the Hotel," and recognized that, in performing that function, GHM was "the sole agent of the Owner." Thus, the agency relationship between the Parties during the life of the Management Agreement is an indisputable fact.

15.   Indeed, the Management Agreement is replete with express indicia of the agency relationship between Owner, as principal, and GHM, as its agent. For example, Section 1 of Article VII recognized that, in taking any action with respect to the operation of the Hotel, GHM "will be acting only as the appointed representative of the Owner." Section 2.7 of that Article authorized and obligated GHM, "for and on behalf of the Hotel" and Owner, to "[e]nter into arms-length contracts in the name of the Owner." Also included among the powers and duties granted to and imposed upon GHM by the Management Agreement was the ability to book and reserve business (*i.e.*, guest stays, dining, group contracts, meetings, banquets, and special events) for the Hotel on Owner's behalf.

16.   In addition, the Management Agreement, in Article X, provided GHM with control over the bank accounts into which the revenues and sales proceeds from the operation of the Hotel were deposited. GHM was granted the power to "pay all Operating Expenses" from those accounts. GHM also paid itself Management Fees from those accounts.

6

17.    All of the foregoing powers, rights, and obligations reflected the existence of an agency between the Parties. As a result thereof, GHM was obligated not only to faithfully abide by and discharge its contractual duties to Owner under the Management Agreement, but also to honor and comply with the fiduciary duties imposed upon an agent as a matter of common law. Those included, but were not limited to, GHM's duties to Owner to act with the utmost good faith, loyalty, fair dealing, candor, and care.

## D.    The Contractual Standards Applicable To GHM's Operation, Marketing, And Care Of The Hotel

18.    Pursuant to Section 1 of Article I of the Management Agreement, GHM "agree[d] to operate the Hotel as a world class five star international hotel comparable to the Mandarin, Four Seasons and Ritz-Carlton hotels in Miami (the 'Standards')." "Standards" is further defined in Section 18 of Article XXVIII as meaning "the highest quality of facilities or operations and services generally consistent with, and expected by, guests at comparable world class five star international hotels, such as those operated under the trade names Mandarin, Four Seasons and Ritz-Carlton."

19.    Under Section 1 of Article V of the Management Agreement, GHM "agree[d] to use its best efforts to advertise and promote the business of the Hotel" and, in accordance with Section 2.2 of Article VII, agreed to "[u]se its best efforts and diligence in the renting of Guest Units participating in the Rental Program."

20.    The Management Agreement also recognized GHM's obligation to ensure the cost-effective operation of the Hotel. For example, under Section 2.7 of Article VII, GHM was responsible for entering into appropriate contracts "necessary in the efficient management and operation of the Hotel."

7

21.     Moreover, in accordance with Section 1 of Article XV of the Management Agreement, GHM "agree[d] to maintain the Hotel in good repair and condition." Clearly, in agreeing to manage Owner's Hotel, GHM committed and undertook to meet all the contractually-prescribed standards with respect to the operation, marketing, and maintenance of Owner's most important asset – including, but not limited to, those standards set forth above.

**E.     The Applicable Fee Provisions Of The Parties' Management Agreement**

**1.     Background**

22.     The Setai is a mixed-used complex consisting of approximately 88 condominium hotel units in the Vanderbilt Building (the "Condo-Hotel Units") and 163 residential condominium units in the Tower Building (the "Tower Units"), as well as commercial areas, including food and beverage outlets, a spa, and other facilities necessary for the operation of portions of the complex as the Hotel, such as a guest registration and check-in area and accompanying lobby.

23.     Owner owns 79 of the Condo-Hotel Units. Third-parties own the remaining nine. A total of 85 Condo-Hotel Units are included in the Hotel (*i.e.*, they are reserved and rented out to guests) pursuant to the Hotel's "Rental Program," which is described in Section 1 of Article XXVII of the Management Agreement. Those 83 Condo-Hotel Units are hereinafter collectively referred to as the "Guest Units."

24.     All 163 Tower Units are owned by third-parties. As stated in Section 2 of Article XXVII of the Management Agreement, GHM was to "offer a similar Rental Program to the Residential Tower Unit owners." A number of Tower Units are currently included in such a program.

25.     As discussed herein, the Management Agreement contains no provision for the payment of any fee to GHM with respect to the rental of the Tower Units. Indeed, with few

exceptions (namely, Sections 2 and 3 of Article XXVII), the Management Agreement addresses *only* GHM's operation of the <u>Hotel</u> – and provides the terms of GHM's compensation for those services *only*.

### 2.   <u>Relevant definitions</u>

26.   "Hotel" is defined in Recital (A) of the Management Agreement as the Guest Units and related "retail space, food and beverage operations, garage, health club and spa, and other facilities" – and is expressly distinguished from the "Residential Tower."  "Guest Units" are defined in Recital (B) as the residential condominium units within the Vanderbilt Building. The broader term "Units" is collectively defined in Recital (B) of the Management Agreement as:  (1) the Guest Units; (2) the restaurants, lounges, bars, retail space, garage, health club and spa and other income-generating areas (collectively, the "Commercial Units"); and (3) the lobby, front desk, hallways, building system and other public areas, administrative areas and "back of house" relating to the operation of the Hotel (collectively, the "Hotel Unit").

### 3.   <u>The Management Agreement entitled GHM to Management Fees only as to the Guest Units (not with respect to Tower Units) and, then, only pursuant to separate Guest Unit Operating Agreements.</u>

27.   The terms and provisions regarding the Management Fees payable to GHM are set forth in Recitals (D)-(E), Sections 1-3 of Article VII, and Section 14 of Article XXVIII of the Management Agreement.

28.   Recital (D) states that all Management Fees for GHM's management of the Guest Units "will be paid to Operator pursuant to separate agreements between Operator and the owners of the Guest Units."  Thus, the Management Agreement does not provide for the payment of any such Fees to GHM.  Indeed, Recital (E) states that "[m]anagement of the individual Guest Units shall only be provided by Operator if separately arranged by contract

9

between the Operator and the applicable Guest Unit Owner who has elected to participate in the Rental Program (the 'Guest Unit Operating Agreements')."

29.    Further, Section 1 of Article XII provides that: "Under the Guest Unit Operating Agreements, (i) a Base Management Fee shall be payable monthly with respect to the Gross Revenues[1] derived from such Guest Unit, and (ii) an Incentive Management Fee shall be payable monthly with respect to estimated Gross Operating Profit[2] for such Unit, to be adjusted at the end of each Fiscal Year."

30.    However, the Management Agreement does not leave it to GHM and the owners of the individual Guest Units to decide the terms of GHM's compensation for managing those units.  Rather, Section 14 of Article XXVIII states that each Guest Unit Operating Agreement shall provide for a Management Fee "with respect to the Guest Units participating in the Rental Program," consisting of two components:  (1) "a 'Base Management Fee' equal to five percent (5%) of Gross Revenue, payable monthly;" and (2) "an 'Incentive Management Fee' equal to ten percent (10%) of the Gross Operating Profit, payable quarterly."

31.    As demonstrated above, not only does the Management Agreement *exclude* the Tower Units from the definition of "Hotel" and "Guest Units" (and, thus, not entitle GHM to any Management Fees in connection therewith), but GHM has no direct right under the Management Agreement to the payment of any fees with regard to the Commercial Units.  Indeed, Section 14 of Article XXVII states that the "Management Fee payable with respect to any Commercial Unit

---

[1] Section 7 of Article XXVIII defines "Gross Revenues" as all income and proceeds of any kind "generated from Units managed by Operator."

[2] Section 6 of Article XXVIII defines "Gross Operating Profit," for any particular Unit, as the excess during each fiscal year of Gross Revenues from such Unit over "Operating Expenses," which term is defined in Section 16 as that Unit's allocable portion of the costs and expenses of maintaining, conducting, and supervising the operation of the Hotel (excluding, however, GHM's Management Fees and other expenses specified therein).

10

managed by Operator shall be as set forth in the applicable Commercial Unit Operating

Agreement" – if any such contract exists.

F.   **GHM Materially Breached Its Contractual Obligations Under The Management Agreement And Violated Its Common Law Fiduciary Duties To Owner.**

   1.   **GHM's self-payment of millions of dollars of alleged "Management Fees" to which it was not entitled**

   32.   GHM materially breached the Fee provisions of the Management Agreement, and

its related fiduciary duties to Owner (including, but not limited to, the duty of loyalty), by paying

itself millions of dollars of Owner's money in excess of the Base Management Fees and

Incentive Management Fees to which it was due under that Agreement.

   33.   Among other wrongful acts, GHM paid itself a 5% Base Management Fee on the

revenues derived from the rental of Tower Units and the revenues related to the Commercial

Units. In doing so, GHM misappropriated from Owner the following amounts for the following

years: over $1,300,000 in 2011; $1,161,988 in 2010; $1,080,650 in 2009; $1,561,442 in 2008;

and $1,541,559 in 2007. Thus, GHM purposefully inflated the Base Management Fees that were

otherwise payable to it under the Management Agreement by over $6.6 million (consisting of

over $3.4 million in improper Tower Unit Management Fees and over $3.2 million in improper

Commercial Unit Management Fees).

   34.   In addition, GHM knowingly overpaid itself Incentive Management Fees, in

violation of the terms of the Management Agreement. It did so, among other ways, by:  (a)

paying such fees on revenue derived from the Tower Units; and (b) failing to deduct from the

Hotel's Gross Operating Profit the monthly amounts set aside for the Reserve for Capital

Replacement (as GHM was required to do under Section 1 of Article XVI and Section 16.12 of

Article XXVIII). Those overpayments were in at least the following amounts for the following

years:  over $160,000 in 2011; $156,621 in 2010; $159,308 in 2009; $182,849 in 2008; and

$183,310 in 2007. In total, GHM intentionally increased the Incentive Fees that were otherwise payable to it by approximately $900,000.

35.      Not only did GHM materially breach the Fee provisions of the Management Agreement by paying itself grossly inflated Management Fees, but its multi-year scheme of misappropriating Owner's funds constitutes a clear violation of its fiduciary duties of loyalty, care, fair dealing, and good faith. Owner's damages with respect to GHM's unlawful Fee-related acts and practices, alone, total over $7,500,000.

2.      **GHM's mismanagement of the Hotel**

a.      **Excessive costs and gross inefficiencies**

36.      In addition to its self-enriching manipulations described above, GHM breached its contractual obligations and violated its fiduciary duties to Owner by wasting and needlessly expending Owner's monies and failing to properly control operational expenses.

37.      For example, the Rooms Department and Marketing Department expenses per occupied room for the Hotel are over *twice* that of the average of such expenses for the Hotel's closest competitors. In addition, the Hotel's Administrative and General expenses per available room are more than 50% greater than those of its competitors.

38.      Given the fact that the Hotel's revenue per available room ("RevPAR") is virtually identical to that of its competitors, the Hotel's grossly-inflated and wasteful cost structure means that its operations are less profitable than those of its competitors – by a wide margin. Indeed, for the period 2010-2011 alone, the Hotel's Rooms Department incurred excessive expenses of over $2 million, its Administrative and General Department incurred excessive expenses of approximately $2.3 million, and its Marketing Department incurred excessive expenses of approximately $3.3 million. Had GHM not negligently expended those

12

amounts — and, instead, operated more efficiently — Owner would have realized an additional $7.6 million in incremental profit.

### b. Poor service and low value

39. Ironically, despite its exorbitant cost structure, the Hotel under GHM's management succeeded in disappointing guest after guest in the unsatisfactory delivery of services and poor quality of the guest experience. Every aspect of GHM's management of the Hotel was consistently deficient. Systemic problems, including lack of training, supervision, and management discipline, plagued operations — from check-in to check-out and everything in between, such as housekeeping, valet service, food quality, property maintenance, room service, staff training, and restaurant service.

40. Recent guests noted inconsistencies in service as well as maintenance problems with the rooms. Publicly-available guest comments in the past few months have included statements such as "poorly organized and not good value for the money," "inconsistent service," "communication was non-existent in this place," "the check-in process took ages," and "we would neither return or recommend the Setai." Numerous guests have complained about the Hotel's price-to-value ratio, which undoubtedly explains why the Hotel has historically operated at approximately 50% occupancy levels (meaning half the available rooms were vacant on an average night).

41. Other examples of poor service and dissatisfied guests abound. In the past year, one disgruntled guest wrote:

> It is unfortunate that such a beautiful hotel could have such poor service and amenities . . . The service is horrendous, everyone smiles but then does nothing . . . . [D]o not expect to have any requests met and do not expect good service or food at the restaurants . . . This is not the hotel for a special occasion or a hotel that is suitable for anyone used to staying at 5 star hotels.

Another guest wrote:

Our expectations were that our stay at the Setai being the highlight of our trip – we were sadly disappointed . . . Previous comments about the staff are accurate – service was painfully slow. I left the Setai feeling tired, ripped-off, and grateful to be leaving. Sad.

Still another guest wrote:

[T]he staff is very cute and smiley but they can't keep up; many basic things were executed incompetently or completely forgotten, taking the shine off the experience. Attention to detail and follow up were surprisingly very poor . . . It is almost as if the staff is more focused on posing and looking cute than paying attention to guests' requirements . . .

Another guest wrote:

Very disappointing and over priced . . . Service in the hotel restaurant for breakfast or at the Beach/Poolside restaurant was consistently appalling – the staff had no idea what they were doing, couldn't understand English and everything was served so slowly. Every day we were confronted with smiles and apologies but all we wanted was the service we thought we were paying for . . . On the surface, especially when you first arrive, you had the impression of a very beautiful and relaxing hotel. After a day you discover it is everything but that. Very poor value for money.

Another guest commented:

Where to begin? I had always wanted to stay at the Setai; it's a great looking hotel. I pictured an oasis of calm in raucous Miami Beach. But it was an expensive disappointment. It wants to be a luxe 5-star hotel but it does not have the excellent service that the Four Seasons (for example) provides. The staff is sometimes helpful, but very poorly trained. Sometimes they seemed clueless . . . [Y]ou will definitely expect more than this hotel offers. Any excellent hotel charging this much money will always try to satisfy its guests and expect them to return; but this hotel is unable to do so.

Yet another guest commented:

The Setai on the surface describes itself as one of the small luxury hotels of the world, but it falls short of its high costs . . . [K]indness and attention don't make up for poor organization and service . . . Since when does a luxury hotel (or any hotel for that matter) complain to their customers about the problems they are having? Overall, the Setai is simply not good value for money.

42.     As Operator of the Hotel during the time period in question, GHM was solely responsible for the poor service delivery, the accounting improprieties, and the uncompetitively high operating costs.

### c.     Other acts of mismanagement

43.     GHM's mismanagement extended to other areas of Hotel operations – such as marketing, sales, advertising, and promotion; cost allocations; unit owner relations, inventory control; and charges for GHM home office services. In addition, GHM entered into Rental Program agreements with condominium owners containing terms and provisions that were not approved by Owner. Such unauthorized conduct violated Recital (E) (which required that Guest Unit Operating Agreements be consistent with the provisions of the Management Agreement and "such other commercially reasonable terms as to which Owner and Operator shall mutually agree") and Section 2 of Article XXVII (which required that Rental Program agreements for Tower Units be consistent with the provisions of the Management Agreement and "such other terms to be reasonably agreed upon between the Owner and the Operator"). Furthermore, GHM entered into other contracts and transactions on commercially unreasonable terms and in derogation of the best interests of Owner.

### 3.     GHM's defiance, disloyalty, and gross insubordination

44.     When Owner requested information relating to the fees, reimbursements, revenues, costs, and expenditures flowing to, from, and through GHM with respect to the Setai, GHM reacted with a flurry of sarcastic and insulting comments and other non-responsive and obstructionist behavior. For example, on January 18, 2012, Owner's asset manager asked for "a summary of all fees, expenses and costs flowing through to GHM and its affiliates." GHM, through the Setai's General Manager, Hansjoerg Meier (a GHM employee), deflected that

15

request by stating: "You never requested such a summary, you are just adding more and more every month," and further commented:

> I don't think it is appropriate that you are sending us more and more requests on statistics, etc. . . . [Y]ou need to manage this yourself . . . If you want us to achieve our goals, let us focus on what needs to be done, rather than keeping you busy with collecting summaries.

In other words, GHM refused to provide Owner with the most basic information that an agent-fiduciary owes to its principal – namely, a specific accounting of the Owner's monies that the agent has paid itself.

45.    By e-mail dated January 27, 2012, Owner's asset manager acknowledged that Mr. Meier was "frustrated with the timeline, the process, and the information requests," but noted that Meier's "adding insulting commentary is not productive." The asset manager further stated that, "Setai Owner is within his rights under the management agreement to question and understand the proposed 2012 revenues and expenses." Then, the asset manager informed Mr. Meier that "without your cooperation I have no choice" but to "get into the details" of why GHM was projecting stagnant margins in 2012 despite increased revenues. In an arrogant and hostile manner, Mr. Meier responded by e-mail dated February 2, 2012 (a copy of which was also sent to the Setai's Director of Finance, Moustapha Guimei, another GHM employee), as follows: "Please go ahead."

46.    GHM's complete lack of loyalty and disclosure to its principal, the Owner, is clearly reflected in the introductory comments of Mr. Meier in that e-mail:

> I don't have the time to send you lengthy Emails . . . Please don't tell me about being productive . . . As of arguing with you, I will continue to do so if I do not agree with your comments and views, just get used to it, simple as that.

47.    More recently, one of the Owner's representatives expressed confusion with respect to an e-mail from Mr. Meier regarding an important matter relating to the collection of

certain shared expenses from the owners of the Tower Units, and requested that Mr. Meier provide for Owner's review GHM's draft of a letter to those owners relating to such billings. In his hostile and offensive response dated March 16, 2012, Mr. Meier told the Owner's representative: "You are indeed confusing, but what's new . . . On a separate note, why should I show you a letter first?" These were the words of the highest-ranking GHM executive assigned exclusively to the operation of Owner's Hotel – who owed Owner the highest fiduciary duties of loyalty, good faith, full disclosure and fair dealing.

48.     In light of its self-payment of millions of dollars of Owner's funds to which it was not entitled, and its shocking mismanagement of the Setai, GHM should have been promptly providing critical information to Owner (without being asked to do so) and diligently attempting to keep its position as agent-manager. Instead, with characteristic haughtiness and cynicism, GHM effectively told its principal that it would henceforth conduct itself without regard to the Owner's wishes, concerns, or best interests. Owner lost all trust and confidence in GHM.

**E.     Owner Properly Exercised Its Common Law Right To Terminate The Management Agreement And GHM's Agency Authority Thereunder.**

49.     Not only did GHM's acts of mismanagement and breaches cause an extraordinary loss of profits to Owner, but the value of Owner's investment in the Hotel has diminished by multiples thereof. Naturally, Owner could not tolerate any further abuse of its property or its funds by such a careless and disloyal agent-fiduciary as GHM. Owner therefore took appropriate action.

50.     Because of GHM's material breaches of the Management Agreement and violations of fiduciary duty, Owner terminated that Agreement and revoked GHM's agency powers on March 31, 2012. A copy of Owner's termination letter to GHM is attached hereto as Exhibit "C."

17

51.     Owner's termination was in strict accord with Florida common law, which provides a non-defaulting party the right to terminate a contract with impunity in the event of the other party's material breach thereof (which is separate from, and in addition to, the contractual termination rights set forth in Section 1.1 of Article XIX of the Management Agreement). Because of its material breaches of contract and violations of fiduciary duty, GHM has no right of recovery against Owner or claim to damages resulting therefrom.

52.     Although Owner's termination of the Management Agreement brought an end to GHM's mismanagement and wrongdoing, the effects of that misconduct will continue into the foreseeable future. Moreover, Owner's termination for cause in no way compensates it for the damages it has sustained over the past several years as a result of GHM's unlawful acts and practices. Accordingly, Owner has retained the undersigned counsel to prepare, prosecute, and present to the Arbitral Tribunal the claims asserted below, and to obtain the relief requested therein.

## V.

## CLAIMS

### A.     Breach Of The Management Agreement

53.     Owner realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

54.     Until Owner properly terminated it and GHM's agency powers thereunder, the Management Agreement was a valid and binding contract between the parties, enforceable in accordance with its terms.

55.     At all relevant times prior to its termination of the Management Agreement, Owner performed its obligations thereunder. Accordingly, Owner has fulfilled all conditions

precedent to the assertion of this claim or, alternatively, any unfulfilled conditions have been excused due to GHM's material breaches of contract.

56.    By engaging in the acts, conduct, and wrongdoing described above, GHM materially breached the Management Agreement between the Parties. As a result thereof, Owner properly exercised its common law right to terminate the Management Agreement and GHM's agency powers thereunder.

57.    In addition, as a direct result of GHM's material breaches of contract, Owner has sustained injury in the form of decreased revenues, increased costs, and lost profits, as well as a substantial diminution in the value of its investment in the Hotel.

58.    Accordingly, Owner seeks an award of monetary damages against GHM including, but not limited to, actual, direct, consequential, and incidental damages in the amount of at least $50 million.

**B.    Count Two:  Breach Of Common Law Agency And Fiduciary Duties**

59.    Owner realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

60.    By virtue of the express terms of the Management Agreement, as well as that contract's other provisions obligating and empowering GHM to act for and on behalf of Owner and Owner's Hotel, GHM acted as Owner's agent in the operation of the Hotel – until Owner properly terminated the Management Agreement on March 31, 2012, and revoked GHM's agency powers thereunder.

61.    During the period in which it was Owner's agent, GHM owed common law fiduciary duties to Owner. Those duties included, but were not limited to, obligations of good faith, fair dealing, loyalty, candor, and care.

62. By engaging in the acts, conduct, and wrongdoing described above, GHM violated its fiduciary duties to Owner.

63. As a result of GHM's material breaches of fiduciary duty, Owner has sustained injury in the form of decreased revenues, increased costs, and lost profits, as well as a diminution in the value of its investment in the Hotel and the Setai brand.

64. Accordingly, Owner seeks an award of monetary damages against GHM, including, but not limited to, actual, special, consequential, and incidental damages in the amount of at least $50 million.

65. Because GHM's breaches of fiduciary duty were committed knowingly and/or in reckless disregard of Owner's rights, Owner seeks an additional award of punitive and exemplary damages in an amount determined by the Arbitral Tribunal as being fair and appropriate.

66. Furthermore, as a result of GHM's material breaches of its fiduciary duties, Owner seeks an order of disgorgement, forfeiture, and restitution, pursuant to which GHM shall be required to return or otherwise turn over to Owner all fees, payments, profits, or other things of value which GHM wrongfully or unjustly received, retained, took, or paid itself during the period in which it was in breach of its fiduciary duties.

**C. Count Three: Request For Declaration Regarding The Propriety Of Owner's Exercise Of Its Right To Terminate The Management Agreement Without Liability**

67. Owner realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

68. As a result of GHM's material breaches of the Management Agreement and/or GHM's violations of its common law fiduciary duties, Owner had the right and power, pursuant

to the laws of the State of Florida, to terminate the Management Agreement and revoke GHM's agency authority thereunder.

69. Owner properly exercised that common law right and power on March 31, 2012.

70. To the extent that GHM fails to recognize the efficacy of Owner's termination and revocation, or otherwise asserts that such termination and revocation constituted a breach of contract entitling GHM to recover damages from Owner therefor, a substantial controversy exists between the Parties necessitating resolution by the Arbitral Tribunal in the form of declaratory relief.

71. Accordingly, Owner requests that the Arbitral Tribunal issue a declaratory judgment that Owner properly exercised its right and power to terminate the Management Agreement without liability to GHM, due to GHM's material breaches of the Management Agreement and/or violations of fiduciary duties to Owner.

## VI.

## STATEMENT OF RELIEF SOUGHT

In light of the foregoing, Owner respectfully requests that the Arbitral Tribunal issue an award in favor of Owner and against GHM, providing for the following relief:

(a) Monetary damages sufficient to fully compensate Owner for the injuries that it has sustained, in an amount no less than $50 million;

(b) Punitive and exemplary damages in an amount to be determined by the Arbitral Tribunal;

(c) An order of disgorgement, forfeiture, and restitution requiring GHM to return or otherwise turn over to Owner all fees, profits, monies, payments, and other things of value which it wrongfully or unjustly received, retained, took, or paid itself in breach of its obligations to Owner;

21

(d)     Prejudgment and post-judgment interest at the maximum rate(s) permitted by Florida law;

(e)     A declaratory judgment that Owner properly exercised its right and power to terminate the Management Agreement, and revoke GHM's agency authority thereunder, without liability to GHM, due to GHM's material breaches of contract and/or violations of fiduciary duty;

(f)     An order prohibiting GHM, its agents, affiliates, employees, representatives, and all those in active concert with them from any unauthorized acts or attempts to: (i) withhold from Owner, or exercise control of, the Hotel's books and records; (ii) maintain possession of, or exercise control over, the Hotel premises or deny (by threat of physical force or otherwise) Owner's access to the Hotel, including the financial management offices of the Hotel; (iii) interfere with Owner's cash management, financial control, and other operational activities with respect to the Hotel; (iv) interfere with any of Owner's other rights of possession and control of the real and personal property comprising the Hotel; (v) interfere with the transition of operations and management of the Hotel to Owner's new management; (vi) hold itself out as Owner's agent or manager; and (vii) associate the GHM brand and chain with the Hotel;

(g)     Arbitration costs;

(h)     Reasonable and necessary attorneys' fees and expert fees incurred by Owner in connection with the prosecution of its claims against GHM in this arbitration proceeding, to the extent permitted by law; and

22

(i)    Such other relief, at law and in equity, to which Owner is entitled and which the

Arbitral Tribunal deems just and proper.

Dated:  March 31, 2012

Respectfully submitted,

BICKEL & BREWER

By: _____

William A. Brewer III
James S. Renard

4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:  (214) 653-1015

**ATTORNEYS FOR CLAIMANT
SETAI OWNERS LLC**

23

# EXHIBIT "A"

Dated the 20th day of March ,2000

## MANAGEMENT AGREEMENT

Between

### GENERAL HOTEL MANAGEMENT LTD.

AND

### DEMPSEY VANDERBILT HOTEL

# TABLE OF CONTENTS

                                        Page

ARTICLE I         Nomination . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE II        Construction, Furnishing and Equipping of the Hotel . . . . . . . . . . . 4

ARTICLE III       Operating Term and Extension thereof . . . . . . . . . . . . . . . . . . . 4

ARTICLE IV      Working Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE V       Training and Pre-opening Program: Advertising and Promotion . . . . . . 5

ARTICLE VI.     Official Opening of the Hotel . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE VII     Operation of the Hotel . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE VIII    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE IX     Assessments, Property Tax and Other Similar Payments . . . . . . . . . 10

ARTICLE X      Bank Accounts and Disbursements . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE XI     Books, Records, Statements and Reports . . . . . . . . . . . . . . . . . 11

ARTICLE XII    Management Fees and Reimbursement . . . . . . . . . . . . . . . . . . 12

ARTICLE XIII   Additional Payments by the Owner . . . . . . . . . . . . . . . . . . . . 13

ARTICLE XIV   Set-off, Counterclaims, etc. . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE XV   Repairs and Maintenance and Capital Improvements . . . . . . . . . . . 13

ARTICLE XVI   Reserve for Capital Replacement . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE XVII  Name of the Hotel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE XVIII  Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE XIX   Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE XX   Procedure upon Termination . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE XXI        Partial Invalidity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE XXII       Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE XXIII      Damage, Destruction, Compulsory Taking . . . . . . . . . . . . . . . . 18

ARTICLE XXIV       Successors and Assigns  . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE XXV        Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE XXVI       Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARTICLE XXVII      Leasing and Property Management Services for Guest Unit
                   Owners and Residential Tower Unit Owners . . . . . . . . . . . . . . . . 21

ARTICLE XXVIII     Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARTICLE XXIX       Special Conditions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE XXX        Miscellaneous  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

911312.4

<u>MANAGEMENT AGREEMENT</u>

THIS AGREEMENT made this 20ᵗʰ day of March 2000 by and between GENERAL HOTEL MANAGEMENT LTD., a company incorporated in the British Virgin Islands with limited liability and having its registered office situated at P.O. Box 71, Craigmur Chambers, Road Town, Tortola, British Virgin Islands ("GHM"), and DEMPSEY VANDERBILT OWNERS LLC, a Delaware limited liability company ("OWNER").

<u>WHEREAS</u>:

(A)     The Owner is in the course of developing and constructing, at its own cost and expense, a mixed-use project (the "Project") consisting of a residential condominium tower (the "Residential Tower") and a hotel condominium (the "Hotel") to be known as the "Dempsey Vanderbilt Hotel." The Hotel will consist of about 91 guest rooms, retail space, food and beverage operations, garage, health club and spa, and other facilities. The Project will be located at Collins Avenue between 20th and 21st Streets in Miami Beach, Florida. The Residential Tower and the Hotel will be governed by separate condominium regimes with appropriate cross-easement agreements.

(B)     The Hotel will be structured as a condominium with three principal components: (i) the 91 or so guest rooms will each be a separate residential condominium unit (collectively, the "Guest Units"), (ii) the restaurants, lounges, bars, retail space, garage, health club and spa and other income-generating areas, to the extent included in the Hotel, shall constitute one or more commercial condominium units (collectively, the "Commercial Units"), and (iii) the lobby, front desk, hallways, building systems and other public areas, administrative areas and "back of house" shall constitute a separate condominium unit (the "Hotel Unit"; the Guest Units, Commercial Units and Hotel Unit being hereinafter sometimes collectively referred to as the "Units").

(C)     As structured, neither the Guest Units nor the Commercial Units will contain any of the structural or mechanical components of the building, but instead will consist almost solely of the air-space within the interiors of the applicable Units. Specifically, the following components of the Hotel building (which shall be referred to in the Project Offering Documents as the "Shared Essential Components") are made part of the Hotel Unit: any and all structural components of the improvements, including, without limitation, all exterior block walls and all finishes (paint, stucco, etc.) and balconies, terraces and/or facades attached or affixed thereto; the roof; all roof trusses, roof support elements and roofing insulation; all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems, including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility,

911312.4

mechanical, telephonic, telecommunications, electrical, plumbing and/or other services; all heating, ventilating and air conditioning systems, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services; all elevator shafts, elevator cabs, elevator cables and/or systems and/or equipment used in the operation of the elevators; and all trash rooms, trash chutes and any and all trash collection and/or disposal systems. The exterior grounds and the hallways connecting the Guest Units are also part of the Hotel Unit.

(D)   In addition, certain non-income producing areas of the recreational facilities to be constructed on the site will be part of the Hotel Unit. It is contemplated that the Hotel condominium will have very little "common areas", as most of the traditional common areas will be included within the Hotel Unit, and thus controlled by the Hotel Unit owner and, pursuant to this Agreement, the Operator. Although the owners of Guest Units will have the right to use certain of these facilities, including the pool and pool deck, the maintenance and operation of them will be the sole responsibility of the Hotel Unit owner. In consideration for the rights of use to certain portions of the Hotel Unit granted to the Guest Unit and Commercial Unit owners, the Guest Unit and Commercial Unit owners are obligated to reimburse the Hotel Unit owner for the portion of the expenses related to the Shared Essential Components and all of the other shared facilities. As no revenues will be generated from the Hotel Unit, no Management Fees will be due or payable under this Agreement. All Management Fees will be paid to Operator pursuant to separate agreements between Operator and the owners of the Guest Units and/or Commercial Unit(s) generating the revenues.

(E)   The costs and expenses of owning and operating the Hotel Unit will be allocated among the various Units pursuant to separate agreements. The revenues derived from the operation of the Hotel will be allocated to the owners of the Units from which such revenues were derived. It is Owner's intention to sell the Guest Units to third party purchasers, who will then determine whether they want their particular Guest Unit to be included in the "Rental Program" (described below). Management of the individual Guest Units shall only be provided by Operator if separately arranged by contract between the Operator and the applicable Guest Unit owner who has elected to participate in the Rental Program (the "Guest Unit Operating Agreements"). The Guest Unit Operating Agreements shall contain terms consistent with the provisions of this Agreement and such other commercially reasonable terms as to which Owner and Operator shall mutually agree.

(F)   It is the intention of the parties that separate agreements are to be entered into between Owner and Operator covering the operation or leasing of the various facilities included in the Commercial Units (the "Commercial Unit Operating Agreements"), exclusive of any retail units (other than a Hotel store). The parties shall negotiate in good faith to arrive at mutually acceptable agreements for the Commercial Units on customary, commercially-reasonable terms with respect to these facilities.



(G)   The Operator has experience in the management and operation of hotels, and is willing to render assistance in its construction, its preparation for operation and its eventual management and operation.

(H)   The Operator, being a member of the General Hotel Management Ltd. Group of companies, is able to procure for the Hotel a license to use the GHMarks, which is included in this Agreement.

(I)   The Owner desires to avail itself of the hotel management experience and know-how of the Operator, and the Operator is willing to render its expertise and assistance in the management and operation of hotels upon the terms and conditions hereinafter appearing.

NOW THEREFORE the parties hereto AGREE AND COVENANT as follows:

## ARTICLE I

### Nomination

1.   Nomination

The Owner hereby appoints and engages the Operator as the exclusive and sole manager and operator of the Hotel, to perform the services provided for in this Agreement. The Operator, as the sole agent of the Owner, will act in accordance with the terms and conditions hereinafter set forth and hereby accepts the said nomination. The Operator agrees to operate the Hotel as a world class five star international hotel comparable to the Mandarin, Four Seasons and Ritz-Carlton hotels in Miami (the "Standards").

2.   No Covenants or Restrictions

The Owner warrants that to the best of its knowledge, information and belief having made all reasonable inquiries that there are, and on the date when the Hotel is available for the use by guests, no covenants or restrictions which would prohibit or unreasonably restrict the Operator from carrying on upon the Hotel the businesses and services customarily associated with a world class five star international hotel. The Owner agrees upon request by the Operator to sign promptly and without charge any applications for Licenses, which the Operator may reasonably request be signed, and which Operator shall be obligated to obtain.



# ARTICLE II

## Construction, Furnishing and Equipping of the Hotel

1. The Owner shall construct with reasonable diligence, at the Owner's own expense and in accordance with a development budget to be mutually agreed upon by Owner and Operator, (each in the exercise of their reasonable good faith judgment), a building designed as a world class five star international hotel in accordance with the Standards. Operator agrees that if the building is constructed in accordance with the approved development budget, subject to its reasonable approval of plans and specifications, the Hotel will satisfy the foregoing criteria.

2. The building shall consist of the Building & Appurtenances in which the Owner shall provide and install:

   2.1   Furnishings & Equipment;

   2.2   Operating Equipment; and

   2.3   Operating Supplies.

# ARTICLE III

## Operating Term and Extension thereof

1. The term "Operating Term" shall mean a period during which the Operator shall manage and operate the Hotel commencing on the date hereof, and (unless sooner terminated as provided in Article XIX), expiring on the last day of the fifteenth (15th) full calendar year following the official opening of the Hotel, subject to any extension thereof as provided in Section 2.

2. The Operator shall be entitled to extend the Operating Term for a further period of five (5) years from the date of its expiration upon the same terms and conditions as are contained in this Agreement but without the inclusion of this Section PROVIDED ALWAYS THAT the Operator shall have given notice to the Owner at least one year prior to the expiration of the initial Operating Term of its intention so to extend the same.



## ARTICLE IV

### Working Capital

1.  The Owner shall provide sufficient Working Capital for the payment of all of the Operating Expenses throughout the Operating Term, pursuant to a budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment), to be paid in such installment(s) and at such time(s) as the Operator reasonably requires.

## ARTICLE V

### Training and Pre-opening Program:
### Advertising and Promotion

1.  The Operator agrees to recruit, hire and train the initial staff of the Hotel through such training programs as it shall consider appropriate, such training to take place only in the Country. The Operator further agrees to use its best efforts to advertise and promote the business of the Hotel through its existing facilities.

2.  The Owner shall provide all monies as may be reasonably required to pay for the cost and expense of providing the training and pre-opening programs referred to in Section 1, as well as the cost and expense of providing or procuring for the Hotel pre-operational staff, organization, advertising, promotion, travel and business entertainment including pre-opening operations, opening celebrations and ceremonies, whether incurred prior to or concurrently with the beginning of full management and operation of the Hotel. The cost of the training and pre-opening programs will be set forth in a pre-opening budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment). Owner agrees to pay into the Hotel account(s), to be operated by the Operator under Article X, the mutually approved training and pre-opening expenses in such installment(s) and at such time(s) as the Operator shall reasonably require.

3.  The cost and expenses of providing training and pre-opening programs and the pre-opening and opening costs and expenses of the Hotel shall be treated as Operating Expenses and amortized equally over a period of five (5) years, commencing with the first full Fiscal Year in which a charge may be made therefor.



## ARTICLE VI

### Official Opening of the Hotel

1. The Hotel shall be considered ready to be opened for full management and operation when it is substantially completed and the Furnishings & Equipment, Operating Equipment and Operating Supplies shall have been substantially installed therein, all Licenses shall have been obtained, full and adequate inventories of food and beverage have been provided and the Hotel shall be ready to receive and render services to guests in accordance with the Standards.

2. The official opening of the Hotel shall be on a date which the Owner and the Operator shall reasonably agree subject to the Hotel being considered ready to be opened for full management and operation as provided in Section 1. Agreement by the Operator of the said date and the official opening of the Hotel shall not relieve the Owner of its obligation to cure any deficiency regarding the Hotel as to which notices shall have been or shall be given by the Operator before or after opening.

3. It is agreed that prior to the date for the official opening of the Hotel, the Operator may conduct partial management and operations of the Hotel for the purposes of further staff training and operational and promotional development the cost and expense of which shall be a pre-opening operational expense, as provided for in Article V.

4. Within six (6) months after the official opening of the Hotel, the Owner shall deliver to Operator an inventory of all Furnishings & Equipment and Operating Equipment.

## ARTICLE VII

### Operation of the Hotel

1. Commencing from the date hereof and during the Operating Term, the Operator shall have the exclusive right and obligation to direct, supervise and control the management and operation of the Hotel generally and in accordance or in keeping with the Standards and objectives of each Annual Plan and to determine the programs and policies to be followed in connection therewith. Subject as may otherwise be provided in this Agreement, the Operator shall, in directing, supervising and controlling the management and operation of the Hotel, be free and maintained by the Owner from interruption or disturbance and the Owner shall, at its own cost and expenses, undertake and prosecute any appropriate action, judicial or otherwise, to assure such freedom to the Operator, subject always as may otherwise be provided by law. In taking any action pursuant to this Agreement, the Operator will be acting only as the appointed representative of the Owner, and nothing in

this Agreement shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties hereto.

2.   Without limiting the generality of the foregoing, and unless otherwise expressly provided, the Operator shall, during the Operating Term, in accordance with the Standards, for and on behalf of the Hotel undertake the following:

2.1   At least two (2) months before the beginning of each Fiscal Year of the Hotel, submit to the Owner for review, recommendations and approval an Annual Plan for the ensuing Fiscal Year which shall consist of:

2.1.1   An estimated profit and loss statement for the ensuing Fiscal Year including a schedule of hotel room rates and all other sources of the Hotel's revenue;

2.1.2   A budget estimate for all Operating Expenses;

2.1.3   A schedule showing proposed replacement of furniture, fixtures, fittings, furnishings and equipment and any other expenditures proposed to be capitalized;

2.1.4   A schedule showing the proposed cash reserve for replacement of furniture, fixtures, fittings, furnishings and equipment;

2.1.5   An estimated cash flow statement for such year; and

2.1.6   A marketing plan.

The Owner shall indicate to the Operator its recommendations and objections, if any, to the Annual Plan before the commencement of the period covered by the Annual Plan.  As and when necessary and from time to time in any Fiscal Year, the Operator may submit to the Owner, for its further review and approval, supplementary budgets to the Annual Plan.  In the event that the Owner and the Operator cannot agree on any or all of the items in the Annual Plan or any supplement thereto, the dispute shall be resolved by the Expert.  Pending such resolution, the Hotel shall be operated in accordance with the prior Fiscal Year's Annual Plan.

2.2   Use its best efforts and diligence in the renting of Guest Units participating in the Rental Program.

2.3   Hire, promote, discharge and supervise the work of the executive staff, including the manager, assistant managers and departmental heads.  Through such executive staff, the Operator shall supervise the hiring, training, promotion, discharge and



work of all other operating and service employees performing services in or about the Hotel. The Operator shall consult with the Owner in handling collective bargaining negotiations and similar important matters of a particularly local nature. The Operator shall be permitted from time to time to provide a reasonable number of hotel guest rooms for the temporary use of the manager and other management employees, if Operator reasonably considers it necessary or expedient. (In addition, Owner shall have the right to use up to two guest rooms per night at no cost to Owner, subject to availability and other commercially reasonable limitations to be agreed upon.) All staff and other operating and service employees employed at the Hotel shall be or be deemed to be for all purposes the employees of the Operator.

2.4     Establish and supervise an accounting department, with appropriate hotel accounting and cost control systems and personnel, to be maintained by the Operator at the Hotel. The Operator shall establish and supervise all bookkeeping, accounting and clerical services, including the maintenance of payroll records incident to the efficient operation and maintenance of the Hotel. All accounts shall be maintained in conformity with the Uniform System. If requested by Owner, an Independent Certified Accountant nominated by the Owner and reasonably approved by the Operator shall be appointed by the Hotel as its auditor.

2.5     Make available to the Hotel in the Country the expertise of the Operator and the services of the Operator's specialized home-office facilities located in the Country and employed in the performance of its hotel operation and management activities, including, without limitation, its engineering, maintenance, accounting, cost control, taxation, food and beverage control, reservations, sales publicity, advertising, convention, labor relations and safety departments.

2.6     Receive, consider and handle with due decorum and courtesy the complaints of all tenants, guests or users of any of the services or facilities of the Hotel.

2.7     Enter into arms-length contracts in the name of the Owner for the furnishing to the Hotel of electricity, gas, water, steam, telephone, cleaning (including window cleaning), vermin extermination, boiler maintenance, air-conditioning maintenance and other necessary utilities or services and purchase all Operating Equipment, Operating Supplies, and other items and enter into any other contract as may be necessary in the efficient management and operation of the Hotel, all at competitive prices.

2.8     Arrange for compliance with the Law affecting or issued in connection with the Hotel.



2.9     Institute any necessary legal actions or proceedings to collect charges, rent or other income due to the Hotel or to oust or dispossess guests, tenants or other persons in possession, or to cancel or terminate any tenancy for the breach thereof or default thereunder by the tenant.

## ARTICLE VIII

### Insurance

1.      During the construction of the Project, the Owner shall procure and maintain the insurance described in Section 1.1 below.  Thereafter, the Operator shall procure and maintain all fire, public liability, indemnity, fidelity, property and other types of insurance which are necessary or appropriate for the operation of the Hotel, including (but without limiting the generality of the foregoing):

1.1     During the period of construction, furnishing and equipping of the Hotel, full and adequate public liability and indemnity and property damage insurance (if available) protecting the Owner and the Operator against loss or damage arising by reason of all activities in connection with the development, construction, furnishing, equipping, management, operation and maintenance of the Hotel.

1.2     Upon commencement of the operation and management of the Hotel, general liability and casualty insurance against loss or damage by fire and other hazards included in an extended coverage endorsement (including business interruption insurance), in such amounts as Owner and Operator shall agree upon.

1.3     If the Owner and the Operator shall consider it appropriate, insurance against loss of income for the Hotel due to riot, civil commotion and insurrections.

1.4     Such other insurance as Owner, Operator or any mortgagee may require and which is customary in the operation of similar hotels.

2.      Concurrently with the submission of the first Annual Plan and continuing annually thereafter, the Operator shall furnish the Owner with a schedule setting forth the kinds and amounts of insurance proposed to be obtained or continued, including the insurance required in the foregoing sections, and such other kinds and amounts of insurance as the Operator shall deem necessary or advisable for the protection of the interest of the Owner and the Operator.  Promptly thereafter, except as to the insurance required in the foregoing sections, the parties shall agree as to the kind, amount and form of additional insurance to be obtained.  The Operator shall thereupon forthwith apply for and obtain on the Owner's behalf, if obtainable, all such insurance.

911312.4                                    -9-

3. All policies of insurance shall name the Owner, and where appropriate, jointly with the Operator and such other parties in accordance with their respective interests. The original of all policies of insurance and certificates of insurance shall be kept and maintained by the Operator, and certificates of insurances shall be forwarded to the Owner. The premiums for and costs and expenses associated with obtaining such insurance policies shall be Operating Expenses.

4. Neither the Owner nor the Operator shall assert against the other and each of them do hereby waive with respect to one another any claims for any losses, damages; liability or expenses (including legal fees) incurred or sustained by either of them to the extent that the same are covered by insurances as aforesaid, on account of damage or injury to person or property arising out of the ownership, management, operation or maintenance of the Hotel.

## ARTICLE IX

### Assessments, Property Tax and Other Similar Payments

1. All assessments, property taxes and other similar payments in respect of any particular Unit shall be paid by the Operator on behalf of the owner thereof promptly as and when the same shall become due; provided the owner has delivered to Operator the funds necessary to pay the same.

2. The Operator shall furnish to the applicable owner copies of the official bills and receipts relating to any such payments.

## ARTICLE X

### Bank Accounts and Disbursements

1. All Working Capital received by the Operator from the Owner shall be deposited in a special account or accounts in the name of the Hotel in a bank or other depository selected by the Owner and approved by the Operator. Such account or accounts shall be operated solely by the Operator's designees.

2. Out of such account or accounts the Operator shall pay all Operating Expenses.

811312.4                                -10-



## ARTICLE XI

### Books, Records, Statements and Reports

1. The Operator shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel on an accrual basis. The books of account and all other records relating to, or reflecting, the operation of the Hotel shall be kept at the Hotel and shall be available to the Owner and its duly authorized representatives for examination, audit, inspection and copying. Such books of account and records shall reflect, for each Unit managed by Operator, the Gross Revenues generated from each such Unit and the Operating Expenses allocable thereto. All of such books and records shall be the property of the Owner and shall not be removed from the Hotel without the written consent of the Owner and the Operator. Upon the termination of this Agreement, all of such books and records up to the date of termination shall forthwith be delivered up to the Owner so as to ensure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be made available to the Operator at reasonable times and intervals for examination, audit, inspection and copying for a period of two (2) years following such termination. · Without prejudice or limitation to the foregoing, the Operator's right of examination, audit, inspection and transcription as provided for in this case shall extend to books and records or parts thereof related to transactions or events taking place or occurring before the date of termination of this Agreement.

2. The Operator shall deliver to the Owner within thirty (30) days after the end of each calendar month a profit and loss statement showing the results of the operation of the Hotel for the immediately preceding calendar month and the Fiscal Year-to-date and as compared to the Annual Plan, and covering such other matters as are customarily covered in such monthly reports for comparable hotels.

3. Within ninety (90) days after the end of each Fiscal Year, the Operator shall deliver to the Owner a profit and loss statement, balance sheet, sources and application of funds statement, and which, if requested by Owner, shall all be audited and certified by the Independent Certified Public Accountant of the Hotel. Any disputes between the Owner and the Operator as to the contents or correctness of any such statement or any accounting matter thereunder shall be decided by the Independent Certified Public Accountant, whose decision shall be final and binding. The cost and expense of audits pursuant to this section shall be Operating Expenses.

4. If no objection shall be made by either the Owner or the Operator to the said certified profit and loss statement and to the Net Profit for any Fiscal Year within forty-five (45) days after delivery of the same, such certified profit and loss statement shall be deemed to be correct and conclusive for all purposes. The Owner and the Operator shall endeavor to resolve any objections or differences which may be made prior to the time fixed herein



for payment of the next succeeding installment to the Owner of its entitlement to the Net Profit, as provided for in Article XIII.

5.    Separate or additional statements may be required to be prepared and delivered to the owners of the Commercial Units and the Guest Units managed by Operator, as may be set forth in the Commercial Unit Operating Agreements and the Guest Unit Operating Agreements.

## ARTICLE XII

### Management Fees and Reimbursement

1.    Under the Guest Unit Operating Agreements, (i) a Base Management Fee shall be payable monthly with respect to the Gross Revenues derived from such Guest Unit, and (ii) an Incentive Management Fee shall be payable monthly with respect to estimated Gross Operating Profit for such Unit, to be adjusted at the end of each Fiscal Year.

2.    For the purpose of calculating the amount of the Base Management Fee, payments for any given calendar month shall be the Base Management Fee percentage of the cumulative Fiscal Year-to-date Gross Revenue, less the amount of any payments on account of the Base Management Fee previously paid to the Operator during such Fiscal Year. Monthly payments of the Incentive Management Fee shall be calculated on the cumulative Fiscal Year-to-date Gross Operating Profit, less the amount of any payments on account of the Incentive Management Fee previously paid to the Operator during such Fiscal Year.

3.    At the end of each Fiscal Year and following the receipt of the annual statements for Units managed by Operator, an adjustment shall be made on the basis of the said statements, if necessary, so that the Operator shall receive its proper Management Fee for the said Fiscal Year.

4.    The Owner shall reimburse the Operator for all Operating Costs which were paid by the Operator and not out of the Hotel account(s).

5.    The Operator may also charge to the Hotel its reasonable travel and other out-of-pocket head office expenses incurred pursuant and in the course of and directly related to the management and operation of the Hotel, and in accordance with the approved Annual Plan. The Operator may offer complimentary rooms, food and beverages and other services to any person if, in the reasonable judgement of the Operator, such action will promote the Hotel and increase the overall profitability of its operations. All such costs and expenses charged pursuant to this Section 5 shall be Operating Expenses.



6.   Notwithstanding any of the foregoing, it is understood and agreed by Owner and Operator that no Management Fees are due from Owner hereunder.  The only Management Fees payable to Operator are pursuant to the Commercial Units Operating Agreements and/or the Guest Unit Operating Agreements.

## ARTICLE XIII

### Additional Payments by the Owner

1.   In the event that for any Fiscal Year a Net Loss shall be sustained for the Hotel, the Owner shall forthwith upon demand by the Operator after the end of such Fiscal Year pay into the Hotel account(s) operated by the Operator under Article X such amounts as may be required to provide sufficient Working Capital to cover anticipated Operating Expenses, as reasonably determined by Operator.

## ARTICLE XIV

### Set-off, Counterclaims, etc.

1.   The Commercial Unit Operating Agreements and Guest Unit Operating Agreements shall contain customary exclusions for set-offs and counterclaims.

## ARTICLE XV

### Repairs and Maintenance and Capital Improvements

1.   Subject to the performance by the Owner of its obligations under this Agreement the Operator agrees to maintain the Hotel in good repair and condition.

2.   Subject to the Owner's prior approval, the Operator is authorized to make such alterations, additions or improvements in or to the Hotel as are customarily made in the operation of deluxe international hotels.  The cost of such customary additions, alterations and improvements shall either be treated as Operating Expenses or shall be capitalized in the books of account in accordance with sound accounting practices.  Such capitalized expenditure shall be amortized by treating such expenditure as Operating Expenses over their estimated useful life.



## ARTICLE XVI

### Reserve for Capital Replacement

1.  During the Operating Term there shall be deducted monthly from the Gross Operating Profit such sum as shall be equal, in the aggregate for each Fiscal Year, to 2.5 percent of the Gross Revenue for that Fiscal Year. A cash fund in the above sum shall be created for the purpose of making replacements of, renewals of and additions to said furniture, fixtures, furnishings and equipment. Such fund shall be recorded on the books of account maintained for the Hotel as "Reserve for Capital Replacements". The fund shall be used solely for such purposes. Any expenditure for replacements of, renewals of and additions to, furniture, fixtures, furnishings and equipment during each Fiscal Year may be made by the Operator without the consent of the Owner up to the amount of such fund (including unused accumulations thereof from earlier Fiscal Years), and any such expenditures shall be paid from such fund. To the extent that such expenditures in any Fiscal Year shall be less than the fund for such year, the excess shall be carried forward and added to the next or any subsequent fund until fully used. Any expenditure in excess of the fund shall be subject to the Owner's approval and shall be deducted from Gross Operating Profit in arriving at the Net Profit.

## ARTICLE XVII

### Name of the Hotel

1.  The Operator and the Owner agree that during the Operating Term the Hotel shall at all times be known and designated as the "Dempsey Vanderbilt Hotel", or by such other name as the parties may from time to time agree in writing.

2.  This Agreement includes a license to the Owner of the terms "GHM", "GHM Resorts" and "GHM Hotels" (collectively, the "GHMarks") for use in connection with the marketing of the Project and the operation of the Hotel, to be used in such manner as Operator shall reasonably determine. It is expressly acknowledged and agreed by the parties hereto that the GHMarks shall be the exclusive property of General Hotel Management Ltd. and no legal right or remedy of the Owner of any kind or nature whatsoever, nor any provision of this Agreement or any other agreement shall confer upon the Owner or any of the successor or successors the right to use the "GHMarks" either alone or in conjunction with some word or words, except in accordance with the provisions of this Agreement. Without prejudice to any other legal right or remedy of the Operator, this covenant shall be enforceable, by injunction or otherwise, by the Operator, shall be deemed to survive any termination of this Agreement, and shall in case of conflict prevail over all other provisions of this Agreement.

3.   All costs and expenses relating to any registration of the businesses of the Hotel as are required by law (including legal fees) and renewals of such registration shall be Operating Expenses.

## ARTICLE XVIII

### Indemnification

1.   The Operator shall not in the performance of this Agreement be liable to the Owner or any other person or entity for any act or omission, negligent, tortious or otherwise, of any officer, agent or employee of Operator, except, however, for the gross negligence or willful misconduct of any such officer, agent or employee of Operator.

2.   The Owner hereby agrees to indemnify and save harmless the Operator and officers, agents and employees of the Operator from and against any and all loss, damage, cost or expense (including lawyer's fees) which Operator or any of the officers, agents or employees of the Operator may sustain or incur by reason of any claim or assertion of wrong doing, error, commission, omission or negligence made by any person or entity involving or arising out of the performance by the Operator or any officer, agent or employee of the Operator of the various services contemplated by this Agreement, whether or not such claim or assertion involves any allegation based on the alleged sole negligence of two or more such entities or individuals (one or more of which may be the Operator or any of its officers, agents or employees) or any other theory, exclusive, however, of any gross negligence or willful misconduct of Operator or of any of its officers, agents or employees. Moreover, the Owner will, at the Operator's request, assume the defense of any proceeding brought by any third party to establish any such liability.

3.   The provisions of this article shall survive any expiration or termination of this Agreement and shall remain enforceable by the Operator notwithstanding such expiration or termination.

## ARTICLE XIX

### Termination

1.   This Agreement may at any time during the Operating Term be terminated in accordance with the following provisions:

1.1   At the option of the Owner:

1.1.1   By giving sixty (60) days notice in writing to the Operator in the event that, despite the fact that the Owner shall have carried adequate insurance in accordance with the provisions of Article VIII, there has been damage to and destruction of the Hotel of such magnitude that the cost of repairing, restoring, rebuilding or replacing the hotel is in excess of one hundred and twenty per cent (120%) of the proceeds of the insurance;

1.1.2   By giving 60 days notice in writing to the Operator, in the event that the Operator shall fail to observe or perform any of the provisions of this Agreement that are the Operator's responsibility to be observed or performed, including the obligation to operate the Hotel in accordance with the Standards, despite the Owner having given written notice of such default to the Operator and such default shall not have been remedied within thirty (30) days after such notice;

1.1.3   By notice in writing to the Operator, in the event of the entire or a substantial portion of the Hotel or its services being acquired, condemned, or closed in accordance with Law;

1.1.4   By notice in writing to the Operator, in the event the Operator enters into liquidation whether voluntarily or compulsorily or compounds with its creditors generally or has a receiver appointed of all or any substantial portion of its assets or takes or suffers any similar action in consequence of its debts.

1.2   At the option of the Operator:

1.2.1   By giving sixty (60) days notice in writing to the Owner, in the event that the Owner shall fail to observe or perform any of the provisions of this Agreement that are the Owner's responsibility to be observed or performed, despite the Operator having given written notice of such default to the Owner and such default shall not have been remedied within thirty (30) days after such notice;

1.2.2   By notice in writing to the Owner, in the event of the entire or a substantial portion of the Hotel or its services being acquired, condemned, or closed by Law;

1.2.3   By giving notice in writing to the Owner, in the event the Owner enters into liquidation whether voluntarily or compulsorily or by law or compounds with its creditors generally or has a receiver appointed over all or any substantial portion of its assets or takes or suffers any similar action in consequence of its debts.

## ARTICLE XX

### Procedure upon Termination

1. In the event of termination of this Agreement, whether by effluxion of time or otherwise, the following steps shall be taken, in the following order:

   1.1 If requested by Owner, the Independent Certified Accountant shall conduct a final accounting and audit of the books and records of the Hotel and shall produce and deliver to the Owner and the Operator final audited accounts to the date of the termination (otherwise, such final statements shall be prepared and delivered by Operator);

   1.2 There shall be paid from the Hotel account(s) all amounts and debts due to the Operator, and if the monies in the Hotel account(s) are insufficient for such purposes by the Owner; and

   1.3 All other amounts and the remaining assets of the Hotel shall be paid to or retained by the Owner.

   1.4 The license to the use of the "GHMarks" shall be terminated and the words "GHM", GHM Resorts and GHM Hotels shall not be used for the Hotel in its name or in any other way.

## ARTICLE XXI

### Partial Invalidity

1. In the event that one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgement of a court of competent jurisdiction, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted in this Agreement.



## ARTICLE XXII

### Force Majeure

1. In the event that the performance by any party to this Agreement of its obligations hereunder is prevented by force majeure, including, but not limited to, acts of God, flood, hurricane, earthquake, tidal wave, landslide, fire, plague, epidemic, quarantine restriction, perils of the sea; war or serious threat of the same, civil commotion, blockade, arrest or restraint of government, rulers or people; strike, lockout, sabotage, other labor dispute; or any other causes or circumstances whatsoever beyond the party's reasonable control, then, such party shall not be liable for loss or damage, or failure or delay in performing its obligations under this Agreement.

## ARTICLE XXIII

### Damage, Destruction, Compulsory Taking

1. If the Hotel or any portion thereof shall be damaged or destroyed at any time during the Operating Term by fire, casualty or any other case, the Owner shall, at its own expense and with due diligence, repair or replace the Hotel so that the Hotel shall be substantially the same as that prior to such damage or destruction. If the Owner shall fail:

   1.1 To commence such work within sixty (60) days of receipt of insurance proceeds or confirmation by the insurance carrier that such proceeds will be made available to cover actual costs of repair or replacement, whichever is earlier; or

   1.2 To complete such work diligently, then the Operator may, at its option, either:

      1.2.1 Terminate this Agreement by written notice to the Owner, effective as of the date of dispatch; or

      1.2.2 Undertake or complete such work for the account of the Owner to the extent of such available insurance proceeds, in which case the Operator shall be entitled to be repaid thereof from such insurance proceeds.

2. If the Hotel is damaged or destroyed by fire or other insurable cause to such an extent that the cost of repair or replacement as estimated by the Operator exceeds one third of the original cost of the Hotel, then the Owner may, if it determines not to repair or replace the Hotel, provisionally terminate this Agreement by notice to the Operator.

3. If thereafter at any time within three (3) years after the termination of this Agreement pursuant to Section 2 above the Owner repairs, rebuilds or replaces the Hotel, the Operator

may, within sixty (60) days of the commencement of such repair or replacement or on receipt of written notice from the Owner of its intention to repair or replace the Hotel, reinstate such services by written notice to the Owner.

4.   If the whole of the Hotel shall be taken by any expropriation, condemnation or similar proceedings, or, if a portion thereof shall be taken, any award (compensation), for such taking shall be equitably apportioned between the Owner and the Operator after recoupment by the Owner or its constituent partners of their investments in the Hotel.

5.   If only a part of the Hotel shall be so taken and the taking of such part does not make it unreasonable, in the Operator's opinion, to operate the remainder of the Hotel as a hotel of the type and class preceding such taking, so much of any award (compensation) to the Owner shall be made available as shall be reasonably necessary for making alterations or modifications to the Hotel as to make it a satisfactory architectural unit as a hotel of similar type and class a prior to the taking. The balance of the award (compensation) shall be equitably apportioned between the Owner and Operator.

## ARTICLE XXIV

### Successors and Assigns

1.   The Owner may sell, assign, transfer, lease, mortgage or otherwise alienate its interest in the Hotel, including any or all of the Units, without the prior written consent of the Operator.  The Operator shall not have the right to assign or transfer to any third party any of its obligations or rights under this Agreement, save with the prior written consent or approval of the Owner; provided, however, that (a) the Operator may assign or transfer this Agreement at any time to any other member of the General Hotel Management Ltd. Group upon notice to the Owner and (b) after the earlier to occur of (i) one year after the opening of the Hotel or (ii) the sale of all the Guest Units to third parties, the Operator may assign or transfer this Agreement in connection with a sale or merger of the General Hotel Management Ltd. Group or a sale of substantially all of the assets thereof.  It is understood and agreed that any consent or approval granted by the Owner to any such assignment shall not be deemed a waiver of the provisions herein contained against assignment, transfer or alienation in relation to any subsequent sale, assignment, transfer or alienation or purporting so to do.

2.   Subject to the provisions of Section 1, the provisions of this Agreement shall be binding upon and shall enure to the benefit of the successors in title and the assigns of the Owner and of the Operator.

ARTICLE XXV

Notices

1.     Any notice required to be given under this Agreement shall be in writing and shall be deemed to have been effectively given (1) when personally delivered, (2) seven (7) working days after being sent by registered or certified airmail, postage prepaid and return receipt requested, or (3) when sent by facsimile, in each such case addressed as follows, or (4) to such other address as either OPERATOR or OWNER may subsequently designate by notice to the other party:

1.1   To OWNER:

Metropolitan Development Group
1411 Broadway
New York, New York 10018
Attention:    Jonathan Breene
Fax. No.:     (212) 704-0546

1.2   To OPERATOR, at both:

General Hotel Management Ltd.
P.O. Box 71
Craigmur Chambers, Road Town
Tortola
British Virgin Islands

AND

General Hotel Management Ltd.
70B Pagoda Street
Singapore 059229
Attention:    Hans R. Jenni
Fax No.:      (65) 221 1535

*WITH copies To:*

*ZaKay Sasson*
*16495 32nd Avenue*
*Eastern Shores, Fl. 33180*
*and*

*Enrique Gefer*
*19333 Collins Avenue, apt 1708*
*Sunny Isles Beach, Fl. 33160*

# ARTICLE XXVI

## Applicable Law

1.      This Agreement shall be governed and interpreted in accordance with the laws of the State of Florida and the United States of America.  The parties agree that in all matters relating to this Agreement, whether during its substance or after its termination, and also in all matters concerning the provisions of this Agreement where any question or dispute or difference shall be settled in mutual good faith.  In case of failure by the parties to reach an amicable settlement, such difference or dispute shall be finally settled through a Board of Arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce.  The venue of the arbitration shall be Dade County, Florida.

# ARTICLE XXVII

## Leasing and Property Management Services for
## Guest Unit Owners and Residential Tower Unit Owners

1.      The Operator shall offer a "Rental Program" (i.e., rental services and property management services) to Guest Unit owners (if desired by them) on the following terms or such other terms to be reasonably agreed upon between Owner and Operator (subject to requirements of applicable laws).

(a)      The Rental Program shall be completely voluntary;

(b)      The Rental Program shall give Guest Unit owners the option to use their units for a maximum number of days and subject to such restrictions as Owner and Operator shall reasonably agree upon in good faith;

(c)      The Rental Program shall contain a rotation system intended to cause similar quality units to be rented for approximately the same amount of times;

(d)      The Rental Program will not involve any pooling of revenues;

(e)      Operator will offer room service, maid service and turndown service to Guest Unit owners participating in the Rental Program;

(f)      The Rental Program will provide each participating Guest Unit owner 100% of the revenue derived from the rental of the owner's unit not less frequently than quarterly, after first deducting travel agent commissions, credit card service charges, applicable taxes and Management Fees; and

911312.4                                -21-

(g)     Participants in the Rental Program will receive activity statements from Operator not less frequently than quarterly.

Any and all revenue generated from the leasing of a Guest Unit under the Rental Program shall be deemed its Gross Revenues, and any and all costs incurred thereunder shall be deemed part of its Operating Expenses.

2.      The Operator shall offer a similar Rental Program to the Residential Tower unit owners (if desired by them) on the following terms or such other terms to be reasonably agreed upon between the Owner and the Operator:

(a)     The Rental Program shall be completely voluntary;

(b)     The Rental Program shall give Residential Tower unit owners' the option to use their units for as many days of the year as they desire;

(c)     The Rental Program shall contain a rotation system intended to cause similar quality units to be rented for approximately the same amount of times;

(d)     The Rental Program will not involve any pooling of revenues;

(e)     Operator will offer room service, maid service and turndown service to Residential Tower unit owners participating in the Rental Program;

(f)     The Rental Program will provide the Residential Condominium unit owners 50% of the net revenues derived from the rental of the owner's unit, after first deducting travel agent commissions, credit card service charges and applicable taxes, with the remaining 50% paid to the Operator as a fee;

(g)     Participants in the Rental Program will receive activity statements from Operator not less frequently than quarterly; and

(h)     Each unit participating in the Rental Program shall contain Furnishings and Equipment approved by Operator.

Any and all revenue generated from the leasing of Residential Tower units under the Rental Program shall be deemed its Gross Revenues, and any and all costs incurred thereunder shall be deemed part of its Operating Expenses.

3.      Operator shall also make available to all Guest Unit and Residential Tower unit owners, whether or not they are enrolled in any Rental Program, other services (whether on an a la carte, or bulk basis, to be agreed to by Operator and Owner subsequent to the execution

911312.4                                   -22-

of this Operating Agreement), which shall include, without limitation, the following: room service, food and beverage charging privileges, daily maid service, routine maintenance assistance. Operator shall be entitled to its standard charges for providing any of these services.

4. Owner and Operator agree to reasonably cooperate with each other to promptly finalize the terms of the Rental Programs and to otherwise establish reasonable rules and regulations and procedures for the operation of the Hotel.


ARTICLE XXVIII

Definitions

As used in this Agreement:

1. The term "Fiscal Year" shall mean the twelve-month period commencing on January 1 and ending on December 31.

2. The term "Annual Plan" means such statements, estimates and schedules as are mentioned in Section 2 of Article VII as amended from time to time.

3. The term "the Country" shall mean the United States of America.

4. The term "Building and Appurtenances" shall mean a building(s) containing about 91 guest rooms, restaurants, lobbies, bars and lounges, retail space, elevators, back-of-the-house and parking areas, recreational facilities and other related facilities.

5. The term "Furnishings & Equipment" shall mean all furniture, furnishings, fixtures, life safety and fire equipment on or required for the management and operation of the Building and Appurtenances.

6. The term "Gross Operating Profit" shall mean, for any particular Unit, the excess during each Fiscal Year (and proportionately, for any period less than a Fiscal Year) of Gross Revenues derived from such Unit over Operating Expenses allocated thereto during the same period, calculated in accordance with the Uniform System.

7. The term "Gross Revenues" shall mean all income and proceeds of every kind (whether in cash or on credit) generated from Units managed by Operator, including the proceeds of business interruption insurance actually received by Operator or Owner or the owner of any such Unit (after deduction of said insurance proceeds of all necessary expenses incurred in the adjustment or collection thereof) less Turnover Taxes which have been



added onto the customer's bills and actually received by the Hotel as part of the Hotel's revenue.

8. The term "Hotel" shall have the meaning ascribed to it in the Preamble to this Agreement.

9. The term "Independent Certified Accountant" shall mean the accountant or firm of accountants referred to in Section 2.4 of Article VII.

10. The term "Law" shall mean all laws, acts, ordinances, rules, regulations, orders, enactment or determinations by any governmental municipal or other authority having jurisdiction.

11. The term "Licenses" shall mean all licenses, permits, consents, approvals and authorizations (governmental, municipal or otherwise) required for the management and operation of the Hotel in accordance with this Agreement including, but not limited to: liquor licenses for the sale of alcoholic beverages at all restaurants and bars in the Hotel and to all guest rooms; restaurant and hotel licenses; all licenses, permits, consents, approvals and authorizations (governmental, municipal or otherwise) required for the procurement and import of Furnishings & Equipment, Operating Equipment and Operating Supplies, for the Hotel to operate as a world class five star international hotel meeting the Standards, and all visas and work permits for staff who require them.

12. The term "Net Loss" shall mean any negative balance which may result after the deductions set out in Section 13 of this Article have been made to the Gross Operating Profit of the Hotel for any Fiscal Year.

13. The term "Net Profit" shall mean, with respect to any particular Unit managed by Operator, the resulting balance after deductions from the Gross Operating Profit for such Unit for a Fiscal Year (and proportionately, for any period less than a Fiscal Year) of all or any allocable portion (as appropriate) of the following charges as they occur in accordance with the Uniform System:

13.1 Real estate and personal property taxes;

13.2 The cost and expense of any matter or thing to be done at Owner's cost and expense under this Agreement or otherwise done at the request of the Owner or of the owner of the Unit;

13.3 The 5% Base Management Fee payable to the Operator; and

13.4 Technical service fees payable for services rendered to the Hotel.

14. The term "Management Fee" shall mean, with respect to the Guest Units participating in the Rental Program, (i) a "Base Management Fee" equal to five percent (5%) of Gross Revenue, payable monthly, and (ii) an "Incentive Management Fee" equal to ten percent (10%) of the Gross Operating Profit, payable quarterly. The Management Fees payable with respect to any Commercial Unit managed by Operator shall be as set forth in the applicable Commercial Unit Operating Agreement.

15. The term "Operating Equipment" shall mean all chinaware, glassware, linens, silverware, uniforms, utensils and other items of a similar nature.

16. The term "Operating Expenses" shall mean, with respect to any particular Unit managed by Operator, all or the allocable portion (as appropriate) of the entire costs and expenses of maintaining, conducting, and supervising the operation of the Hotel (but shall not include, except as otherwise provided in this Agreement (a) principal or interest on Owner's indebtedness and any rent payable by Owner, (b) any taxes payable by the Owner, (c) the Management Fees, and (d) the costs of any other things specified in this Agreement to be done or provided at Owner's expense and not otherwise denominated as an Operating Expense) incurred by Operator directly or at its request or as otherwise provided in this Agreement, or under the applicable Commercial Unit or Guest Unit Operating Agreement, which Operating Expenses are properly attributable to the period under consideration under Operator's system of accounting, including without limitation:

16.1 The cost of all food and beverages sold or consumed and of all Operating Equipment and Operating Supplies, other than initial inventories of Operating Equipment and Operating Supplies furnished by Owner.

16.2 Salaries and wages and employee benefits of Hotel personnel, including, without limitation, pension plans, medical insurance, life insurance, travel accident insurance and bonuses, including cost of payroll taxes and employee benefits, severance or other termination benefits and accruals therefor; the cost of moving Hotel personnel (including expatriates), their families and personal belongings to the Hotel and their return, and all other expenses not specified or referred to herein which are referred to as "Administrative and General Expenses" in the Uniform System. Subject to prior consultation with the Owner and conformity with the approved Annual Plan, Operating Expenses may include the cost of visas, work permits, residence documentation, salaries, bonuses, payroll taxes and employee benefits (including family home leave airfares and allowances) for Hotel personnel from other countries. Except as herein otherwise expressly provided, the salary or wages of other employees or executives of Operator, or any member of the Operator's group of companies, shall in no event be Operating Expenses, but reasonable and customary traveling expenses incurred by them in connection with the management of the Hotel, including reasonable and customary living expenses incurred during travel, shall be Operating Expenses.



Notwithstanding the foregoing, if it becomes necessary for an employee or executive of any member of the Operator's group of companies to perform temporary services at the Hotel of a nature normally performed by Hotel personnel, his salary (including payroll taxes and employee benefits) as well as his reasonable and customary traveling expenses (including living expenses) shall be Operating Expenses.

16.3    The cost of all other goods and services obtained by Operator in connection with its operation of the Hotel including, without limitation, heat and utilities, office supplies and services performed by third parties.

16.4    The cost of repair and maintenance of the Hotel.

16.5    Insurance premiums and losses incurred from any self-insured risks of the foregoing types provided that Owner and Operator have approved in advance such self-insurance or have agreed in advance to the unavailability of insurance to cover such risks. Premiums on policies for more than one (1) year and/or not for a period within the fiscal year in question will be pro-rated over the period of insurance, and premiums under blanket policies will be fairly allocated among properties covered.

16.6    All taxes (other than income taxes and, unless otherwise included in Gross Revenues, Turnover Taxes), with respect to the operation of the Hotel, and water and sewage charges but excluding all taxes levied or imposed against the Hotel or its contents, such as real and personal property taxes.

16.7    Legal costs and fees, and fees of any Independent Certified Accountant, for services relating to the obtaining of all necessary approvals of this Management Agreement and of matters relating thereto, including any requisite registration of Operator (as a branch, an office or otherwise), and the operation of the Hotel and its facilities.

16.8    The reasonable costs and expenses (including salaries) incurred after the Hotel has opened of technical consultants and specialized operational experts for specialized services in connection with non-recurring work on operation, functional, decorating, design or construction problems and activities, including the reasonable fees of any member of the operator's group of companies in connection therewith.

16.9    All expenses for advertising the Hotel and all expenses of sales promotion and public relations activities incurred after the Hotel has opened.

16.10   All out-of-pocket expenses and disbursements reasonably, properly and specifically incurred by any member of the Operator's group of companies pursuant to, in the course of or directly related to, the management and operation of the Hotel. Without limiting the generality of the foregoing, such charges may include all reasonable travel, telephone, facsimile, telex, telegram, cablegram, radiogram, air express, courier service and other incidental expenses, but except as herein otherwise expressly provided, shall not include any of the regular expenses of the offices maintained by any member of the Operator's group of companies other than offices maintained at the Hotel for the management of the Hotel.

16.11   Bad debts and allowances for uncollectible accounts receivable.

16.12   Reserve for Capital Replacements.

16.13   Those items not included above described as Operating Expenses in this Agreement and any other payments made by Owner hereunder which are to be amortized over a period of years.

17.   The term "Operating Supplies" shall mean all inventories of paper supplies, cleaning materials and similar consumable items.

18.   The term "Standards" shall mean the highest quality of facilities or operations and services generally consistent with, and expected by, guests at comparable world class five star international hotels, such as those operated under the trade names Mandarin, Four Seasons and Ritz-Carlton.

19.   The term "taxes" includes, without limitation, all present or future taxes (of any nature and howsoever termed), levies, fiscal charges, imposts, duties, fees, assessments, surcharges, or other charges of whatever nature and however arising, imposed, assessed, charged, levied or demanded by any person at any time, together with all interest thereon and penalties or similar liabilities with respect thereto but does not include any stamp, registration or documentary taxes, duties or similar charges of any kind and Turnover Taxes.

20.   The term "Turnover Taxes" shall mean sales taxes, hotel occupancy taxes, gross receipts or value added tax or similar turnover taxes and any other direct room or room sales related taxes.

21.   The term "Uniform System" shall mean the latest edition of the "Uniform System of Accounts for Hotels", as published by the Hotel Association of New York City, Inc., or any later or revised edition thereof, and as modified by the mutual agreement of the Owner and the Operator.

911312.4                                          -27-

22. The term "Working Capital" shall mean amounts sufficient to cover anticipated Operating Expenses.

23. The term "Expert" shall mean an independent, nationally-recognized hotel consulting firm or individual qualified to resolve the issue in question and who is appointed in each instance by agreement of the parties or, failing agreement, by each party selecting one Expert and the two chosen experts selecting a third.

## ARTICLE XXIX

### Special Conditions

1. Owner and Operator agree to make such revisions to this Agreement as may be required by the Owner's mortgage lender or to better market the Guest Units, provided that such changes do not materially adversely affect the economic benefits to either party.

## ARTICLE XXX

### Miscellaneous

1. Any consent and approval required of the Owner or the Operator shall be ineffective unless in writing and signed by a duly authorized officer or agent of the respective parties.

2. No modification, alteration or amendment of this Agreement nor any waiver of any provision hereof shall be effective unless in writing and signed by the party sought to be charged therewith or by its duly authorized agent.

3. The headings of the Articles and Sections of this Agreement and all of its Appendices are inserted for convenience only and are not intended to affect the meaning of any of the provisions.

4. All Appendices to this Agreement are an integral part of this Agreement and all terms defined in this Agreement and the Appendices shall have the same meaning throughout this Agreement and its Appendices.

5. References in this Agreement to Articles, Sections, subsections and Appendices are to the Articles, Sections, subsections and the Appendices to this Agreement. References to Articles or Sections, except where the context otherwise requires, are references to the relevant Article or Section in this Agreement or Article in which the reference appears. References to subsections are references to the relevant subsection in the Section in which the reference appears.

6. The Owner hereby represents that in entering into this Agreement the Owner has not relied on any projections of earnings, statements as to the possibility of future success or other similar matter which may have been prepared by the Operator or any member of the General Hotel Management Ltd. group of companies, and understands that no guarantee is made or implied by the Operator or any member of the General Hotel Management Ltd. group of companies as to the cost or future financial success of the Hotel.

7. This agreement constitutes the entire agreement between the Owner and the Operator relating to the subject matter hereof, superceding all prior agreements, oral or written.

IN WITNESS WHEREOF GENERAL HOTEL MANAGEMENT and OWNER have duly executed this Agreement on the date first above written.

<u>SIGNED by the OWNER</u>
DEMPSEY VANDERBILT OWNERS, LLC.

By _____  by _____

Metropolitan Development Group, Ihe
And SKIP Properties, N.V. Members
in the presence of: _____

AND

<u>SIGNED by GENERAL HOTEL MANAGEMENT LTD.</u>



By Hans R. Jenni, its Director

in the presence of: _____

# THE SETAI GROUP

Jonathan J. Breene
Partner

January 8, 2003

Hans R. Jenni
General Hotel Management
No. 1 Orchard Spring Land #04-02
Tourism Court
Singapore 247729

Re:   Management Agreement, dated March 20, 2000, between General Hotel Management  Ltd. ("GHM") and Setai Owners, LLC (formerly known as Dempsey Vanderbilt Hotel) (the "Agreement)

Dear Hans:

Further to our previous conversations, this letter agreement will amend the Agreement in certain respects and confirm certain understandings that we have agreed to.  We have agreed as follows:

1.     All capitalized terms used herein shall have the meanings given to them in the Agreement.

2.     The parties acknowledge that "Dempsey Vanderbilt Owners LLC" has changed its name to "Setai Owners LLC" and that the proposed name of the Project has been changed from "Dempsey Vanderbilt Hotel" to the "Setai Resort and Residences".

3.     Section 2(f) in Article XXVII of the Agreement is hereby corrected by deleting the word "Operator" on the last line and changing it to "Owner".

4.     Article XXVII is hereby amended by adding the following provision at the end thereof:

"5.  Notwithstanding anything herein to the contrary, the parties agree that, in connection with the Rental Program, Owner and Operator will endeavor to rent each Hotel Guest Unit in the Hotel to transient guests of the Hotel prior to offering to rent any of the residential units in the Residential Tower to transient guests of the Hotel."

5.     This will confirm that GHM will be entitled to a development fee equal to $964,000, (1/3 of $2,892,000). GHM acknowledges having already received $310,000 in development fee payments through the date hereof. The balance of $654,000 will be paid in equal monthly installments until May, 2004.

25/01 '03 SAT 10:51 FAX                                                          ☒003

THE SETAI GROUP

6.    GHM will be entitled to a brokerage commission equal to 1% of the sales price of any residential condominium units and hotel guest units; provided that GHM will not be entitled to a brokerage commission in connection with the sale of any unit with respect to which the Setai Group LLC or any entity affiliated with Setai Group LLC, Jonathan Breene or John Conroy (the "Breene/Conroy Group") does not also receive a brokerage commission (e.g., neither the Breene/Conroy Group nor GHM will be entitled to brokerage commissions in connection with the sale of units to "inside parties"). Such commissions will be payable when and to the extent such payments are made to the Breene/Conroy Group.

7.    Except as modified hereby, the Agreement remains in full force and effect and unmodified.

Please execute this letter in the lower left hand corner to confirm your agreement to the foregoing.

                                    Sincerely,

                                    Setai Owners LLC

                                    By:  Setai South Beach LLC

                                    By: _____
                                          Jonathan Breene

GENERAL HOTEL MANAGEMENT LTD.

By: _____
     Hans R. Jen

# EXHIBIT "B"



A STYLE TO REMEMBER

7 February 2005

The Setai Group
405 Lexington Avenue 54/F
New York, NY 10174

Attn: Mr. Jonathan Breene

Dear Jonathan:

Re: The Setai – Assignment & Assumption Agreement

Article XXIV clause 1 of the Management Agreement dated 20 March 2000 covering the
Setai Resort and Residences gives the Operator the ability to assign or transfer its rights
and obligations to any member of the GHM Group of companies.

I am writing to notify you that General Hotel Management Ltd, a BVI company, has
assigned all its rights and obligations under the above mentioned Management
Agreement to GHM (South Beach) LLC, a Delaware company, which is a member of the
GHM Group of Companies.

This assignment was effected on 18 January 2005 by means of an Assignment and
Assumption Agreement of that date. For your records a copy of that agreement is
enclosed with this letter.

Your primary contact at GHM (South Beach) LLC is Mr. Mavinder Puri. I believe you
know Mr. Puri and have his contact details.

Kind regards

Kendall L. Oei
Director

cc: Mr. M. Puri, GHM (South Beach) LLC

GENERAL HOTEL MANAGEMENT LTD
c/o NO. 1 ORCHARD SPRING LANE #04-02 TOURISM COURT SINGAPORE 247729,  TEL: (65) 223 3755   FAX: (65) 221 1335
e-mail: ghmsin@signet.com.sg  internet: http://www.ghmhotels.com

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made this 13th day of January, 2005 by and between GENERAL HOTEL MANAGEMENT LTD., a British Virgin Islands limited liability company, having an office at P.O. Box 71, Craigmur Chambers, Road Town, Tortola, British Virgin Islands ("Assignor"), and GHM (SOUTH BEACH) LLC, a Delaware limited liability company, having an office at 420 Lincoln Road, Suite 256, Miami, Florida 33139 ("Assignee").

### WITNESSETH

WHEREAS, Assignor and Dempsey Vanderbilt Owners LLC ("Dempsey Vanderbilt") entered into that certain Management Agreement dated March 20, 2000 covering the Setai Resort and Residences located at Collins Avenue between 20th and 21st Streets, Miami Beach, Florida (the "Management Agreement");

WHEREAS, Dempsey Vanderbilt changed its name to Setai Owners LLC pursuant to that certain Certificate of Amendment to Certificate of Formation dated June 27, 2000 and filed with the Secretary of State of the State of Delaware on June 27, 2000;

WHEREAS, Assignor desires and intends to assign to Assignee, all of its right, title and interest in, to and under the Management Agreement; and

WHEREAS, Assignee desires and intends to (i) accept the aforementioned assignment of Assignor's rights in, to and under the Management Agreement, and (ii) assume all of the duties and obligations of the Assignor under the Management Agreement.

NOW THEREFORE, for Ten Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the parties hereto agree as follows:

1.      The Recitals hereto are fully incorporated by this reference as set forth herein.

2.      As of the date hereof, Assignor hereby assigns, transfers, releases and sets over unto Assignee all of its right, title and interest in, to and under the Management Agreement.

3.      As of the date hereof, Assignee hereby accepts the foregoing assignment and hereby assumes all of the duties and obligations of Assignor under the Management Agreement.

4.      Assignor shall indemnify, defend and hold harmless Assignee from and against all claims, losses, costs, expenses (including, but not limited to, reasonable attorney's fees and expenses), liabilities or damages arising from or related to the Management Agreement which may arise in connection with events occurring before the date hereof.

5.      Assignee shall indemnify, defend and hold harmless Assignor from and against all claims, losses, costs, expenses (including, but not limited to, reasonable attorney's fees and

NY55/425196.1

expenses), liabilities or damages arising from or related to the Management Agreement and accruing from and after the date hereof.

6.  Assignor represents and warrants to Assignee that the execution and delivery of this Assignment has been duly authorized, and this Assignment constitutes the legal, valid and binding obligation of Assignor and is enforceable against Assignor in accordance with its terms.

7.  Assignee represents and warrants to Assignor that the execution and delivery of this Assignment has been duly authorized, and this Assignment constitutes the legal, valid and binding obligation of Assignee and is enforceable against Assignee in accordance with its terms.

8.  The parties hereto covenant and agree that they will execute, deliver and acknowledge from time to time at the request of the other party, and without further consideration, all such further instruments, documents, agreements or certificates as may be required to give effect to the transactions described herein.

9.  This Assignment shall be construed under, and governed by the laws of the State of Florida (without regard to principals of conflicts of laws).

10.  This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, and together shall be deemed one in the same document.

[Signature Page Follows]

NY55/4251961

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of he date first written above.

ASSIGNOR:

GENERAL HOTEL MANAGEMENT LTD., a British Virgin Islands limited liability company

By: ~~Gordon Oki~~
Title: Director

ASSIGNEE:

GHM (SOUTH BEACH) LLC, a Delaware limited liability company

By: MPS PURI
Title: GENERAL MANAGER

NYSS/425196.1

# EXHIBIT "C"

**SETAI OWNERS LLC**
**1271 Avenue of the Americas**
**39th Floor**
**New York, New York  10020**

March 31, 2012

**VIA FACSIMILE, CERTIFIED**
**AIR MAIL, RETURN RECEIPT**
**REQUESTED, AND REGULAR AIR MAIL**

General Hotel Management Ltd.          GHM (South Beach) LLC
GHM (South Beach) LLC                   c/o CorpDirect Agents, Inc.
1 Orchard Spring Lane                   515 East Park Avenue
#04-02 Tourism Court                    Tallahassee, Florida  32301
Singapore 247729
Attn:  Mr. Hans R. Jenni                GHM (South Beach) LLC
   Mr. Adrian Zecha            c/o CorpDirect Agents, Inc.
   Facsimile No.:  (65) 6221 1535   160 Greentree Drive, Suite 101
             Dover, Delaware  19904

General Hotel Management Ltd.
70B Pagoda Street                       General Hotel Management Ltd.
Singapore 059229                        P.O. Box 71
Attn:  Mr. Hans R. Jenni                Craigmur Chambers, Road Town
   Facsimile No.:  (65) 221 1535    Tortola, British Virgin Islands
         (65) 6221-1535

  Re: Management Agreement dated March 20, 2000, between Setai Owners LLC, as
     Owner, and General Hotel Management Ltd., as Operator, as amended (the
     "Management Agreement"), relating to the management and operation of the
     Setai Resort & Residences (the "Hotel") located in Miami Beach, Florida

Dear Messrs. Jenni and Zecha:

  Please be advised that, effective immediately, Setai Owners LLC (the "Owner") hereby
terminates the above-referenced Management Agreement and its principal-agent relationship
with General Hotel Management Ltd. and GHM (South Beach) LLC (together, "GHM") --
including any authority that GHM may have with respect to the Hotel, the Abbey Building, and
the rental program for participating hotel-condominium and residential-condominium units.

  Owner has assumed exclusive control of the Hotel and has installed Trevi Luxury
Hospitality Group, Inc. as its new agent-manager of the Hotel. In connection therewith, Owner
expects GHM to:  (1) cooperate fully with Owner to effectuate a smooth transition and turnover

March 31, 2012
Page 2

of Hotel operations to new management and provide all necessary assistance to accomplish that objective as expeditiously as possible; and (2) comply with and fulfill all of GHM's post-termination obligations, as set forth in the Management Agreement and as provided by the common law of Florida governing agency and fiduciary relationships.

Please also be advised that Owner is initiating an arbitration proceeding against GHM in the International Court of Arbitration of the International Chamber of Commerce, pursuant to Section 1 of Article XXVI of the Management Agreement. A copy of Owner's Request for Arbitration is being delivered to you by separate letter. Pursuant to that Request, Owner seeks, among other relief: (a) monetary damages sufficient to fully compensate Owner for the injuries that it has sustained as a result of GHM's breaches of its contractual and common law obligations to Owner; (b) an order of disgorgement, forfeiture, and restitution requiring GHM to return or otherwise turn over to Owner all fees, profits, monies, payments, and other things of value which GHM wrongfully or unjustly received, retained, took, or paid itself in breach of its obligations to Owner; and (c) a declaration that Owner properly exercised its right and power to terminate the Management Agreement and revoke GHM's authority thereunder, without liability to Owner, due to GHM's material breaches of contract and violations of fiduciary duty.

Owner has no intention to take or use any GHM property including, but not limited to, any GHM intellectual property or confidential and proprietary information. Therefore, GHM should contact Owner to arrange for the removal of such property from the Hotel in a reasonable manner so as not to interfere with the provision of services to the Hotel's guests or otherwise detrimentally affect Hotel operations. Furthermore, it is Owner's intent to pay to GHM any outstanding fees or other amounts owed to GHM pursuant to the Management Agreement as of the date of termination thereof. However, we remind GHM of its termination-related obligations: (i) pursuant to Section 1 of Article XI of the Management Agreement, to deliver to Owner, and not to remove from the Hotel, Owner's books and records, "so as to ensure the orderly continuance of the operation of the Hotel;" and (ii) pursuant to Section 1 of Article XX, to pay or otherwise deliver to Owner all the assets of the Hotel, including any accounts related thereto. In addition, GHM must immediately cease any use of, or affiliation with, the "Setai" name and brand, just as Owner intends to disassociate the Hotel from GHM. Finally, Owner demands that neither GHM nor any of its agents, representatives, or affiliated parties destroy, or otherwise impair the accessibility or availability of, any documents, data, or other materials that relate, directly or indirectly, to the Hotel or GHM's activities under the Management Agreement.

Please immediately inform us in writing of the earliest date and time when authorized representatives of GHM will be available to meet with Owner to discuss any remaining issues with respect to the orderly transition of Hotel operations to new management and other termination-related matters, including, but not limited to, arrangements regarding the Hotel employees.

We thank you for your anticipated cooperation and courtesy with respect to this important matter.

March 31, 2012
Page 3

Sincerely,

**SETAI OWNERS LLC,**
**a Delaware Limited Liability Company**

By:    Setai Mezzanine LLC,
        a Delaware Limited Liability Company,
        its Sole Member

        By:    LB South Beach LLC,
                a Delaware Limited Liability Company,
                its Managing Member

                By:    _____
                        Jeffrey Fitts
                        Vice President

cc:    Mr. Hansjoerg Meier
        General Manager
        (via e-mail: hmeier@ghmamericas.com)

        Mr. Moustapha Guimei
        Director of Finance
        (via e-mail: mguimei@ghmamericas.com)

## EXHIBIT B

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-17427 CA 10

GHM (SOUTH BEACH) LLC,
a Delaware limited liability company,

       Plaintiff,

v.

SETAI OWNERS LLC,
a Delaware limited liability company,
TREVI LUXURY HOSPITALITY GROUP,
INC., a Texas corporation, and SMB MANGEMENT
LLC, a Florida limited liability company,

       Defendants.
_____/

### AFFIDAVIT OF HANSJOERG MEIER

1.     My name is Hansjoerg Meier and I was the General Manager of the Setai Resort & Residences (the "Hotel") for approximately six years on behalf of GHM (South Beach) LLC ("GHM"). As General Manager, I was the highest ranking employee of GHM at the Hotel, overseeing all aspects of the Hotel, including the operational, human resources, financial, and sales and marketing departments. In my capacity, I was also the primary GHM employee at the Hotel responsible for executing GHM's responsibilities under the Management Agreement with the Setai Owners LLC ("Owner") and for interacting with Owner and its representatives.

2.     In the early morning of March 31, 2012, Owner came to the Hotel with security personnel and forcibly removed GHM as manager of the Hotel. At that time, Owner provided the night manager on duty with a letter advising of the termination of GHM.

3.      Prior to the raid on March 31, 2012, Owner gave GHM no written notice of any default by GHM under the Management Agreement or its intent to terminate the Management Agreement.

4.      In fact, the first time I was made aware of many of Owner's allegations regarding why the Management Agreement should be terminated was when I read the Arbitration Request filed by Owner. Owner has never tried to discuss or resolve in good faith any of the complaints listed in the Arbitration Request before it evicted GHM from the Hotel.

5.      For example, I note that Owner has made complaints about the financial accounting records. Prior to the raid and pursuant to the Management Agreement, Owner and GHM jointly retained PricewaterhouseCoopers to perform an independent audit of the Hotel's financial accounting records. PricewaterhouseCoopers has not yet issued its audit results.

6.      In addition, because I was never advised of these issues, I (and GHM) never had the opportunity to cure or correct them. And now that GHM has been removed as manager, I *cannot* cure or correct them, though I could have done so (were there any need to cure) if the contractually-required procedures regarding notice, cure, termination, and mutual good faith attempt to resolve differences had been followed.

7.      Given that we have never discussed or attempted to resolve in good faith the complaints that Owner has listed in its Arbitration Request, I was surprised when Owner terminated the Management Agreement without any notice or opportunity for GHM to resolve those problems.

*Execution page to follow.*

2

I have read and subscribed to the above and swear, under oath, that the information is true and correct. I understand that a false statement in this affidavit will subject me to penalties for perjury.

_____
Hansjoerg Meier

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

Subscribed and sworn to before me this 4th day of May, 2012.



_____
Notary Public, Miami-Dade County

My Commission expires _____

LORENA FERNANDEZ
Notary Public - State of Florida
My Comm. Expires Jun 17, 2014
Commission # EE 2173
Bonded Through National Notary Assn.

3

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-17427 CA 10

GHM (SOUTH BEACH) LLC,
a Delaware limited liability company,

    Plaintiff,

v.

SETAI OWNERS LLC,
a Delaware limited liability company,
TREVI LUXURY HOSPITALITY GROUP,
INC., a Texas corporation, and SMB
MANAGEMENT LLC, a Florida limited
liability company,

    Defendants.

_____/



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of (1) Motion to Enjoin Use and Compel Return of GHM's Privileged Documents and Confidential Trade Secret Materials and to Enjoin Further Use of GHM's Trademarks and (2) Motion to Permanently Enjoin Or, In the Alternative, For a Preliminary Injunction Enjoining Defendant Setai Owners LLC From proceeding with the Arbitration Filed Before the International Court of Arbitration of the International Chamber of Commerce was served via Federal Express and/or e-mail on May 8, 2012 to all parties listed on the attached serviced list.

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Attorneys for Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800

By_____

      Kenneth R. Hartmann
      Florida Bar No. 664286
      Daniel F. Benavides
      Florida Bar No. 81675
      Douglas A. Wolfe
      Florida Bar No. 28671

337618.1

## Setai Service List
### Case No.12-17427 CA 10

James S. Renard, Esq.
Jack Ternan, Esq, Esq.
BICKEL & BREWER
4800 Comercia Bank Tower
1717 Main Street
Dallas, TX 75201

Trevi Luxury Hospitality Group, Inc.
Atef N. Mankarios, Registered Agent
2828 N. Harwood, Suite 1717
Dallas, TX 75201

Setai Owners, LLC
Corporation Service Co., Registered Agent
2711 Centerville Road, Suite 400
Wilmington, DE 19808

SMB Management, LLC
Corporation Service Co., Registered Agent
1201 Hays Street
Tallahassee, FL 32301