

# EXHIBIT 6

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:12-cv-21932-KMM / TORRES

GHM (SOUTH BEACH) LLC, a Delaware
limited liability company,

      Plaintiff,

v.

SETAI OWNERS LLC, a Delaware limited
liability company, TREVI LUXURY
HOSPITALITY GROUP, INC., a Texas
corporation, and SMB MANAGEMENT
LLC, a Florida limited liability company,

      Defendants.

_____/

## DECLARATION OF JACK G. B. TERNAN

1.     My name is Jack G. B. Ternan. I am fully competent and qualified in all respects to make this declaration. The facts set forth herein are true and correct and, unless otherwise qualified, are within my personal knowledge.

2.     I am an associate with Bickel & Brewer. Bickel & Brewer is co-counsel for Setai Owners LLC and SMB Management LLC in the above-captioned action. I am familiar with the correspondence between counsel for the parties.

3.     Attached hereto as Exhibit A is a true and correct copy of a letter from Daniel Benavides dated April 13, 2012.

4.     Attached hereto as Exhibit B is a true and correct copy of a letter from Kenneth Hartman dated April 13, 2012.

5.     Attached hereto as Exhibit C is a true and correct copy of a letter from James Renard dated April 18, 2012.

6.      Attached hereto as Exhibit D is a true and correct copy of a letter from Daniel Benavides dated April 24, 2012.

7.      Attached hereto as Exhibit E is a true and correct copy of a letter from James Renard dated May 4 ,2012.

8.      Attached hereto as Exhibit F is a true and correct copy of a letter from James Renard dated May 7, 2012.

9.      Attached hereto as Exhibit G is a true and correct copy of a letter from James Renard dated May 17, 2012.

10.     Attached hereto as Exhibit H is a true and correct copy of an e-mail exchange between Daniel Benavides and me, with the password information redacted.  In the e-mail, Mr. Benavides acknowledges receipt of a hard-drive containing copies of the hard-drives of desktops at the Hotel, which was sent to Mr. Benavides so that Plaintiff GHM (South Beach) LLC could review it for purposes of asserting ownership or privilege as to particular portions of the data on the hard-drive.

11.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of June, 2012.

Jack G. B. Ternan

# "EXHIBIT A"

## To the Declaration of Jack G.B. Ternan



**KOZYAK · TROPIN**
**THROCKMORTON**
A T T O R N E Y S   A T   L A W

**Daniel F. Benavides,** Esq.
dfb@kttlaw.com l 305.728.2980

April 13, 2012

**VIA EMAIL AND US MAIL**

James S. Renard, Esq.
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201

Re:   **Improper Termination of the Management Agreement dated March 20, 2000,
between Setai Owners LLC and GHM (South Beach) LLC (the "Management
Agreement") for the Setai Resort & Residences (the "Hotel")**

Dear Jim and Jack,

As you know, I was at the Hotel with Jack until yesterday identifying and attempting to retrieve all GHM property and employee personal effects. I am writing to follow up on open transition issues and in response to your letters dated April 4 and April 10, 2012.

**1.   Employee personal effects**

We believe most of the employee personal effects have now been removed from the Hotel. However, Jack refused to allow me to remove the personal rolodexes of Kevin Abramowitz and Hansjoerg Meier, as well as a copy of a rental program agreement for the St. Regis Hotel, which we believe are personal effects and should be returned to the employees. As discussed with Jack and until we are able to resolve this dispute, please send me a scanned copy of all business cards contained in the rolodexes and the St. Regis Hotel rental program agreement. If there are any other personal effects at the Hotel, I will let you know.

**2.   GHM Marks**

We remind you that further use of the GHM marks by Setai Owners and Trevi is strictly prohibited. On April 8, 2012, per your request, I provided you with a list of known items containing the GHM logo. Let me know if you need me to resend the list.

### 3. GHM proprietary information and materials

GHM reiterates its prior demand that Setai Owners and Trevi not review and immediately return all of GHM's confidential and proprietary information. As agreed, all remaining SOP manuals, training manuals, employee files, privileged and confidential communications, and information related to other GHM properties found on Hotel property must immediately be returned to me. GHM further demands the immediate return of the following items, which Jack did not allow me to remove from the property:

    a. Privileged and potentially privileged communications and materials relating to Hotel property inspections, financial audit reports, and rental program agreement negotiations.
    b. Marketing plans
    c. Sales and marketing materials for the Hotel and other GHM properties
    d. All pre-termination guest data, information, and files
    e. Any contracts between GHM and third parties
    f. Hotel reviews and reports made by or for third parties, including press releases and publications
    g. GHM product knowledge materials
    h. Internal meeting minutes and notes
    i. Rental program agreements and related materials and files
    j. Style guides
    k. Materials relating to Jaya Ibrahim
    l. General Manager handover notebook
    m. Pictures of employees
    n. Group, catering and banquet contracts and related event details
    o. Information related to GHM clients and travel agent contacts
    p. Sales reports
    q. GHM corporate audit materials
    r. Employee incentive pay sheets and summary reports
    s. Financial and other information relating to GHM USA and GHM Americas
    t. Documents relating to GHM's funding of Hotel opening expenses

GHM hereby demands that Setai Owners and Trevi not use, review, or otherwise access these materials until a court or tribunal determines their proper owner. If you choose to ignore this admonition, to the extent Setai Owners and Trevi intends to use, access, or review any of these materials for operation of the Hotel or otherwise without GHM's and/or court authorization, GHM hereby demands that Setai Owners and Trevi provide a list of all such materials to be used, accessed or reviewed and the purpose therefor.

GHM reserves the right to supplement this list as additional proprietary items and materials are identified.

### 4. Electronic Data, Records, and Files

GHM reiterates its demand that Setai Owners and Trevi refrain from accessing, searching, or using any electronic data, records, and/or files existing prior to termination. You have represented that (i) your client has retained an independent third party, Huron Consulting Group, to make forensic images of the servers and computer terminals and that Huron will be holding the images in its evidence lockers (ii) Setai Owners, Trevi, and its designees have not accessed, reviewed, searched or used any electronic data, records and/or files existing prior to termination, and (iii) neither GHM nor Setai Owners/Trevi will have access or be allowed to review or search these electronic records, data, and files without the prior written consent of the other party or an order of a court or tribunal.

When the forensic images are completed, we request that you provide us with a complete list of all servers and terminals imaged and obtain our written consent prior to deleting any electronic data, records or files. This task must be prioritized.

In addition to preserving the electronic data, records and files at the Hotel, GHM hereby demands that all security tapes at the Hotel from at least March 1, 2012 going forward be preserved pending resolution of the litigation/arbitration between the parties.

### 5. Outstanding pre-termination obligations

As previously mentioned, Setai Owners must immediately pay to GHM all known outstanding pre-termination amounts owed including, without limitation, employee 401K contributions, reimbursement for professional fees and other expenses incurred in connection with Hotel operations, February management fees in the amount of approximately $273,589.32, and March management fees. Please provide us with a copy of the March financial statement so that we can provide you with an accounting of known amounts owed.

This demand does not waive and is made without prejudice to GHM's right to seek additional damages, costs and expenses from Setai Owners incurred by GHM and its affiliates as a result of the termination of the Management Agreement and Setai Owners' pre- and post-termination actions.

### 6. Email Communications

To date and despite repeated requests, our client informs us that certain individuals are still unable to access their "ghmamericas.com" email accounts. It has further come to our attention that Setai Owners and/or Trevi are continuing to use/access the GHM email system to receive and send email correspondence. We repeat our demand that this must cease immediately, and we will hold Setai Owners and/or Trevi accountable for any damages resulting from this improper use of and interference with the GHM email system.

### 7. Setai Owners' Alleged Property

Per your request, we will provide you with a list of property, if any, in the possession of GHM employees that was either utilized in operation of the Hotel or paid for by Setai Owners.

### 8. GHM employees

We strongly reject any implication of wrongdoing on the part of GHM contained in your statement that GHM has "induced residents of the Abbey Hotel to cease their employment at the Hotel by promising, among other things, alternative housing until they return to their home country." As you are well aware, the Hotel employees were all GHM employees prior to termination. Trevi and Setai Owners, by threat of termination of their employment, have induced some GHM employees to cease their employment with GHM and work for Trevi. However, there are many employees who either did not want to work for Trevi or could not work for Trevi because of immigration visa issues (issues which Setai Owners and Trevi were irresponsibly unprepared to handle). GHM, in accordance with its contractual, legal, and moral obligations, has provided assistance to its employees, including offering a return flight to their home countries and accommodations in the event of an eviction by Setai Owners. It is our understanding that all of the employees living at the Abbey Hotel that do not intend to work for Trevi have either already departed or will be departing by early next week.

### 9. Pending third-party litigation related to Hotel operations

GHM was sued individually, along with Setai Owners, in that certain case styled *American Express v. Marisa Comaianni v. GHM (South Beach), LLC & Setai Owners, LLC*, Case No. 2011-08068T-GC pending before the 41B District Court for the County of Macomb, Michigan (the "Comaianni Case"). The case was brought by a Hotel guest seeking return of her deposit. GHM expects that Setai Owners will defend, indemnify, and hold harmless GHM from all claims made in the Comaianni Case as well as all other pending and future litigation brought against GHM individually as a result of its normal operation of the Hotel.

### 10. Other important issues

While at the Hotel, I noted several alarming instances of improper tampering with GHM's proprietary and privileged materials. For example, there were several privileged communications between myself and GHM senior management, including some relating to the arbitration case brought by your client against GHM, on the desk of the Hotel's former Director of Finance. Some of these communications contained highlighting marks which were not made before the termination, indicating that they had been reviewed by someone under the control of Setai Owners. Others were moved into bags or boxes from their original location. We noted similar tampering with employee files, I-9 immigration forms, and guest files. We also noted that a copy of GHM's most recent internal audit was missing from the Director of Finance's office. **We repeat our demand that GHM's proprietary and privileged information and materials should not be accessed, reviewed, used, or otherwise disturbed without the express written consent of GHM or a court order.**

Finally, we can agree to disagree for now about whether the takeover of the Hotel, made without any notice or an opportunity to cure and without following any of the termination procedures set forth in the Management Agreement, was lawful. However, it is disingenuous to argue that a "raid" does not truthfully describe the sudden, forceful, and deliberately demeaning and damaging manner in which GHM and its employees were removed from the Hotel property on the night of March 31, 2012.

Sincerely,

Daniel F. Benavides

cc:  Trevi Luxury Hospitality Group, Inc.
     (via fax to 214-220-9151)

KOZYAK · TROPIN
THROCKMORTON
ATTORNEYS AT LAW

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134

7520184505

James S. Renard, Esq.
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201



# "EXHIBIT B"

# To the Declaration of Jack G.B. Ternan



### KOZYAK · TROPIN
### THROCKMORTON
ATTORNEYS AT LAW

**Kenneth R. Hartmann,** Esq.
krh@kttlaw.com I 305.377.0657

April 13, 2012

Bickel & Brewer
Attn: William Brewer
1717 Main Street, Suite 4800
Dallas, TX 75201

**Re:     GHM / Setai Owners LLC**

Mr. Brewer:

By this letter, you and your clients are hereby given notice not to destroy, conceal or alter any paper or electronic files and other data generated by and/or stored on your clients' computers and storage media (e.g., hard disks, floppy disks, backup tapes), or any other electronic data, such as voice mail. As you know, your clients' failure to comply with this notice can result in severe sanctions being imposed by the Court and liability in tort for spoliation of evidence or potential evidence.

Through discovery we expect to obtain from you a number of documents and things, including files stored on your clients' computers and your clients' computer storage media, or in some cases, our own clients' of which you have taken possession.  In order to avoid spoliation, you must be prepared to provide the data requested on the original media.  Do not reuse any media on which potentially relevant data is presently stored.  Although we may bring a motion for an order preserving documents and things from destruction or alteration, your clients' obligation to preserve documents and things for discovery in this case arises in law and equity independently from any order on such motion.

Electronic documents and the storage media on which they reside contain relevant, discoverable information beyond that which may be found in printed documents.  Therefore, even where a paper copy exists, we may seek all documents in their electronic form along with information about those documents contained on the media. We also may seek paper printouts of only those documents that contain unique information after they were printed out (such as paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting and redactions) along with any paper documents for which no corresponding electronic files exist.

Our discovery requests may ask for certain data on the hard disks, floppy disks and backup media used in your clients' computers, some of which data are not readily available to

Letter to Bickel & Brewer
April 13, 2012
Page 2

an ordinary computer user, such as "deleted" files and "file fragments." As you may know, although a user may "erase" or "delete" a file, all that is really erased is a reference to that file in a table on the hard disk; unless overwritten with new data, a "deleted" file can be as intact on the disk as any "active" file you would see in a directory listing.

Accordingly, electronic data and storage media that may be subject to our discovery requests and that your clients are obligated to maintain and not alter or destroy, include but are not limited to the following:

Description of files and file types subject to discovery:

1.      All digital or analog electronic files, including "deleted" files and file fragments, stored in machine-readable format on magnetic, optical or other storage media, including the hard drives or floppy disks used by your clients' computers and their backup media (e.g., other hard drives, backup tapes, floppies, Jaz cartridges, CD-ROMs) or otherwise, whether such files have been reduced to paper printouts or not. More specifically, your clients are to preserve all of your e-mails, both sent and received, whether internally or externally; all word-processed files, including drafts and revisions; all spreadsheets, including drafts and revisions; all databases; all CAD (computer-aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and personal information management (PIM) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of personal data assistants (PDAs), such as PalmPilot, HP Jornada, Cassiopeia or other Windows CE-based or Pocket PC devices; all data created with the use of document management software; all data created with the use of paper and electronic mail logging and routing software; all Internet and Web-browser-generated history files, caches and "cookies" files generated at the workstation of each employee and/or agent in your client's clients' employ and on any and all backup storage media; and any and all other files generated by users through the use of computers and/or telecommunications, including but not limited to voice mail. Further, you are to preserve any log or logs of network use by employees or otherwise, whether kept in paper or electronic form, and to preserve all copies of your backup tapes and the software necessary to reconstruct the data on those tapes, so that there can be made a complete, bit-by-bit "mirror" evidentiary image copy of the storage media of each and every personal computer (and/or workstation) and network server in your control and custody, as well as image copies of all hard drives retained by you and no longer in service.

Your clients are also not to pack, compress, purge or otherwise dispose of files and parts of files unless a true and correct copy of such files is made.

Letter to Bickel & Brewer
April 13, 2012
Page 3

Your clients are also to preserve and not destroy all passwords, decryption procedures (including, if necessary, the software to decrypt the files); network access codes, ID names, manuals, tutorials, written instructions, decompression or reconstruction software, and any and all other information and things necessary to access, view and (if necessary) reconstruct the electronic data we are requesting through discovery.

2. **Online Data Storage on Mainframes and Minicomputers:** With regard to online storage and/or direct access storage devices attached to your clients' mainframe computers and/or minicomputers: they are not to modify or delete any electronic data files, "deleted" files and file fragments existing at the time of this letter's delivery, which meet the definitions set forth in this letter, unless a true and correct copy of each such electronic data file has been made and steps have been taken to assure that such a copy will be preserved and accessible for purposes of this litigation.

3. **Offline Data Storage, Backups and Archives, Floppy Diskettes, Tapes and Other Removable Electronic Media:** With regard to all electronic media used for offline storage, including magnetic tapes and cartridges and other media that, at the time of this letter's delivery, contained any electronic data meeting the criteria listed in paragraph 1 above: Your clients are to stop any activity that may result in the loss of such electronic data, including rotation, destruction, overwriting and/or erasure of such media in whole or in part. This request is intended to cover all removable electronic media used for data storage in connection with their computer systems, including magnetic tapes and cartridges, magneto-optical disks, floppy diskettes and all other media, whether used with personal computers, minicomputers or mainframes or other computers, and whether containing backup and/or archive data sets and other electronic data, for all of their computer systems.

4. **Replacement of Data Storage Devices:** Your clients are not to dispose of any electronic data storage devices and/or media that may be replaced due to failure and/or upgrade and/or other reasons that may contain electronic data meeting the criteria listed in paragraph 1 above.

5. **Fixed Drives on Stand-Alone Personal Computers and Network Workstations:** With regard to electronic data meeting the criteria listed in paragraph 1 above, which existed on fixed drives attached to stand-alone microcomputers and/or network workstations at the time of this letter's delivery: Your clients are not to alter or erase such electronic data, and not to perform other procedures (such as data compression and disk de-fragmentation or optimization routines) that may impact such data, unless a true and correct copy has been made of such active files and of completely restored versions of such deleted electronic files and file fragments, copies have been made of all directory listings (including hidden files) for all directories and subdirectories containing such files, and arrangements have been made to preserve copies during the pendency of this litigation.

Letter to Bickel & Brewer
April 13, 2012
Page 4

6. **Programs and Utilities:** Your clients are to preserve copies of all application programs and utilities, which may be used to process electronic data covered by this letter.

7. **Log of System Modifications:** Your clients are to maintain an activity log to document modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria listed in paragraph 1 above, regardless of whether such modifications were made by employees, contractors, vendors and/or any other third parties.

8. **Personal Computers Used by Your Employees and/or Their Secretaries and Assistants:** The following steps should immediately be taken in regard to all personal computers used by your clients' employees and/or their secretaries and assistants.

a.       As to fixed drives attached to such computers: (i) a true and correct copy is to be made of all electronic data on such fixed drives relating to this matter, including all active files and completely restored versions of all deleted electronic files and file fragments; (ii) full directory listings (including hidden files) for all directories and subdirectories (including hidden directories) on such fixed drives should be written; and (iii) such copies and listings are to be preserved until this matter reaches its final resolution.

b.       All floppy diskettes, magnetic tapes and cartridges, and other media used in connection with such computers prior to the date of delivery of this letter containing any electronic data relating to this matter are to be collected and put into storage for the duration of this lawsuit.

9. **Evidence Created Subsequent to This Letter:** With regard to electronic data created subsequent to the date of delivery of this letter, relevant evidence is not be destroyed and your clients are to take whatever steps are appropriate to avoid destruction of evidence.

In order to assure that your and your clients' obligation to preserve documents and things will be met, please forward a copy of this letter to all persons and entities with custodial responsibility for the items referred to in this letter.

Sincerely,

Kenneth R. Hartmann

336956/3515-106

Bickel & Brewer
Attn: William Brewer
1717 Main Street, Suite 4800
Dallas, TX 75201

FIRST CLASS MAIL



# "EXHIBIT C"

# To the Declaration of Jack G.B. Ternan

# BICKEL & BREWER

ATTORNEYS AND COUNSELORS
4800 COMERICA BANK TOWER
1717 MAIN STREET
DALLAS, TEXAS 75201
PHONE: (214) 653-4000
FAX: (214) 653-1015

www.bickelbrewer.com

707 FIFTH AVENUE
50TH FLOOR
NEW YORK, NEW YORK  10153
(212) 489-1400

April 18, 2012

<u>VIA E-MAIL AND U.S. MAIL</u>

Daniel F. Benavides, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Miami, FL  33134

   Re: Termination of Management Agreement dated March 20, 2000, between
      Setai Owners LLC ("Owner") and General Hotel Management Ltd., as
      Operator, as amended (the "Management Agreement"), relating to the
      management and operation of the Setai Resort & Residences (the
      "Hotel") located in Miami Beach, Florida

Dear Danny:

   This responds to your letter dated April 13, 2012.

## I.

## PRELIMINARY STATEMENT

   As an initial matter, it is important to recognize the legal standards applicable to the
documents, materials, and electronically-stored data relating to the Hotel.  Pursuant to Section 1
of Article XI of the above-referenced and now-terminated Management Agreement:

> The books of account and all other records relating to, or reflecting, the operation
> of the Hotel shall be kept at the Hotel . . . All such books and records shall be the
> property of the Owner . . . Upon the termination of the Agreement, all of such
> books and records up to the date of termination shall forthwith be delivered up to
> Owner so as to ensure the orderly continuance of the operation of the Hotel. . . .

Put simply, <u>all</u> records relating to the operation of the Hotel belong to Owner and, consequently,
must remain with Owner.  Indeed, if General Hotel Management Ltd. and/or GHM (South
Beach) LLC (together, "GHM") have any documents that either are located within GHM's home
office, GHM-managed hotels, or other facilities or are within the possession of any GHM

Daniel F. Benavides, Esq.
April 18, 2012
Page 2

employees (or ex-employees who are represented by GHM's counsel), and which relate to the operation of the Hotel, those materials must be turned over to Owner at once.[1]

Moreover, the fact that GHM may have created, generated, or maintained those records (or gathered and organized the information contained therein) in the course of operating the Hotel does not affect Owner's rights of ownership or control over those materials. As set forth in Section 1 of Article I of the Management Agreement, GHM's pre-termination operation of the Hotel was undertaken solely in its capacity as "agent of the Owner," and GHM has no right to possession or use of the information it acquired while acting as Owner's agent and operating the Hotel.[2] Furthermore, GHM was obligated, both before and after the termination of the Management Agreement, not to commingle Owner's property with its own or that of any third-party.[3]

Regrettably, your letter betrays a fundamental misunderstanding of the foregoing principles. GHM is claiming as its own property numerous categories of records, data, contracts, plans, customer information, marketing materials, and other items relating to the operation of the Hotel that are clearly the property of Owner. Furthermore, in the few instances in which you have identified information that may belong to GHM, your client improperly commingled it with Owner's information. Against that background, we address below the points raised in your most recent letter in the order in which you presented them.

---

[1] Such Owner information would include, but not be limited to, data regarding Setai Hotel guests and customers, Hotel financial statements and operating reports (or excerpts thereof), communications with owners of Setai condominium units, notes and minutes of any discussions regarding the Hotel, and any financial or operational audits of the Hotel – whether such information is in hard-copy or electronic form (and whether any such electronic data is stored in servers, hard-drives, personal computers, laptops, or handheld communications devices).

[2] See RESTATEMENT (THIRD) OF AGENCY § 8.05 ("An agent has a duty (1) not to use property of the principal for the agent's own purposes or those of a third party; and (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party."); id. at cmt. b. ("Termination of an agency relationship does not end an agent's duties regarding property of the principal. A former agent who continues to possess property of a principal has a duty to return it . . .").

[3] See RESTATEMENT (THIRD) OF AGENCY § 8.12 ("An agent has a duty . . . not to mingle the principal's property with anyone else's").

Daniel F. Benavides, Esq.
April 18, 2012
Page 3

## II.

### OWNER'S RESPONSE

**A.**     **Alleged Personal Effects**

You acknowledge that "most of the employee personal effects have now been removed from the Hotel." Nevertheless, you assert a claim to the Rolodexes of Kevin Abramowitz and Hansjoerg Meier as well as a form St. Regis rental program agreement. To the extent that the Rolodexes were used by Messrs. Meier and Abramowitz in connection with the performance of their duties as Owner's sub-agents — and contain names and contact information as to suppliers, sources of business, and other persons or entities important to the operation of the Hotel — they are Owner's property. If that premise is incorrect, please let us know. With respect to the form rental program agreement, we understand that you represented that such document was being used for purposes of evaluating possible modifications to the Setai form agreement. Based upon your representation, that form is not GHM's property. However, if GHM obtained that St. Regis document through improper means, Owner does not want it.

**B.**     **GHM Marks**

As we have repeatedly stated, Owner has no desire to utilize the GHM marks in the operation of the Hotel and is working diligently to complete its removal of all GHM marks from the property. At this time, Owner has removed most, if not all, of the GHM marks from the Hotel. However, because GHM placed the GHM marks on numerous categories of Hotel amenities and promotional materials (which are Owner's property), without the consent and against the wishes of Owner, Owner cannot yet represent to a certainty that all GHM marks have been removed from such property.

**C.**     **GHM Proprietary Information And Materials**

Owner does not intend to utilize GHM's confidential and proprietary information and has returned dozens of boxes of documents to GHM. Without conceding that such materials belong to GHM, Owner has turned over SOP manuals, training manuals prepared by GHM employees, employee files for GHM employees, allegedly-privileged communications between GHM and its counsel, and non-public information about other GHM properties found on the Hotel property, and will return to GHM any such materials remaining at the Hotel as they are located.

You state that "GHM further demands the immediate return of the following items, which Jack [Ternan] did not allow me to remove from the property," and you identify 20 categories of documents. Notably, you neither identify which of those categories of documents GHM claims are its property nor state a basis for any such claim. Given that many of items identified in the letter are clearly not GHM's property, it appears that GHM's demand for the materials is merely

Daniel F. Benavides, Esq.
April 18, 2012
Page 4

an improper attempt to prevent or hinder Owner's lawful operation of its own Hotel.
Nonetheless, Owner addresses below each of the 20 categories of documents:

### 1.   Privileged and potentially privileged communications and materials

Mr. Ternan informs me that you personally inspected documents to determine whether
they were privileged or potentially privileged, that you were given any documents that you were
able to affirmatively state were privileged, and that any documents that you asserted were
potentially privileged were separately identified, stored in specially-marked boxes identifying the
potentially privileged nature of materials, and placed in a locked room.  We have instructed
Owner and Trevi not to access or review any of the potentially privileged materials kept in the
locked room.

### 2.   Marketing plans

The marketing plans relate to the operation of the Hotel and are, therefore, Owner's
property.  If there is any legal authority that you believe stands for the contrary proposition,
please provide us with such authority and we will consider it.

### 3.   Sales and marketing materials for the Hotel and other GHM properties

As with marketing plans, the sales and marketing materials for the Hotel relate to the
operation of the Hotel and are, therefore, Owner's property.  Mr. Ternan informs me that he
allowed you to remove sales and marketing materials for other GHM properties, unless such
materials included the Hotel.  If you believe that any other sales and marketing materials specific
to existing GHM properties are still located at the Hotel, please identify such materials so that we
can return them to you.

### 4.   Pre-termination guest data, information, and files

The pre-termination guest data, information, and files relate to the operation of the Hotel
and are, therefore, Owner's property.  To the extent that the guest data includes information
gathered at other GHM-managed hotels regarding the guest stays there (which is information
over which Owner makes no claim of ownership), then we need to explore a way to extract that
information for turnover to GHM without detrimentally affecting the integrity and usability of
the remaining data.  Similarly, GHM must turn over to Owner any Setai guest information
located at GHM's corporate headquarters or other GHM-managed hotels.

### 5.   Contracts between GHM and third-parties

Any contracts between GHM and third-parties relating to the operation of the Hotel are
Owner's property.  Indeed, GHM had no authority to bind the Hotel or Owner to any contractual
obligations except as agent of Owner.  Furthermore, we are unaware of any contracts located at

Daniel F. Benavides, Esq.
April 18, 2012
Page 5

the Hotel that are between GHM and third-parties that do not involve the Hotel.  If you know of any such contracts, please specifically identify such materials so that we can return them to you.

### 6.     Hotel reviews and reports made by or for third-parties

Any hotel reviews and reports made by or for third-parties relating to or reflecting the operation of the Hotel and stored at the Hotel are Owner's property.  Mr. Ternan does not recall that you identified any reviews or reports made by or for third-parties that you contend are GHM's Property and that do not involve the Hotel.  If you are aware of any such reviews or reports, please specifically identify such materials so that we can return them to you.

### 7.     GHM product knowledge materials

It is not clear what you mean by "GHM product knowledge materials."  Please tell us precisely what materials you contend should be returned to you.

### 8.     Internal meeting minutes and notes

Internal meeting minutes and notes that relate to the operation of the Hotel are Owner's property.  If it is your contention that "internal" meetings took place at the Hotel or during periods in which Hotel employees were being paid for purportedly performing services for the Hotel, but which actually did not relate to the Hotel, please let me know.

### 9.     Rental program agreements and related materials and files

Rental program agreements and related materials and files relate to the operation of the Hotel and are, therefore, Owner's property.  However, if it is your contention that GHM, during the term of the Management Agreement and while acting as Owner's agent in connection with the operation of the Hotel, entered into rental agreements on its own behalf and for its own benefit, please identify those agreements.

### 10.    Style guides

The style guides for the Hotel relate to the operation of the Hotel and are, therefore, Owner's property.  Mr. Ternan informs me that he allowed you to take style guides for other GHM properties, unless such materials included the Hotel.  If you believe that any style guides for other GHM properties were retained, please specifically identify such materials so that we can return them to you.

### 11.    Materials relating to Jaya Ibrahim

As you know, Jaya Ibrahim was involved in the design of the Hotel and, therefore, any materials located at the Hotel that were produced by Jaya Ibrahim likely relate to the Hotel and

Daniel F. Benavides, Esq.
April 18, 2012
Page 6

are Owner's property. If there are such materials that do not relate to the Hotel and were not paid for by Owner, please let us know.

### 12.  General Manager handover notebook

The General Manager handover notebook is clearly a record that relates to the operation of the Hotel and, in fact, was presumably prepared for purposes of facilitating a smooth change from one Hotel general manager to another. It is, therefore, Owner's property.

### 13.  Pictures of employees

As you know, Owner permitted departing employees to take personal pictures with them, along with their other personal effects. To Mr. Ternan's knowledge, the only photographs of employees that remained behind were contained on a disc that was made prior to the termination for the purpose of creating a record of all the individuals working at the Hotel during a certain time period. Accordingly, the pictures relate to the operation of the Hotel and are, therefore, Owner's property. However, given that the disc is not necessary to manage the Hotel, Owner and Trevi have no present plans to use it in connection with operations.

### 14.  Group, catering, and banquet contracts and related event details

Group, catering, and banquet contracts relate to the operation of the Hotel and are, therefore, Owner's property.

### 15.  Information related to GHM clients and travel agent contacts

On an initial note, your reference to GHM "clients" is unclear. With respect to GHM hotels that are owned by third-parties, GHM's clients are the owners of the properties that GHM manages. The guests and customers of those hotels are not GHM's clients — they are the clients of the respective owners of those properties. In any event, regardless of the definition, information related to GHM clients and travel agent contacts that also relates to the operation of the Hotel is Owner's property. Mr. Ternan informs me that he already allowed you to take any information relating to GHM clients and travel agent contacts if it did not relate to the Hotel. If you believe that any similar information remains at the Hotel, please specifically identify such materials so that we can return them to you.

### 16.  Sales reports

Sales reports related to or reflecting the operation of the Hotel belong to Owner. Mr. Ternan informs me that he allowed you to take sales reports relating to other GHM properties. If you believe that any sales reports relating to other GHM properties were retained, please identify such materials so that we can return them to you.

Daniel F. Benavides, Esq.
April 18, 2012
Page 7

### 17.   GHM corporate audit materials

GHM corporate audit materials stored at the Hotel that relate to the operation of the Hotel are Owner's property.  Such audits were undoubtedly conducted for purposes of determining whether GHM was operating the Hotel, or portions thereof, in accordance with applicable standards.  Additionally, GHM corporate audit materials that relate to or reflect the operation of the Hotel, or that constitute books of account for the Hotel, that are stored by GHM at another location are Owner's property and must "forthwith be delivered up to Owner" in accordance with the Management Agreement.  Please turn over any such materials to Owner immediately.

### 18.   Employee incentive pay sheets and summary reports

Arguably, all employee incentive pay sheets and summary reports are Owner's property because such records relate to the operation of the Hotel and/or constitute books of account. Nonetheless, Mr. Ternan permitted you to retain most employee incentive information as part of the employee files.  The only employee incentive pay information retained over your objection was of a broad nature and will be kept solely for the purpose of preserving information relating to a critical component of Hotel payables.

### 19.   Financial and other information relating to GHM USA and GHM Americas

Owner was disturbed to learn that GHM was commingling the record-keeping of the Hotel with that of other GHM activities, thus creating a post-termination problem of GHM's own making.   The Hotel's files and electronic information systems were never meant to be repositories for GHM documents and data unrelated to the Hotel.  Nor were Hotel employees being paid to work with such information.  One unfortunate consequence of these inexcusable practices is that, in your words, "financial and other information relating to GHM USA and GHM Americas" was apparently stored at the Hotel.  In cooperation with you, Owner has taken steps to segregate information potentially belonging to GHM USA and GHM Americas from the other records at the Hotel.  However, without an inspection of those materials, it is impossible to know if they relate to the Hotel and/or constitute books of account for the Hotel.  Indeed, at the time of Owner's termination of the Management Agreement, GHM managed no hotels in the U.S., let alone the Americas, other than Owner's Hotel.  Accordingly, those materials cannot be turned over to GHM at this time.

### 20.   Documents relating to GHM's funding of Hotel opening expenses

Documents relating to GHM's funding, if any, of Hotel opening expenses relate to the operation of the Hotel and/or constitute books of account and, therefore, such documents are Owner's property.

Daniel F. Benavides, Esq.
April 18, 2012
Page 8

**D.    Electronic Data, Records, And Files**

    **1.    GHM's demand and alleged representations**

You state in your letter that "GHM reiterates its demand that Setai Owners and Trevi refrain from accessing, searching, or using any electronic data, records, and/or files existing prior to termination." GHM's demand flatly contradicts Article XI, Section 1 of the Management Agreement and evidences your client's continued refusal to abide by that agreement. Owner has the right to use and review, *inter alia*, all records pre-dating the termination that relate to or reflect the operations of the Hotel.

You also incorrectly recite what we have told you with respect to the electronic data. While Owner has retained Huron Consulting Group to make forensic images of the servers and computers, and Huron will be holding those images in its evidence lockers, Owner has not represented that it will refrain from accessing, reviewing, searching, or using electronic data existing prior to the termination. In fact, Mr. Ternan explicitly informed you and Mr. Hartmann on Thursday, April 12, 2012, that Owner intended to use the electronic data that belongs to Owner.

    **2.    List of servers and computers that were imaged**

The following is a list of the servers that have been imaged by Huron Consulting:

1. SETAI-FILESVR
2. SETAI-FIN
3. SETAI-AB
4. SETAI-SALES
5. SETAI-DC
6. SETAI-9700
7. SETAI-ENG
8. SETAI-EXCH
9. SETAI-ISI
10. SETAI-GMS
11. SETAI-SPICE
12. SETAI-TIMESAVER (A4760 SERVER)

In addition, set forth below is a list of the computers, identified by custodian, that have been imaged by Huron Consulting:

Daniel F. Benavides, Esq.
April 18, 2012
Page 9

1. Crain, Katherine

2. Meier, Hans

3. Guimei, Moustapha

4. Zhao, Jane

5. Collazo, Jorge

6. Abramowicz, Kevin

7. Espinosa, Jose

8. Vasquez, Xavier

9. Wendt, Melody

10. Choi, Jung

11. Lui, Meizi

12. Robinson, Paul

13. Randall, Lorraine

14. Werly, David

15. Cavatore, Phillip

16. Martinez, Mario

17. Almeida, Leslie

18. Sibug, Priscila

19. Okeefe, Greg

20. Paalman, Rene

**3.**     **Security Tapes**

You demand that Owner preserve the security tapes at the Hotel from at least March 1, 2012 "going forward."  In early March 2012, GHM replaced the security camera recording system.  Owner intends to make a copy of the security tapes from the initiation of that system until the date of copying, which will likely be this week, and preserve that copy pending a resolution of the arbitration between the parties.  It is not Owner's intention to indefinitely preserve all data from the security cameras generated while the arbitration is pending, nor do we see any conceivable relevance of such recordings.

Daniel F. Benavides, Esq.
April 18, 2012
Page 10

**E.   Outstanding Pre-Termination Obligations**

You request a copy of the March financial statement in order to provide an accounting of amounts owed by Owner to GHM. Unfortunately, in the short time that Owner has had access the books and records of the Hotel, Owner has uncovered what it believes to be pervasive accounting irregularities that cast serious doubt on the accuracy and reliability of the financial statements previously prepared by GHM. The March financial statement underway at the time of the transition cannot be relied upon to determine any management fees potentially owed by Owner to GHM.

**F.   E-Mail Communications**

GHM's improper commingling of its Hotel-related information with other information is further reflected in the fact that the "ghmamericas.com" e-mail accounts were hosted on one of Owner's computers at the Hotel, and those e-mail accounts were intertwined with user accounts utilized to operate the Hotel. As a result, it was not possible for certain GHM employees to continue accessing their e-mail accounts following the termination of the Management Agreement once their operational accounts at the Hotel were disabled. While this outcome was unfortunate, it could easily have been avoided had GHM complied with its fiduciary duties and segregated the information relating to the operation of the Hotel. Owner remains willing to work with GHM to find a way to allow GHM to utilize its e-mail accounts.

You state that "[i]t has further come to our attention that Setai Owners and/or Trevi are continuing to use/access the GHM email system to receive and send email correspondence." You are misinformed. The "ghmamericas.com" e-mail accounts have been disabled in accordance with your request, and no one can send or receive e-mail messages from those accounts. After Mr. Ternan's conversation with you on this topic last week, he undertook a further investigation and learned that some individuals had configured the version of Microsoft Outlook operating on their work computers to store a duplicate of their "ghmamericas.com" e-mails on their work computer. Accordingly, such individuals had access to their pre-termination e-mail correspondence. It was our intention to delete that duplicate copy and prevent such individuals from accessing their pre-termination e-mail correspondence, but before we were able to do so, we received your letter instructing us not to delete any electronic data. Please advise if you would like us to delete the local copies of the "ghmamericas.com" e-mail data.

However, because the "ghmamericas.com" e-mail system undoubtedly contains information that is the property of Owner (as records relating to the operation of the Hotel) in addition to other information, it is imperative that our respective clients reach agreement on a process for separating those two categories and ensuring that Owner's property is promptly returned to Owner.

Daniel F. Benavides, Esq.
April 18, 2012
Page 11

## G.   Owner's Property

As the foregoing demonstrates, GHM and its employees are likely in possession of multiple categories of Owner's property.  In order to ensure that Owner has all information and other property necessary for the continued operation of the Hotel, and that none of that information and property is compromised or misused, we need the list that you undertook to provide us of the property in the possession of GHM employees that was either utilized in the operation of the Hotel or paid for by Owner.  That property must be turned over to Owner forthwith.

## H.   GHM Employees

We disagree with your contentions regarding the events and circumstances relating to the employment and cessation of employment of various individuals previously working at the Hotel; however, we believe such issues will be resolved in the arbitration and need not be addressed here.  In addition, it is our understanding that all individuals who chose not to be employed with new management have now departed from the Abbey Hotel.

## I.   Pending Third-Party Litigation Related To Hotel Operations

Owner intends to comply with Article XVIII of the Management Agreement, to the extent the terms and provisions thereof apply to any litigation to which GHM is a party and is contractually entitled to a defense and/or indemnification from Owner, and in which GHM is not otherwise guilty of gross negligence or willful misconduct.

## J.   Other Issues

You identify a handful of examples of purportedly "alarming instances of improper tampering with GHM's proprietary and privileged materials."  All but one of the examples involve the movement of records relating to the operations of the Hotel (*i.e.*, Owner's property), and there is nothing improper about moving such records from one location within the Hotel to another.  With respect to the highlighting of certain documents in the Director of Finance's office purportedly containing privileged communications, I am informed that such office was disorganized when the change in management occurred, and one of the employees (who is not a lawyer and did not recognize the allegedly privileged nature of those documents) attempted to organize that information by highlighting and then alphabetizing the documents.  In any event, that employee did not read the documents other than to identify how to organize the information and, further, those documents have now been turned over to you.

Finally, there is little purpose in arguing with you about how to characterize or describe the transition to new management; however, it is inaccurate to state that any employees were removed from the Hotel property in a deliberately demeaning or damaging manner on March 31,

Daniel F. Benavides, Esq.
April 18, 2012
Page 12

2012, or at any other time. Owner took every step possible to ensure that employees were treated with respect.

III.

**CONCLUSION**

Danny, we should attempt to promptly resolve the issues identified above. To the extent, however, that your clients agree to disagree over one or more of these property-related questions, we should present the parties' dispute to the arbitration panel as soon as practicable. To that end, we suggest that GHM nominate its proposed arbitrator on an expedited basis and that, after their qualification and certification, Owner's and GHM's respective arbitrators immediately appoint the third member of the panel (the International Court of Arbitration has informed us that the two party-appointed arbitrators may choose the third). In that way, we can submit to the full panel any requests for provisional relief at the earliest possible date.

If you have any questions or comments, please do not hesitate to contact us.

Sincerely,

James S. Renard

cc:    Kenneth R. Hartmann, Esq.

# "EXHIBIT D"

# To the Declaration of Jack G.B. Ternan



KOZYAK · TROPIN
THROCKMORTON
A T T O R N E Y S   A T   L A W

**Daniel F. Benavides,** Esq.
dfb@kttlaw.com | 305.728.2980

April 24, 2012

**VIA EMAIL AND US MAIL**

James S. Renard, Esq.
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201

> **Re:  Improper Termination of the Management Agreement dated March 20, 2000, between Setai Owners LLC and GHM (South Beach) LLC (the "Management Agreement") for the Setai Resort & Residences (the "Hotel")**

Dear Jim,

I am writing in response to your letter dated April 18, 2012. Unfortunately, based on your actions to date and the tone and substance of your letters, it is clear that you have no intention of cooperating to resolve open transition issues amicably, and that you and your clients are completely unconcerned with the damage you have caused GHM and are continuing to cause GHM as a result of the improper raid and your seizure of GHM's proprietary and privileged information. It is further clear that we have a fundamental disagreement regarding this case and the relationship between our clients which will need to be resolved through litigation. Accordingly, I will not respond to your legal commentary in this letter.

Instead, I will simply reiterate the following demands that GHM has made since the night of the raid and which still remain unsatisfied:

1.  Setai Owners must return all the personal property of GHM employees. This personal property includes the rolodexes of Messrs. Meier and Abramowitz as well as the St. Regis rental program agreement. If Setai Owners would like to make a copy of these items to preserve for litigation, that is fine. However, the property must be returned immediately. Your statement that GHM may have "obtained that St. Regis document through improper means" is ridiculous and insulting.

2. Setai Owners must immediately cease any and all use of the GHM marks. GHM will hold Setai Owners and its cohorts responsible for any damages resulting from the improper use of the marks. Your excuse that Setai Owners is "working diligently to complete its removal of the GHM marks" is unacceptable, as it was Setai Owners' decision to terminate the Management Agreement without notice and without providing for an orderly transition.

3. Setai Owners must immediately return all confidential, proprietary, and privileged information which clearly belongs to GHM, including SOP manuals, employee files, and privileged documents. As you well know, these items are scattered all over the Hotel and are on the electronic drives being used by Setai Owners and Trevi. Again, your "we are working on it" excuse is unacceptable, as it was Setai Owners' decision to terminate the Management Agreement without notice and without providing for an orderly transition. GHM will hold Setai Owners and its cohorts responsible for all damages resulting from your seizure and use of these materials. As I mentioned in my previous letter and as you admitted in your response letter, we have found evidence that Setai Owners has already tampered with GHM's proprietary and privileged information.

4. GHM previously demanded and continues to demand that Setai Owners and Trevi not use, review, or otherwise access the materials listed in my letter dated April 13, 2012 until a court or tribunal determines their proper owner. Your letter indicates that you are choosing to ignore this admonition. Accordingly, to the extent Setai Owners and Trevi intend to use, access, or review any of these materials for operation of the Hotel or otherwise without GHM's and/or court authorization, GHM repeats its demand that Setai Owners and Trevi maintain a list for purposes of litigation of all such materials to be used, accessed or reviewed and the purpose therefor. GHM will hold Setai Owners and its cohorts accountable for all improper use of GHM's proprietary materials as well as the destruction of or failure to maintain evidence relevant to litigation.

5. Setai Owners and its cohorts must not access, review, search or use electronic data existing prior to termination, as much of the electronic data may be GHM's proprietary, privileged, and confidential information and/or materials. Again, your letter indicates that you are choosing to ignore this admonition. Accordingly, please identify which specific steps you are taking to ensure GHM's electronic materials are protected and that GHM is not further damaged.

6. Setai Owners must provide GHM with a financial statement for March so that it may determine its management fees for that month. Setai Owners must also provide GHM access to the accounting records so that it can determine all pre-termination amounts owed to GHM. We view your allegation that "accounting irregularities" have been discovered as a delay tactic. As you and your client know, all financial information was shared with Setai Owners throughout the course of the relationship between the parties.

7. Setai Owners and its cohorts must immediately cease all use of the ghmamericas.com email accounts and refrain from tampering with such accounts. Setai Owners was well aware, prior to the raid, that these accounts were hosted at the Hotel. Again, your "we are



working on it" excuse is unacceptable, as it was Setai Owners' decision to terminate the Management Agreement without notice and without providing for an orderly transition.

Setai Owners has greater financial resources than GHM and Setai Owners had several months to plan for the secret raid of the Hotel and the ensuing legal battle. Furthermore, Setai Owners seized GHM's documents and electronic files containing all evidence pertaining to this case. Nevertheless, rest assured that we are working as quickly as possible to respond to the actions taken by Setai Owners and its cohorts and to protect GHM's rights. To that end, please advise when you intend to provide us with access to the servers listed in your letter or, at a minimum, copies of the servers, so that we may move forward.

Sincerely,

Daniel F. Benavides

cc:  Trevi Luxury Hospitality Group, Inc.
     (via fax to 214-220-9151)



# "EXHIBIT E"

## To the Declaration of Jack G.B. Ternan

# BICKEL & BREWER

ATTORNEYS AND COUNSELORS
4800 COMERICA BANK TOWER
1717 MAIN STREET
DALLAS, TEXAS 75201
PHONE: (214) 653-4000
FAX: (214) 653-1015

www.bickelbrewer.com

767 FIFTH AVENUE
50TH FLOOR
NEW YORK, NEW YORK 10153
(212) 489-1400

May 4, 2012

<u>VIA E-MAIL AND U.S. MAIL</u>

Daniel F. Benavides, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Miami, FL 33134

> Re: Termination of Management Agreement dated March 20, 2000, between Setai Owners LLC ("Owner") and General Hotel Management Ltd., as Operator, as amended (the "Management Agreement"), relating to the management and operation of the Setai Resort & Residences (the "Hotel") located in Miami Beach, Florida

Dear Danny:

This replies to your letter dated April 24, 2012.

Your letter is essentially a non-response to my correspondence dated April 18, 2012. Despite the fact that both the contract and agency law make clear that almost all of the information referenced in your letter belongs to Owner, you continue to demand, without authority or support, that those documents and data be turned over to you. In addition, you have failed to respond to many of our inquiries. It is impossible to resolve the "open transition issues amicably" when you refuse to provide any legal or factual basis for your contentions.

## A.    Response To Your "Demands"

### 1.    Alleged personal property

You reiterate your demand for the rolodexes of Messrs. Meier and Abramowitz and a St. Regis rental program agreement. You did not respond to our inquiry regarding whether the rolodexes and agreement were used or intended to be used in the performance of their duties as Owner's sub-agents. Based on your prior statements to Mr. Ternan, it appears that these materials are the property of Owner. Until you provide us a legal or factual basis for concluding otherwise, Owner will retain possession of these materials.

Daniel F. Benavides, Esq.
May 4, 2012
Page 2

### 2.     **GHM marks**

You reiterate your demand that Owner cease using the GHM marks at the Hotel. Owner believes that all such marks have been physically removed or removed from public view. If you have contrary facts of which Owner is unaware, please share them with us.

### 3.     **Purported confidential, proprietary, and privileged information.**

You reiterate your demand that Owner turn over purported confidential, proprietary, and privileged information. Owner has returned most, if not all, of the SOP manuals, employee files, and privileged hard-copy documents in its possession. With respect to the electronic data, GHM has provided contradictory instructions and failed to clarify its request. Do you want us to segregate the electronic information residing on Owner's computers that may be GHM's property or do you want us to leave the data where it was residing prior to the transition? It is not possible to do both of these things. It is Owner's preference to segregate the information.

### 4.     **Accounting information**

In your letter, you again request a financial statement for March and incorrectly state that "all financial information was shared with Setai Owners throughout the course of the relationship between the parties." Prior to the termination, GHM repeatedly failed to provide basic financial information to Owner. In fact, GHM's lack of professionalism when responding to Owner's requests for information was one of the grounds for terminating the Management Agreement. Now that Owner has access to the accounting records, it is clear that the little information that GHM did provide to Owner was not accurate.

### 5.     **The "ghmamericas.com" email server**

In your letter, you again demand that Owner cease all use of the ghmamericas.com email accounts and refrain from tampering with such accounts. As stated in previous correspondence, the email accounts have been disabled and are not being used. Owner continues to ask that GHM work with us to determine a process for separating the information in the email accounts belonging to Owner from the information belonging to GHM.

### 6.     **Access to server data**

In the last sentence of your letter, you request access to the servers and/or copies of the servers. On what basis does GHM contend it is entitled to access Owner's servers or copies of the data on Owner's servers?

Daniel F. Benavides, Esq.
May 4, 2012
Page 3

**B.** **Reiteration Of Prior Requests**

GHM has not responded to several inquiries raised in prior correspondence, including the following.

**1.** **Turnover of records belonging to Owner**

As noted in my letter dated April 18, 2012, the Management Agreement provides that "[u]pon termination of the Agreement, all of such books and records up to the date of termination shall forthwith be delivered up to Owner." It has been a month since the termination of the agreement, and GHM has not turned over any records relating to the Hotel, including, but not limited to, originals and copies located in GHM's corporate offices and other GHM-managed resorts, concerning, *inter alia*, the Hotel's guests, financial performance, and GHM's Hotel-related corporate audits. When will we be receiving that information?

**2.** **Turnover of property belonging to Owner held by GHM employees**

You previously stated that you would prepare a list of property that is being held by GHM employees and that was paid for by Owner or used by the employee as part of the operation of the Hotel. We have not received the list. When will we be receiving that information?

**3.** **Document and data preservation**

What steps has GHM taken to prevent the destruction of documents and data relevant to the pending arbitration? We have received no response to our past inquiries.

**4.** **Contracts**

You had previously requested that Owner provide you with contracts between GHM and third-parties. I responded that Owner is unaware of any such contracts that do not involve the Hotel, and that if you were aware of such contracts, I requested that you identify such materials. You have not identified any contracts that GHM contends were between GHM and third-parties that were unrelated to the Hotel. Accordingly, it appears that GHM contends that there are no such contracts.

**5.** **"GHM product knowledge materials"**

You have previously requested that Owner turn over "GHM product knowledge materials," and I requested that GHM provide further clarification regarding what documents or data was being requested. GHM has provided no clarification.

Daniel F. Benavides, Esq.
May 4, 2012
Page 4

## C.     Additional Open Issues

The following issues are also outstanding:

### 1.     Carlos H. Lopez v. Setai Owners LLC and GHM (South Beach) LLC

We have received the complaint and jury demand in the above-referenced case. Based on Owner's initial review of the complaint, it appears that the conduct alleged, if true, constitutes gross negligence or willful misconduct by GHM. Accordingly, Owner likely has no indemnification obligation with respect to the claims asserted in that case. GHM should prepare to defend itself in the litigation.

It has come to our attention that GHM has sought to retain Patrick DeBlasio, Esq. of Littler Mendelson, P.C. to represent it in this employment matter. Mr. DeBlasio has requested that Owner sign a conflict waiver. Owner is willing to waive any conflict presented by Mr. DeBlasio's representation of GHM in the defense of claims asserted by Mr. Lopez, but is not willing to waive any conflict that may be presented by Mr. DeBlasio or his firm representing GHM in a manner adverse to Owner, which would include filing cross-claims against Owner in that employment case or otherwise initiating a separate action against Owner with respect thereto.

### 2.     GHM's reversal of the 401(k) contributions

The information provided by GHM regarding the amount of the 401(k) contributions outstanding, and attempting to explain (unsuccessfully so) why the pre-termination contributions were reversed, is inadequate to satisfy Owner's concerns. Because Owner does not have access to the information necessary to compute or verify the appropriate amount for the 401(k) contributions, GHM should promptly pay the amount of the outstanding contributions and provide Owner an accounting of what is owed.

## D.     Conclusion

Owner would like to resolve the foregoing issues by agreement and as soon as possible. However, as indicated, we need additional information from you and your clients in response to our outstanding inquiries. We hope that your firm and GHM will cooperate and work with us to further pare down, if not eliminate, the list of disputed transition-related matters – so that we can focus on the arbitration and the claims asserted therein.

Daniel F. Benavides, Esq.
May 4, 2012
Page 5

We look forward to your response.

Sincerely,

James S. Renard

cc:   Kenneth R. Hartmann, Esq.

# "EXHIBIT F"

## To the Declaration of Jack G.B. Ternan

# BICKEL & BREWER

ATTORNEYS AND COUNSELORS
4800 COMERICA BANK TOWER
1717 MAIN STREET
DALLAS, TEXAS 75201
PHONE: (214) 653-4000
FAX: (214) 653-1015

www.bickelbrewer.com

767 FIFTH AVENUE
50TH FLOOR
NEW YORK, NEW YORK   10153
(212) 489-1400

May 7, 2012

<u>**VIA E-MAIL**</u>

Daniel F. Benavides, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Miami, FL  33134

> Re:   Termination of Management Agreement dated March 20, 2000, between Setai Owners LLC ("Owner") and General Hotel Management Ltd., as Operator, as amended (the "Management Agreement"), relating to the management and operation of the Setai Resort & Residences (the "Hotel") located in Miami Beach, Florida

Dear Danny:

This responds to your e-mail dated May 4, 2012.

You are obviously attempting to fabricate an inaccurate record of events regarding Owner's good faith attempts to work with you to ensure the return of any property belonging to General Hotel Management Ltd. or GHM (South Beach) LLC (together "GHM") that is still located at the Hotel.  We wish to set the record straight with respect to Owner's diligent efforts to resolve any remaining issues related to ownership and possession of records at the Hotel.

For the two weeks immediately following the transition to new management, you and Mr. Ternan of this firm, along with certain present and/or former GHM employees, reviewed and segregated documents located at the Hotel into three categories:  (1) those belonging to Owner; (2) those likely belonging to GHM; and (3) those as to which ownership is presently in dispute. This joint effort was completed on April 12, 2012.  While that process was underway, Huron Consulting was making forensic copies of the relevant servers and computers.

It was our expectation that a similar segregation process for electronically-stored data would occur.  However, on April 13, 2012, you sent a letter that materially misstated prior conversations regarding electronic data and requested a list of servers and computers imaged. Your letter did not propose any plan for segregating or otherwise addressing GHM's prior commingling of its own data with data belonging to Owner.  Moreover, on Monday, April 16,

Daniel F. Benavides, Esq.
May 7, 2012
Page 2

2012, we received a letter from Mr. Hartmann, dated April 13, 2012, asserting completely improper requests regarding data preservation,[1] but likewise making no mention of segregating or otherwise addressing the GHM-commingled data.

By letter dated April 18, 2012, I identified the relevant contract provisions and legal principles demonstrating that most of the documents and data at the Hotel belong to Owner. My letter also provided a list of the computers and servers that had been imaged and reiterated that "it is imperative that our respective clients reach agreement on a process for separating" the information belonging to GHM from the information belonging to Owner.

In purported reply, on April 24, 2012, you sent a letter that was essentially a non-response to my prior correspondence. In particular, you did not state any intent to cooperate with Owner in a process for segregating data belonging to Owner from that supposedly belonging to GHM. Instead, you reiterated your previous demands that the pre-termination data not be altered or reviewed. Of course, if we are not permitted to review the data and you are not willing to assist in segregating that data, it is not possible to provide you with GHM's electronically-stored information, if any. Furthermore, your demand for return of GHM's property appears disingenuous, given your refusal to engage in a good faith discussions to identify the property in which GHM truly has an ownership interest (the existence of which depends, in large part, upon the relevant provisions of the Management Agreement and applicable law).[2]

By letter dated May 4, 2012, I again requested that GHM cooperate in an effort to segregate data that may belong to GHM from other data residing on Owner's electronic systems. In your e-mail response dated May 4, 2012, you ignored that request and tried to portray Owner as uncooperative by stating, "I have asked you and Jack several times when we are going to get access to the servers and/or copies of the servers so that we can identify which documents are ours." While such discussions did occur prior to the letters dated April 13, 2012, since that time,

---

[1] We responded to Mr. Hartmann's correspondence on April 26, 2012. *See* Letter from William Brewer to Kenneth Hartmann, dated April 26, 2012, at 1-2 ("In effect, you are demanding that Owner 'freeze' the present state of its record-keeping and data-storage files, systems, and processes. No such obligation exists in the law, and your demand for compliance with such a non-existent obligation is improper . . . Companies are not obligated to shut down their operations or place their record-keeping on hold merely because they happen to be parties to legal proceedings. Rather, their obligation is to preserve relevant information. With respect to that duty, Owner has taken and continues to take steps to preserve such information. Those efforts have included, but are not limited to, obtaining copies of the contents of numerous servers and computers. . . . Please advise us of what steps, if any, GHM has taken to preserve relevant materials and electronic information."). Mr. Hartmann never responded to Mr. Brewer's letter and, more importantly, GHM never responded to Owner's request that GHM confirm compliance with its duty to preserve potential evidence and other relevant information.

[2] *See* Letter from Daniel Benavides to James Renard, dated April 24, 2012, at 1 ("I will not respond to your legal commentary . . . I will simply reiterate [GHM's] demands").

Daniel F. Benavides, Esq.
May 7, 2012
Page 3

you have rebuffed our invitations to discuss the segregation of the data on the servers and have simply repeated your unsupportable claims that Owner cease using its electronic systems.

It appears from your e-mail that GHM may now be willing to work with Owner to review and segregate any data that may belong to GHM from the rest of the data residing on Owner's electronic systems. To that end, we propose a conference call occur on Wednesday, May 9, 2012, to discuss ways of addressing the different types of data. Owner anticipates that the approach for addressing data on the disabled "ghmamericas.com" e-mail server will differ from the approach for addressing data on the live electronic systems.[3] For the live systems, Mr. Ternan can be available later this week to meet with you to review the network and file systems on the active servers.

We look forward to your prompt response.

Sincerely,

James S. Renard

cc:    Kenneth R. Hartmann, Esq.

---

[3] For the e-mail server, some method for separating GHM's allegedly privileged or proprietary information from the information belonging to Owner will need to be devised. It may also make sense to consider how e-mails from the server will be addressed for purposes of document production so that the expense of reviewing individual e-mails first for ownership and later for responsiveness can be avoided.

5267474.2
2159-02

# "EXHIBIT G"

## To the Declaration of Jack G.B. Ternan

# BICKEL & BREWER

ATTORNEYS AND COUNSELORS
4800 COMERICA BANK TOWER
1717 MAIN STREET
DALLAS, TEXAS 75201
PHONE: (214) 853-4000
FAX: (214) 853-1015

www.bickelbrewer.com

767 FIFTH AVENUE
50TH FLOOR
NEW YORK, NEW YORK  10153
(212) 489-1400

May 17, 2012

**VIA E-MAIL**

Daniel F. Benavides, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Miami, FL  33134

> Re:   Termination of Management Agreement dated March 20, 2000, between Setai Owners LLC ("Owner") and General Hotel Management Ltd., as Operator, as amended (the "Management Agreement"), relating to the management and operation of the Setai Resort & Residences (the "Hotel") located in Miami Beach, Florida

Dear Danny:

This responds to your letters dated May 8 and 16, 2012.

As a preliminary matter, we are compelled to address the allegation set forth in your letter dated May 8, 2012, that Owner has exhibited a "lack of cooperation" with respect to property-related issues.  To the contrary, Owner's good faith desire to resolve those issues – most of which are the result of GHM's commingling of its own information with that belonging to Owner, refusal to recognize the Management Agreement's clear provision that all "books of accounts and all other records relating to, or reflecting, the operation of the Hotel" are "the property of the Owner," and wrongful denial of its pre-termination agency relationship with Owner – is reflected in our multiple letters on those subjects and the numerous hours that we have spent with you and your colleagues in furtherance of bringing closure to those issues.

Furthermore, your assumption that our "new, more cooperative tone" is somehow the result of Owner being "served with a copy of [y]our state court complaint" is wrong.  We did not even see your complaint until May 8, and my letter dated May 7, 2012, exhibited the same "cooperative tone" that characterized my prior correspondence.  That said, I will now address the specifics of your letter in light of our subsequent discussions and meetings.

Daniel F. Benavides, Esq.
May 17, 2012
Page 2

### A.     Rolodexes And St. Regis Rental Program Agreement

Based on your representation that the St. Regis Rental Program Agreement was in the former general manager's office because he was considering personally purchasing a unit at a St. Regis (which is materially different than what you had previously told Mr. Ternan), we have turned the agreement over to you.  In addition, you have been provided with electronic copies of the rolodexes.

### B.     GHM Marks

You conducted a walkthrough of the Hotel on Thursday, May 10, 2012, not Wednesday, May 9, as stated in your latest letter.  You did not identify any GHM marks in the guest rooms or public areas of the Hotel, although there were a few instances of materials bearing a GHM mark being found in the non-public, back-of-house areas.  We trust that the walkthrough has resolved GHM's concerns that its trademarks were being intentionally used in connection with the sale of hotel and restaurant services to guests and the general public.

With respect to the GHM marks on the keys that GHM previously issued to the unit owners, Owner is attempting to retrieve those keys from the unit owners and is issuing new keys without the GHM logo.  Of course, the unit owners are not under Owner's control and, therefore, Owner cannot make any assurances that its retrieval efforts will be immediately successful.

Moreover, as Mr. Ternan mentioned during the walkthrough, some of the materials with the GHM mark that were removed from the Hotel are currently in storage at a warehouse.  We would like to schedule a walkthrough of the warehouse so that decisions can be made regarding the return, destruction, or sale of those materials.

### C.     GHM's Purportedly Privileged And Trade Secret Materials

We have repeatedly advised GHM of Owner's position regarding the ownership of particular materials.  Despite those repeated statements, GHM continues to misstate Owner's position.  To reiterate, the Management Agreement provides that all records that relate to or reflect the operation of the Hotel are the property of Owner.

In your letter, you identify five categories of materials that you contend that Owner agrees belong to GHM.  Owner addresses those five categories as follows:

First, Owner has returned, and intends to return any remaining, standard operating procedure manuals ("SOPs") relating to the Hotel and style guides that do not relate to the Hotel.  Owner does not intend to return style guides that relate to the Hotel.

Daniel F. Benavides, Esq.
May 17, 2012
Page 3

Second, Owner has returned, and intends to return any remaining, GHM employee files and training manuals developed by GHM (as opposed to training manuals developed by third-parties).

Third, Owner generally considers documents relating to GHM affiliates that are not books of account or records relating to or reflecting Hotel operations to be property that should be returned to GHM.

Fourth, Owner is not certain that "travel agent contacts" constitutes "property" or why travel agent contact information belonging to GHM affiliates that is unrelated to the Hotel would be found therein. Nonetheless, to the extent that travel agent contact information unrelated to the Hotel is at the Hotel, Owner is willing to turn that information over to GHM.

Fifth, information regarding the Hotel's guests that is generated at the Hotel belongs to Owner. Guest information generated at other GHM facilities belongs to GHM. To the best of the knowledge of the Hotel's IT department, it does not appear that guest information generated at other GHM facilities was ever downloaded into the systems at the Hotel. Accordingly, the guest information at the Hotel would appear to be the property of Owner. If you know anything to the contrary, please advise us.

You note in your letter dated May 16, 2012, that in your walkthrough you identified several GHM SOPs. For instance, you located an expired SOP in a cabinet outside the restaurant, several expired SOPs at the bottom of a stack of materials located on a high shelf at the back of the housekeeping office, and some spa records and SOPs located on a high self in the spa office. The expired SOPs were from 2009 and 2010 and likely were not being used even immediately prior to the termination of GHM. The spa materials consisted both of records belonging to Owner and the types of materials that Owner has been turning over to GHM. Those materials have, therefore, been moved to the locked room where other disputed materials are being stored.

You state in your letter dated May 16, 2012, that there "may be Excel spreadsheets and other forms used at the Hotel which were created by GHM, used by GHM at its other properties, and are property of GHM." Owner is unaware of any spreadsheets used at the Hotel that GHM was using at other properties. Please provide us with any detail that you have so that Owner can identify any such spreadsheets.

**D.   Electronic Servers And Records**

On Thursday, May 10, 2012, you met with Mr. Ternan, Mr. O'Keefe, Chris Caudillo, and a vendor retained by GHM to discuss a process for segregating the data belonging to GHM residing on the servers at the Hotel from the data belonging to Owner. Owner agrees to that process as set forth below.

Daniel F. Benavides, Esq.
May 17, 2012
Page 4

1.      Owner has provided you with a list of servers at the Hotel with usable data.

2.      GHM will identify a list of servers that it wishes to copy using a physical-to-virtual (P to V) method.

3.      For the servers that Owner agrees can be copied, GHM's vendor will create a P to V copy of those servers.  Owner may have representatives present during the copying process, and GHM agrees that the copying process must not disrupt the operation of the Hotel.

4.      GHM will provide a list of individual workstations, the hard-drives of which GHM would like a copy.  Owner will ensure that GHM receives a copy either from Huron Consulting or another vendor if needed.  The expense of that copying will be paid for by GHM.

5.      After copying of the servers and workstations is completed, GHM's vendor will delete all data created after March 31, 2012, including data modified after March 31, 2012.

6.      GHM will then review the copies of the data from the servers and workstations and compile a list of information that GHM contends constitutes its proprietary information.

7.      GHM will then provide the list of information that GHM contends constitutes its proprietary information to Owner.  Owner will review the list, and if Owner agrees that the data constitutes GHM's property, Owner will delete the data from the servers and workstations at the Hotel.  If possible, GHM will provide a script to allow the data to be deleted in an automated fashion.

8.      Owner anticipates implementing new servers over the course of the next six months.  In the event the new servers are installed, the deleted data will not be copied to the new servers, and the old servers will be preserved in a locked room off-site.

As previously stated, in order for Owner to agree to this process, GHM must provide written assurances that the copies of the servers and workstations will be used solely for purposes related to the Hotel, including the pending legal proceedings, and not for the benefit of any other hotels operated by GHM.

Based on an email you sent yesterday, it appears that GHM's vendor can be available on Monday, May 21, 2012.  We propose that the P to V copying begin at that time.

**E.      <u>Outstanding Pre-Termination Amounts Owed</u>**

Your demand for "all outstanding pre-termination amounts owed to GHM" assumes that anything is owed to your clients.  That assumption is doubtful in light of, among other things: (1) the damages that Owner contends are owed by GHM as compensation for GHM's prior acts

Daniel F. Benavides, Esq.
May 17, 2012
Page 5

of mismanagement; and (2) GHM's inaccurate and unsupportable accounting records, policies, and practices with respect to the Hotel.  Nevertheless, in my letter dated May 2, 2012, Owner proposed an escrow arrangement to provide for the payment of any pre-termination amounts ultimately determined to be due to GHM in fees and employee-related reimbursements.  I reiterated that proposal in my letter dated May 7, 2012.  However, GHM has apparently rejected the escrow arrangement.

**F.**     **Workers' Compensation**

On Thursday, May 10, 2012, you delivered a box of materials relating to workers' compensation claims.  The Management Agreement provides that "all staff and other operating and service employees employed at the Hotel shall be or deemed to be for all purposes the employees of the Operator."   Accordingly, GHM is responsible for addressing workers' compensation issues arising prior to the termination of the Management Agreement.  The fact that GHM breached the agreement by improperly employing some individuals through Setai South Beach LLC does not relieve GHM of its obligation to handle the pre-termination workers' compensation claims.

Owner intends to return the workers compensation materials to GHM.  Please advise if the materials should be delivered to you or Xavier Vazquez.

**G.**     **HSBC Accounts**

It is Owner's contention that GHM delayed the transition of the bank accounts to the name of Owner; however, there is no reason to address that dispute now.  Owner simply notes that GHM is refusing to cooperate with the efforts of Owners to recover the funds in the HSBC accounts.

**H.**     **Off-Site Copies Of Books And Records Belonging To Owner**

In your letter, you state that all books and records relating to or reflecting the operation of the Hotel are located on-site.  However, your pleadings with the Court note that corporate audits of the property occurred.  Unless all copies of such audits were kept at the property, some copies likely exist at the corporate office.  Owner demands the return of those books and records, as well as any other property belonging to Owner, located at GHM's corporate office or other locations.

**I.**     **Turnover Of Property Belonging To Owner Held By GHM Employees**

In your letter dated May 17, 2012, you state that "it is my understanding that you do not want us to forensically copy and wipe clean the Blackberries and iPad."  This is incorrect. Owner agreed to you depositing the Blackberries and iPad with Iris Data Services for the purposes of creating a forensic copy of the materials.  Owner does not agree to the destruction of

Daniel F. Benavides, Esq.
May 17, 2012
Page 6

data on those devices and requests that the unaltered devices be turned over to Owner upon the completion of the forensic copying. While the parties disagree with what to do with the devices upon the completion of copying, the forensic copying should commence as soon as possible.

You can bring the garage openers and keys to the Hotel on Monday, May 21, 2012, when the P to V copying begins.

**J.     Human Resources**

The Director of Human Resources has been directing all inquiries to Mr. Vazquez. If there are current employees of the Setai who continue to call your office, please let us know, and we will ensure that they receive the message to call Mr. Vazquez.

To Owner's understanding, expenses incurred by GHM relating to GHM employee activity during the post-termination period are not reimbursable, so your expectation that "Setai Owners will reimburse GHM" is not well-founded. That said, Owner is willing to consider appropriate requests for reimbursement upon the presentment of an accounting and explanation as to why the expenses should be reimbursed.

**K.     401(k)**

Owner is processing payment of the 401(k) contributions and the ADP invoices.

As always, if you have any questions or comments regarding any of the foregoing matters, please give me a call.

Sincerely,

James S. Renard

cc:     Kenneth R. Hartmann, Esq.

# "EXHIBIT H"

## To the Declaration of Jack G.B. Ternan

**From:** DANIEL BENAVIDES <DFB@kttlaw.com>
**Sent:** Monday, June 04, 2012 4:54 PM
**To:** Jack Ternan
**Cc:** James Renard; CHRIS CARDILLO; DANIEL BENAVIDES
**Subject:** Re: Hard-drive with Custodian Images

Jack,

Thanks. I did receive the package and will get back to you if I have any issues.

Danny


Daniel F. Benavides, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
305.728.2980 | dfb@kttlaw.com
>>> Jack Ternan <JGT@bickelbrewer.com> 6/4/2012 5:27 PM >>>
Danny,

The Huron folks tell me that you should receive a hard-drive today via UPS with copies of the images.   The data on the
hard drive is encrypted with a free software utility, True Crypt.  The password needed to access the data is
 Let me know if you have any difficulties accessing the data.

Jack G. B. Ternan
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201
214-653-4000


The information contained in this e-mail message, including any attachments, is attorney privileged and/or confidential
information intended only for the use of the individual or entity named as addressee. The review, dissemination,
distribution, or copying of this communication by or to anyone other than the intended addressee is strictly prohibited.
If you have received this communication in error, please immediately notify the sender by reply e-mail and destroy all
copies of the original message. Thank you.


----Scanned by eMail Protection Services----
 http://www.harding-group.com/eps.html