UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 12-cv-21932-KMM

GHM (SOUTH BEACH) LLC,

    Plaintiff,

v.

SETAI OWNERS LLC, TREVI LUXURY
HOSPITALITY GROUP, INC., and SMB
MANAGEMENT LLC,

    Defendants.
_____/

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO
ENJOIN USE AND COMPEL RETURN OF GHM'S PRIVILEGED DOCUMENTS
AND CONFIDENTIAL TRADE SECRET MATERIALS AND TO
ENJOIN FURTHER USE OF GHM'S TRADEMARKS**

Plaintiff, GHM (South Beach) LLC ("GHM" or "Plaintiff"), having previously filed its Motion to Enjoin Use and Compel Return of GHM's Privileged Documents and Confidential Trade Secret Materials and to Enjoin Further Use of GHM's Trademarks (the "Motion"), now replies to Defendants' Response in Opposition to the Motion [D.E. 25] (the "Response"), and states:

**INTRODUCTION AND RECENT DEVELOPMENTS**

Plaintiff filed this Motion after the unlawful raid of the Setai Resort & Residences (the "Hotel") and improper ouster of GHM orchestrated by the Defendants, Setai Owners LLC ("Owner"), Trevi Luxury Hospitality Group ("Trevi") and SMB Management LLC ("SMB"), at 2:00 a.m. on Saturday, March 31, 2012. As demonstrated in the Plaintiff's opening brief, following the raid, the Defendants and their accomplices unlawfully seized, inspected and/or began to use GHM's attorney-client privileged documents and correspondence, GHM's

trademarks, and GHM's confidential information and trade secrets, including its standard operating procedures ("SOPs").

In response to the Motion, the Defendants certainly concede that they seized these materials, and the correspondence between the parties confirms that the Defendants held onto most of them <u>until</u> Plaintiff filed its Motion. Now Defendants attempt to defend their conduct by claiming that even though they evicted GHM from the Hotel, seized materials they knew to be privileged, confidential and proprietary, and continued to operate the Hotel with the GHM trademarks until they got around to removing most of them, they never really "intended" to seize or use those materials or marks, and they do not "intend" to review proprietary or privileged information going forward. Given that the Defendants chose a midnight raid and forcible seizure rather than termination with notice and an orderly transition, as the Agreement required,[1] the Defendants' claim as to their intentions ring hollow. And their "anticipated process" of sorting through the tens of millions of hard copy and electronic documents (spanning 7 years of management) at the Hotel appears calculated to allow Defendants the maximum opportunity to enjoy the illegal advantage they have created. Even if its claim of good faith intentions moving forward could be credited (and as we demonstrate below, that claim is based on demonstrably false statements), GHM is not required to rely on the good faith of the owner for trade secret and privilege protection.

The Defendants also urge that there is no need for the Court to get involved here because they have given back some of the seized materials. However, the Defendant's timeline is false. In fact, it was only <u>after</u> GHM filed and served the Motion, that the Defendants finally began to

---

[1] *See* Management Agreement, Article XIX (1.1.2) (requiring 60 days notice prior to termination of GHM); *see also* Article XI (1) (envisioning a procedure whereby GHM would deliver the books and records to Owner upon termination).

2

cooperate. For example, three days before the Motion was filed, the Defendants continued to question GHM's position that it was entitled to access the electronic documents at the Hotel.[2] Then, immediately after the Motion was filed, the Defendants reversed course and advised they would "allow" GHM to access and copy the servers and computer terminals at the Hotel. The Owner also allowed GHM on the premises (without being paraded around the Hotel by security, as required during the first visit) to retrieve those hard copies of privileged documents identified in the Motion which Owner had previously refused to return. Owner also allowed GHM to inspect the Hotel to verify whether there were any improper uses of the GHM marks. However, it bears repeating that although the Defendants have allowed GHM to obtain copies of materials on some of the servers, the Defendants still retain <u>all</u> of those materials, many of which constitute GHM's privileged and proprietary materials.

As a result of the post-motion cooperation by the Defendants and their counsel, the parties have narrowed the issues currently in dispute. Specifically, GHM is no longer seeking an injunction with respect to the GHM marks.[3] However, this cooperation has not resolved all issues, and, as further discussed below, the majority of issues presented in the Motion remain to be decided by this Court.

## ARGUMENT

I.  **The Defendants Must Immediately Allow GHM to Copy <u>All</u> of the Electronic Servers.**

Although the Defendants allowed GHM to copy most of the servers and computer

---

[2] *See* May 4, 2012 Letter from J. Renard at 2, ¶6, attached hereto as **Exhibit A** ("On what basis does GHM contend it is entitled to access Owner's servers or copies of the data on Owner's servers?"). The Motion was filed May 7, 2012.
[3] On several occasions prior to the filing of the Response, GHM's counsel advised the Defendants' counsel that it was no longer seeking an injunction with respect to these categories of materials. GHM's counsel further advised Defendants' counsel that, although GHM is no longer seeking an injunction at this time, GHM does not waive its

terminals at the Hotel after the Motion was filed, GHM has not been allowed to copy certain other servers in order to determine whether they contain any documents belonging to GHM. According to the Defendants, those servers contain only documents relating to operation of the Hotel that belong solely to Owner and, therefore, GHM should not be allowed to obtain copies of the servers.

The Defendants' argument fails for three reasons. First, the Defendants do not know the contents of each and every document on those servers to verify the accuracy of their statement. Second, there are many categories of documents which are in dispute, and GHM should be afforded an opportunity to claim ownership of such documents. Third, even if the servers contained only books and records that indisputably belonged to Owner, the books and records must nonetheless be "made available to [GHM] at reasonable times and intervals for examination, audit, inspection and copying for a period of two (2) years following [the termination of GHM]." Management Agreement, Article XI (1). Accordingly, GHM must be allowed to copy all of the electronic servers at the Hotel without further delay.

## II. The Defendants Must Immediately Cease Accessing GHM's Privileged Materials

The Defendants continue to turn privilege on its head. At base, the Defendants' argument is that a party should be allowed to take possession of privileged documents by force while planning to file litigation and then maintain possession of those documents pending court action. *See* Resp. at 12-14. But this position wholly inverts the usual rule of protecting privileged information. *See* Fla. R. Civ. P. 1.280(b)(1) & (5); *see also* Mot. at 8-9. By ignoring the contractual procedures governing an orderly transition and deciding instead to seize and hold GHM's documents, the Defendants upset the usual legal process of discovery and recklessly

---

right to seek damages or other relief resulting from the Defendants' past and future improper use of the GHM Marks

exposed GHM's privileged material in the middle of litigation.

Although the Defendants did finally agree to return the hard copies of GHM's privileged materials after GHM filed this Motion, the Defendants have refused to cease using and reviewing the electronic servers—which also contain GHM's privileged material—or even keep a log of the materials that they have reviewed. Indeed, in their Response, the Defendants brazenly assert their right to keep possession of numerous servers and other electronic information, and purport to have the authority to choose whether or not to delete GHM's privileged material. *See* Resp. at 13. Moreover, the Defendants' current assertion that they "intend to refrain from reviewing such communications until a court or tribunal resolves the question of privilege," *id.*, is contrary to the Defendants' actual behavior regarding privileged documents, and inconsistent with the Defendants' continued assertions that they must be allowed to continue accessing GHM's servers to operate the Hotel. For example, Richard Siu asserts that the Defendants would be prejudiced if they were prohibited from accessing GHM's data, *see* Richard Siu Aff. ¶ 19, attached as Exhibit 1 to Resp., thereby making clear that the Defendants fully intend to continue accessing GHM's material unless ordered to stop doing so.[4] It also is clear that, despite the Defendants' representations that they were not accessing the ghmamericas.com email server, employees working at the direction of Trevi and/or Lehman Brothers continued to access and, indeed, sent out emails from GHM's email domain. *Compare* J. Renard Letter (Apr. 3, 2012), attached as Exhibit H to Mot., *and* setairesidences@ghmamericas.com Email (Apr. 10, 2012), attached hereto as **Exhibit B**.[5] Thus, the Defendants have demonstrated that they will continue to access

---

and Privileged Documents.
[4] Mr. Sui's statement is consistent with Defendants' correspondence with GHM. For example, on April 18, 2012, counsel for the Defendants informed Plaintiffs that "Owner intended to use the electronic data that belongs to Owner" even though the ownership of that data was in dispute. J. Renard Letter at 8 (Apr. 18, 2012).
[5] Tellingly, none of the Defendants' affidavits deny that Trevi employees have, in fact, accessed the GHM email server. Mr. Siu's affidavit carefully states that "Lehman employees were not permitted to access or use the

5

files containing GHM's privileged materials until they are prevented by court order.

The Defendants cannot be allowed to use the crisis of their own making to continue to access GHM's privileged materials contained within these electronic servers. It is utterly irrelevant whether the Defendants "intend" to view these privileged documents or will stumble across them as part of their review of GHM's electronic data. That they were seizing potentially privileged materials was an <u>entirely foreseeable consequence</u> of engaging in a hostile takeover without notice, since GHM had no opportunity to remove any of its privileged material from the servers, or time to shut off access to its email account. Since the Defendants' own choices created this unnecessary risk, they can hardly claim that they should be undisturbed as they maintain and, indeed, increase that risk. Nor can they legitimately argue that any prejudice to them necessitated by mitigating that risk is unwarranted.

The prejudice to GHM of having its privileged materials reviewed by a party that is currently adverse to GHM in pending litigation is so obvious as to require little comment. *See* Fla. R. Civ. P. 1.280(b)(1) & (5). Every day that this material remains in the possession of the Defendants increases the likelihood that the Defendants will come across GHM's privileged material. The Defendants have no right to GHM's privileged materials and cannot be prejudiced by failure to access them. Nor, apparently, do the Defendants have any pressing need to see the other documents in the electronic servers. Defendants' new operator, Trevi, has now represented

---

'ghmamericas.com' email server, and were not given access to any of the desktop computers in the offices <u>prior to the creation of forensic copies</u> of those computers." Siu Aff. ¶16 (emphasis added). Reading between the lines of this carefully constructed paragraph therefore strongly suggests that other employees – say those actually operating the Hotel – <u>were</u> given access to the email server. It also appears that Lehman employees had access to the desktop computers and email server after the forensic copies were made. Similarly, despite Mr. Mankarios' lofty assurances that Trevi has no "desire or need" for GHM's proprietary information, nowhere in his Affidavit does he deny that Trevi employees have indeed accessed GHM's electronic servers or reviewed GHM's proprietary information. *See generally* A. Mankarios Aff. Moreover, now that GHM finally has copies of some of the servers in its possession, GHM also has noticed that the ghmamericas.com email server is missing all emails from April 4, 2012 to April 11, 2012, which strongly implies that the emails were re-routed to an addressed owned by the Defendants and which

6

to this Court that it has no desire or need for GHM information to run the Hotel. *See* A. Mankarios Aff. ¶¶ 5-6, attached as Exhibit 3 to Resp. Thus, the operation of the Hotel would not be at risk by preventing the Defendants from accessing GHM's servers while GHM removes any privileged or proprietary information. The public interest in protecting privileged materials is well-established and will be served here.

## II.     The Defendants Do Not Own GHM's Confidential and Proprietary Materials

GHM also is entitled to a temporary injunction preventing the Defendants from accessing and using GHM's Trade Secret Materials. The Defendants fail to grapple with Florida case law that establishes that the six categories of proprietary material identified by GHM, ranging from Standard Operating Procedures to formulas to calculate employee incentives, are protected trade secrets. Moreover, contrary to Defendants' contentions, GHM never agreed to convey ownership of those trade secrets in the Management Agreement. The exposure of these trade secrets to an upstart competitor to GHM will cause irreparable harm, whereas the Defendants cannot show any comparable harm, particularly where their new operator claims to have no need of such materials to run the Hotel. *See* A. Mankarios Aff. ¶¶ 5-6. As recognized by Florida courts' willingness to issue temporary injunctions in these cases, the public interest is served by the protection of trade secrets.

### A. The Defendants Have Admitted They Have No Ownership Claim to Items Belonging to GHM's Affiliates

In its Response, the Defendants concede that two categories of documents do not belong to them: (1) sales and marketing materials prepared by GHM for other GHM-managed properties and (2) confidential information and materials belonging to GHM's affiliates. *See* Resp. at 16.

---

should be turned over to GHM. These communications likely will shed more light on the scope of the intrusion into the ghmamericas.com email server.

7

Many of these items are owned jointly by GHM and its affiliates. Moreover, GHM, as assignee of the Management Agreement, has the right and obligation to recover any items at the Hotel belonging to its affiliates. In any event, as Defendants have admitted that they have no claim of ownership, and the best they can muster by way of response is to question whether GHM or its affiliate owns them, there is absolutely no basis for Owner to refuse to return these documents.

### B. The Defendants Have Seized Numerous Categories of Documents Long-Recognized as Valuable Trade Secrets.

In its opening memorandum, GHM identified six categories of proprietary material seized by the Defendants that have long been recognized as trade secrets under Florida law. Florida courts have already recognized that the revelation of such trade secrets, especially to a competitor are necessarily deeply prejudicial and that it behooves the public interest to prevent disclosure. The Defendants' arguments to the contrary misrepresent the facts presented by GHM in its opening motion and reveal a deep misunderstanding of the precedent regarding trade secrets.[6] Their attempt to distinguish this case law confuses the question of whether something is a trade secret with whether that trade secret has been revealed. *See* Resp. at 15-16 & n. 66. The case law makes clear that the categories of documents identified by GHM are trade secrets, as confirmed by industry practice and the parties' behavior over the course of the contract. *See*

---

[6] As a threshold matter, contrary to the Defendants' assertions, *see* Resp. 14, GHM clearly identified six categories of trade secret documents that collectively constituted its "Trade Secret Materials":

> (i) GHM standard operating procedures manuals, style guides, manager handover materials, and other such materials; (ii) GHM employee files and training manuals; (iii) guest, group and travel agent files; (iv) sales and marketing materials prepared by GHM for the Hotel and other GHM-managed properties; (v) confidential information and materials belonging to GHM's affiliates; and (vi) GHM management committee meeting notes and minutes (collectively, the "Trade Secret Materials").

Mot. at 3. The motion further expressly incorporated the details as to the nature of these proprietary materials, the manner by which GHM kept them secret, and their value described in the affidavit of Hans Meier, GHM's manager of the Setai for six years before the ouster. *See* Mot. at 3-4 (incorporating paragraphs 5-13 of Hans Meier's Affidavit). And the Argument Section referred to "Trade Secret Materials" throughout. *See* Mot. at 9-12. Thus, the categories of documents at issue were clearly identified and supported by the record.

8

*East v. Aqua Gaming, Inc.*, 805 So.2d 932, 934 (Fla. 2d DCA 2001); *Aqua Gaming*, 805 So. 2d at 934-35; *Four Seasons Hotel & Resorts B.V. v. Consorcia Barr, S.A.*, 267 F. Supp. 2d 1268, at 1276-79; 1325-27 (S.D. Fla. 2003), *aff'd in part, rev'd in part on other grounds*, 138 F. App'x 297 (11th Cir. 2005); *cf. AutoNation, Inc. v. Maki*, No. 03-18896, 2004 WL 1925479, at *3-4, 9 (Fla. Cir. Ct. Aug. 25, 2004), *aff'd*, 895 So. 2d 453 (Fla. 4th DCA 2005); H. Meier Aff. ¶¶ 6-13, attached as Exhibit to B Mot.; *see also* Mot. at 9-12. And the undisputed facts of this case demonstrate that GHM has never shared those trade secrets with the Defendants. *See, e.g.*, H. Meier Aff. ¶¶ 6-13; *see also infra* II.B; II.C. GHM would be irreparably prejudiced by the revelation of each and any of these trade secrets, as described in detail below. Every day that GHM's materials remain accessible to the Defendants increases the risk that GHM's trade secrets will be revealed to its competitor.

### a. Standard Operating Procedures & Manager's Handbook

GHM's Standard Operating Procedures contain the key to the very service it is marketing to owners. *See* H. Meier Aff. ¶¶ 6-7. Here, GHM had general standard operating procedures and "Style Guides," which ensured a consistent GHM experience across all GHM-managed properties, and a specific manager's handbook that had been created to inform the new manager of how these standards applied to this particular property. *See id.*[7] These guidelines are the culmination of GHM's expertise and are carefully guarded secrets. *See id.* At the Setai, GHM kept these out of view of any guests and never shared them with the Owner or any other third parties. *See id.* If shown to a competitor, it would enable that competitor to shortcut this careful process by misappropriating the benefit from others' hard work. Indeed, Florida courts have

---

[7] In some cases, these standard operating procedures took the form of electronic templates through which GHM was able to create standardized forms governing all printed material, including marketing materials, interoffice forms, and financial forms, according to GHM protocol. This information also was stored on electronic servers and

already recognized the economic value of such materials and the need for injunctive relief to protect against disclosure to competitors. *E.g., Maki*, 2004 WL 1925479, at *3-4, 9; *see also AutoNation, Inc. v. Hatfield*, No. 05-02037, 2006 WL 60547, at *2 (Fla. Cir. Ct. Jan. 4, 2006), *aff'd*, 939 So. 2d 155 (Fla. 4th DCA 2006).[8]

The Owner's decision to oust GHM without giving it time to remove these Trade Secret Materials has put these materials at risk of discovery by Trevi, the competitor that the Owner abruptly installed as a replacement for GHM. The Defendants attempt to minimize this risk by claiming that Trevi is not interested in GHM's methods of operating the hotel because it has its own methods. *See* A. Mankarios Aff. ¶ 6. Significantly, however Trevi has not implemented its own Standard Operating Procedures, and in fact, it has simply directed the former GHM employees to "to continue using the same operating procedures that were in place before March 31, 2012, which were the standard operating procedures used by GHM while it was managing the Hotel," Camilla Mork Aff., attached hereto as **Exhibit C**, at ¶ 2.[9] Thus, Trevi is already relying on GHM's SOPs. And every day that these materials remain at the Hotel increases the risk that Trevi's employees will turn to GHM's proprietary guidelines to make up for the lack of guidance from Trevi.

Certainly Defendants cannot demonstrate any prejudice from an order barring them from accessing these operational materials. After all, Mr. Mankarios' affidavit discounts any need for the information to operate the Hotel since he desires to "allow the professional staff to use their

---

constitute part of GHM's Trade Secret Materials. These electronic templates were never shared with the Defendants or any third parties.

[8] Owner's bizarre assertion that these cannot be trade secrets because a guest might be able to see the results of these procedures, *see* Resp. at 17, is directly contrary to these precedents. A customer of AutoNation also will experience the service or marketing mandated by AutoNation's internal procedures but that customer is not then assumed to be interested in reverse engineering that process. Here, Owner has taken GHM's proprietary standards and placed them in the possession of GHM's competitor, no reverse engineering required.

expertise and individual creativity to its maximum." *See* A. Mankarios Aff. ¶¶ 5-6. As Florida courts already have recognized, a temporary injunction is the proper remedy in such cases.

### b. Employee Information

Employee information also has long been recognized as a valuable trade secret. Contrary to Defendants' assertion that "the formulas used to calculate disclosed incentive payments do not derive independent economic value," *see* Resp. 18, Florida courts already have recognized that information about employee compensation is a valuable trade secret. *See, e.g., Maki*, 2004 WL 1925479, at *3-4, 9; *see also Hatfield*, No. 05-02037, 2006 WL 60547, at *2. The reason for this is obvious: if a competitor learns of GHM's internal processes developed to manage its employees, that information can be used to unfairly compete with GHM. It is undisputed that GHM guarded the secrecy of these formulas and refused to share any details of the methodology used. *See* H. Meier Aff. ¶ 8. And GHM's concerns about the risks of allowing Owner to see such formulas were well-founded given that Owner's new operator immediately attempted to poach the majority of GHM's former employees. Nor have Defendants identified a single reason to claim ownership of this information or even demonstrated a need for it. The public interest in protecting employee information, whether for the privacy of the employees[10] or the protection of a proprietary business model, is best served by entering a temporary injunction here.

### c. Contacts with Elite Travel Agencies

GHM's position that its "travel agent files" constitute a trade secret, *see* Mot. 3, 10-11; H. Meier Aff. ¶ 10, is consistent with Florida precedent. Courts applying Florida law have expressly affirmed that information regarding preferred travel agency partners are valuable trade

---

[9] Upon information and belief, these instructions to continue using GHM's proprietary guidelines throughout numerous areas in the Hotel.

secrets. *See Four Seasons Hotel and Resorts B.V.*, 267 F. Supp. 2d 1268, at 1276-79; *cf. Hatfield*, 2006 WL 60547, at *2 (issuing a preliminary injunction requiring the return of any trade secrets "including . . . information reflecting the identity and background of any customer, prospect, or supplier"); *Aqua Gaming, Inc.*, 805 So.2d at 934 (recognizing that a customer list can qualify as a trade secret). As described in Mr. Meier's Affidavit, information relating to GHM's relationship with preferred travel agencies, including the "names and information for GHM's contacts within the agencies," was an "extremely valuable" asset to GHM that was zealously guarded from the Owner. *See* H. Meier Aff. ¶ 10. For the same reasons that Florida courts have long protected such information, GHM seeks to prevent its competitor, Trevi, from poaching that information to use in its own management. Indeed, Trevi clearly recognizes the value of such relationships and information since it mentions its own connections. *See* A. Mankarios Aff. ¶ 6. Obviously then, Owner has no claim of prejudice, since its new Operator has its own contacts. As courts applying Florida law also have recognized, a temporary injunction protecting the investment in such carefully built up trade secrets is also in the public interest.

### d. Guest Profiles

As with supplier and prospect lists, courts applying Florida law have recognized that guest profiles are valuable trade secrets and are recognized as such in the hospitality industry. *See Four Seasons Hotel and Resorts B.V.*, 267 F. Supp. 2d 1268, at 1276-79, 1307-08; *cf. Hatfield*, 2006 WL 60547, at *2 (issuing a preliminary injunction requiring the return of any trade secrets "including . . . information reflecting the identity and background of any customer,

---

[10] For example, the benefits and health information found in the employee files is protected from disclosure to the Defendants by HIPAA. During GHM's tenure, even the general manager of the Hotel could not access the employee files.

prospect, or supplier"); *Aqua Gaming, Inc.*, 805 So.2d at 934 (recognizing that a customer list can qualify as a trade secret). The Defendants claim that since information was entered at the Hotel, Owner owns all that information. This is nonsense. For ownership purposes, the issue is where the information that was entered came from. Here, employees at the Hotel could and did request additional information from GHM and its affiliates about the particular preferences of guests who had previously stayed at properties managed by GHM. This information, based on stays at other properties, was then used to "enhance guests' stays and encourage long-term relationships with GHM," and was not shared with the Owner. *See* H. Meier Aff. ¶ 9. If this carefully culled information about the preferences of GHM's loyal customers is shared with a competitor, that competitor can then replicate that experience, thereby misappropriating GHM's investment in tailoring its service to individual clients. A temporary injunction would enable GHM to remove any such GHM proprietary information from the guest database, as it would have done if given the opportunity to do so under the orderly transition envisioned in the Management Agreement.

### e. Meeting Minutes

Finally, GHM's management's notes as to regular internal meetings likely contained information about GHM's Trade Secret Material. *See* H. Meier Aff. ¶ 13. Although the Defendants have recently handed over copies of this material to GHM, the Defendants also have maintained copies of those materials, at the very least on GHM's servers. This material is not a financial book or record and so belongs to GHM. To the extent that the Court determines that the Defendants should be able to access this material for purposes of their defense, GHM will redact any material that pertains to its Trade Secret Material as per the regular course of discovery. A temporary injunction enjoining the Defendants from accessing this material in the

interim is consistent with Florida trade secret law for the reasons listed above.

### C. The Management Agreement Does Not Assign Ownership of GHM's Confidential and Proprietary Materials to the Defendants

In an attempt to hold on to all the seized documents, Defendants raise a more global argument in which they claim that the Management Agreement essentially conveyed ownership of all records to Owner. This claim is without merit.

The Defendants claim that under the Management Agreement, every "record relating to … the operation of the Hotel" belongs to the Owner, regardless of whether it constitutes GHM's proprietary information built up through GHM's and its affiliates' years of accumulated luxury hotel expertise and experience or not. Resp. at 14-15. But a common sense reading of the Agreement makes clear that while the Defendants may own "such books and records" that relate to the Hotel's finances (subject to a right of copying for Plaintiff), Defendants' claim to own all of GHM's proprietary materials "relating to" managing the hotel is without merit.

The "books and records" provision on which Defendants rely is clearly aimed at financial accounts and records "reflecting the results of the operation" of the Hotel. Management Agreement, Article XI.1. Defendants' selective quotes effectively masks the context of the entire provision, so we have set it forth here in full :

> Article XI. Books, Records, Statements, and Reports.
>
> The Operator shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel on an accrual basis. The books of account and all other records relating to, or reflecting the operation of the Hotel shall be kept at the Hotel and shall be available to the Owner and its duly authorized representatives for examination, audit, inspection, and copying. Such books of account and records shall reflect, for each Unit managed by the Operator, the Gross Revenues generated from each such Unit and the Operating Expenses allocable thereto. All of such books and records shall be the property of the Owner and shall not be removed from the Hotel without the written consent of the Owner and the Operator. Upon the termination of this Agreement, all of such books and records up to the date of termination shall forthwith be delivered up to the Owner so as to ensure the orderly continuance of the Hotel, but such books and

14

records shall thereafter be made available to the Operator at reasonable times and intervals for examination, audit, inspection, and copying for a period of two (2) years following such termination. Without prejudice or limitation to the foregoing, the Operator's right of examination, audit, inspection, and transcription as provided for in this case shall extend to books and records or parts thereof related to transactions or events taking place or occurring before the date of termination of this Agreement.

Management Agreement, Article XI.1. Read as a whole, then, the books and records provision is plainly designed to ensure that the Owner has the <u>financial</u> information the Owner would need to ensure and protect its financial interest in the Hotel. Indeed, in the first sentence of that provision, the Agreement refers to "books of <u>account</u> and <u>other records</u> reflecting the <u>results of operation of the Hotel on an accrual basis</u>." *See id.* (emphasis added). This phrasing of accounts and accrual clearly refers to financial books and records, and the use of that or similar phrasing throughout the paragraph, such as "books of account" and "<u>such</u> books of account and records" just as plainly relates back to those financial records referenced in the first sentence.[11] Given the hotel management context, this language makes sense: the Owner has a significant financial investment, and it obviously needed to know and understand the performance of its investment, and of its costs and expenses in paying its manager and others.

But just as significantly, Owner had <u>no</u> right to "direct, supervise, and control the management and operation of the Hotel"— that right was "exclusive" to GHM under Article VII.1. Owner engaged GHM because of GHM's expertise and know-how in managing hotels, an expertise Owner lacked and therefore needed.[12] And GHM agreed to provide that expertise in exchange for a twenty-year agreement during which GHM would be paid for its expertise and

---

[11] These books of account and records are to reflect "gross revenues" and "operating expenses" as explained in the provision. And the other four paragraphs in Article XI also relate specifically and exclusively to particular types of financial statements: a profit and loss statement, balance sheet, and sources and applications of funds statement.

[12] "[GHM] has experience in the management and operation of hotels, and is willing to render its assistance in its construction, its preparation for operation, and its eventual management and operation," (Agreement, Whereas Clause (G)) and, "Owner desires to avail itself of the hotel management experience and know-how of [GHM]." Agreement, Whereas Clause (I).

15

know-how. While the Agreement does not require GHM to bring to the property GHM's proprietary materials, such as its Standard Operating Procedures, Style Guides, personnel policies and training information, contacts in the travel industry, historical management information, and other records reflecting GHM and its affiliates' long experience and knowledge, those materials are the tangible stock-in-trade of a hotel management company, and their presence at any hotel is customary in the industry. It would be odd indeed then, for GHM to have transferred (in a provision about financial books and records) all its proprietary materials to Owner.

If Defendants' version of the contract were to be credited, then an owner could hire a luxury hotel manager for 15 years, install them for a day or two, raid the hotel at 2 a.m., fire the manager, seize all the materials, and then hire a cheap replacement to simply implement the manager's procedures and plans. Indeed, that cheap manager could also compete with that manager at other properties, as it would be free to use that manager's proprietary materials anywhere. In short, the Defendants' reading of the Agreement would deliver up to the Owner all of Manager's proprietary information the minute it shows up on the property. No reasonable management company would agree to such terms, and GHM certainly did not either. Defendants' suggested interpretation is simply wrong and must be rejected.

### D. GHM Was Not Owner's Agent

Nor did GHM enter into an agency relationship with the Owner, much less one that retroactively converted GHM's trade secrets into the Owner's property. In their Response, the Defendants allege that GHM created its proprietary materials in its capacity as Owner's "agent" or "representative." The Argument section of the Response does not indicate whether and, if so, how this allegation was intended to support the Defendants' position with respect to the pending

16

issues in the Motion. Nevertheless, GHM is compelled to point out that GHM was not the agent or representative of Owner pursuant to the Management Agreement. The parties expressly agreed that "nothing in [the Management Agreement] shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties." Management Agreement, Article VII (1). Accordingly <u>no relationship</u>, other than a contractual relationship, was created between the parties, including an agency relationship. Although GHM may have acted as Owner's representative for discreet tasks related to certain aspects of Hotel operations, the Management Agreement and the actions of the parties made clear that the sole authority to operate and manage the Hotel rested with GHM. Moreover, many of the materials in dispute were created by GHM and/or its affiliates before GHM began operating the Hotel and before any alleged "agency" relationship could possibly have arisen. Accordingly, the Defendants' blanket allegation that GHM created its proprietary materials in its capacity as Owner's "agent" or "representative" is without any basis.

## CONCLUSION

This Court should enter an order:

(a) Enjoining Defendants from reviewing and/or using any and all of GHM's Privileged Documents and Trade Secret Materials;

(b) Compelling Defendants to return any and all hard copies of GHM's Trade Secret Materials, and any copies made by Defendants of such materials, within one (1) week of the Order;

(c) Compelling Defendants to immediately turn over <u>all</u> copies of the electronic servers at the Hotel to GHM so that GHM can review that material and remove any of GHMs proprietary, privileged, or confidential property.

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Counsel for Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800/Fax: (305) 372-3508

By:    /s/Kenneth R. Hartmann
         Kenneth R. Hartmann
         Florida Bar No. 664286
         Daniel F. Benavides
         Florida Bar No. 81675

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY**S that a true and correct copy of the foregoing was efiled with the Clerk of Court and was electronically served by the Court this 22nd of June, 2012 to all parties on the attached service list.

By: /s/Kenneth R. Hartmann
       Kenneth R. Hartmann
       Florida Bar No. 664286
       Daniel F. Benavides
       Florida Bar No. 81675
       Douglas A. Wolfe
       Florida Bar. No. 28671

3515/106/338480.2

## SERVICE LIST

*GHM (South Beach LLC) v. Setai Owners, LLC, et al.*
**CASE NO. 12-cv-21932-KMM**
**United States District Court, Southern District of Florida**

Richard H. Critchlow, Esq. (Florida Bar No. 155227)
rcritclow@knpa.com
Elizabeth B. Honkonen, Esq. (Florida Bar No. 149403)
ehonkonen@knpa.com
Kenny Nachwalter, P.A.
201 South Biscayne Blvd.
Suite 1100
Miami, FL  33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
*Counsel for Defendants*

William A. Brewer, III
wab@bickerbrewer.com
James S. Renard,
jsr@bickerbrewer.com
Jack G. Ternan
jgt@bickerbrewer.com
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, Texas  75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015
*Counsel for Defendants*