# EXHIBIT "K"

THE INTERNATIONAL COURT OF ARBITRATION
OF THE INTERNATIONAL CHAMBER OF COMMERCE

SETAI OWNERS, LLC,

      Claimant and Counterclaim-Respondent,

      v.

                              ICC Case No. **18610/VRO**

GENERAL HOTEL MANAGEMENT, LTD.
and GHM (SOUTH BEACH) LLC,

      Respondents and Counterclaimants.

---

### ANSWER TO REQUEST FOR ARBITRATION AND COUNTERCLAIM

Respondents and Counterclaimants General Hotel Management, LTD, ("GHM Ltd.") and

GHM (South Beach) LLC ("GHM (South Beach)") (collectively, the "Respondents" or "GHM"),

by their undersigned attorneys and pursuant to Article 5 of the International Chamber of

Commerce Rules of Arbitration, respectfully submit the following Answer to the Request for

Arbitration, dated March 31, 2012, submitted by Setai Owners, LLC ("Owner"), and

Counterclaim against Owner.[1] Respondents submit this Answer and Counterclaim without

prejudice to their position taken in the Miami-Dade County Circuit Court, the United States

Federal District for the Southern District of Florida, and before this body, that Owner has waived

the right to request arbitration and had failed to meet the necessary conditions for it.

### I.      PRELIMINARY STATEMENT

1.     The Setai Resort & Residences in Miami Beach, Florida (the "Setai" or "Hotel"),

has been recognized repeatedly as one of the premier hotels in North America.  This sterling

---

[1] Respondents submit this answer on behalf of named Defendant GHM Ltd. out of an abundance
of caution even though GHM Ltd. assigned the Management Agreement to GHM (South Beach),
as described *infra*.  Respondents reserve all rights to raise any arguments regarding the effects of
this assignment.

reputation results from the careful design, planning, day-to-day management and relentless focus on guest experience provided at the Setai by GHM from the very beginning. As the original manager of the property, which opened in 2004, GHM assisted in designing the property, and then created, adopted, and were solely responsible for implementing the essential elements that have come to define the Setai experience. These elements, many of which comprise GHM's proprietary Standard Operating Procedures ("SOPs") for the Setai, have in turn led to accolade upon accolade for the Setai as a leading luxury resort hotel.

2.      This public and critical success has been matched by the financial success of the Hotel. Under GHM's development and management, the Setai has become extremely profitable, achieving revenues per available room far surpassing all other hotels in the region and generating record-breaking property values for its private residences. In December 2011, one of the penthouses at the Setai sold for an astonishing $21.5 million, shattering several Miami Beach real estate records.

3.      Despite the Hotel's accolades and awards, despite its financial success, and despite having expressly contracted that GHM would exclusively manage the Hotel for at least 15 years after opening, Owner repeatedly attempted to sabotage GHM (South Beach)'s operation of the Hotel and to manufacture "cause" to terminate GHM, presumably to try to sell the Hotel without the burden of a management agreement.[2] When those attempts proved unsuccessful, Owner and its accomplices planned and executed a 2 a.m. raid under cover of darkness on the Hotel premises with dozens of armed security personnel, who summarily fired GHM (South Beach)'s

_____

[2] It is generally more lucrative to sell a hotel without an existing management agreement, since a new owner may prefer to install its own management company, or at a minimum, be able to re-negotiate with the previous management.

2

management personnel and removed them from the premises, not even allowing them to gather their personal belongings.

4.    Owner terminated GHM *without* the required notice of any potential breach, *without* providing GHM the required opportunity to cure, *without* the required 60-day notice of termination, *without* the required attempt to negotiate and settle in mutual good faith, and *without* completing the required dispute resolution provisions of the contract for accounting and other discrete issues.

5.    Instead, Owner took the law into its own hands, and unlawfully and forcibly removed GHM as manager in the most demeaning and damaging manner possible. On the same day, Owner filed the instant Request for Arbitration to retroactively ask this Court to absolve it from liability for the actions it had already taken.

6.    Owner's damaging conduct did not stop at the termination. Once in the Hotel, Owner and its accomplices forced Respondents' employees, by threat of termination, to work for the Setai's "new" management company (a start-up company with no SOPs of its own and no other hotels under management), continued to use GHM's marks, and helped themselves to GHM's proprietary materials—including GHM's proprietary SOPs, which are still in use at the Hotel. Owner then proceeded to defame GHM, *inter alia*, by leaking to the press a copy of the Arbitration Request they filed on the day of the raid, which is riddled with false and defamatory statements about GHM.[3]

---

[3] On the very day of the takeover, *USA Today* reported on the raid, noting that "Lehman Brothers filed a 'request for arbitration' notice at the International Court of Arbitration of the International Chamber of Commerce in Paris. *The filing provides a glimpse as to the hotel's budgets over the past two years and why the owners take issue with it.*" (emphasis added). The paper goes on to correctly quote an excerpt of paragraph 38 from the Request for Arbitration, even down to the punctuation.   Since the Respondents were not even aware of the Arbitration Request on that date, and would not have released it to the press in any event, it is clear that Owners leaked the

## II.    PARTIES

7.      GHM Ltd. is a company organized under the laws of the British Virgin Islands
with its principal place of business located at 1 Orchard Spring Lane, #04-02 Tourism Court,
Singapore 247729 (Telephone (65) 62233755; Facsimile (65) 6221 1535). Established in 1992
by the legendary hotelier Adrian Zecha, GHM Ltd. and its affiliates have created some of the
world's most highly regarded boutique luxury resorts and hotels from its home base in Singapore
including The Chedi, Chiang Mai, Thailand; The Legian, Bali, Indonesia; The Strand, Yangon,
Mynmar; The Chedi, Muscat, Oman; The Nam Hai, Hoi An, Vietnam, The Chedi, Andermatt,
Switzerland, and The Ananti Club Seoul, South Korea. It is known for its contemporary
interpretations of Asian designs combined with distinctive local touches to create inspired,
memorable spaces that provide guests with a distinctive lifestyle experience that is unrivalled.  In
2000, GHM Ltd. entered into a long-term Management Agreement to provide development
services and, upon opening, management services for the Dempsey Vanderbilt Hotel, later re-
named the Setai.  The Setai was the only property managed by GHM in the United States and
was their flagship property. A copy of the Management Agreement and Letter Agreement
Amending the Management Agreement (collectively, the "Management Agreement") is attached
hereto as **Exhibit A**.

8.      GHM (South Beach) is a Delaware limited liability company. Prior to the illegal
raid of the Hotel and improper termination described herein, GHM (South Beach)'s principal
place of business was at the Setai, located at 2001 Collins Avenue, Miami Beach, Florida 33139.
By virtue of assignment of the Management Agreement from GHM Ltd., GHM (South Beach)

---

document in an attempt to smear GHM's name and reputation, and to try to justify Owners'
extraordinarily demeaning and destructive conduct.

managed and operated the Setai from its opening until March 31, 2012.     A copy of the

Assignment and Assumption Agreement dated January 13, 2005 is attached hereto as **Exhibit B**.

      9.     Owner is a Delaware limited liability company with its principal place of business

located at 1271 Avenue of the Americas, 39th Floor, New York, New York 10020. Owner is an

affiliate or subsidiary of Lehman Brothers, the failed financial institution.

      10.    Both Respondents are represented in this arbitration by their legal counsel:

Kenneth B. Hartmann, Esq.
Daniel F. Benavides, Esq.
Kozyak, Tropin & Throckmorton, P.A.
2525 Ponce de Leon
9th Floor
Miami, Florida  33134
Tel  +1 305.377.0657
Fax  +1 305.372.3508
krh@kttlaw.com
dfb@kttlaw.com

David A. Handzo, Esq.
Julie M. Carpenter, Esq.
Jenner & Block
1099 New York Avenue, NW
Washington, DC  20001
Tel  +1 202 639 6085
Fax +1 202 661 4853
dhandzo@jenner.com
jcarpenter@jenner.com

### III.    ARBITRATORS, VENUE, LAW, AND LANGUAGE

      11.    In the event that the instant arbitration proceeds, the Respondents agree with

Owner that the dispute should be resolved by three arbitrators. The Respondents have requested

that this Court appoint the third arbitrator, who will act as president of the arbitral tribunal.

      12.    The Respondents have nominated Mr. Joseph M. Matthews, Esq. as an arbitrator.

Mr. Matthew's contact information is as follows:

255 Alhambra, PH,

Coral Gables, FL 33134
Tel +1 305 761 2323
Fax +1 305 476 7444 (Fax)
Joseph@colson.com

13.     The Management Agreement provides, and the parties do not dispute, that if any matters asserted by Claimant are arbitrable, the place of arbitration shall be Miami, Florida.  The Management Agreement specifies Dade County Florida, and Miami is a city within that county.

14.     The Management Agreement provides that the applicable law governing the Management Agreement, and therefore any arbitrable matters relating to it, shall be "the laws of the State of Florida and the United States of America."

15.     Although the arbitration agreement does not specify a language in which the arbitration shall be conducted, the parties agree on the use of the English language.

## IV.     ARBITRATION JURISDICTION

### A.     This Matter is Not Arbitrable Because Owner has Willfully and Irreparably Failed to Comply with the Required Prerequisites to Arbitration.

16.     The Management Agreement clearly sets forth a sequential process for dispute resolution with arbitration as the last resort.

17.     First, the Management Agreement has specific dispute resolution methods for particular disputes, such as those arising from financial statements and accounting matters and disputes regarding budgetary, expense, marketing and other matters set forth in the Annual Plan given to Owner by GHM (South Beach) each year.  *See* Management Agreement at Art. XI (3) (Any disputes "as to the contents or correctness of any [financial statements] or any accounting matter thereunder *shall be decided* by the Independent Certified Public Accountant, whose decision shall be final and binding.") and Art. VII(2.1) ("In the event that Owner and

6

[Respondents] cannot agree on any or all of the items in the Annual Plan or any supplement thereto, *the dispute shall be resolved by the Expert*.").

18.     Second, the Management Agreement requires notice of a default and an opportunity to cure prior to any termination for cause. *Id.* at Art. XIX (1.1.2).

19.     Third, the Management Agreement requires that, if these provisions do not lead to resolution, the parties engage in a "good faith" attempt to settle their difference. *Id.* at Art. XXVI.

20.     *Only* "[i]n case of failure by the parties to reach an amicable settlement," the "dispute shall be *finally* settled through a Board of Arbitrators in accordance with [ICC Rules]." *Id.* (emphasis added).

21.     Owner willfully disregarded all of these steps.  Contrary to the Management Agreement, Owner chose not to give any notice of the concerns it now raises in arbitration and chose to ignore the proper procedures for resolving specific disputes as set forth in the Management Agreement. It also chose not to give GHM (South Beach) the contractually-required opportunity to cure any alleged default, and it chose not to give the required 60 days notice of termination to provide for an orderly transition.  Owner did not even bother to feign a "good faith" attempt to settle any differences amicably, as the Management Agreement expressly requires prior to initiating arbitration.

22.     Instead, Owner acted in objectively <u>bad faith</u> by forcibly removing GHM (South Beach) as manager of the Hotel without any notice and under cover of darkness, and then filing the instant action to ask this Court to retroactively bless the actions it had already taken. By acting in this manner, Owner has wholly vitiated the dispute resolution provisions in the

Management Agreement in ways that cannot now be remedied. GHM *cannot* now cure the mismanagement alleged by Owner and good faith negotiations are impossible.

23.     Because Owner determinedly repudiated the critical conditions precedent to the arbitration clause, its conduct makes any cure impossible. Where Owner failed to comply with the conditions precedent to arbitration, and where that failure cannot now be cured, Owner is precluded from initiating this arbitration.

### B.     Accounting Matters Are Not Arbitrable.

24.     Even if Owner had met (or could meet) the requirements for arbitration under the Management Agreement, not all disputes raised in the Request for Arbitration would be arbitrable. For some defined categories of disputes, the Management Agreement establishes another final dispute resolution process, which precludes arbitration. For example, Article XI.3 provides that GHM (South Beach) was to annually deliver "P&L Statement, balance sheet, sources and applications of funds statement, and which, if requested by Owners, shall all be audited and certified by the Independent Certified Public Accountant of the Hotel." Any disputes "as to the contents or correctness of any such statement or any accounting matter thereunder *shall be decided by the [CPA]*, whose decision shall be final and binding." *Id.* Here, Owner claims that GHM did not properly calculate its management fees (Arb. Req. para. 32 – 35). That issue is plainly a dispute "as to the contents or correctness of the statements or any accounting matter thereunder," so it must be resolved by an Independent CPA, as the Agreement provides, and not by arbitration.

25.     Significantly, Owner and GHM (South Beach) had already begun the very process required by Article XI.3 before Owner decided to abandon that effort and seek another opinion through arbitration. The parties had engaged PricewaterhouseCoopers to evaluate and analyze

8

the historical calculation and treatment of the Setai's gross revenues, operating expenses, reserve for capital replacements (FF&E), base and incentive management fees, and common area charges and to provide commentary on the appropriate treatment and/or calculation of these issues. PwC had issued a draft report, on which both parties had commented, but did not issue a final report despite Respondents' expectations that one would be issued. Instead, Owner decided to seek another answer by starting this arbitration process. But where the clear language of the Management Agreement provides for a non-arbitration resolution on "any accounting matter" relating to the financial records of the Setai, those issues are *not* subject to arbitration until that process is completed. As to the proper calculation of management fees, then, the parties must pursue the proper dispute resolution procedure set forth in the Management Agreement.

26. Similarly, the Management Agreement precludes arbitration of disputes about matters included in the Annual Plan. Article VII.2 provides that the Operator shall submit to the Owner each year an Annual Plan which is defined in the Agreement to include an estimated P&L statement, a budget for operating expenses, a schedule showing FF&E replacement, a schedule showing proposed cash reserve for replacement of FF&E, an estimated cash flow statement, and a marketing plan. GHM did submit such Annual Plans every year, and Owner often objected to various points in the Plans. But the Agreement provides in Article VII.2.1.6 that if the Owner and the Operator "cannot agree on any or all of the items in the Annual Plan or any supplement thereto, *the dispute shall be resolved by the Expert*." And Article XXVIII.23 establishes the procedure for choosing an Expert to "resolve the issue in question." Owner's complaints in this proceeding about expenses, about cash reserves for FF&E, and about "marketing," for example, are all complaints that can be resolved only by "the Expert." Like the claim relating to the

9

calculation of management fees, then, these claims are not arbitrable under the Management Agreement.

## V.    FACTUAL BACKGROUND

### The Setai by GHM

27.    The Setai is an intimate, serene oceanfront resort in the heart of South Beach. Infused with natural materials, space and light, the Setai's Asian-inspired design bears the unmistakable imprint of GHM and their legendary founder and principal, Adrian Zecha.

28.    GHM was the Setai's original operator. Since well before the official opening of Setai in 2005, GHM (South Beach) and its parent company, GHM Ltd., brought their industry-leading reputation to bear on the marketing of the Hotel and the creation of the "Setai" brand. At Owner's specific request, GHM used the "GHM" marks in connection with the Setai. Because of GHM's stellar international reputation, the Setai achieved the rare honor of being admitted among the "Leading Hotels of the World" even before opening.

29.    As a direct result of the GHM's experience, management, and reputation, the Setai by GHM has become one of the most highly regarded hotels in North America. The following are a few of the accolades received by the Setai by GHM in 2011 alone:

   a. Conde Nast Johansens Awards, "Most Excellent Hotel in the USA & Canada"

   b. U.S. News, "#1 hotel in Florida"

   c. Conde Nast Traveler "The Platinum Circle" Award, recognizing five consecutive years of being on "The Gold List"

   d. Smith Travel Reseach, "Best Performing Hotel, Independent Segment" (Award for RevPar Index)

   e. The Gallivanter's Guide 2011 Award for Excellence – second on list "Best Resort in North America"

   f. Wine Spectator, "The Best of Award of Excellence"

10

    g. Hotels Magazine, "10 Great Restaurants of the World"

    h. The Miami New Times, Best of Award, "Best Hotel Restaurant"

    i. Organic Spa Magazine, "Top 10 Green Spa Awards"

    j. Conde Nast Traveler, "Top 50 Hotel Spas in the U.S."

30.    In addition to the many accolades, under GHM's management, the Setai has become extremely profitable, achieving revenues per available room far surpassing all other hotels in the region and generating record-breaking property values for its private residences. In December 2011, one of the penthouses at the Setai sold for an astonishing $21.5 million, shattering several Miami Beach real estate records.

31.    GHM was able to manage this feat, despite the economic downturn. And because of GHM (South Beach)'s careful management, Owner has not been required to contribute a single penny to the operation of the Setai since its opening. Instead, through careful budgeting and excellent management and marketing, GHM (South Beach) was able to successfully fund all hotel operations with hotel revenues as well as yield a substantial profit to Owner.

**The Management Agreement**

32.    The Management Agreement was entered into on March 20, 2000 between GHM Ltd. and Dempsey Vanderbilt Owners LLC (which later changed its name to Setai Owners, LLC). On January 13, 2005, GHM Ltd. assigned the Management Agreement to GHM (South Beach). Accordingly, the current parties to the Management Agreement are Owner, as owner of the Hotel, and GHM (South Beach), as manager of the Hotel.

33.    The Operating Term guaranteed to GHM under the Management Agreement extended to 15 years following the official opening of the Hotel, with an option for GHM to extend for an additional 5 years. The Management Agreement could be terminated only for

11

cause, only with notice and an opportunity to cure, and only after 60 days written notice of termination. *See* Article XIX (1.1.2). As of the date of Owner's unlawful termination of GHM, approximately 8 years remain on the original term of Management Agreement.

34.     The Management Agreement vested GHM with substantial operational and managerial authority. For example, under Article VII of the Management Agreement, Respondents have "the *exclusive* right and obligation to direct, supervise and control the management and operation of the Hotel." Article VII (emphasis added). To ensure GHM's exclusive managerial authority, Owner promised that GHM "shall, in directing, supervising, and controlling the management and operation of the Hotel, be free and maintained by the Owner from interruption or disturbance and the Owner shall, at its own cost and expense, undertake and prosecute any appropriate action, judicial or otherwise, to assure such freedom to [GHM]..." *Id.*

35.     Owner also had obligations under the Management Agreement.  Among these, Owner was bound to sign promptly and without charge all applications for required licenses (Article I.2.), to "provide sufficient Working Capital" as the hotel required (Article IV), to review and discuss financial information (Article VII), to deposit monies for Working Capital into accounts operated by GHM to pay Operating Expenses (Article X), to give prior approval for "alterations, additions or improvements in the Hotel as are customarily made in the operation of deluxe international hotels," (Article XV.2), and to give 60 days' notice in writing for any termination for cause (Article XIX.1).

36.     The parties further agreed that "nothing in [the Management Agreement] shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties." Accordingly, the Agreement created only a contractual relationship – and no other relationship (including a fiduciary or agency relationship) – between the parties. Although GHM

(South Beach) may have acted as Owner's representative for discreet tasks related to some aspects of Hotel operations, the Management Agreement and the actions of the parties made clear that the sole authority to operate and manage the Hotel rested with GHM.

### Owner's Repeated Failure To Live Up To Its Responsibilities and Attempts to Manufacture "Cause" to Terminate Respondents

37.     GHM's extraordinary achievements came notwithstanding Owner's failure to live up to its own responsibilities under the Management Agreement and its constant attempts to manufacture "cause" to terminate GHM, at the expense of the well-being of the Hotel.

38.     On countless occasions and to the detriment of the Setai, Owner deliberately and/or unnecessarily delayed or refused simple requests by GHM (South Beach) to sign permits, approve critical maintenance and renovation projects for the Hotel, or comply with its other obligations related to Hotel operations, all  as required under the Management Agreement in order to insure compliance with GHM's exacting standards. For example:

    a.  As a result of Owner's unwillingness to provide competent assistance, a critical balcony renovation project was unnecessarily delayed for over 5 years. Owner further insisted that the renovations be completed during the busy high season. The result was that many homeowners/residents and Hotel guests were unable to access their balconies, resulting in guest/resident complaints and significant lost revenues and reputational damage to GHM and the Hotel.

    b.  Although the Hotel opened in December 2004, Owner failed to comply with its duty to obtain a certificate of occupancy for the Hotel in a timely fashion, which was not obtained until 2010, when GHM finally obtained the certificate of occupancy notwithstanding Owner's attempts to delay the process.

    c.  Owner deliberately delayed approving a critical painting and exterior repairs project sought by GHM (South Beach) for over one year. Upon information and belief, the painting and exterior repairs project was commenced the day after the improper termination.

    d.  Despite repeated requests, Owner refused to provide GHM (South Beach) with a proper engineering workshop at the Hotel. Instead, GHM (South Beach) forced to maintain "temporary engineering workspaces" outside the Hotel. To date, the engineering workshop for the Hotel is located off-site, which is both inefficient and dangerous.

    e.  Owner failed to provide GHM (South Beach) with adequate "back of house" facilities. Astonishingly, the Hotel's back of house is located approximately one block from the Hotel, in a very old, cramped building. This greatly reduced the efficiency of Hotel operations and resulted in increased labor costs and lost profits for GHM.

    f.  Owner refused repeated requests to sign a permit application to serve hot food at the Beach Bar & Restaurant, notwithstanding the fact that the City of Miami Beach threatened to close the Beach Bar & Restaurant and impose daily fines.

    g.  For over two years, Owner refused to sign documents necessary to give signing authority to the Setai's Director of Finance over the Hotel's accounts and checks, creating payment and contractual problems between the Hotel and its vendors.

39.  In addition, GHM (South Beach) was frequently pulled away from operating the Hotel to attend meetings with Lehman Brothers/Owner's asset managers and on-site representative, John Duggan, who were woefully unprepared for meetings and unwilling to resolve even the most basic Hotel-related issues. The correspondence between the parties, which Owner improperly seized and has refused to turn over to Respondents, logs GHM (South Beach)'s frustration with the lack of preparation and efficiency of Richard Siu, Lehman/Owners' asset manager, who often arrived late to scheduled meetings and/or lost or was "too busy with other important meetings" to bring the meeting agenda and financial documents for discussion.

40.  Owner also deliberately attempted to sabotage the relationship between GHM and the condominium owners' association. In December 2011, Richard Siu and Lori Geisler, Lehman/Owner's asset managers, in order to increase Owner's profits, agreed and encouraged GHM (South Beach) to shift more expenses from Owner to the condominium owners' association on the 2012 budget. The shift was intended to benefit Owner, not GHM. In mid-January, 2012, Owner suddenly and in complete contradiction of its previous decision, asked GHM (South Beach) to allocate expenses based on the 2011 budget until further notice. Owner then refused to send the association a simple letter advising the association of its decision and the

14

possibility that outstanding fees may be due when the 2012 budget is finalized, demanding instead that the letter be signed and sent by GHM (South Beach). The purpose behind Owner's strange behavior became clear following the termination, when it was revealed that Owner was misleading the association to believe that <u>GHM (South Beach)</u> was unilaterally attempting to increase condominium fees in order to boost its own profits.

41.    Recently, during one of Owner's attempts to manufacture "cause" to terminate GHM, Owner accused GHM (South Beach) of failing to properly maintain the Hotel. Owner requested all of the maintenance logs for the Hotel. These were immediately turned over to Owner along with a report by an independent structural engineer, paid for by GHM, proving that the Hotel was impeccably maintained.

<b><u>Owner's Reckless and Lawless Raid of the Hotel</u></b>

42.    Unable to find "cause" to properly terminate GHM, at approximately 2:00 a.m. in the pre-dawn hours of Saturday, March 31, 2012, Owner and its new management company raided the Hotel with dozens of armed security personnel. Owner advised the Hotel's manager on duty that it was purporting to terminate the parties' Management Agreement "effective immediately." A copy of the letter is attached hereto as **Exhibit C**. Owner's termination letter does not identify any basis for the termination and raid.

43.    Contrary to the express requirements of the Management Agreement, Owner failed to give notice or an opportunity to cure any purported mismanagement to GHM before the raid and the improper termination.  And Owner did not even bother to feign a "good faith" attempt to settle any differences amicably, as the Management Agreement also requires.

44.    Once in the Hotel, Owner seized and began accessing GHM's proprietary and confidential information, including Standard Operating Procedure manuals, employee files, and

15

attorney-client privileged communications.   Owner also seized control of GHM's "GHM Americas" mail server, which was located at the Hotel, thereby blocking GHM's personnel access to the "GHM Americas" domain, which was property of and used by GHM (South Beach)'s parent company for all of its email correspondence, not just correspondence related to the Hotel.

45.     As GHM employees arrived to work amidst the chaos that ensued as a result of the raid, they were handed an "announcement" advising them of the termination of GHM and soliciting them to work for Owner and its new management company or face termination. A copy of the announcement to employees is attached as **Exhibit D**. Upon information and belief, GHM's former employees have also been forced to sign loyalty oaths to and/or confidentiality agreements with Owner and/or its new management company.   Moreover, as a result of Owner's midnight raid and wholesale dismissal with no warning or discussion, more than 100 of GHM's employees in the United States on immigration visas linked to GHM (of whom Owner was well aware) were in jeopardy with respect to their immigration status.

46.     Owner also abruptly fired most of GHM's managerial employees, escorting them off of the property with armed personnel and/or preventing them from accessing the property, even to retrieve their personal belongings.   The Owner provided GHM with no prior notice of any of these actions so that it could make arrangements for its employees and their families, instead electing a sneak attack under cover of darkness.

47.     As described above, Owner also demeaned and defamed GHM by publicly accusing GHM of mismanagement and misappropriation of funds by leaking the Request for Arbitration they had already prepared before the raid was executed.

16

**Substantial Harm to Respondents Resulting from Defendants' Lawless Actions**

48.     Miraculously, there were no physical injuries as a result of Owner's lawless night-time raid by armed personnel. However, the deliberately demeaning and damaging manner in which the Management Agreement was terminated, which went well beyond a simple breach of contract, and the post-termination actions of Owner, have caused and continue to cause substantial harm to GHM and their business.

49.     Owner's actions have damaged GHM's reputation, and harmed both their ongoing business interests as well as interfered with developing business interests. Owner's or its agents' false statements that GHM "misappropriated" funds and "mismanaged" the Hotel have significantly harmed GHM's reputation, with the effect that potential partners have expressed concern about moving ahead with existing hotel management plans.

50.     The primary assets of GHM Ltd. and GHM (South Beach) are (a) their long-term management agreements, (b) their reputation and goodwill that have become associated worldwide with "GHM" management; and (c) their experience in, understanding of and ability to operate luxury hotels to a five-star standard.   These are not companies that own buildings or that build computers.  Their stock-in-trade is their expertise, their tradecraft in the form of SOPs as well as other methods, systems, and know-how about how to manage a luxury hotel, their reputation in the public to be able to reliably provide a five-star experience, and the relationships with and trust of travel agents and meeting planners whose own success depends on an extraordinary guest experience.

51.     The Respondents generally earn money by entering into management contracts with hotel and condominium owners. Indeed, the economic value of GHM is calculated based on the revenue stream from its management agreements with owners. GHM's goodwill and solid

reputation are critical to their relationships with its owners and with prospective clients. As a direct result of the raid and the post-termination defamatory statements made by Owner, prospective developers and owners have decided not to invest in the "GHM" brand. Consequently, GHM's business has been severely impaired.

52.     Owner's actions also have damaged GHM's goodwill and reputation among their guests. Following the raid, guests who expected to stay at the Hotel managed by GHM unexpectedly found themselves in a hotel managed by Trevi Luxury Hospitality Group ("Trevi"), which is an inexperienced, unknown, start-up hotel management company with no SOPs of its own and no other properties under management. Many guests are still unaware that Trevi is managing the property. For weeks following the raid, guest reservation responses were sent from "ghmamericas.com" email addresses and contained the "GHM" logos on the email signature blocks. Even though GHM (South Beach) was no longer managing the Hotel, GHM was blamed for the poor service and accommodations being offered by Trevi, which is causing substantial reputational damage to the brand.

53.     What is true of individual guests is even truer of GHM's loyal travel agents and group travel managers who generate much of the business for the Hotel and GHM's other properties worldwide.  One of GHM's most valuable contributions to the Hotel and most valuable assets is its significant relationships with travel agencies and group accounts, developed by GHM's sales teams. These relationships are built on trust, and travel agencies, which depend on customer satisfaction to sustain their business, are highly risk-averse.  As a result of the raid, travel agents and managers who booked groups into what they believed was a GHM-managed hotel unexpectedly had to explain to the group members, who had invested significant resources in making arrangements for their meetings and conference, that they would not in fact be staying

at a property managed by GHM or receiving the experience they expected. Accordingly, GHM (South Beach)'s premature eviction, which the Owner is falsely holding out to the public is the result of GHM's faulty management, has caused these agencies to look at GHM differently in determining whether to book clientele at other "GHM" properties.

54.     The Respondents are also suffering substantial damages as a result of Owner's seizure of their proprietary, confidential, and privileged materials and the exposure of GHM's trade secrets to a competitor, the new management company Owner has installed.   Due to Owner's actions, Trevi has certainly had access to, and may still be in possession of voluminous written information and other materials relating to GHM's proprietary methods for operation of hotels including its employee files, training manuals, and operating procedure manuals. Trevi and Owner also are in possession of documents relating to GHM's global business operations, which are completely unrelated to the Hotel. Perhaps most egregiously, Setai Owners and Trevi are in possession of GHM's privileged and confidential communications with counsel.

55.     These confidential materials and trade secrets, especially when taken as a whole, represent an extremely valuable asset — GHM's knowledge of how to manage ultra-luxury hotels effectively and efficiently. This is confidential and proprietary information that required considerable time and expense to create and which the Respondents go to great lengths to protect. Because Trevi is a competitor of GHM and a start-up entity, Owner's actions have essentially handed to a competitor, at no cost, the blueprints for how to operate a hotel according to GHM's carefully developed, proprietary methods.

56.     By threat of termination, deportation, and even eviction (as many employees lived in a building provided by the Setai), Owner and Trevi also forcibly poached GHM's employees, many of whom were brought to work at the Hotel from other properties managed by GHM.

19

GHM spent considerable time and money training these employees, all of which is now lost. The loss of these key employees also severely impacts GHM's ability to take on other management projects.

57. Of course, in addition to the aforementioned damages and other actual and consequential damages incurred as a result of Defendants' actions, GHM also has lost its anticipated profits for the approximately thirteen years remaining under the Management Agreement (comprised of the original term and GHM's option extend that term by an additional five years), *see supra* ¶ 33, as well as incurred costs and fees in connection with the termination, and is owed certain pre-termination fees and costs by Owner.

## VI. DENIAL OF SETAI OWNERS' CLAIMS[4]

58. To the extent the Request for Arbitration makes factual allegations against Respondents, Respondents deny such allegations. In particular, Respondent sets forth relevant and objective facts below demonstrating that Owner's claims are but a thin gruel. However, this denial, and the preceding and following summary of facts does not set forth all the evidence, arguments, authorities or which Respondents will rely in this arbitration, should any matters be found arbitrable and/or the parties allowed to continue to arbitrate.

59. At bottom, Owner raises three areas of dispute, in addition to its request for post hoc absolution for its midnight raid:

     a.   Whether the amount of management fees paid to Respondents was excessive.

     b.   Whether Respondents mismanaged the Hotel.

---

[4] Due to the vagueness and conclusory nature of Owner's allegations, Respondents are unable to respond fully and expressly reserves the right to make further submissions, in the event that Owner makes specific allegations. Respondents will present their case in this proceeding, should it continue – including evidence, arguments, and authorities – in accordance with the timetables and procedures established by the Arbitral Tribunal.

c.   Whether there was an agency relationship, and, if so, its effect on Owner's claims.

**A.    Management Fee Dispute Is Not Arbitrable.**

60.    But as shown above in Section IV.B, the dispute as to the calculation of management fees is simply not subject to arbitration even if this arbitration were proper.  As we noted there, Article XI.3 of the Management Agreement requires that any dispute "as to the contents or correctness of any such statement" (including P&L Statements, balance sheets, sources and applications of funds statements) or any accounting matter thereunder *shall be decided by the [independent CPA]*, whose decision shall be final and binding."  Nor was the Owner unaware of this provision, since Owner and Respondent jointly engaged PricewaterhouseCoopers to under this very provision to resolve the management of the calculation fees.  *See* PwC Engagement Letter dated October 6, 2010, attached hereto as **Exhibit E**; *see also* Letter Agreement dated January 14, 2011, attached hereto as **Exhibit F**.

61.    Over several months, PwC issued two draft reports, which both parties had commented on, and a final report was expected at any moment. *See* PwC Second Draft Report (dated 1/27/2012), attached hereto as **Exhibit G**. Apparently unhappy with the direction in which the independent PwC audit was headed, Owner raided the Hotel before PwC could issue its final report, in an attempt to improperly shift the decision to an Arbitration Tribunal.

62.    Owner should not be allowed to circumvent the express protocols of the Management Agreement and the agreement between the parties by submitting this issue to arbitration.

21

**B.**    **Owner's Claims of Mismanagement Are Entirely Contrary to Objective Fact.**

63.    According to widely accepted publications in the hospitality industry, the Setai ranks as one of the top luxury hotels in Miami Beach and one of the finest of hotels in North America.

64.    As discussed above, the following are just a few of the accolades received by the Setai by GHM *in 2011 alone:*

   a.   Conde Nast Johansens Awards, "Most Excellent Hotel in the USA & Canada"

   b.   U.S. News, "#1 hotel in Florida"

   c.   Conde Nast Traveler "The Platinum Circle" Award, recognizing five consecutive years of being on "The Gold List"

   d.   Smith Travel Reseach, "Best Performing Hotel, Independent Segment" (Award for RevPar Index)

   e.   The Gallivanter's Guide 2011 Award for Excellence – second on list "Best Resort in North America"

   f.   Wine Spectator, "The Best of Award of Excellence"

   g.   Hotels Magazine, "10 Great Restaurants of the World"

   h.   The Miami New Times, Best of Award, "Best Hotel Restaurant"

   i.   Organic Spa Magazine, "Top 10 Green Spa Awards"

   j.   Conde Nast Traveler, "Top 50 Hotel Spas in the U.S."

65.    In addition, as Owner is well aware, (and flatly contrary to Owner's allegations here) the Hotel's revenue per available room ("RevPAR") under GHM's management was by far higher than that of any other hotel in the region. Each year under GHM (South Beach)'s management, the Setai by GHM commanded an incredible average room rate of over $900, even through the economic downturn.

22

66.     In the face of this widely available, widely shared, and *objective* evidence, Owner's complaint or mismanagement is based on six negative comments that appear to have originated on TripAdvisor, a website in which individual travelers can rate hotels and other hospitality services.[5]  Owner plucks only these 6 out of more than 250 postings about the Setai, the overwhelming majority of which are entirely positive.

67.     Owner's claims regarding "excessive" expenses are similarly false, and offer not a shred of information that could lead logically to the conclusion of "mismanagement."  In the face of the overwhelming objective evidence to the contrary, Owner's "mismanagement" claim and its paucity of support strongly suggest that Owner recognized that its management fees claim was not subject to arbitration, so it sought another hook to proceed with this arbitration.

**C.     There Was No Agency Relationship.**

68.     As discussed above, the parties expressly agreed that "nothing in [the Management Agreement] shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties." Accordingly no relationship, other than a contractual relationship, was created between the parties, including a fiduciary or agency relationship. Although GHM (South Beach) may have acted as Owner's representative for discreet tasks related to some aspects of Hotel operations, the Management Agreement and the actions of the parties made clear that the sole authority to operate and manage the Hotel rested with GHM (South Beach).

69.     In addition, although GHM (South Beach) was not acting as Owner's agent, it went out of its way to provide Owner with all information it reasonably requested regarding Hotel accounting and operations. GHM (South Beach) provided Owner with detailed monthly

---

[5] Due to the anonymous nature of TripAdvisor postings, these comments could have been made by the Setai's competitors or even by Owner itself.

and yearly financial reports and attended monthly meetings with Owner's asset managers. GHM (South Beach) also allowed Owner to have a full-time, on-site representative at the Hotel. Unfortunately, as described above in Section V, Owner's asset managers and on-site representative were unwilling or unable to prepare for meetings, to review financial documents, or to help resolve even the most basic Hotel-related issues.

## VII.    COUNTERCLAIMS

70.    In the event that Owner's claims (or any subset of such claims) are determined by be arbitrable, the Respondents raise counterclaims to assure that the substantial damages caused by Owners are remedied. The Respondents make these counterclaims in this arbitration proceeding without waiving, and without prejudice to their position (1) that this matter is not arbitrable as a whole for Owner's failure to consult and seek amicable settlement, and (2) that specific issues raised in this proceeding by Owner, including but not limited to, calculation of management fees and any other accounting-related issues, are not arbitrable under the Management Agreement because the Management Agreement specifies other final dispute resolution procedures for those issues.[6]

### A.    Count One:  Breach of the Management Agreement

71.    Respondents reallege paragraphs 1-70 as if fully set forth herein.

72.    Respondents have fulfilled all conditions precedent to the assertion of its claims against Owner, including the performance of all of its obligations under the Management Agreement. Alternatively, Respondents' performance has been excused by the wrongful acts and material breaches of the Management Agreement by Owner.

---

[6] Respondent GHM Ltd. also joins these counterclaims without prejudice to any arguments that GHM Ltd. is not properly a party to this arbitration, *see supra* n.1.

73.      Owner has breached the Management Agreement, *inter alia,* by (i) prior to termination, intentionally refusing or delaying approval for items critical Hotel operations and maintenance, as required by Articles VII & XV of the Management Agreement (ii), terminating Respondents without cause, without the contractually required 60 days' notice, and without any notice or an opportunity to cure, as required by Article XIX of the Management Agreement, and (iii) filing for arbitration immediately after termination without attempting to settle the dispute in "mutual good faith," as required by Article XXVI of the Management Agreement, *see also supra* ¶¶ 24-26.

74.      As a result of Owner's breach of the Management Agreement, Respondents have sustained economic injury for which it seeks actual and consequential damages, including compensation for attorneys fees as provided in the Management Agreement, in an amount to be determined by the trier of fact.

75.      Respondents seek an award of monetary damages against Owner, including, but not limited to any and all actual damages, costs and expenses, pre- and post-judgment interest, costs, attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by Respondents arising from the above-described wrongful acts of Owner.

**B.      Count Two:  Breach of Duty of Good Faith and Fair Dealing**

76.      Respondents reallege paragraphs 1 through 70 above as if fully set forth herein.

77.      Implied in the Management Agreement, as a matter of law, is a covenant of good faith, fair dealing and commercial reasonableness.

78.      Owner has acted in bad faith, *inter alia*, by intentionally failing to comply with the termination provisions of the Management Agreement which require Owner to (i) advise

Respondents of any alleged material deficiencies in Respondents' management and operation of the Hotel, (ii) give Respondents an opportunity to cure any such deficiencies, (iii) attempt to settle any differences in good faith, and, at the very least, (iv) refrain from effecting an armed midnight raid on the premises and forcibly evicting Respondents.

79.     Owner has breached its duty of fair dealing by purposely engaging in a pattern to exclude and evict Respondents from the Hotel despite Owner agreeing to a 15-year term with an option for Respondents to extend that term by an additional five years.

80.     Owner's breach of its duty of good faith, fair dealing and commercial reasonableness has damaged Respondents.

81.     Respondents seek an award of monetary damages against Owner, including, but not limited to any and all actual damages, costs and expenses, pre- and post-judgment interest, costs, attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by Respondents arising from the above-described wrongful acts of Owner.

C.     **Count Three:  Tortious Interference with Business Relationships (Employees)**

82.     Respondents reallege paragraphs 1 through 70 above as if fully set forth herein.

83.     Owner knew that the employees at the Hotel were Respondents' employees.

84.     Owner further knew or should have known that Respondents invest significant resources in recruiting and training its employees to work at properties managed by Respondents. Owner further knew or should have known that Respondents' employees are a valuable asset of GHM and its affiliates.

85.     As Respondents' employees arrived at work following the midnight raid, those employees that were not improperly terminated by Owner were forced by threat of termination,

26

deportation, and/or eviction to end their business relationship with Respondents and work for the Hotel for the benefit of Owner.

86.     Owner intentionally participated in orchestrating the improper raid of the Hotel, the ouster of Respondents from the Hotel, and the recruitment of Respondents' employees to work for the Hotel post-termination. Owner induced Respondents' employees to end their business relationship with Respondents.

87.     Owner acted without proper justification.

88.     As a direct and proximate result of the wrongful conduct of Owner, Respondents have suffered and continues to suffer substantial money damages.

89.     Respondents seek an award of monetary damages against Owner, including, but not limited to any and all actual damages, costs and expenses, pre- and post-judgment interest, costs, attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by Respondents arising from the above-described wrongful acts of Owner.

**D.    Count Four:  Tortious Interference With Business Relationships (Private Residence Owners)**

90.     Respondents reallege paragraphs 1 through 70 above as if fully set forth herein.

91.     Owner knew that Respondents had entered into separate contracts to manage certain private residences at the Setai participating in a "rental program."

92.     By its conduct, including but not limited to disparaging and defaming Respondents, orchestrating the improper raid of the Hotel and ouster of Respondents from the Hotel, misleading the condo owners as to accounting matters, and failing to take steps to ensure the proper upkeep and maintenance of the hotel, Owner interfered with Respondents' ability to maintain and continue these separate contracts with the private residence owners.

93.     Owner acted without proper justification.

94.     As a direct and proximate result of Owners wrongful conduct, Respondents have suffered and continues to suffer substantial money damages.

95.     Respondents seek an award of monetary damages against Owner, including, but not limited to any and all actual damages, costs and expenses, pre- and post-judgment interest, costs, attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by Respondents arising from the above-described wrongful acts of Owner.

E.     **Count Five:  Violation of Florida Trade Secrets Act**

96.     Respondents reallege paragraphs 1 through 70 above as if fully set forth herein.

97.     Owners engaged Respondents because they had experience in the management and operation of hotels (Agreement, Whereas Clause #G) and because "Owner desires to avail itself of the hotel management experience and know-how of the Operator." (*Id.*, Whereas Clause #I).

98.     To bring its experience and know-how to bear in the operation of the Hotel, Respondents predictably brought and used its confidential and proprietary information and materials, including standard operating procedure manuals, training manuals, and employee files, in the Hotel.

99.     Respondents use their confidential and proprietary information and materials to operate, manage, and market the hotels it manages, including not only the Hotel but also other properties managed by Respondents.

28

100. The confidential and proprietary information and materials consist of unique and specific information with significant actual and potential economic value to others in the hotel industry, including Owners and any new management company they might wish to engage.

101. Respondents have taken strict measures to protect the confidentiality of the above-described confidential and proprietary information and materials.

102. Upon being improperly terminated without any notice on March 31, 2012, Respondents' employees were escorted off the property, and were not allowed by Owner's hired security guards to remove its confidential and proprietary information and materials from the Hotel. Instead, Owner seized possession and control of that confidential and proprietary information.

103. Although Owner eventually returned some portion of that information, Owner has refused to return other confidential and proprietary information and materials belonging to Respondents.

104. Owner's failure to return Respondents' confidential and proprietary information and materials constitutes misappropriation, in violation of Florida Statutes Section 688.001, et seq.

105. Owner's misappropriation is willful and malicious.

106. Respondents have retained undersigned counsel and agreed to pay its counsel a reasonable fee.

107. Respondents seek an order (i) awarding compensatory and statutory damages, and/or a reasonable royalty, pursuant to F.S. § 688.004; (ii) enjoining Owner from using Respondents' confidential and proprietary information and materials pursuant to F.S. § 688.003; (iii) requiring Owner to return the confidential and proprietary information and materials to

29

Respondents pursuant to F.S. § 688.003; (iv) awarding attorney's fees pursuant to F.S. § 688.005; and (v) awarding Respondents any other relief this Court deems just and proper.

**F.     Count Six:  Defamation**

108.     Respondents reallege paragraphs 1 through 70 above as if fully set forth herein.

109.     Owner published false statements about Respondents to third parties including, without limitation, the press and Respondents' current and former employees.

110.     The falsity of these statements has caused substantial injury to Respondents' reputation and business.

111.     Owner acted without proper justification.

112.     Respondents seek entry of an order awarding Respondents any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by Respondents arising from the above-described wrongful acts of Owner.

**G.     Count Seven:  Conversion**

113.     Plaintiff realleges paragraphs 1 through 70 above as if fully set forth herein.

114.     Owner's conduct during and after the unlawful raid permanently and indefinitely deprived the Respondents of significant property, which was located at the Hotel and Abbey Hotel.  This property includes, but is not limited to Respondents' operating procedure manuals, employee files, training manuals, attorney-client privileged communications, global operations documentation, style guides, guest profile databases, GHM P&P files, supplier lists and contracts, accounting books and records, personal belongings and effects of Respondents' employees.

115.     Respondents have been severely damaged by Owner's wrongful depravation of Respondents' property and has incurred great cost and expense in attempting to replace, restore, and repair the wrongfully deprived property. In addition, Respondents incurred and will continue to incur substantial consequential damage including lost profits as a direct and proximate result of Owner's wrongful depravation of Respondents' property.

116.     Respondents seek entry of an order awarding Respondents any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by Respondents arising from the above-described wrongful acts of Owner, in addition to an order requiring Owner to return all such materials to GHM.

## H.     **Count 8:  Willful and Wanton Termination**

117.     Respondents reallege paragraphs 1 through 70 above as if fully set forth herein.

118.     Pursuant to Articles XIX and XX of the Management Agreement, if ground for termination existed under those Articles, Owner had a duty of care to terminate the contract in a safe and orderly manner, with notice to Respondents, and to give Respondents an opportunity to wind up its business. Specifically, in addition to the notice and cure requirement, the Management Agreement required 60 days' notice of termination.

119.     Owner breached this duty of care by terminating the Management Agreement in an unlawful raid, without notice to Respondents, at 2:00 a.m. on a Saturday night, with armed security personnel.

120.     Owner intentionally engaged in a surprise raid of the Hotel, which harmed Respondents, *inter alia*, in the following ways:

a. Respondents had no time to retain their employees who were poached by the new management company;

b. Respondents' competitor, Trevi, was given access to their trade secrets and proprietary information, including without limitation operating procedure manuals, employee files, training manual, attorney-client privileged communications, global operations documentation, style guides, guest profile databases, GHM P&P files, supplier lists and contracts, accounting books and records;

c. The bank accounts used by Respondents to pay their vendors and employees were frozen as a result of the raid and no advance notice was provided to Respondents to make accommodations for payment of outstanding obligations including payments to employees and vendors; and

d. Respondents were denied the opportunity to provide notice to their guests, travel agents, and group travel managers that future management would be provided not by Respondents, but by another management company so that guests, travel agents, and group travel managers would not be misled into believing that Respondents were managing the Hotel when they were not.

121.    As part of the unlawful raid and termination process, Owner engaged in a negative public relations campaign by making false and misleading press releases.

122.    Owners' intentional breach of its contractual termination duties are willful, wanton, malicious, and in reckless disregard for the rights of Respondents.

123.    As a direct and proximate result of the willful and wanton misconduct of Owner, Respondents' business has suffered significant injury to its goodwill and reputation, which has resulted in and will continue to result in irreparable injury and substantial monetary damages.

124.    Respondents seek entry of an order awarding Respondents any and all actual damages, costs and expenses, pre- and post-judgment interest, compensation for attorneys fees, and consequential damages, including lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities sustained by Respondents arising from the above-described wrongful acts of Owner.

## PRAYER FOR RELIEF

WHEREFORE, *in the event that the arbitration is determined to continue, and without waiving its position that Owner has waived the right to arbitrate by failing to take all steps necessary to effect arbitration, and without prejudice to its position that specific issues in Owners' Request are not arbitrable under the Management Agreement*, Respondents, respectfully requests the following relief:

A.      Dismissal of Owner's claims;

B.      A declaration that Owner's claims arising from any accounting matter relating to the Setai financial statements is not subject to arbitration, but must be resolved according to the Management Agreement;

C.      A declaration that Owner's claims arising from any or all of the items in the Annual Plan or any supplement thereto are not subject to arbitration, but must be resolved according to the Management Agreement;

D.      A declaration that Respondents are not liable for any damages to Owner;

E.      Monetary damages sufficient to fully compensate Respondents for the injuries that they have sustained, including, without limitation, breach of contract damages, lost profits, damage to goodwill and business reputation, lost business value, and lost business opportunities. Respondents note that unlike Owner, they have not had months to prepare for this arbitration, and, unlike Owner, they have no access to the books and records relating to the Hotel. Accordingly, their estimate of damages is necessarily preliminary, incomplete, and an ongoing effort. Nevertheless, in an effort to quantify in some preliminary sense, Respondents expect to prove damages of no less than $100 million, and probably significantly more;

33

F.      Punitive and exemplary damages in an amount to be determined by the Arbitral Tribunal;

G.      An Order awarding compensatory and statutory damages, and/or a reasonable royalty, pursuant to F.S. § 688.004;

H.      An order enjoining Owner from using Respondents' confidential and proprietary information and materials pursuant to F.S. § 688.003;

I.      An order requiring Owner to return the confidential and proprietary information and materials to Respondents pursuant to F.S. § 688.003;

J.      Prejudgment and post-judgment interest at the maximum rate(s) permitted by Florida law;

K.      Arbitration costs;

L.      Reasonable and necessary attorneys fees and expert fees incurred by Respondents in connection with the defense of and prosecution of claims between Respondents and Owner to the extent permitted by law;  and

M.      Such other and further relief as the Arbitral Tribunal shall deem just and proper.

Dated: June 12, 2012

_Julie Carpenter_

Julie M. Carpenter, Esq.
David A. Handzo, Esq.
Jenner & Block
1099 New York Avenue, NW
Washington, DC  20001
Tel  +1 202 639 6085
Fax +1 202 661 4853

Kenneth B. Hartmann, Esq.
Daniel F. Benavides, Esq.
Kozyak, Tropin & Throckmorton, P.A.
2525 Ponce de Leon
9th Floor
Miami, Florida  33134
Tel  +1 305.377.0657
Fax  +1 305.372.3508

**ATTORNEYS FOR RESPONDENTS
GENERAL   HOTEL   MANAGEMENT,
LTD. & GHM (SOUTH BEACH) LLC**