# EXHIBIT "A"

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 18610/VRO/AGF/RD

SETAI OWNERS LLC (U.S.A.)

**vs/**

**1.** GENERAL HOTEL MANAGEMENT LTD. (British Virgin Islands)

**2.** GHM (SOUTH BEACH) LLC (U.S.A.)

This document is an original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

Case No. 18610/VRO/AGF/RD

## INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

Between

**Setai Owners LLC**,

*Claimant,*

– and –

**General Hotel Management, Ltd.**, and
**GHM (South Beach) LLC**,

*Respondents.*

# FINAL AWARD

### The Tribunal

*Gerald Aksen, Esq. (President)*
*Joseph M. Matthews, Esq.*
*Hon. Richard E. Neville*

**TABLE OF CONTENTS**

I.     **INTRODUCTION** ...................................................................................**1**
   A.   The Parties ................................................................................ 1
   B.   Arbitral Tribunal ...................................................................... 2
   C.   Summary of the Dispute .......................................................... 3
   D.   Arbitration Agreement and Governing Law ............................ 3

II.    **ARBITRATION PROCEEDINGS** ....................................................**4**
   A.   Terms of Reference ................................................................. 4
   B.   Pre-Hearing Submissions ........................................................ 4
   C.   Hearings .................................................................................. 6

III.   **BACKGROUND** ...............................................................................**9**
   A.   Prior to the Setai's Opening .................................................... 9
   B.   Subsequent to the Setai's Opening .........................................11
   C.   The PwC Report .....................................................................14
      1.   Gross Revenues .................................................................14
      2.   Base and Incentive Management Fees ...............................15
      3.   FF&E Reserves ..................................................................15
      4.   CAM Charges ....................................................................16

IV.   **THE PARTIES' CLAIMS** ...............................................................**16**
   A.   Claimant ................................................................................16
   B.   Respondents ...........................................................................18

V.    **DISCUSSION** ................................................................................**20**
   A.   Issues Disputed as Non-Arbitrable .........................................20
   B.   Owner's Claims .....................................................................22
      1.   Breach of Contract ............................................................22
         a.   Performance-Related Obligations ...............................23
         b.   Fee-Related Obligations ..............................................25
         c.   Facilities-Related Obligations .....................................26
         d.   Employee-Related Obligations ....................................27
         e.   Accounting-Related Obligations .................................28
      2.   Breach of Fiduciary Duty ..................................................29
   C.   GHM's Claims .......................................................................37

VI.   **DAMAGES** ....................................................................................**40**
      1.   Tower Units .......................................................................42
      2.   Unsold Hotel Units and Commercial Unit .........................42
      3.   Calculation of Management Fees on Property or Unit Level ...........43

VII.     COSTS ............................................................................................................... 45

VIII.    SUMMARY ......................................................................................................... 46

IX.      AWARD .............................................................................................................. 46

## **List of Abbreviations**

| | |
|---|---|
| Base Management Fee | "BMF" |
| General Hotel Management Ltd. and GHM South Beach LLC | "GHM" |
| Incentive Management Fee | "IMF" |
| Management Agreement, dated March 20, 2000 between GHM Ltd. and Dempsey Vanderbilt Owners LLC | "HMA" |
| PwC final report, dated October 1, 2012 | "PwC Report" |
| Rental Pool Agreements | "RPAs" |
| Revenue per available room | "RevPAR" |
| Setai Owners LLC | "Claimant" or "Owner" |
| Setai Resort & Residences | "Hotel" or "Setai" |
| Statement of Undisputed Facts, dated August 30, 2013 | "SUF" |
| Uniform System of Accounts for the Lodging Industry, 10th Edition | "Uniform System" |

I. **INTRODUCTION**

A. **The Parties**

1.      Claimant Setai Owners LLC ("Claimant" or "Owner") is a limited liability company organized and existing under the laws of the State of Delaware of the United States of America with its principal place of business located at:

> 1271 Avenue of the Americas, 39th Floor
> New York, New York 10020

2.      Claimant is represented by:

> William A. Brewer III
> James S. Renard
> Jack G. Ternan
> Jeremy Camp
> Bickel & Brewer
> 4800 Comerica Bank Tower
> 1717 Main Street
> Dallas, Texas 75201
> Tel:    +1 214-653-4000
> Fax:    +1 214-653-1015
> Email: wab@bickelbrewer.com
>           jsr@bickelbrewer.com
>           jgt@bickelbrewer.com
>           jyc@bickelbrewer.com

3.      Respondent General Hotel Management Ltd. ("GHM Ltd.") is a company incorporated and existing under the laws of the British Virgin Islands with its principal place of business located at:

> 1 Orchard Spring Lane
> #04-02 Tourism Court
> Singapore 247729

4.      Respondent GHM (South Beach) LLC ("GHM (South Beach)") is a limited liability company organized and existing under the laws of the State of Delaware of the United States of America with its principal address formerly at:

> 2001 Collins Avenue
> Miami Beach, Florida 33139

5.      Respondents GHM Ltd. and GHM (South Beach) (collectively, "GHM") are represented by:

Kenneth R. Hartmann     - and -
Detra Shaw-Wilder
Daniel F. Benavides
Douglas A. Wolfe
Kozyak, Tropin &
   Throckmorton, P.A.
2525 Ponce de Leon
9th Floor
Miami, Florida 33134
Tel:   + 1-305-377-0657
Fax:   + 1-305-372-3508
krh@kttlaw.com
dps@kttlaw.com
dfb@kttlaw.com
daw@kttlaw.com

Lawrence Schaner
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456
Tel:   +1 312-222-9350
Fax:   +1 312-527-0484
lschaner@jenner.com

Julie M. Carpenter
David A. Handzo
Jenner & Block
1099 New York Avenue, NW
Washington, DC 20001
Tel:   +1 202-639-6085
Fax:   +1 202-661-4853
jcarpenter@jenner.com
dhandzo@jenner.com

**B.**     **Arbitral Tribunal**

6.     The President of the Arbitral Tribunal, appointed on October 18, 2012 by the

International Court of Arbitration upon the proposal of the United States National

Committee, pursuant to Article 13(3) of the ICC Rules, is:

Gerald Aksen, Esq.
805 Third Avenue, 10th Floor
New York, NY 10022
U.S.A.
Tel:    +1 212-752-1000
Fax:    +1 212-355-4608
Email: gerald.aksen@yahoo.com

7.     The co-arbitrator, confirmed on October 17, 2012 by the Secretary General

upon Claimant's nomination, pursuant to Article 13(2) of the ICC Rules, is:

The Honorable Richard E. Neville
c/o Brooke Stauffer
JAMS
71 S. Wacker Drive, Suite 3090
Chicago, IL 60606
U.S.A.
Tel:    +1 312-655-0555
Fax:    +1 312-655-0644
rneville@jamsadr.com
bstauffer@jamsadr.com

2

**8.**     The co-arbitrator, confirmed on October 17, 2012 by the Secretary General upon Respondents' joint nomination, pursuant to 13(2) of the ICC Rules, is:

> Joseph M. Matthews, Esq.
> 255 Alhambra Circle, PH
> Coral Cables, FL 33134
> U.S.A.
> Tel:    +1 305-761-2323
> Fax:    +1 305-476-7444
> Email: joseph@colson.com

**C.**     **Summary of the Dispute**

**9.**     The Parties' claims arise out of the Management Agreement dated March 20, 2000 between GHM Ltd. and Dempsey Vanderbilt Owners LLC (which subsequently changed its name to Setai Owners LLC), and amended by letter dated January 8, 2003 ("2003 Amendment") (together, the "HMA").  On January 13, 2005, GHM Ltd. and GHM (South Beach) entered into an Assignment and Assumption Agreement under which GHM Ltd. assigned the HMA to GHM (South Beach).

**10.**     Under the HMA, Owner engaged GHM as the operator of the Setai Resort & Residences (the "Hotel" or "Setai") located in Miami Beach, Florida.  The operating term of the HMA is fifteen years from the official opening of the Hotel, with GHM having an option to extend the term by five years.  The Hotel had its official opening in August 2005.

**11.**     By letter dated March 31, 2012, Owner terminated the HMA and on that date removed GHM management personnel from the Hotel.

**D.**     **Arbitration Agreement and Governing Law**

**12.**     The jurisdiction of the Tribunal is derived from the Arbitration Agreement (incorporating the ICC Rules) contained in the HMA.

**13.**     Article XXVI of the HMA provides:

> This Agreement shall be governed and interpreted in accordance with the laws of the State of Florida and the United States of America.  The parties agree that in all matters relating to this Agreement, whether during its substance or after its termination, and also in all matters concerning the provisions of this Agreement where any question or dispute or difference

3

shall be settled in mutual good faith. In case of failure by the parties to reach an amicable settlement, such difference or dispute shall be finally settled through a Board of Arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce. The venue of the arbitration shall be Dade County, Florida.

## II.   ARBITRATION PROCEEDINGS

### A.   Terms of Reference

**14.**   Owner initiated the Arbitration by filing with the ICC Court a Request for Arbitration, dated March 31, 2012.

**15.**   GHM filed its Answer to Request for Arbitration and Counterclaim, dated June 12, 2012.

**16.**   Owner thereafter filed Claimant's Reply to Respondents' Counterclaim, dated August 24, 2012.

**17.**   Pursuant to Article 23 of the ICC Rules, the Terms of Reference dated December 17, 2012 were transmitted to the Court on January 3, 2013. They provided, *inter alia,* that the place of the arbitration and locale of the hearings is Miami-Dade County, Florida, U.S.A.; that the language of the arbitration would be English; and that the ICC Rules amended and as in force from January 2012 would apply.

### B.   Pre-Hearing Submissions

**18.**   By Procedural Order No. 1, dated January 4, 2013 (as revised by Procedural Order No. 3, dated April 15, 2013), the Parties agreed to a Provisional Time Table for the scheduling of the Arbitration, including document disclosures and the submission of direct fact testimony statements and expert reports.

**19.**   By Procedural Order No. 2, dated March 21, 2013, the Tribunal approved a Confidentiality Agreement entered into among the Parties.

**20.**   On May 22, 2013, the ICC Court, pursuant to Article 30(2) of the ICC Rules, extended the time limit for rendering a final award until November 29, 2013.

**21.**   The Parties submitted the following pre-hearing pleadings:

4

i)   Claimant's Statement of Claims, dated May 31, 2013;

ii)   Respondents' Statement of Claim, dated May 31, 2013;

iii)   Claimant's Response in Opposition to Respondents' Statement of Claim, dated June 28, 2013;

iv)   GHM's Statement of Defense, dated June 28, 2013;

v)   Claimant's Reply in Support of Its Statement of Claims, dated July 17, 2013;

vi)   Reply in Support of GHM's Statement of Claim, dated July 17, 2013;

vii)   Claimant's Reply to Respondents' Counterclaim, dated August 24, 2013; and

viii)   Statement of Undisputed Facts, dated August 30, 2013 ("SUF").

22.   Claimant submitted 61 initial and rebuttal affidavits and statements from the following fact witnesses:

| | |
|---|---|
| Anthony Barsanti | Pamela Greacen |
| Ivan Bauza | Joelle Halperin |
| Embree (Chuck) Bedsole | I Made Karya |
| Scott Blair | Devisha Khanna |
| David Broderick | Dev Ludewig |
| Amelia Cancerina | Erik Magnuson |
| David Casey | Atef Mankarios |
| Clare Cella | Robert Muehlich |
| Patti Chiacchiero | Edna Nakamoto |
| Dean Coetzer | Francis Nardozza |
| Jennifer Coleman | Gregory O'Keefe |
| Timothy Dick | Lorraine Randall |
| John Duggan | Guenter Richter |
| Lynn Eckroth | Heather Roberts |
| Patrick Fernandes | Mildred Rodriguez |
| Alex Furrer | Jaime Schapiro |
| Lori Geisler | Richard Siu |
| Mathias Gervais | Nastasia Stierli |

23.    Respondents submitted initial and rebuttal statements from the following fact witnesses:

| | |
|---|---|
| Jonathan Breene | Hans Jenni |
| Philippe Cavatore | Hansjeorg Meier |
| Monica Chang | Christopher Meredith |
| Jorge Collazo | Camilla Mork |
| Katherine Crain | Andrea Prevosti |
| Desak Dewi | Manvinder Puri |
| Michael Franzen | Georg Rafael |
| Moustapha Guimei | Charles Schoenherr |
| Johannes Hartfuss | Melody Wendt |
| Janet Humphreys | David Werly |

24.    Claimant submitted 18 initial and rebuttal expert reports from the following:

| | |
|---|---|
| Don Avalier | William Langmade |
| Robert Cotter | Christopher Leisner |
| FTI Consulting | Francis Nardozza |
| HREC | Lee Swanger |
| Fred Kleisner | |

25.    Respondents submitted initial and rebuttal expert reports from the following:

| | |
|---|---|
| Roger Cline | Barry Mukamal |
| Miroslav Mladenovic | The Weitzmann Group, Inc. |

C.    **Hearings**

26.    Hearings were held in Miami-Dade County, Florida on September 3-6 and 9-13 for the examination of the following witnesses (transcript references are cited herein as "Tr. __"):

Claimant

| | |
|---|---|
| Anthony Barsanti | Alex Furrer |
| Embree (Chuck) Bedsole | Lori Geisler |
| David Broderick | Pamela Greacen |
| Clare Cella | Joelle Halperin |
| Patti Chiachierro | Erik Magnuson |
| Dean Coetzer | Gregory O'Keefe |
| Timothy Dick | Lorraine Randall |
| John Duggan | Jaime Schapiro |
| Patrick Fernandes | Richard Siu |

6

<u>Respondents</u>

Jonathan Breene            Janet Humphreys
Philippe Cavatore         Hans Jenni
Jorge Collazo             Hansjeorg Meier
Katherine Crain           Christopher Meredith
Moustapha Guimei

27.     In addition, the deposition testimony of fact witness Charles Schoenherr was taken on November 13, 2013.

28.     On November 28, 2013, the ICC Court extended the time limit for rendering a final award until February 28, 2014.

29.     The Parties submitted the following briefs on the issues of common law right to terminate and agency:

        i)      Claimant's Memorandum of Law Regarding Its Common Law Right to Cancel the Management Agreement Due to Respondents' Material Breach, dated October 4, 2013;

        ii)     Claimant's Memorandum of Law Regarding Its Principal-Agent Relationship with Respondents, dated October 4, 2013, and

        iii)    GHM's Memorandum of Law, dated October 4, 2013.

30.     By Decision dated November 14, 2013, the Tribunal determined that questions of fact precluded a summary disposition of either issue.

31.     The Parties' experts submitted four Joint Reports, one dated November 1, 2013 and the other three dated November 19, 2013.  The Parties further each submitted a Road Map of Expert Opinions dated December 11, 2013.

32.     Hearings were held in Miami-Dade County, Florida on December 16-19, 2013 for the examination of the following expert witnesses:

        <u>Claimant</u>
        Robert Cotter             Francis Nardozza
        Fred Kleisner             Alan Tantleff
        Christopher Leisner

7

<u>Respondents</u>
Roger Cline                    Barry Mukamal
Miroslav Mladenovic

33.    The Parties submitted the following post-hearing pleadings:

i)    Post-Hearing Memorandum of Claimant Setai Owners LLC, dated January 31, 2014 ("Owner P-H Mem.");

ii)   GHM's Post-Hearing Submission and Proposed Findings of Fact and Conclusions of Law, dated January 31, 2014 ("GHM P-H Mem");

iii)  Post-Hearing Response of Claimant Setai Owners LLC (including Decision Tree), dated February 24, 2014 ("Owner P-H Resp."); and

iv)   GHM's Response Post-Hearing Submission (including Decision Tree), dated February 24, 2014 ("GHM P-H Resp.")

34.    On February 20, 2014, the ICC Court extended the time limit for rendering a final award until May 30, 2014.

35.    On March 5, 2014, the Parties submitted their respective applications for costs.  Respondents objected to Claimant's application on March 10, 2014.

36.    The Tribunal closed the proceedings, pursuant to Article 27 of the ICC Rules, on March 12, 2014.

37.    On May 22, 2014, the ICC Court extended the time for rendering a final award until June 30, 2014.

8

III.   **BACKGROUND**[1]

A.   **Prior to the Setai's Opening**

38.   The Setai is a condominium.  The property at the Setai includes the former Dempsey Vanderbilt Hotel building ("Hotel Building") consisting of, among other things, 88 condominium hotel units ("Hotel Units") and an adjoining tower building ("Tower Building") consisting of, among other things, 163 residential condominium units ("Tower Units").  Setai Owners LLC was the developer and the initial owner of all the units comprising the Setai.  (SUF ¶ 1).

39.   One hundred and sixty-three Tower Units and nine Hotel Units were sold by Owner and are owned by non-parties to this proceeding, with nearly all of those units being sold prior to August 2005.  Owner continues to own all other units at the Setai, including 79 Hotel Units (currently reduced to 77), the Commercial Unit consisting of the commercial spaces at the Setai, and other space consisting of some shared areas and structural elements of the Setai (collectively, the "Owner's Units").  (SUF ¶ 2).

40.   Prior to 1999, the Hotel Building was owned by the Sasson family, who possessed a valuable, grandfathered right to build a 40-story, beachfront tower.  In 1999, the Sasson family entered into an agreement with Metropolitan Development Group and its principals, Jonathan Breene and John Conroy, to renovate the existing Hotel Building and to build the Tower Building.  Mr. Breene was the primary person associated with Owner who was responsible for putting the Setai project together.  (Breene Statement ("Stmt")) ¶¶ 2-4).

41.   Lehman Brothers ("Lehman") contributed most of the equity required to develop the project, and was an equity partner/owner of the Hotel.  From the Setai project's inception until October 2008, Charles Schoenherr was the primary person at Lehman responsible for overseeing the Setai project.  He supervised all senior Lehman

---

[1] The facts set forth in this Background section are based in part upon the Statement of Undisputed Facts (SUF) and in part upon the testimony of witnesses or exhibits received in evidence.  Where the Tribunal has made specific reference to exhibits or testimony, it has found such evidence to be persuasive.

employees involved with the Setai project, including Joelle Halperin and Anthony Barsanti. (Schoenherr Stmt ¶¶ 3, 5).

42.   The project was intended to be a high end "condominium-hotel." Lehman planned to sell all of the Hotel Building and Tower Building units to individual investors who would, in turn, participate in a "rental program" managed by a hotel operator. As a result, Lehman anticipated that it would "cash out" of the project (i.e., receive its return on investment) before the Hotel opened for business. (Breene Stmt ¶ 7). Owner is not and never has been in the business of operating hotels. Since the development of the Setai project, it has been Owner's intention to sell its interests in Owner's Units at an appropriate time and price. (SUF ¶ 29).

43.   Because the project was intended to be a high end "condominium-hotel," the addition of a luxury hotel operator with an excellent reputation was crucial to attracting prospective purchasers for the Owner's Units. In 1999, Mr. Breene sought out GHM to manage the Setai. (Breene Stmt ¶¶ 7-8).

44.   Between 1999 and early 2000, the Parties negotiated the terms of a management agreement that culminated in the HMA. Mr. Breene, with Mr. Schoenherr's consent, was primarily responsible for negotiating the HMA on behalf of the Owner's entities, including Lehman. Owner's representatives were aware that GHM's business model focuses more on high room rates than high occupancy. (Breene Stmt ¶¶ 9, 11; Schoenherr Stmt ¶¶ 10, 12). The HMA is a valid contract, enforceable in accordance with its terms and provisions. (SUF ¶ 12).

45.   At the request of Owner, GHM agreed to lend its time, resources, and reputation to the development, design, and marketing of the Setai project and brand, both before and after the opening of the Hotel. As compensation to GHM for this commitment, Owner gave GHM the exclusive right to manage the Setai during the term of the HMA. It was the understanding of the Parties that Lehman would not have significant involvement or approval rights over management or operations after the opening of the Hotel. (Breene Stmt ¶¶ 9-10; Schoenherr Stmt ¶¶ 10-11).

10

46.     During the five-year development phase of the Hotel, from 2000 to 2005, GHM devoted its time and resources to the marketing, design, and development of the Setai property and brand.  (SUF ¶ 19).  GHM's efforts and reputation resulted in far higher than expected, record-breaking sales prices for the Tower Units.  (Breene Stmt ¶ 13).

47.     Most of the units in the Tower Building were sold or under contract by the end of 2004.  The Setai partially opened for business in December 2004, although the official opening (as that term is used in the HMA) occurred in August 2005.  (SUF ¶ 21).

48.     Although the Tower Building was very successful, there were substantial construction cost overruns at the Hotel Building not due to GHM.  Lehman could have sold the Hotel Units to individual investors prior to the opening of the Hotel, as previously planned, but at a loss.  However, Lehman believed that it could maximize its return on investment by selling the Owner's Units in bulk to one buyer, such as Ritz Carlton or Four Seasons.  Accordingly, Lehman decided to keep the unsold Hotel Units until it could find a suitable bulk buyer.  (Breene Stmt ¶ 14; Schoenherr Stmt ¶ 15).

B.     **Subsequent to the Setai's Opening**

49.     Setai South Beach, LLC (the entity controlled by Messrs. Breene and Conroy) surrendered its role as managing member of Owner in August 2005.  Thereafter, an entity controlled by Lehman was the sole managing member.  (SUF ¶ 6).

50.     From 2006 to 2008, Owner made several attempts to sell Owner's Units; but no sale was concluded.  (SUF ¶ 30).  Lehman was aware that GHM's long-term HMA would deter potential purchasers and would narrow the pool of potential purchasers, because most prospective purchasers (such as Ritz Carlton and Four Seasons) would prefer the opportunity to both own and manage the Hotel.  Moreover, Lehman did not see eye to eye with GHM on how to maximize the Hotel's profitability from operations.  Lehman repeatedly requested that GHM cut staff and focus on increasing occupancy.  Lehman believed that by cutting staff and increasing occupancy, the Hotel would be more profitable and more attractive to potential buyers.  GHM resisted these requests, and the tension

11

between Lehman and GHM permeated the Parties' relationship since the opening of the Hotel. (Schoenherr Stmt ¶¶ 17-19).

51.    Lehman's representatives contemporaneously complained about the "one-sided" nature of the HMA. For example:

- **Barsanti**: "The property is subject to a management agreement (above market) with GHM Hotels based out of Singapore. Termination provisions for the management agreement are nominal and it is unlikely that the management company could be terminated."
  - October 23, 2008 (Appendix ("App.") 507

- **Bedsole**: "Management Agreement. This agreement is completely one-sided and makes it very difficult to find cause for dismissal on any level. There are no performance requirements, there is limited control from an Owner perspective on hiring, expense approvals or even on quality controls, etc. Because of these limitations, there are very few instances where there can be a legitimate breach of the management agreement resulting in termination for cause and possibly failure to cure."
  - February 26, 2009 (App. 178)

- **Dick:** "Reviewed the memo. On the management agreement – nothing really to comment on that. It is terribly one-sided and that is the issue with the operation as it also de-levers the owners' ability to effectuate any real change."
  - February 27, 2009 (App. 178)

52.    On June 6, 2006, Owner sent GHM a "Notice of Default." (Exhibit ("Ex.") D13). At that time, however, Owner's representatives did not believe that Owner had a legal basis to terminate GHM. (Tr. 63 (Schoenherr) ("I didn't think we had a strong enough case at that point to terminate them, although I wanted to."); Tr. 2256 (Breene); Tr. 1073, 1076 (Broderick); Tr. 1520-22 (Dick)).

53.    By 2008, the Setai was receiving top hotel citations from leading industry publications, such as:

- Condé Nast Traveler – The Gold List, The World's Best Places to Stay 2008
- Condé Nast Traveller – The Gold List, US & UK 2008

12

- The Gallivanter's Guide 2008 Award for Excellence – Best Resort in
  North America
- The Gallivanter's Guide 2008 – Cuisine Editor's Choice
- Forbes Traveler 2008 – The Sexiest Hotels in America
- Forbes Traveler 2008 – World's 400 Best Hotels
- Wine Spectator 2008 – The Best Award of Excellence (App. 14)

The Setai continued to garner accolades in the ensuing years, including recognition in 2011 by Smith Travel Research, the leading hotel data collection firm, as the Best Performing Independent Hotel. (First Cline Report at 92-93).

54.     Lehman filed for bankruptcy on September 15, 2008. Shortly after the bankruptcy, Mr. Schoenherr ceased his employment with Lehman. Alvarez & Marsal became the primary restructuring firm in connection with the Lehman bankruptcy estate and utilized the services of several third-party and in-house asset managers, including Tim Dick, Pam Greacen, Lori Giesler, and Richard Siu ("Asset Managers"). Owner's Asset Managers regularly met with GHM's representatives at the Setai to discuss budgets and operational issues. (SUF ¶¶ 9-10, 31).

55.     On or about May 1, 2011, Building Diagnostics Associates ("BDA") issued a Property Condition Report at the request of the Setai Resort & Residences Condominium Association, Inc. ("Association"), which represents third-party unit Owners. By letter dated June 8, 2011, the Association provided the report to Owner. In its letter, the Association demanded that Owner prepare a comprehensive structural engineering report within 30 days, and remedy any defects found within 90 days. On June 13, 2011, Owner forwarded the BDA report to GHM. (SUF ¶¶ 22-24). On July 7, 2011, GHM notified Owner that it was retaining a structural engineering firm, M2E Consulting Engineers ("M2E") to conduct an inspection. GHM also proposed that, going forward, inspections be conducted annually. GHM sent the M2E report to Owner on September 18, 2011. (SUF ¶¶ 25-26).

56.     On November 22, 2011, Owner advised GHM that it would be commissioning its own consultant, EBL Partners, to prepare a report. Representatives of Owner and EBL Partners, with GHM's consent, conducted an inspection of the property in December 2011. The EBL Partners report was not provided to GHM prior to the termination. (SUF ¶¶ 27-28).

13

**57.**     On March 31, 2012, Owner terminated the HMA and issued a press release regarding the termination of GHM.  In addition, Owner's counsel provided a copy of Owner's Request for Arbitration to several media sources.  (SUF ¶ 37).

**C.     The PwC Report**

**58.**     In August 2008, GHM and Owner agreed to utilize PricewaterhouseCoopers ("PwC").  On October 2, 2008, PwC sent a draft retainer letter to Owner and GHM. (SUF ¶ 32).

**59.**     On or about October 6, 2010, PwC sent another retainer letter to Owner and GHM.  On May 3, 2011, PwC sent the Parties a supplemental letter.  In May 2011, the Parties jointly retained PwC pursuant to the terms of the retainer letter dated October 6, 2010, and supplemental letter dated May 3, 2011 (collectively, the "Engagement Letter").  PwC issued draft reports on November 8, 2011, and January 27, 2012.  (SUF ¶ 33).

**60.**     PwC issued its final report on October 1, 2012 at GHM's request ("PwC Report") (SUF ¶ 34).

**61.**     The Parties identified four specific issues for PwC to address (App. 128, at 7):

| | | |
|---|---|---|
| 1) | Gross Revenue | Should Rental Program revenues be recorded on a gross or net basis? |
| 2) | Base and Incentive Management Fees | How should the fees be calculated with respect to the Rental Program? |
| 3) | Furniture, Fixtures and Equipment ("FF&E") Reserves | How do FF&E calculations impact Gross Operating Profit ("GOP") and Net Operating Income ("NOI")? |
| 4) | Common Area Maintenance ("CAM") Charges | Should CAM charges be recognized above or below GOP? |

**1.     Gross Revenues**

**62.**     Owner argued that Rental Program revenues should be determined on a net basis.  Treatment of Rental Program revenues is commonly defined in hotel management agreements but not in the HMA here.  Based on PwC's industry research, these revenues

are typically recorded on a gross basis, although select condo-hotels also record these revenues on a net basis. (App. 128, at 7).

63.   The HMA states, in Article VII(2.4), that all accounts shall be maintained in accordance with the Uniform System of Accounts for the Lodging Industry, 10th Edition. ("Uniform System"). Applying the Uniform System, PwC found that more gross revenue indicators appear to apply to Rental Program revenues, suggesting that a gross basis is more appropriate than a net basis at the Setai. (Id. at 27).

### 2.   Base and Incentive Management Fees

64.   GHM calculated management fees on a property-wide level, as is typical industry practice. PwC found that, while the HMA indicates that management fees should be paid at a unit level, based on Rental Program Agreements ("RPAs") and "Commercial Unit Operating Agreements," they have historically been calculated on an aggregate, property-level basis. This methodology for calculating management fees does not appear to be contractually supported. (App. 128, at 7).

65.   The HMA provides, for Hotel Units participating in the Rental Program, a base management fee ("BMF") of five percent of gross revenues and an incentive management fee ("IMF") of ten percent of GOP. (HMA, Art. XVIII(14)). But, except for the nine Hotel Units sold to third parties, the 77 remaining Hotel Units owned by Claimant are not part of the Rental Program because Owner and GHM have never executed RPAs for those units. Nor have the Parties entered into an agreement for the Commercial Unit under which, as contemplated by the HMA, the management fees would be set forth. In addition, no HMA provision specifically addresses management fees for Tower Units. "As a result, it is not possible to determine GHM's management fees strictly according to contractual stipulations." (App. 128, at 21).

### 3.   FF&E Reserves

66.   GHM calculated management fees by deducting FF&E reserves below the GOP line. PwC found that, based on its understanding of the HMA, property-level FF&E reserves are based on revenues generated from Hotel and Commercial Units. Calculation of

FF&E reserves should not factor in the revenues generated by the Tower Units. However, Tower Unit revenues have historically been taken into account for the purposes of determining the FF&E reserve. As a result, the escrow for FF&E may have been over-allocated, which would have reduced the Setai's overall Adjusted NOI. The Setai's property-level FF&E reserves appear to have a limited impact on GOP as they are deducted below GOP, in accordance with Uniform System guidelines. (App. 128, at 7).

    4.   CAM Charges

**67.**    GHM deducted this expense below the line. Owner argued some portion of this expense – that pertaining to its unsold Hotel Units – should be deducted above the line. PwC found no guidance on this issue in the HMA, and found that, although CAM charges are typically recorded below GOP, it was aware of comparable condo-hotels in which adjustments to the IMF calculations were made to account for the impact of unsold units. (App. 128, at 7). While noting that "no single approach appears to be universally applicable," PWC's survey of industry practices indicated that "[CAM charges] for unsold units are commonly recognized below GOP, similar to how they are currently accounted at the [Setai]." (Id. at 33).

## IV.   THE PARTIES' CLAIMS

### A.   Claimant

**68.**    When the Parties entered into the HMA, Owner obtained two critical assurances that were conditions to GHM's future right to manage the Hotel – specifically, that GHM would: (1) operate the property in accordance with world-class, five-star international hotel "Standards" comparable to those of Mandarin, Four Seasons, and Ritz-Carlton and their respective hotels in Miami; and (2) carry out its duties under the HMA as Owner's "agent" and "representative." In that capacity, and pursuant to those standards, GHM promised to maximize occupancy, utilize best efforts to market the Hotel, and only expend funds pursuant to competitively-priced contracts necessary to the efficient operation of the Hotel.

69.     So bad was GHM's management of the Hotel that Owner delivered a formal notice of default in June 2006.  Owner identified a host of operations- and financial-related acts and omissions that constituted breaches of a number of specified provisions of the HMA.  Owner made clear that any cure of such breaches would not only necessitate the implementation of contract-compliant policies and procedures going forward, but also require the payment of compensation for the injuries that GHM's conduct had already caused Owner.  Despite that notice, nothing changed.

70.     Indeed, what followed was the beginning of countless exchanges between the parties, and their respective counsel, concerning the previously-noticed breaches as well as additional violations by GHM of the HMA.  Prominent in those communications were Owner's complaints regarding the Hotel's lack of profitability and GHM's excessive and inefficient cost structures, payments of inflated management fees, profit-prohibitive occupancy policies, ineffective marketing efforts, inaccurate and unreliable accounting and financial reporting, and excessive and improper staffing.

71.     As GHM made its way into and through 2011 (which was its sixth full year as Owner's agent-operator), there arose a "perfect storm" of GHM-caused problems.  The Hotel in 2010 had suffered yet another adjusted net operating loss, which increased the cumulative net loss-since-opening.  GHM's maintenance-related failures surfaced as the Association began complaining about GHM's failure to maintain the property and threatening litigation against Owner as a result.  Around the same time, a local newspaper published a scathing article regarding GHM's mistreatment of Hotel employees, which was corroborated by dozens of former and current employees.  Still further, PwC issued its draft report in the fall of 2011, which confirmed what Owner had previously asserted – that is, GHM was paying itself "fees" to which it had no contractual entitlement.  Finally, GHM's insubordination, obstructiveness, and open hostility to Owner reached new and unacceptable heights.

72.     The combination of those events led Owner, in March 2012, to terminate the HMA and commence this proceeding.

73.     Owner requests that the Tribunal issue an award in favor of Owner and against Respondents, jointly and severally, providing for the following relief:

    i)      monetary damages in the range of US$42,418,000-US$57,540,000;

    ii)      in the alternative, an order of disgorgement, forfeiture, and restitution requiring Respondents to return or otherwise turn over to Owner the amount of US$17,830,499 in "fees" that Respondents paid themselves during the period in which they were in breach of their obligations to owner;

    iii)      punitive and exemplary damages to Owner in an amount to be determined by the Tribunal;

    iv)      prejudgment and post-judgment interest at the maximum rate(s) permitted by Florida law;

    v)      dismissal of Respondents' counterclaims with prejudice;

    vi)      arbitration costs, including reasonable and necessary attorneys' and experts' fees, incurred by Owner in connection with this proceeding, to the extent permitted by law; and

    vii)      such other relief to which Owner is entitled and which the Tribunal deems just and proper.

**B.      <u>Respondents</u>**

74.     At 2:00 a.m. on a Saturday morning, without warning or notice of any kind, Owner's officials and a cadre of armed security forces took over the Setai and ousted GHM. In so doing, Owner deprived GHM of all of its contractual rights, including the right to earn millions of dollars in management fees.  Owner also converted GHM's proprietary information, including its operating procedure manuals, confidential corporate information, and privileged communications.  Owner then engaged in a campaign to publicly smear GHM by distributing a press release and its Request for Arbitration, containing false allegations, to media outlets.

75.     Owner's claim that its actions were motivated by some default on GHM's part is meritless.  Internal documents confirm that, in reality, Owner wanted to terminate the HMA because it considered the agreement onerous and an impediment to Claimant's plan to sell the Hotel.  Lehman, which was the principal investor in Owner, paid scant attention

18

to the negotiation of the HMA because it intended to sell all of the condominium units before or shortly after the Hotel opened and believed it would have no subsequent relationship with the Hotel.  But in 2005, Lehman was left as the sole managing member of Owner, with 77 of the less-desirable Hotel Units as yet unsold.  Unexpectedly still in the project and now in control, Lehman set Owner on a course to compel GHM to sellout or re-negotiate.

**76.**    A heavy-handed attempt in 2006 to force a re-negotiation of the HMA by serving a purported Notice of Default failed to achieve Owner's objectives.  Owner's campaign to find an excuse to terminate the HMA included an attempt to use the ambiguities in the HMA to accuse GHM of misconduct in its accounting procedures and calculation of management fees.  But, when Owner received draft reports from PwC in November 2011 and January 2012, it learned that PwC had found no violations of the unambiguous provisions of the HMA, and to the extent that the HMA was incomplete or unambiguous, PwC concluded that GHM acted in a manner consistent with industry practice.

**77.**    Owner then took matters into its own hands and seized the Hotel by force in March 2012.  Notably, Owner did not issue a notice of default in the months prior to the takeover, because it had no interest in a cure.

**78.**    GHM requests that the Tribunal award it the following relief:

    i)    dismissal of Claimant's claims against GHM;

    ii)    finding that Claimant breached the HMA and its good faith obligations under the HMA by its termination of GHM from its long term contract;

    iii)    contract damages of US$34,757,000, including unpaid management fees for February and March 2012; amounts GHM paid from its own pocket post-termination for Hotel-related expenses; and lost management fees GHM would have earned for the full term of the HMA;

    iv)    statutory pre-award interest on its contract damages of 4.75% per annum, running from March 31, 2012, until the date of payment of the Award;

    v)    finding that Claimant made false statements about GHM to the press at the time of the takeover of the Setai;

19

vi)     finding that Claimant's publication of reckless and false allegations constitutes libel per se;

vii)    finding that GHM lost a number of potential management deals and was otherwise injured as a consequence of Claimant's defamatory statements and the improper termination;

viii)   damages for defamation committed by Claimant in the range of US$14-$31.3 million;

ix)     finding that Claimant engaged in other tortious conduct in relation to GHM, including tortious interference with GHM's business relationships, the misappropriation of GHM's trade secrets; and the conversion of GHM's personal property;

x)      finding that Claimant committed willful and wanton misconduct in connection with the tortious manner in which it seized control of the Setai and terminated GHM, the intentional dissemination of false statements to the press, and the commission of other torts;

xi)     punitive damages against Claimant in an amount to be determined by the Tribunal; and

xii)    its arbitration costs and legal fees incurred in this arbitration.

## V.     **DISCUSSION**

**79.**    The Parties agreed in the Terms of Reference (¶ 36) that the Tribunal shall decide the issues necessary to resolve the claims for relief as finally submitted to the Tribunal.  The Parties, however, contested, as set forth in Section IV(C) of the Terms of Reference, the arbitrability of three issues which are discussed below.

### A.     **Issues Disputed as Non-Arbitrable**

**80.**    GHM first asserts that the PwC Report should be given preclusive effect as to Owner's claims of accounting improprieties, including the calculation of management fees. (*See* Terms of Reference, ¶ 39).  On January 9, 2013, GHM requested by letter submission that the Tribunal treat the PwC Report as having preclusive effect in these proceedings.  On January 10, 2013, Owner responded by letter submission opposing GHM's request.

**81.**    By email of the President to the Parties dated January 24, 2013, the Tribunal determined that:

> Whilst the [PwC] Report does address each of the issues identified and provides analysis and evaluation of the historical accounting treatment of these issues, our review seems to indicate that the Report does not "decide the appropriate treatment and/or calculation of each item" as the Engagement Letter indicated it would. Instead, the Report identifies "Potential Resolution Scenarios", without actually determining which such scenario should be imposed in the absence of agreement among the parties.
>
> Accordingly, (i) the Tribunal will give great weight to the issues decided by the Report, but there remain open disputed issues that the Tribunal will have to decide in the Arbitration. The parties should be able to agree on which issues the Report does finally decide and which will have preclusive effect. Those issues left open that the Report does not appear to have resolved (e.g. absent clear contractual provisions and/or absent some new contract arrangement between the parties), will be left for determination by the Tribunal. (ii) Issues regarding whether the correct information was supplied to PwC from the outset will be subject to the usual evidentiary grounds with Claimant having the burden of proof on any such arguments.

82.     Second, GHM initially contended that the Tribunal lacked jurisdiction to adjudicate the tortious interference and defamation claim asserted in GHM's counterclaim against Owner.  (*See* Terms of Reference, ¶ 40).  Nonetheless, GHM pursued both claims in this Arbitration and submitted evidence and argument in their support.  Accordingly, this Tribunal has considered and addresses them as part of this Final Award.

83.     To the extent that GHM had not waived its arbitrability objection by its pursuit of both claims in this proceeding, the Tribunal concludes that it has jurisdiction to hear such claims pursuant to Article XXVI of the HMA, which requires the Parties to arbitrate "all matters relating to this Agreement, whether during its substance or after its termination."  Both claims are matters relating to the HMA.

84.     Finally, GHM sought interim relief in the form of payments by Owner for certain costs related to operations of the Hotel that GHM incurred after March 31, 2012, the date of termination.  *(See* Terms of Reference, ¶ 41).  Owner opposed any interim award of money.  The issue is moot, because the Tribunal did not enter such interim relief and has considered GHM's claim for payments as part of this Final Award.

85.     The Tribunal turns next to examine Owner's claims.

**B.**   **Owner's Claims**

**86.**    Under Article XIX of the HMA, Owner had the following contractual

termination right:

> 1. The Agreement at any time during the Operating Term may be terminated in accordance with the following provisions:
>
>> 1.1.  At the option of the Owner:
>>
>> …
>>
>> 1.1.2.  By giving 60 days notice in writing to the Operator, in the event that the Operator shall fail to observe or perform any of the provisions of this Agreement that are the Operator's  responsibility to be observed or performed, including the Operator's obligation to operate the Hotel in accordance with the Standards, despite the Owner having given written notice of such default to the Operator and such default shall not have been remedied within thirty (30) days after such notice; . . . .

**87.**    GHM contends that Owner is liable for breach of contract because it did not

comply with Article XIX when it terminated GHM as hotel operator in March 2012.  Owner,

however, does not rely upon Article XIX as the basis of the termination.  "Owner's

termination was not predicated on that provision but, rather, was based on the common

law right of contract cancellation." (Owner P-H Resp., at 5).  In addition, Owner asserts that

it had an independent ground to terminate GHM for breach of fiduciary duty.

### 1.    Breach of Contract

**88.**    The Parties do not dispute that, where there is no contractual termination

provision, Florida common law recognizes a party's right to terminate an agreement for

material breach on the other party's part.  They disagree, however, whether the common

law right survives in the presence of contract language providing that a party "may"

terminate under specified circumstances.

**89.**    The two Florida appellate cases cited by the parties are split on the

mandatory effect of such language.  *Compare Leghorn v. Wieland*, 289 So. 2d 745, 747-48

(Fla. 2d DCA 1974) ("may" language was permissive and does not bar common law remedy

if breach "so grave as to be irreparable and incurable"), *with Florida Recycling Servs. v.

Greater Orlando Auto Auction, Inc.*, 898 So. 2d 129, 130-31 (Fla. 5th DCA 2005) ("may"

termination clause enforced where party failed to give contractually required notice and

22

opportunity to cure).  There is no Florida Supreme Court case dealing with the issue, nor are there any cases discussing the issue under Florida law in the context of HMAs.

90.     Thus, to the extent that Owner proceeds under the authority of *Leghorn,* it has the burden to establish that the alleged breach is "so grave as to be irreparable and incurable."  In any event, even if a common law right to terminate is found to exist under the HMA, the Tribunal has to determine whether the underlying breaches relied upon by Owner as a basis for termination satisfy the lesser, but still substantial, standard of materiality.  Owner acknowledges this point and asserts five grounds of material breach. For purposes of this discussion, the Tribunal examines whether any ground constitutes a material breach.

### a.     *Performance-Related Obligations*

91.     Owner contends that GHM materially breached the HMA by its failure to "maximize profits" from its operation of the Hotel.  (Owner P-H Resp. at 13).  This is Owner's main complaint against GHM.  "The purpose for which an owner of a hotel hires a management company is to make a profit."  (Owner P-H Resp. at 1).

92.     If Owner is to argue (as it did at length) that GHM failed to perform financially, it must establish what those requirements were.  This, however, Owner failed to do.  The HMA contains no specific numerical targets for operating profits – a fact that frustrated Owner's representatives.  *(See,* e.g., Tr. 2304, 2315-16; 2320 (Bedsole) ("When we looked at the management agreement we noticed that there was certainly a lack of performance standards, which are pretty commonplace in all operating agreements that had been negotiated or drafted in – in the last 15, 20 years."); Tr. 1048 (Broderick); Tr. 1320 (Dick); Tr. 228 (Barsanti); Tr.  262 (Greacen)).

93.     Under Article 1(1) of the HMA, GHM "agree[d] to operate the Hotel as a world-class five-star international hotel comparable to the Mandarin, Four Seasons and Ritz-Carlton hotels in Miami (the "Standards")".  Owner argues that the word "Standards" obliged GHM to achieve certain financial performance goals, even though Owner's contract negotiator stated that the HMA did not contain such provisions.  (Tr. 2268 (Breene)).  To

23

the extent that Owner argues that GHM was supposed to match the profitability of the Ritz-Carlton, Four Seasons and Mandarin Oriental hotels in Miami, Owner presented no evidence as to the profitability of those hotels.

**94.**    Moreover, the HMA's definition of "Standards" specifically refers to the operations and services expected by guests:

> The term 'Standards' shall mean the highest quality of facilities or operations and services generally consistent with, and expected by, guests at comparable world class five star international hotels, such as those operated under the trade names Mandarin, Four Seasons and Ritz Carlton.

Not only does it say so expressly, but the star rating system referenced in this definition was designed to be a short-hand reference for guests to differentiate between hotels, and not some short-hand reference for hotel owners to know whether their hotel will maximize revenues.  Indeed, the entities who award stars or diamonds, such as Forbes and AAA, evaluate hotels from the guest perspective, and those star and diamond ratings do not reflect profitability.

**95.**    In addition, Owner's complaint that the Hotel only had a 55 percent occupancy rate ignores the key revenue per available room ("RevPAR") metric.  One of the most common industry measures of performance, RevPAR measures the <u>combination</u> of room rate and occupancy, and thus offers an important indicator of how well a hotel's management has performed with respect to revenue generation.  (Tr. 2558-59 (Nardozza)).

**96.**    Owner's own expert conceded that GHM achieved RevPAR levels that were 76 percent higher than its competitive set.  (Tr. 2565 (Nardozza)).  Mr. Nardozza also conceded that, despite his many years of experience in the hotel business, he could not recall any other hotel that had consistently earned such a RevPAR premium over its competitors.  (<u>Id</u>. at 2567).  He further admitted that, because financial performance tests in HMAs normally contain a RevPAR metric, the Setai's extraordinarily high RevPAR meant that GHM would have passed a hypothetical financial performance test, had the HMA included such a requirement (which it did not).  (<u>Id</u>. at 2588, 2602).

24

97.    Owner's challenge to the cost of GHM's operation also ignores the fact that, when costs are measured as a percentage of hotel revenue, GHM was comparable to its competitors. (Tr. 2603 (Nardozza)).  And, because GHM's revenue per available room exceeded that of its competitors by such a wide margin, even the data compiled by Owner's experts show that GHM earned gross operating profits per available room (as well as per occupied room) that more than doubled the gross operating profits of the competitive hotels. (*See* Nardozza Stmt, Exs. F & G).

98.    Owner also argues that GHM violated its contractual duty to generate profits based on the HMA's requirement that GHM prepare an Annual Plan.  But, as Owner admits, in 2011, the last full year immediately preceding the termination, GHM exceeded its predicted profits in the Annual Plan.  (Owner P-H Mem. at 32 n.93).

99.    The uncommon absence of financial performance requirements in the HMA makes sense in the context of the business deal upon which the Setai project was struck.  As both of Owner's two primary dealmakers testified, Owner planned to make its profits by selling most, if not all, of the Hotel and Tower Units before the Hotel opened.  Owner had not planned to be in the picture after the Hotel opened, which is why Messers. Breene and Schoenherr were not particularly concerned about inserting financial performance standards into the HMA.  The Tribunal finds the testimony of these two principals to be credible and reliable.

100.   The Tribunal concludes that Owner did not establish material breach by GHM of a financial performance obligation under the HMA.

### b.    *Fee-Related Obligations*

101.   Owner contends that GHM breached the HMA by calculating management fees based on revenues (and expenses) from all sectors of the property and applying the 5%/10% formula from the HMA that specifically applied only to the nine Hotel Units sold to third parties.  According to Owner, GHM is not entitled to the millions in management fees it received from 2006 onwards for managing the 77 unsold Hotel Units, the rented Tower Units, or the Commercial Units.

25

102.   Mr. Breene, Owner's contract negotiator for the HMA and 2003 Amendment, testified to his understanding that the revenues for all three components of the project (Tower, Hotel and Commercial) would be pooled and GHM would receive 5% of gross revenues and 10% of gross operating profit as its management fee for managing all those spaces. (Tr. 2274-75 (Breene)). David Broderick, Lehman's in-house counsel from 2002 to 2008, also testified that this was his understanding. (Tr. 968, 1031-32, 1036-37, 1045-46 (Broderick)). However, that understanding is not set forth in plain language in the HMA.

103.   Nevertheless, for six years, GHM used the 5%/10% formula and pooled the revenues for all three components of the Hotel in calculating its management fees. This methodology was fully disclosed to Owner every month, and fees were paid with no objection from Owner as to GHM's entitlement to some management fees for managing all three components. (Tr. 1038 (Broderick); Tr. 614 (Duggan); Tr. 251, 261 (Greacen)).

104.   A situation existed for six years, pursuant to which, among other things, 77 Hotel Units were unsold and RPAs and Commercial Unit agreements were not executed. Obviously, this created ambiguities and uncertainties in the relationship between the parties. As the PwC Report recognized: "The [Setai's] structure is compromised by partially ambiguous contractual terms, a lack of critical agreements, and inconsistencies between applied industry conventions and [HMA] provisions." (App. 128, at 10). Given all the circumstances, such an ambiguous situation does not prove an intentional or material breach of the HMA.

105.   Based on the above analysis of the fee-related obligations asserted by Owner as the basis for its termination, the Tribunal finds that Owner has not established a material breach by GHM of fee-related obligations under the HMA, and certainly not one so grave as to be irreparable and incurable.

### c.    Facilities-Related Obligations

106.   The HMA requires GHM to maintain the Hotel in "good repair and condition...subject to the performance by the Owner of its obligations under this Agreement." (HMA, Art. XV). To the extent that maintenance conditions existed, both

26

Parties' experts agreed that all alleged maintenance deficiencies were curable. (Mladenovic/Swanger Joint Report, at 2).  At the time of the termination, GHM had already hired an independent structural engineer to inspect the Hotel, made many recommended repairs, and sought annual inspections to avoid any future issues.  (*See* SUF ¶¶ 25-26).

**107.**   With respect to the allegedly "unauthorized" beach bar and restaurant, *ad hoc* (and unpermitted) cooking facilities were installed near the pool at Owner's request because, during the soft opening from 2004 to 2005, the Setai had no other food and beverage outlet.  (*See* Apps. 245, 246).  The pool bar was popular and profitable and, at the time of the termination, GHM and Owner were in the process of improving and obtaining a permit for the cooking facilities and Owner itself requested the installation of these pool cooking facilities.  (Apps. 82-84).

**108.**   Owner's claim that GHM "intentionally" violated facilities-related laws disregards the fact that obtaining the Certificate of Occupancy ("CO") was Owner's (and its construction company's) obligation, not GHM's.  Due to significant construction issues with the balconies and other problems, Owner did not obtain the CO until 2011.

**109.**   Based on the above analysis of the facilities-related obligations asserted by Owner as the basis for its termination, the Tribunal finds that Owner has not established a material breach by GHM of facilities-related obligations under the HMA, and certainly not one so grave as to be irreparable and incurable.

### d.   *Employee-Related Obligations*

**110.**   Owner asserts that GHM breached the HMA by violating employment laws, mistreating employees and hiring too many foreign employees.  However, Owner has failed to establish or even allege that it was damaged by GHM's alleged misconduct toward its own employees.  To the contrary, the fact remains that the Hotel's employees performed well enough to enable the Setai, during the time GHM operated it, to continue garnering hotel service award accolades and attract guests who sustained the Hotel's exceptional RevPAR numbers.

27

**111.**   The Tribunal thus finds that Owner has not established a material breach by GHM of employee-related obligations under the HMA, and certainly not one so grave as to be irreparable and incurable.

### e.   *Accounting-Related Obligations*

**112.**   Claimant's last claim is that GHM breached its HMA obligations to "establish and supervise an accounting department, with appropriate hotel accounting and cost accounting and cost control systems and personnel." (HMA, Art. II (2.4)).

**113.**   Owner points to a handful of errors and adjustments to year-end reports. Making errors in accounting from time to time is not a breach of contract, and certainly not a material one.  Also, updating the books after year-end close with more accurate information is not inconsistent with accounting principles.  Occasional accounting errors are not, in and of themselves, breaches of contract.  Owner failed to demonstrate that these issues were material such that they could not be cured, and it also has failed to show any damage.

**114.**   Owner's experts also assert that GHM failed to establish a reliable system of internal controls.  The fact that GHM's internal audits identified areas for improvement does not establish that it was contractually deficient.  Moreover, despite a clear duty to report "material deficiencies," the Setai's auditor, which was selected by Owner, never reported any deficiencies, including deficiencies in internal controls.  (Tr. 2960-62 (Leisner)).

**115.**   With respect to the Association receivable, Owner claims that GHM improperly billed "Shared Costs" to the Association, rather than individual unit owners. But it relies on the Declaration of Condominium – to which GHM was not a party – and the HMA does not preclude such billing.  Nor did GHM breach the HMA by classifying those expenses as "below-the-line," as found in the PwC Report.

**116.**   Finally, Owner claims that GHM violated the HMA when, to cover hotel operating expenses, it moved money from the Hotel FF&E reserve account to the Hotel

operating account and then later moved that money back to the Hotel reserve account. However, GHM told Owner about the transaction and showed it in the books.  (Tr. 1816-17 (Meier); Tr. 2001-01 (Guimei)).  Nor did Owner show that this transaction violated the Uniform System or other accounting rules, or that the transaction caused Owner damages.

117.    Based on the above analysis, and particularly based on the PwC Report, the Tribunal finds that Owner has not established a material breach by GHM of accounting-related obligations under the HMA.  The Tribunal further concludes that these accounting-related obligations are precisely what the PwC Report intended to address.

118.    To summarize, the Tribunal concludes that none of the alleged breaches of contract asserted by Owner were either material or so grave as to be irreparable and incurable.

2.    Breach of Fiduciary Duty

119.    Owner also contends that it had the right to cancel the HMA due to GHM's breach of fiduciary duty.  In Florida, "[t]he elements of a cause of action for breach of fiduciary duty are (i) the existence of a duty, (ii) breach of that duty, and (iii) damages flowing from the breach." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).  Claimant acknowledges that it bears the burden of establishing the existence of a fiduciary relationship.  (Owner Reply ¶ 87).

120.    With respect to the first element, Owner asserts that GHM owed it fiduciary duties as its "agent."  Florida law invokes a three-part test for determining whether a principal-agent relationship exists: (i) the principal's acknowledgment that the agent will act for the principal, (ii) the agent's acceptance of the undertaking, and (iii) control by the principal over the actions of the agent.  *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990).  The Depression Era case cited by Owner predates the three-part test.  See *Fisher v. Grady*, 178 So. 2d 852 (Fla. 1938) (nephew hotel operator is agent of hotel owner aunts).

121.    The first two elements of Florida's agency test require Owner to prove intent – i.e., both parties acknowledged and accepted the undertaking of an agency relationship when they signed the HMA.  It is undisputed that "at the time the HMA was signed, [Owner]

29

intended to sell over time all or most of the units at the Setai." (SUF ¶ 18). Since Owner expected to have no ongoing relationship with the Hotel property, it is less than likely the Parties expected GHM to owe continuing fiduciary duties. Indeed, Messrs. Breene and Schoenherr unequivocally stated that, when negotiating the HMA on Owner's behalf, they expected that Owner "would not have significant involvement or approval rights over management or operations after the opening of the Hotel." (Breene Stmt. ¶ 10; Schoenherr Stmt ¶ 11). The contract language they drafted bears them out.

122.    Owner argues that the Parties did intend to create an agency relationship because (i) the word "agent" appears once in the HMA, and (ii) anyone signing an HMA in Florida in 2000 would have known that a 10-year-old California case, *Woolley v. Embassy Suites, Inc.*, 227 Cal. App. 3d 1520, (Cal. Ct. App. 1991), established that HMAs are agency contracts as a matter of law.

123.    With respect to the first argument, Florida courts have uniformly rejected the argument that descriptive labels used by the parties determine the existence of an agency relationship. E.g., *Villazon v. Prudential Health Care Plan, Inc.,* 843 So. 2d 842, 854 (Fla. 2003). This is especially true where, as here, the HMA interchangeably uses the words "agent", "manager", "operator" and "representative" to describe GHM's relationship. (*See* HMA, Arts. I(1) and VII(1)).

124.    With respect to the *Woolley* argument, no Florida court has adopted Owner's interpretation of *Woolley*. Furthermore, the contract language in *Woolley*, unlike the HMA here, included language that affirmatively stated that "[t]he sole relationship between Owner and [manager] is that of principal and agent." 227 Cal. App. 30 at 1531. On the contrary, Article VII(1) of the HMA expressly provides that "nothing in the Agreement shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties hereto". *Woolley* is, therefore, unpersuasive authority.

125.    Thus, as set forth under Florida case law, the critical element here is the third element of Florida's agency test: control. "The principal consideration in determining whether one is working as an independent contractor or as an employee or agent is the

right of control over his mode of doing the work." *Amedas, Inc. v. Brown*, 505 So. 2d 1091, 1092 (Fla. 2d DCA 1987). "If a person is subject to the control or direction of another as to his result only, he is an independent contractor." (Id. (citations omitted)). "If he is subject to control over the means used to achieve the results, he is an employee or agent." (Id. at 1092-93 (citations omitted)).

126. The HMA does not grant Owner any right to direct or control the method or mode of GHM's operation of the Setai. To the contrary, the HMA broadly provides GHM in Article VII(1) with "the exclusive right and obligation to direct, supervise and control the management and operation of the Hotel...." GHM had plenary authority to hire, promote, discharge and supervise Hotel employees (Art. VII(2.3)); establish and supervise all bookkeeping, accounting and clerical services (Art. VII(2.4)); enter into contracts for Hotel services (Art. VII(2.7)); purchase all Operating Equipment, Operating Supplies, and other items (id.); and collect Hotel revenues, have exclusive access to Hotel bank accounts, and handle Hotel disbursements (Art. X). In addition, GHM had authority and responsibility to maintain the premises, to set rates, and rent rooms.

127. Instead of providing Owner with the level of control that Florida law requires in order to conclude that a principal-agent relationship has been established, the HMA interposed a third party expert procedure to resolve disputes between the Owner and GHM as to the operation of the Hotel. This procedure was designed to prevent Owner from imposing its will on GHM with respect to the day-to-day operations of the Hotel.

128. That Owner lacked the typical owner controls was well-documented by the contemporaneous repeated complaints of its representatives about this fact. Mr. Bedsole: "This agreement is completely one-sided and makes it very difficult to find cause for dismissal on any level. There are no performance requirements, and there is limited control from an Owner perspective on hiring, expense approvals or even on quality controls etc." (App. 178). Mr. Dick agreed, adding: the HMA is "terribly one sided and that is the issue with the operation as it also de-levers the owner's ability to effectuate any real change." (Id.). Ms. Graecen: the HMA did not provide Claimant with (i) "budget review approval rights," (ii) the right to "performance termination," or (iii) "approval rights" over

the General Manager's employment.  (Tr. 262, 268, 270 (Greacen)).  These complaints are entirely consistent with the business deal agreed to by Owner's contract negotiators.

129.    Owner contends that it had control because (i) the HMA had "Standards" and (ii) it could comment on the Annual Plan and refer any disputes to the Expert.  In Florida, what distinguishes an independent contractor from an agent is whether the person is subject to control over the means used to achieve the results.  Although the "Standards" called for a certain level of luxury, the means used to achieve the "Standards" were exclusively up to GHM.  GHM was given plenary authority to, *inter alia,* purchase guest amenities, take reservations, collect revenues and hire and train staff.  Thus, Owner lacked control relevant to the Standards.

130.    Nor did the Annual Plan process give Owner a principal's control over Hotel operations.  The HMA required GHM to "submit to the Owner for review, recommendations, and approval an Annual Plan for the ensuing Fiscal Year."  (HMA, Art. VII ( 2.1)).  But, whatever "approval" might mean in some agreements, it does not give Owner control under the HMA.  To the contrary, if Owner objected to the Annual Plan, its only recourse was to go to the Expert for a decision.  This does not constitute "control" over the objectives set forth in the Annual Plan.  Instead, as Owner's representatives repeatedly acknowledged both in and outside these proceedings, Owner lacked control over Hotel operations pursuant to the HMA.

131.    The Tribunal determines that, as a matter of Florida law, Owner has not established, under the terms of the HMA, the existence of a fiduciary principal-agent relationship between Owner and GHM.

132.    Owner lists eleven instances of breach of fiduciary duty.  Even if GHM owed Owner a fiduciary duty, none of Owner's eleven specific claims under this theory rises to the level of a breach of that duty.

(i)    Financial Reports

133.    Claimant accuses GHM of falsifying financial reports because expenses were sometimes matched with revenues earned in other monthly periods.  This practice,

otherwise known as applying the matching principle, is a basic accounting principle acceptable under GAAP pursuant to which expenses are recorded during the period in which they are incurred.  At the hearing, Mr. Meier explained how the matching principle was appropriately used at the Hotel when a cost incurred in January 2010 to purchase and prepare hamburger patties for the Miami Super Bowl the first week of February 2010, was appropriately recorded in February 2010, when the revenues from those hamburger patties was actually earned.  (Tr. 1865 (Meier)).

134.    Claimant's experts broadly argued that "GHM's moving of expenses...violated the matching principle" or was "just inappropriate."  (Tr. 2485 (Cotter)).  But, their only basis for doing so is that they disagreed with the matching principle (Tr. 2920 (Leisner)), and Claimant's experts failed to support their general accusations with any specific expense that was moved improperly.

135.    Moreover, it is undisputed that GHM provided Claimant's sophisticated Asset Managers with detailed monthly statements and they went over those statements on a line-by-line basis in the monthly asset manager meetings.  (Tr. 357, 58, 360-62 (Siu); Tr. 263-65 (Greacen)).

136.    Claimant's allegation is also legally insufficient to establish breach of fiduciary duty, as it has not shown (or even alleged) any damages resulting from the alleged shifting of expenses.

(ii)    Guest Reviews

137.    Claimant argues that GHM improperly attempted to boost the Setai's rankings on Trip Advisor by encouraging employees to post positive comments about the Setai.  Claimant fails to establish any damages resulting from this alleged action.

(iii)    Unit Owner Relations

138.    Claimant argues that GHM breached its fiduciary duties by once trying to placate a loudly complaining Hotel Unit guest upset by street noise by upgrading him to a Tower Unit, and then listing the complaining guest as a travel agent to avoid potential complaints by the Tower Unit owner.  GHM's conduct here, aimed at smoothing friction

between unhappy guests and owners so as to further the interests of the Hotel, did not breach any fiduciary duty owed to Claimant. And again, Claimant has not established, or even alleged, any damages resulting from GHM's attempt to maintain peace among the Hotel's guests and rental program participants.

(iv)    <u>Life-Safety Matters</u>

**139.**    Claimant describes certain signs to be placed temporarily on the balcony doors as "critical life-safety matters." The balcony railings were, in fact, "just under" the 42 inches required by code and, while they required replacing to conform with the City building code, Unit owners and guests had used the balconies for five years prior to the City requesting that the signs be put up in 2010. While GHM pondered taking down the signs to prevent the anticipated anger from guests and resulting damage to the Hotel's reputation, there is no indication that it did so except on one or two occasions when guests who had already seen the signs demanded that they be taken down. (Tr. 1630 (Meier)). Nor does Claimant show how it was damaged.

(v)    <u>Competitive Bidding Records</u>

**140.**    Claimant accuses GHM of breaching its fiduciary duties by, in a few emergency situations, failing to obtain competitive bids prior to purchasing items for the Hotel until after the item was purchased. As Mr. Meier explained at the hearing:

> "sometimes things break down and you need to replace it urgently, you could buy it in Florida or you could order a less expensive item in, I don't know, California or Texas. So sometimes you had to make decisions on the spot." (Tr. 1723 (Meier))

Moreover, Claimant has neither identified any fiduciary duty GHM had or breached by this alleged conduct nor shown (or even alleged) any damages resulting from it.

(vi)    <u>Hotel Sale Sabotage</u>

**141.**    Claimant suggests that GHM engaged in efforts to sabotage the sale of the Hotel. The evidence shows no such activity. Prior to the termination, GHM introduced Claimant to a potential purchaser, Shahab Karmely, who was interested in bidding on the Setai, but by then, Owner wanted to wait until after terminating GHM before pursuing a sale. (*See* App. 538).

34

142.    Claimant refers to a potential sale to Gencom.  But that sale contemplated a joint venture between Gencom and GHM and a restructuring of the HMA, which Claimant had no right to impose on GHM, and which GHM had every right to reject. Moreover, the internal correspondence Claimant complains about, dated August 17, 2008, was apparently written by someone who was unaware that the Gencom deal had already been called off in July 2008. (*See* Apps. 91, 685).  Claimant has not shown a violation of any duty or any damage.

(vii)    Bribery/Public Corruption

143.    Claimant accuses GHM of "condoning bribery and public corruption" for hiring "The Permit Doctor" to resolve certain permitting issues at the Hotel.  The Permit Doctor is a local permit facilitator whose clients include several hotels in Miami Beach.  (*See* Tr. 555 (Duggan)).  GHM hired the Permit Doctor because Owner recommended that it do so (Tr. 1806 (Meier)), and GHM complied with Claimant's request to transfer the Permit Doctor's duties to, Mr. Duggan.  Owner may not now be heard to complain when the action was taken at Owner's recommendation.

(viii)    Alcohol Law Violations

144.    Claimant's charge regarding violation of alcohol laws is similarly exaggerated.  At the hearing, Mr. Fernandes clarified that Mr. Meier's alleged instruction to serve alcohol to minors was merely an instruction that, particularly for the Setai's international clientele, service staff might consider not denying those under 21 "that are accompanied by their parents alcohol service or a glass of wine to enjoy with dinner." (Tr. 637 (Fernandes)).  Mr. Fernandes made clear that Mr. Meier otherwise instructed him that minors unaccompanied by parents should never be served alcohol.  (Id. at 657-58).

(ix)    Concealing Material Information

145.    Owner's assertion of withholding of information was not substantiated.  It is undisputed that GHM met with Owner's representatives on a weekly basis to discuss facilities-related issues (Tr. 484-89, 491-92 (Duggan)); that they provided monthly summaries of approximately 170 pages with detailed information about revenues, expenses, and budget; and that they met at least monthly for a full day, at least, to review

that information line-by-line and answer any questions. (Tr. 357-58, 360-62 (Siu); Tr. 263-65 (Greacen)). It is also undisputed that Claimant had a full-time, on-site representative at the Hotel (Mr. Duggan), who admitted at the hearing that he had access to every Hotel employee. (Tr. 585 (Duggan)). Indeed, Claimant has not identified a single requested document or any specific requested information that was not provided by GHM.

146.    Moreover, Claimant's accusation that GHM provided confidential Hotel information to a party in litigation against Claimant omits that the other "party" was also an owner at the Setai, just like Claimant, and was, therefore, entitled to the information relating to his investment, just like Owner.

(x)    <u>Self-Dealing</u>

147.    Owner lists several grounds of self-dealing:

- 20% deferred bonuses. To encourage management trainees to remain with the company, GHM encouraged and the trainees agreed to have 20% of their salary withheld on a monthly basis and paid in one lump sum upon the completion of a 1-2 year stint with GHM following their training. Deployment depended upon the employee's and GHM's needs; many remained at the Setai, including arbitration witnesses Philippe Cavatore and Dean Coetzer. Offering a training program and creating incentives to stay with GHM after training is neither unusual nor "self-dealing" for a hotel operator whose capital is its operating procedures and skilled personnel to run its hotels.

- RPAs. Owner suggests GHM violated a fiduciary duty simply by "asserting" a right to execute the RPAs in its own name. Such an assertion violated no duty, especially here where it is undisputed that GHM complied with Owner's request and executed the RPAs in Owner's name before termination.

- Legal Fees. As the evidence showed, Owner knew GHM's counsel represented GHM prior to the termination in connection with its day-to-day operation of the Hotel, including responding to Owner's letters. Once hostilities surfaced, GHM's counsel billed separately for Hotel-related work specifically relating to Owner, and GHM reimbursed the Hotel for all but $4,685.47, which GHM had not reimbursed yet at the time of termination. GHM is willing to deduct $4,685.47 from its damages should the Tribunal deem this appropriate. The Tribunal will credit said amount in Owner's favor.

- Owner also charges GHM with running all of its unrelated American financial transactions through the Hotel. Owner does not specify which financial

36

transactions were improperly run through the Hotel, why this might be improper, or any damage resulting from this alleged conduct.

(xi)   <u>Insubordination</u>

**148.**   Owner argues that GHM breached fiduciary duties because its representatives sometimes were short-tempered with Owner's representatives.  Occasional displays of temper do not make for a breach of fiduciary duty, nor can Owner recover damages for the hurt feelings of its representatives.

**149.**   In short, Owner failed to establish the existence of a fiduciary relationship with GHM or, even assuming a fiduciary duty did exist, a breach of such duty.

### C.   **GHM's Claims**

#### Count One – Breach of Contract

**150.**   GHM's main claim in the Arbitration is that Owner breached the HMA by terminating it without complying with Article XIX.  The Tribunal has rejected Owner's argument that it did not have to comply with Article XIX because it could establish alternative grounds to justify termination.  Accordingly, the Tribunal determines that GHM has established that Owner is liable in breach of contract for its termination of GHM as the Hotel's operator.

#### Count Two – Breach Of Duty Of Good Faith And Fair Dealing

**151.**   The parties submitted relevant Florida jurisprudence in their submissions. Florida law recognizes an implied covenant of good faith and fair dealing in every contract. However, this covenant is intended to protect "the reasonable expectations of the contracting parties in light of their express agreement."  *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012).  *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So.2d 652, 654 (Fla. 2nd DCA 2004).

**152.**   Under Florida law, the implied covenant of good faith and fair dealing is often described as a "gap-filling default rule" that is "usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a

discretionary decision without defined standards." *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So.2d 652, 654 (Fla. 2d DCA 2004).

153.   The implied covenant does <u>not</u> apply where: (a) it would contravene the express terms of the agreement or (b) there is no accompanying claim for breach of a related express term of the agreement. (*See* <u>id</u>. (citation omitted)). The implied duty of good faith must "relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." (<u>Id</u>.) Thus, the duty of good faith "does not attach until the plaintiff can establish a term of the contract that defendant was obligated to perform." <u>See</u> *Ins. Concepts & Design, Inc.*, 785 So. 2d at 1235.

154.   In Count Two, GHM asserts that Owner breached the duty of good faith and fair dealing in seven ways as set forth in paragraph 196 of its Statement of Claim.  However, the allegations in paragraph 196 do not involve improper exercise of discretion by Owner under the unclear terms of the HMA.  To the contrary, they are the same allegations of misconduct that support the alleged breach of the HMA terms.  The Tribunal finds that these allegations fail to allege, and GHM failed to prove, conduct that establishes breach of the implied covenant of good faith and fair dealing by virtue of the improper exercise of discretion granted under the terms of HMA.  Further, the Tribunal rejects GHM's recital of additional instances of breach after the hearings.  (*See* GHM P-H Mem. ¶¶ 131-35).

<u>Count Three – Tortious Interference with Business Relationships</u>

155.   The basis for this claim is a list of contracts and RPAs.  (*See* Resp. App. 61 & Supp. App. 4).  Pursuant to the 2003 Amendment, these agreements were to be in the name of Setai Owners LLC.  (*See* Resp. Supp. App. 4).  The tort of tortious interference involves three parties -- two contracting parties and a third party who interferes with that contract.  Once the HMA was amended to provide that the RPAs were to be contracts between the unit purchasers and Owner, GHM could not bring a claim against Owner for interfering with those contracts.

38

156.   Accordingly, GHM's rights, if any, with respect to these contracts were to be determined by the HMA, not by an independent tort claim for interference with the RPAs. The Tribunal determines that GHM did not have a separate property right in these contracts.

### Count Four – Misappropriation of Trade Secrets

157.   GHM claims that Owner violated the Florida Uniform Trade Secrets Act by misappropriating "SOPs, Style Guides, customer lists, travel agent lists, guest profiles and supplier lists (collectively, the "Confidential Information"). (GHM P-H Mem. ¶ 149). The evidence shows that many of the materials allegedly constituting trade secrets were developed at the Setai by Hotel employees for use at the Hotel. The HMA states that all records "relating to, or reflecting, the operations of the Hotel constitute Owner's property.' (HMA, Art. XI(i)).

158.   The Tribunal finds that GHM failed to establish that Owner misappropriated GHM's Confidential Information or caused GHM actual damages.

### Count Five – Defamation

159.   The parties cited to relevant Florida jurisprudence in their submissions. Under Florida law, the elements of defamation are: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." See *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105-06 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A-580B). The claimant must prove that the damages were caused by the defamatory statement.

160.   GHM's primary testimony to support the causal connection between the allegedly defamatory statements contained in the Request for Arbitration and actual damage suffered by GHM was the testimony of Mr. Meredith:

> [GHM] were initially our favorite…[but] there was obviously a level of discomfort that GHM hasn't properly done something, in a project very similar to what we were aiming to do…when you see articles like this, it's quite easy for the investment group to lean towards a

more traditional Asian operator, which is why, you know, we continued discussions with [GHM's competitors]. (Tr. 1440-42) (Meredith).

161.     This testimony failed to provide a causal connection between the alleged defamatory statements and actual damage to GHM.  Even if the investors in that project "leaned toward" a more traditional Asian operator, that is insufficient to establish that the allegedly defamatory statements were the cause of any decision that may be made by the investors in that project.  The Tribunal determines that GHM failed to establish that any alleged defamatory statements in fact caused GHM damages.

### Count Six – Conversion

162.     GHM alleges that Owner converted its "confidential and proprietary information at the Hotel, including its SOP manuals, Style Guides, guest profiles, and privileged communications" and "the exclusive right to manage the Setai units owned by third parties participating in the rental program." (GHM P-H Brief ¶¶ 147-48).  The evidence shows, however that, after the termination, Owner made good faith efforts to turn over to GHM all hard-copy versions of SOPs, privileged communications, and other property that GHM's counsel identified as belonging to GHM.  Owner turned over all hard-copy versions of SOPs, privileged communications, and other property that GHM's counsel identified as belonging to GHM. (*See* 2nd Duggan Aff., ¶¶ 8-14).  Owner also provided GHM with virtual copies of electronic servers at the Hotel that purportedly contained GHM's property. (*See* 2nd Duggan Aff. , ¶ 14; 2nd O'Keefe Aff., ¶¶ 10-11; Exs. F54, F55).

163.     The Tribunal finds that GHM has failed to prove Owner converted its personal property.

### Count Seven – Willful and Wanton Misconduct

164.     GHM's claim for "willful and wanton misconduct" must fail because no such cause of action exists in Florida.  GHM has provided no authority for the existence of such a claim, and the Tribunal has found none.

## VI.   DAMAGES

165.     The Tribunal assesses the quantum of damages to be awarded in favor of GHM exclusively pursuant to the counterclaim for breach of contract, all other counts of the

40

counterclaim having been denied.  Under applicable Florida law, the measure of such damages is the amount that will put the non-breaching party in the same position it would have been had the other party not breached the agreement.  It is also sometimes stated that the amount of damages is that which naturally results from the breach and can reasonably be said to have been contemplated by the parties at the time they entered into the agreement.  *See, Florida Standard Jury Instructions 351 (*citing *Capitol Environmental Svcs., Inc. v. Earth Tech, Inc.*, 25 So.3d 593, 596 (Fla. 1st DCA 2009) ("It is well-settled that the injured party in a breach of contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract.")); (*Sharick v. Se. University of the Health Sciences, Inc.*, 780 So.2d 136, 139 (Fla. 3d DCA 2000) ("Damages recoverable by a party injured by a breach of contract are those which would naturally result from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was made.").

166.    Florida law permits the recovery of lost profits for breach of contract where there is a reasonable basis for estimating such losses. *See, Florida Standard Jury Instruction 352 (*citing *River Bridge Corp. v. Am. Somax Ventures ex rel. Am. Home Dev. Corp.*, 18 So.3d 648, 650 (Fla. 4th DCA 2009) ("When a party seeks lost future profits based upon a breach of contract or other wrong, the party must prove that the lost profits were a direct result of the defendant's actions and that the amount of the lost profits can be established with reasonable certainty.")).

167.    During the period from 2004 through 2012, GHM received Base and Incentive Management Fees totaling approximately $16.7 million, based upon revenue of $248.1 million. Owner contested entitlement to and the calculation of the amount of these fees throughout the relationship.  Resolution of these long-standing disputes relating to the method of calculating fees has two impacts in this arbitration.  First, it impacts Owner's defense that it is entitled to setoffs with respect to the $16.7 million in past fees.  Second, it impacts the determination of what fees were lost as a natural result of the breach.

168.    The issues relating to proper calculation of management fees formed a large part of the dispute that was submitted to PwC.  The Parties anticipated that resolution of

41

those issues would provide the basis for reaching a final and binding resolution of the ongoing disputes between them. Unfortunately, this did not happen and Owner terminated the HMA prior to issuance of the final PwC Report. Nonetheless, PwC's findings and conclusions are afforded great weight by the Tribunal even though PwC did not complete the task it was requested to perform. It thus falls on the Tribunal to employ those determinations that were made by PwC and complete the task that PwC commenced. In doing so, this Tribunal must quantify a fair amount of damages resulting from the improper termination of the HMA.

### 1.   Tower Units

169.   The HMA before the 2003 Amendment stated that RPAs for the Tower Units would be in the name of GHM, which would therefore have received significantly greater fees for the rental of those units. The 2003 Amendment changed that and gave Owner the right to these fees. Mr. Jenni testified that this was a concession because of the change in economic circumstances, and Mr. Breene testified that it was a clarification of the original agreement; but, both testified that GHM was not required to agree to the 2003 Amendment and that, because it did, GHM was to receive fees of 5% for BMF and 10% for IMF on the revenue from the Tower Units. However, Mr. Breene appears to have thought these fees would be based on the net revenue after deducting the owners' participation, while GHM thought (and calculated) its fee percentages based on gross revenues from these RPAs. The Tribunal accepts Mr. Breene's position and, therefore, concludes that both BMF and IMF during the years GHM ran the Hotel were overstated as to the Tower Units. Although PwC stated that the majority of condo-hotels tend to calculate management fees based on the entire gross revenues in such situations, as GHM did, PwC did not have the benefit of the testimony of Mr. Jenni and Mr. Breene on the subject. This Tribunal did.

### 2.   Unsold Hotel Units and Commercial Unit

170.   The 2003 Amendment does not apply to these units because Owner never sold them. Consequently, the Tribunal concludes that Owner was required to execute RPAs for the unsold Hotel Units and the Commercial Unit, and that those agreements should have provided that the revenue from these units would be subject to the 5%/10% management

42

fee formula. These fees also should have been calculated on a net basis rather than on a gross basis.

### 3. Calculation of Management Fees on Property or Unit Level

**171.** GHM calculated its fees on a property-wide (gross) basis rather than on a unit-by-unit (net) basis. Owner argued that this was not supported by any language in the HMA. PwC found that, while the HMA indicates that management fees should be paid at a unit level, based on RPAs and Commercial Unit Operating Agreements, they have historically been calculated on an aggregate, property-level basis. This methodology for calculating management fees does not appear to be contractually supported. (App. 128, at 7).

**172.** The PwC Report concludes (App. 128 at 25) that, if RPA revenue had been recorded on a net rather than a gross basis, BMF for both Tower and Hotel Units would have been reduced by approximately $426,000 per year from 2007 to 2010. Thus, the Tribunal finds that Owner is entitled to a setoff for overpayment of management fees of $2,556,000 for the years 2006-2011, the six full years during which GHM operated the Hotel pursuant to the HMA.

**173.** GHM's damages expert calculated the present value of lost management fees (base and incentive) to be about $32,840,000 through 2025 based on a discount rate of 8%. The Tribunal found the expert's testimony helpful but insufficient to reasonably assess the proper quantum of damages that flowed from the improper termination of the HMA, without modification of the assumptions upon which the testimony is based. The Tribunal finds some of the expert's assumptions to be overly aggressive for the years 2013-2025. In addition, the failure to attribute any costs that should properly be allocated to offset the revenue from the management fees seems inappropriate.

**174.** Taking into consideration the adjustments to calculation of both Base and Incentive Management Fees set forth above (which were not included in the GHM expert's calculations), the failure to factor in any costs of operation, and the risk that the number of unit owners executing RPAs is unpredictable in the future, the Tribunal concludes that the expert's projection of future lost profits over-stated the reasonable estimation of such damages.

175.    Taking into account all of the above factors, the Tribunal has determined that a reasonable basis for fixing the lost profits resulting from the improper termination is to calculate it based on anticipated total profit (management fees minus costs of operation) of approximately $1,000,000 per year, with a modest increase of 3% per year for the balance of the HMA term until August 2025.  Employing various discount rates from 7% to 12%, this produces estimated lost profits in the following ranges:

| Present Value Calculations | | | 7% | 9% | 10% | 12% |
|---|---|---|---|---|---|---|
| Year | FV | Years | PV | PV | PV | PV |
| 2012 | 750,000 | -2 | 858,675.00 | $891,075.00 | $907,500.00 | $940,800.00 |
| 2013 | 1,000,000 | -1 | $1,070,000.00 | 1,090,000.00 | $1,100,000.00 | $1,120,000.00 |
| 2014 | 1,030,000 | 0 | 1,030,000.00 | 1,030,000.00 | $1,030,000.00 | $1,030,000.00 |
| 2015 | 1,060,900 | 1 | 991,495.33 | 973,302.75 | $964,454.55 | $947,232.14 |
| 2016 | 1,092,727 | 2 | 954,430.08 | 919,726.45 | $903,080.17 | $871,115.27 |
| 2017 | 1,125,509 | 3 | 918,750.45 | 869,099.31 | $845,611.43 | $801,114.94 |
| 2018 | 1,159,274 | 4 | 884,404.58 | 821,258.93 | $791,799.74 | $736,739.58 |
| 2019 | 1,194,052 | 5 | 851,342.57 | 776,051.87 | $741,412.35 | $677,537.17 |
| 2020 | 1,229,873 | 6 | 819,516.31 | 733,333.09 | $694,231.25 | $623,091.94 |
| 2021 | 1,266,769 | 7 | 788,880.07 | 692,966.02 | $650,052.80 | $573,021.96 |
| 2022 | 1,304,772 | 8 | 759,389.18 | 654,821.07 | $608,685.77 | $526,975.53 |
| 2023 | 1,343,915 | 9 | 731,000.72 | 618,775.80 | $569,951.15 | $484,629.22 |
| 2024 | 1,384,232 | 10 | 703,673.36 | 584,714.56 | $533,681.36 | $445,685.66 |
| 2025 | 950,505 | 11 | 451,578.08 | 368,351.91 | $333,146.20 | $273,247.47 |
| Total | 15,892,528 | | 11,813,135.73 | 11,023,476.76 | 10,673,606.75 | 10,051,190.89 |

176.    The Tribunal has considered all the expert testimony and argument, and concludes that the nature of the hospitality industry in South Florida for condominium hotels -- including the uncertainty of individual owners continuing to enter into successive RPAs pursuant to the same terms and in light of the other uncertainties presented by this particular condominium hotel -- suggests use of the 12% discount rate.  Thus, the Tribunal concludes that a reasonable and fair estimate of the lost profits experienced by GHM as the result of Owner's improper termination of the HMA is $10,051,190.89.

177.    From this amount, the $2,556,000 setoff determined in paragraph 172 above must be deducted, as well as the legal fee reimbursement of $4,685.47as indicated in paragraph 147 above, producing a damages award for lost profits, based exclusively on the breach of the HMA by improper termination, in the amount of $7,490,505.42.

44

178.    In addition, GHM seeks, and the Tribunal grants, simple interest on the breach of contract damage at the appropriate Florida rate of interest, from April 1, 2012 to the date of payment.  The rate is currently 4.75 percent per annum, and has been unchanged since October 2012.

VII.    **COSTS**

179.    ICC Article 37 provides the Tribunal with discretion on which of the Parties shall bear the costs of the arbitration, and in what proportion they shall be borne by the Parties.  Costs include:  (i) the fees and expenses of the arbitrators, (ii) ICC administrative fees, and (iii) reasonable legal and other costs incurred by the Parties.

180.    GHM is the prevailing Party in the Arbitration.  It succeeded in establishing liability and entitlement to damages on its main claim for wrongful termination, while Owner did not prevail on any of its claims.  The Tribunal determines that GHM is entitled to recover 100 percent of its costs.

181.    The Tribunal notes that, at its session of July 26, 2012, the ICC Court fixed the advance of costs at $650,000 and, then, at its session of March 6, 2014, readjusted the advance on costs to $870,000. GHM has paid its total advance on costs in the amount of $435,000.

182.    At its session of May 22, 2014, the ICC Court fixed the total costs of arbitration at $870,000.  The Tribunal determines that GHM is entitled to recover from Owner 100 percent of its advance on costs, or $435,000.

183.    GHM also seeks recovery of its legal, expert and other fees and expenses in the amount of $3,773,429.59.  The Tribunal finds that this amount, given the hotly contested nature of this case, is, without doubt, reasonable.  One need only note that Claimant requested costs of $12,093,229.86 – an amount that is three times the number GHM is seeking.

184.    The Tribunal, therefore, determines that GHM is entitled to recover 100 percent of its costs, including arbitrators' fees and expenses, ICC administrative fees, and

45

reasonable legal and other costs incurred by Respondents in the amount of $4,208,429.59 [i.e., $3,773,429.59 +$435,000].

## VIII.   SUMMARY

**185.**   The Tribunal concludes that Owner is liable in damages for breach of contract, as a result of its improper termination of the HMA.  The Tribunal denies all of the Parties' other claims as set forth in the Terms of Reference and the Parties' post-hearing briefs.  GHM is awarded monetary damages and all its costs of arbitration.  The disputed issues of non-arbitrability listed in Section IV(C) of the Terms of Reference are decided as set forth in paragraphs 80-84 above.

## IX.   AWARD

**186.**   The Tribunal awards as follows:

(i)   Claimant Setai Owners LLC shall pay to Respondents General Hotel Management, Ltd. and GHM (South Beach) LLC, within thirty (30) days from the date of this Award, the amount of United States Dollars Seven Million Four Hundred Ninety Thousand Five Hundred Five and Forty-Two Cents (US$7,490,505.42), together with simple interest at the rate of Four and Three-Quarters percent (4.75%) from April 1, 2012 until date of payment;

(ii)   Claimant shall pay Respondents their costs of the arbitration in the amount of United States Dollars Four Million Two Hundred Eight Thousand Four Hundred Twenty-Nine and Fifty-Nine Cents (US$4,208,429.59); and

(iii)   This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All claims and counterclaims not expressly granted herein are hereby **DENIED**.

Dated: June _____, 2014

*Place of Arbitration:  Miami-Dade County, Florida, U.S.A.*


_____
Gerald Aksen, Esq.,
President


_____
Joseph M. Matthews, Esq.,
Co-Arbitrator


_____
Hon Richard E. Neville,
Co-Arbitrator

Dated: June / 2 , 2014

*Place of Arbitration:  Miami-Dade County, Florida, U.S.A.*

Gerald Aksen, Esq.,
President

Joseph M. Matthews, Esq.,
Co-Arbitrator

Hon Richard E. Neville
Co-Arbitrator

47