# EXHIBIT "B"

Dated the 20th day of March ,2000

## MANAGEMENT AGREEMENT

Between

GENERAL HOTEL MANAGEMENT LTD.

AND

DEMPSEY VANDERBILT HOTEL

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE I | Nomination | 3 |
| ARTICLE II | Construction, Furnishing and Equipping of the Hotel | 4 |
| ARTICLE III | Operating Term and Extension thereof | 4 |
| ARTICLE IV | Working Capital | 5 |
| ARTICLE V | Training and Pre-opening Program: Advertising and Promotion | 5 |
| ARTICLE VI | Official Opening of the Hotel | 6 |
| ARTICLE VII | Operation of the Hotel | 6 |
| ARTICLE VIII | Insurance | 9 |
| ARTICLE IX | Assessments, Property Tax and Other Similar Payments | 10 |
| ARTICLE X | Bank Accounts and Disbursements | 10 |
| ARTICLE XI | Books, Records, Statements and Reports | 11 |
| ARTICLE XII | Management Fees and Reimbursement | 12 |
| ARTICLE XIII | Additional Payments by the Owner | 13 |
| ARTICLE XIV | Set-off, Counterclaims, etc. | 13 |
| ARTICLE XV | Repairs and Maintenance and Capital Improvements | 13 |
| ARTICLE XVI | Reserve for Capital Replacement | 14 |
| ARTICLE XVII | Name of the Hotel | 14 |
| ARTICLE XVIII | Indemnification | 15 |
| ARTICLE XIX | Termination | 15 |
| ARTICLE XX | Procedure upon Termination | 17 |

911312.4

-i-

ARTICLE XXI       Partial Invalidity . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

ARTICLE XXII      Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

ARTICLE XXIII     Damage, Destruction, Compulsory Taking . . . . . . . . . . . . . . .   18

ARTICLE XXIV      Successors and Assigns . . . . . . . . . . . . . . . . . . . . . .   19

ARTICLE XXV       Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

ARTICLE XXVI      Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . .   21

ARTICLE XXVII     Leasing and Property Management Services for Guest Unit
                  Owners and Residential Tower Unit Owners . . . . . . . . . . . . . .   21

ARTICLE XXVIII    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

ARTICLE XXIX      Special Conditions . . . . . . . . . . . . . . . . . . . . . . . .   28

ARTICLE XXX       Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . .   28

911312.4                                    -ii-

<u>MANAGEMENT AGREEMENT</u>

THIS AGREEMENT made this 20th day of _March_ 2000 by and between GENERAL HOTEL MANAGEMENT LTD., a company incorporated in the British Virgin Islands with limited liability and having its registered office situated at P.O. Box 71, Craigmur Chambers, Road Town, Tortola, British Virgin Islands ("GHM"), and DEMPSEY VANDERBILT OWNERS LLC, a Delaware limited liability company ("OWNER").

<u>WHEREAS</u>:

(A)   The Owner is in the course of developing and constructing, at its own cost and expense, a mixed-use project (the "Project") consisting of a residential condominium tower (the "Residential Tower") and a hotel condominium (the "Hotel") to be known as the "Dempsey Vanderbilt Hotel." The Hotel will consist of about 91 guest rooms, retail space, food and beverage operations, garage, health club and spa, and other facilities. The Project will be located at Collins Avenue between 20th and 21st Streets in Miami Beach, Florida. The Residential Tower and the Hotel will be governed by separate condominium regimes with appropriate cross-easement agreements.

(B)   The Hotel will be structured as a condominium with three principal components: (i) the 91 or so guest rooms will each be a separate residential condominium unit (collectively, the "Guest Units"), (ii) the restaurants, lounges, bars, retail space, garage, health club and spa and other income-generating areas, to the extent included in the Hotel, shall constitute one or more commercial condominium units (collectively, the "Commercial Units"), and (iii) the lobby, front desk, hallways, building systems and other public areas, administrative areas and "back of house" shall constitute a separate condominium unit (the "Hotel Unit"; the Guest Units, Commercial Units and Hotel Unit being hereinafter sometimes collectively referred to as the "Units").

(C)   As structured, neither the Guest Units nor the Commercial Units will contain any of the structural or mechanical components of the building, but instead will consist almost solely of the air-space within the interiors of the applicable Units. Specifically, the following components of the Hotel building (which shall be referred to in the Project Offering Documents as the "Shared Essential Components") are made part of the Hotel Unit: any and all structural components of the improvements, including, without limitation, all exterior block walls and all finishes (paint, stucco, etc.) and balconies, terraces and/or facades attached or affixed thereto; the roof; all roof trusses, roof support elements and roofing insulation; all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems, including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility,

911312.4



mechanical, telephonic, telecommunications, electrical, plumbing and/or other services; all heating, ventilating and air conditioning systems, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services; all elevator shafts, elevator cabs, elevator cables and/or systems and/or equipment used in the operation of the elevators; and all trash rooms, trash chutes and any and all trash collection and/or disposal systems.  The exterior grounds and the hallways connecting the Guest Units are also part of the Hotel Unit.

(D)   In addition, certain non-income producing areas of the recreational facilities to be constructed on the site will be part of the Hotel Unit.  It is contemplated that the Hotel condominium will have very little "common areas", as most of the traditional common areas will be included within the Hotel Unit, and thus controlled by the Hotel Unit owner and, pursuant to this Agreement, the Operator.  Although the owners of Guest Units will have the right to use certain of these facilities, including the pool and pool deck, the maintenance and operation of them will be the sole responsibility of the Hotel Unit owner. In consideration for the rights of use to certain portions of the Hotel Unit granted to the Guest Unit and Commercial Unit owners, the Guest Unit and Commercial Unit owners are obligated to reimburse the Hotel Unit owner for the portion of the expenses related to the Shared Essential Components and all of the other shared facilities.  As no revenues will be generated from the Hotel Unit, no Management Fees will be due or payable under this Agreement.   All Management Fees will be paid to Operator pursuant to separate agreements between Operator and the owners of the Guest Units and/or Commercial Unit(s) generating the revenues.

(E)   The costs and expenses of owning and operating the Hotel Unit will be allocated among the various Units pursuant to separate agreements.  The revenues derived from the operation of the Hotel will be allocated to the owners of the Units from which such revenues were derived.  It is Owner's intention to sell the Guest Units to third party purchasers, who will then determine whether they want their particular Guest Unit to be included in the "Rental Program" (described below).  Management of the individual Guest Units shall only be provided by Operator if separately arranged by contract between the Operator and the applicable Guest Unit owner who has elected to participate in the Rental Program (the "Guest Unit Operating Agreements").   The Guest Unit Operating Agreements shall contain terms consistent with the provisions of this Agreement and such other commercially reasonable terms as to which Owner and Operator shall mutually agree.

(F)   It is the intention of the parties that separate agreements are to be entered into between Owner and Operator covering the operation or leasing of the various facilities included in the Commercial Units (the "Commercial Unit Operating Agreements"), exclusive of any retail units (other than a Hotel store).  The parties shall negotiate in good faith to arrive at mutually acceptable agreements for the Commercial Units on customary, commercially-reasonable terms with respect to these facilities.

911312.4                                        -2-

(G)   The Operator has experience in the management and operation of hotels, and is willing to render assistance in its construction, its preparation for operation and its eventual management and operation.

(H)   The Operator, being a member of the General Hotel Management Ltd. Group of companies, is able to procure for the Hotel a license to use the GHMarks, which is included in this Agreement.

(I)   The Owner desires to avail itself of the hotel management experience and know-how of the Operator, and the Operator is willing to render its expertise and assistance in the management and operation of hotels upon the terms and conditions hereinafter appearing.

NOW THEREFORE the parties hereto AGREE AND COVENANT as follows:

## ARTICLE I

### Nomination

1.   Nomination

The Owner hereby appoints and engages the Operator as the exclusive and sole manager and operator of the Hotel, to perform the services provided for in this Agreement. The Operator, as the sole agent of the Owner, will act in accordance with the terms and conditions hereinafter set forth and hereby accepts the said nomination. The Operator agrees to operate the Hotel as a world class five star international hotel comparable to the Mandarin, Four Seasons and Ritz-Carlton hotels in Miami (the "Standards").

2.   No Covenants or Restrictions

The Owner warrants that to the best of its knowledge, information and belief having made all reasonable inquiries that there are, and on the date when the Hotel is available for the use by guests, no covenants or restrictions which would prohibit or unreasonably restrict the Operator from carrying on upon the Hotel the businesses and services customarily associated with a world class five star international hotel. The Owner agrees upon request by the Operator to sign promptly and without charge any applications for Licenses, which the Operator may reasonably request be signed, and which Operator shall be obligated to obtain.

911312.4                                -3-



## ARTICLE II

### Construction, Furnishing and Equipping of the Hotel

1. The Owner shall construct with reasonable diligence, at the Owner's own expense and in accordance with a development budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment), a building designed as a world class five star international hotel in accordance with the Standards. Operator agrees that if the building is constructed in accordance with the approved development budget, subject to its reasonable approval of plans and specifications, the Hotel will satisfy the foregoing criteria.

2. The building shall consist of the Building & Appurtenances in which the Owner shall provide and install:

   2.1   Furnishings & Equipment;

   2.2   Operating Equipment; and

   2.3   Operating Supplies.

## ARTICLE III

### Operating Term and Extension thereof

1. The term "Operating Term" shall mean a period during which the Operator shall manage and operate the Hotel commencing on the date hereof, and (unless sooner terminated as provided in Article XIX), expiring on the last day of the fifteenth (15th) full calendar year following the official opening of the Hotel, subject to any extension thereof as provided in Section 2.

2. The Operator shall be entitled to extend the Operating Term for a further period of five (5) years from the date of its expiration upon the same terms and conditions as are contained in this Agreement but without the inclusion of this Section PROVIDED ALWAYS THAT the Operator shall have given notice to the Owner at least one year prior to the expiration of the initial Operating Term of its intention so to extend the same.

911312.4                                    -4-



ARTICLE IV

Working Capital

1. The Owner shall provide sufficient Working Capital for the payment of all of the Operating Expenses throughout the Operating Term, pursuant to a budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment), to be paid in such installment(s) and at such time(s) as the Operator reasonably requires.

ARTICLE V

Training and Pre-opening Program:
Advertising and Promotion

1. The Operator agrees to recruit, hire and train the initial staff of the Hotel through such training programs as it shall consider appropriate, such training to take place only in the Country. The Operator further agrees to use its best efforts to advertise and promote the business of the Hotel through its existing facilities.

2. The Owner shall provide all monies as may be reasonably required to pay for the cost and expense of providing the training and pre-opening programs referred to in Section 1, as well as the cost and expense of providing or procuring for the Hotel pre-operational staff, organization, advertising, promotion, travel and business entertainment including pre-opening operations, opening celebrations and ceremonies, whether incurred prior to or concurrently with the beginning of full management and operation of the Hotel. The cost of the training and pre-opening programs will be set forth in a pre-opening budget to be mutually agreed upon by Owner and Operator (each in the exercise of their reasonable good faith judgment). Owner agrees to pay into the Hotel account(s), to be operated by the Operator under Article X, the mutually approved training and pre-opening expenses in such installment(s) and at such time(s) as the Operator shall reasonably require.

3. The cost and expenses of providing training and pre-opening programs and the pre-opening and opening costs and expenses of the Hotel shall be treated as Operating Expenses and amortized equally over a period of five (5) years, commencing with the first full Fiscal Year in which a charge may be made therefor.

911312.4

-5-



## ARTICLE VI

### Official Opening of the Hotel

1. The Hotel shall be considered ready to be opened for full management and operation when it is substantially completed and the Furnishings & Equipment, Operating Equipment and Operating Supplies shall have been substantially installed therein, all Licenses shall have been obtained, full and adequate inventories of food and beverage have been provided and the Hotel shall be ready to receive and render services to guests in accordance with the Standards.

2. The official opening of the Hotel shall be on a date which the Owner and the Operator shall reasonably agree subject to the Hotel being considered ready to be opened for full management and operation as provided in Section 1. Agreement by the Operator of the said date and the official opening of the Hotel shall not relieve the Owner of its obligation to cure any deficiency regarding the Hotel as to which notices shall have been or shall be given by the Operator before or after opening.

3. It is agreed that prior to the date for the official opening of the Hotel, the Operator may conduct partial management and operations of the Hotel for the purposes of further staff training and operational and promotional development the cost and expense of which shall be a pre-opening operational expense, as provided for in Article V.

4. Within six (6) months after the official opening of the Hotel, the Owner shall deliver to Operator an inventory of all Furnishings & Equipment and Operating Equipment.

## ARTICLE VII

### Operation of the Hotel

1. Commencing from the date hereof and during the Operating Term, the Operator shall have the exclusive right and obligation to direct, supervise and control the management and operation of the Hotel generally and in accordance or in keeping with the Standards and objectives of each Annual Plan and to determine the programs and policies to be followed in connection therewith. Subject as may otherwise be provided in this Agreement, the Operator shall, in directing, supervising and controlling the management and operation of the Hotel, be free and maintained by the Owner from interruption or disturbance and the Owner shall, at its own cost and expenses, undertake and prosecute any appropriate action, judicial or otherwise, to assure such freedom to the Operator, subject always as may otherwise be provided by law. In taking any action pursuant to this Agreement, the Operator will be acting only as the appointed representative of the Owner, and nothing in

911312.4                                    -6-

this Agreement shall be construed as creating a tenancy, partnership, joint venture or any other relationship between the parties hereto.

2.  Without limiting the generality of the foregoing, and unless otherwise expressly provided, the Operator shall, during the Operating Term, in accordance with the Standards, for and on behalf of the Hotel undertake the following:

2.1  At least two (2) months before the beginning of each Fiscal Year of the Hotel, submit to the Owner for review, recommendations and approval an Annual Plan for the ensuing Fiscal Year which shall consist of:

2.1.1  An estimated profit and loss statement for the ensuing Fiscal Year including a schedule of hotel room rates and all other sources of the Hotel's revenue;

2.1.2  A budget estimate for all Operating Expenses;

2.1.3  A schedule showing proposed replacement of furniture, fixtures, fittings, furnishings and equipment and any other expenditures proposed to be capitalized;

2.1.4  A schedule showing the proposed cash reserve for replacement of furniture, fixtures, fittings, furnishings and equipment;

2.1.5  An estimated cash flow statement for such year; and

2.1.6  A marketing plan.

The Owner shall indicate to the Operator its recommendations and objections, if any, to the Annual Plan before the commencement of the period covered by the Annual Plan. As and when necessary and from time to time in any Fiscal Year, the Operator may submit to the Owner, for its further review and approval, supplementary budgets to the Annual Plan. In the event that the Owner and the Operator cannot agree on any or all of the items in the Annual Plan or any supplement thereto, the dispute shall be resolved by the Expert. Pending such resolution, the Hotel shall be operated in accordance with the prior Fiscal Year's Annual Plan.

2.2  Use its best efforts and diligence in the renting of Guest Units participating in the Rental Program.

2.3  Hire, promote, discharge and supervise the work of the executive staff, including the manager, assistant managers and departmental heads. Through such executive staff, the Operator shall supervise the hiring, training, promotion, discharge and



work of all other operating and service employees performing services in or about the Hotel. The Operator shall consult with the Owner in handling collective bargaining negotiations and similar important matters of a particularly local nature. The Operator shall be permitted from time to time to provide a reasonable number of hotel guest rooms for the temporary use of the manager and other management employees, if Operator reasonably considers it necessary or expedient. (In addition, Owner shall have the right to use up to two guest rooms per night at no cost to Owner, subject to availability and other commercially reasonable limitations to be agreed upon.) All staff and other operating and service employees employed at the Hotel shall be or be deemed to be for all purposes the employees of the Operator.

2.4     Establish and supervise an accounting department, with appropriate hotel accounting and cost control systems and personnel, to be maintained by the Operator at the Hotel. The Operator shall establish and supervise all bookkeeping, accounting and clerical services, including the maintenance of payroll records incident to the efficient operation and maintenance of the Hotel. All accounts shall be maintained in conformity with the Uniform System. If requested by Owner, an Independent Certified Accountant nominated by the Owner and reasonably approved by the Operator shall be appointed by the Hotel as its auditor.

2.5     Make available to the Hotel in the Country the expertise of the Operator and the services of the Operator's specialized home-office facilities located in the Country and employed in the performance of its hotel operation and management activities, including, without limitation, its engineering, maintenance, accounting, cost control, taxation, food and beverage control, reservations, sales publicity, advertising, convention; labor relations and safety departments.

2.6     Receive, consider and handle with due decorum and courtesy the complaints of all tenants, guests or users of any of the services or facilities of the Hotel.

2.7     Enter into arms-length contracts in the name of the Owner for the furnishing to the Hotel of electricity, gas, water, steam, telephone, cleaning (including window cleaning), vermin extermination, boiler maintenance, air-conditioning maintenance and other necessary utilities or services and purchase all Operating Equipment, Operating Supplies, and other items and enter into any other contract as may be necessary in the efficient management and operation of the Hotel, all at competitive prices.

2.8     Arrange for compliance with the Law affecting or issued in connection with the Hotel.



2.9   Institute any necessary legal actions or proceedings to collect charges, rent or other income due to the Hotel or to oust or dispossess guests, tenants or other persons in possession, or to cancel or terminate any tenancy for the breach thereof or default thereunder by the tenant.

## ARTICLE VIII

### Insurance

1.   During the construction of the Project, the Owner shall procure and maintain the insurance described in Section 1.1 below.  Thereafter, the Operator shall procure and maintain all fire, public liability, indemnity, fidelity, property and other types of insurance which are necessary or appropriate for the operation of the Hotel, including (but without limiting the generality of the foregoing):

1.1   During the period of construction, furnishing and equipping of the Hotel, full and adequate public liability and indemnity and property damage insurance (if available) protecting the Owner and the Operator against loss or damage arising by reason of all activities in connection with the development, construction, furnishing, equipping, management, operation and maintenance of the Hotel.

1.2   Upon commencement of the operation and management of the Hotel, general liability and casualty insurance against loss or damage by fire and other hazards included in an extended coverage endorsement (including business interruption insurance), in such amounts as Owner and Operator shall agree upon.

1.3   If the Owner and the Operator shall consider it appropriate, insurance against loss of income for the Hotel due to riot, civil commotion and insurrections.

1.4   Such other insurance as Owner, Operator or any mortgagee may require and which is customary in the operation of similar hotels.

2.   Concurrently with the submission of the first Annual Plan and continuing annually thereafter, the Operator shall furnish the Owner with a schedule setting forth the kinds and amounts of insurance proposed to be obtained or continued, including the insurance required in the foregoing sections, and such other kinds and amounts of insurance as the Operator shall deem necessary or advisable for the protection of the interest of the Owner and the Operator.  Promptly thereafter, except as to the insurance required in the foregoing sections, the parties shall agree as to the kind, amount and form of additional insurance to be obtained.  The Operator shall thereupon forthwith apply for and obtain on the Owner's behalf, if obtainable, all such insurance.

911312.4                                          -9-

3. All policies of insurance shall name the Owner, and where appropriate, jointly with the Operator and such other parties in accordance with their respective interests. The original of all policies of insurance and certificates of insurance shall be kept and maintained by the Operator, and certificates of insurances shall be forwarded to the Owner. The premiums for and costs and expenses associated with obtaining such insurance policies shall be Operating Expenses.

4. Neither the Owner nor the Operator shall assert against the other and each of them do hereby waive with respect to one another any claims for any losses, damages, liability or expenses (including legal fees) incurred or sustained by either of them to the extent that the same are covered by insurances as aforesaid, on account of damage or injury to person or property arising out of the ownership, management, operation or maintenance of the Hotel.

## ARTICLE IX

### Assessments, Property Tax and Other Similar Payments

1. All assessments, property taxes and other similar payments in respect of any particular Unit shall be paid by the Operator on behalf of the owner thereof promptly as and when the same shall become due; provided the owner has delivered to Operator the funds necessary to pay the same.

2. The Operator shall furnish to the applicable owner copies of the official bills and receipts relating to any such payments.

## ARTICLE X

### Bank Accounts and Disbursements

1. All Working Capital received by the Operator from the Owner shall be deposited in a special account or accounts in the name of the Hotel in a bank or other depository selected by the Owner and approved by the Operator. Such account or accounts shall be operated solely by the Operator's designees.

2. Out of such account or accounts the Operator shall pay all Operating Expenses.



ARTICLE XI

Books, Records, Statements and Reports

1.   The Operator shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel on an accrual basis. The books of account and all other records relating to, or reflecting, the operation of the Hotel shall be kept at the Hotel and shall be available to the Owner and its duly authorized representatives for examination, audit, inspection and copying. Such books of account and records shall reflect, for each Unit managed by Operator, the Gross Revenues generated from each such Unit and the Operating Expenses allocable thereto. All of such books and records shall be the property of the Owner and shall not be removed from the Hotel without the written consent of the Owner and the Operator. Upon the termination of this Agreement, all of such books and records up to the date of termination shall forthwith be delivered up to the Owner so as to ensure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be made available to the Operator at reasonable times and intervals for examination, audit, inspection and copying for a period of two (2) years following such termination. Without prejudice or limitation to the foregoing, the Operator's right of examination, audit, inspection and transcription as provided for in this case shall extend to books and records or parts thereof related to transactions or events taking place or occurring before the date of termination of this Agreement.

2.   The Operator shall deliver to the Owner within thirty (30) days after the end of each calendar month a profit and loss statement showing the results of the operation of the Hotel for the immediately preceding calendar month and the Fiscal Year-to-date and as compared to the Annual Plan, and covering such other matters as are customarily covered in such monthly reports for comparable hotels.

3.   Within ninety (90) days after the end of each Fiscal Year, the Operator shall deliver to the Owner a profit and loss statement, balance sheet, sources and application of funds statement, and which, if requested by Owner, shall all be audited and certified by the Independent Certified Public Accountant of the Hotel. Any disputes between the Owner and the Operator as to the contents or correctness of any such statement or any accounting matter thereunder shall be decided by the Independent Certified Public Accountant, whose decision shall be final and binding. The cost and expense of audits pursuant to this section shall be Operating Expenses.

4.   If no objection shall be made by either the Owner or the Operator to the said certified profit and loss statement and to the Net Profit for any Fiscal Year within forty-five (45) days after delivery of the same, such certified profit and loss statement shall be deemed to be correct and conclusive for all purposes. The Owner and the Operator shall endeavor to resolve any objections or differences which may be made prior to the time fixed herein

911312.4                                     -11-

for payment of the next succeeding installment to the Owner of its entitlement to the Net Profit, as provided for in Article XIII.

5. Separate or additional statements may be required to be prepared and delivered to the owners of the Commercial Units and the Guest Units managed by Operator, as may be set forth in the Commercial Unit Operating Agreements and the Guest Unit Operating Agreements.

## ARTICLE XII

### Management Fees and Reimbursement

1. Under the Guest Unit Operating Agreements, (i) a Base Management Fee shall be payable monthly with respect to the Gross Revenues derived from such Guest Unit, and (ii) an Incentive Management Fee shall be payable monthly with respect to estimated Gross Operating Profit for such Unit, to be adjusted at the end of each Fiscal Year.

2. For the purpose of calculating the amount of the Base Management Fee, payments for any given calendar month shall be the Base Management Fee percentage of the cumulative Fiscal Year-to-date Gross Revenue, less the amount of any payments on account of the Base Management Fee previously paid to the Operator during such Fiscal Year. Monthly payments of the Incentive Management Fee shall be calculated on the cumulative Fiscal Year-to-date Gross Operating Profit, less the amount of any payments on account of the Incentive Management Fee previously paid to the Operator during such Fiscal Year.

3. At the end of each Fiscal Year and following the receipt of the annual statements for Units managed by Operator, an adjustment shall be made on the basis of the said statements, if necessary, so that the Operator shall receive its proper Management Fee for the said Fiscal Year.

4. The Owner shall reimburse the Operator for all Operating Costs which were paid by the Operator and not out of the Hotel account(s).

5. The Operator may also charge to the Hotel its reasonable travel and other out-of-pocket head office expenses incurred pursuant and in the course of and directly related to the management and operation of the Hotel, and in accordance with the approved Annual Plan. The Operator may offer complimentary rooms, food and beverages and other services to any person if, in the reasonable judgement of the Operator, such action will promote the Hotel and increase the overall profitability of its operations. All such costs and expenses charged pursuant to this Section 5 shall be Operating Expenses.



6.  Notwithstanding any of the foregoing, it is understood and agreed by Owner and Operator that no Management Fees are due from Owner hereunder. The only Management Fees payable to Operator are pursuant to the Commercial Units Operating Agreements and/or the Guest Unit Operating Agreements.

## ARTICLE XIII

### Additional Payments by the Owner

1.  In the event that for any Fiscal Year a Net Loss shall be sustained for the Hotel, the Owner shall forthwith upon demand by the Operator after the end of such Fiscal Year pay into the Hotel account(s) operated by the Operator under Article X such amounts as may be required to provide sufficient Working Capital to cover anticipated Operating Expenses, as reasonably determined by Operator.

## ARTICLE XIV

### Set-off, Counterclaims, etc.

1.  The Commercial Unit Operating Agreements and Guest Unit Operating Agreements shall contain customary exclusions for set-offs and counterclaims.

## ARTICLE XV

### Repairs and Maintenance and Capital Improvements

1.  Subject to the performance by the Owner of its obligations under this Agreement the Operator agrees to maintain the Hotel in good repair and condition.

2.  Subject to the Owner's prior approval, the Operator is authorized to make such alterations, additions or improvements in or to the Hotel as are customarily made in the operation of deluxe international hotels. The cost of such customary additions, alterations and improvements shall either be treated as Operating Expenses or shall be capitalized in the books of account in accordance with sound accounting practices. Such capitalized expenditure shall be amortized by treating such expenditure as Operating Expenses over their estimated useful life.

911312.4                              -13-



## ARTICLE XVI

### Reserve for Capital Replacement

1. During the Operating Term there shall be deducted monthly from the Gross Operating Profit such sum as shall be equal, in the aggregate for each Fiscal Year, to 2.5 percent of the Gross Revenue for that Fiscal Year. A cash fund in the above sum shall be created for the purpose of making replacements of, renewals of and additions to said furniture, fixtures, furnishings and equipment. Such fund shall be recorded on the books of account maintained for the Hotel as "Reserve for Capital Replacements". The fund shall be used solely for such purposes. Any expenditure for replacements of, renewals of and additions to, furniture, fixtures, furnishings and equipment during each Fiscal Year may be made by the Operator without the consent of the Owner up to the amount of such fund (including unused accumulations thereof from earlier Fiscal Years), and any such expenditures shall be paid from such fund. To the extent that such expenditures in any Fiscal Year shall be less than the fund for such year, the excess shall be carried forward and added to the next or any subsequent fund until fully used. Any expenditure in excess of the fund shall be subject to the Owner's approval and shall be deducted from Gross Operating Profit in arriving at the Net Profit.

## ARTICLE XVII

### Name of the Hotel

1. The Operator and the Owner agree that during the Operating Term the Hotel shall at all times be known and designated as the "Dempsey Vanderbilt Hotel", or by such other name as the parties may from time to time agree in writing.

2. This Agreement includes a license to the Owner of the terms "GHM", "GHM Resorts" and "GHM Hotels" (collectively, the "GHMarks") for use in connection with the marketing of the Project and the operation of the Hotel, to be used in such manner as Operator shall reasonably determine. It is expressly acknowledged and agreed by the parties hereto that the GHMarks shall be the exclusive property of General Hotel Management Ltd. and no legal right or remedy of the Owner of any kind or nature whatsoever, nor any provision of this Agreement or any other agreement shall confer upon the Owner or any of the successor or successors the right to use the "GHMarks" either alone or in conjunction with some word or words, except in accordance with the provisions of this Agreement. Without prejudice to any other legal right or remedy of the Operator, this covenant shall be enforceable, by injunction or otherwise, by the Operator, shall be deemed to survive any termination of this Agreement, and shall in case of conflict prevail over all other provisions of this Agreement.

911312.4                           -14-

3. All costs and expenses relating to any registration of the businesses of the Hotel as are required by law (including legal fees) and renewals of such registration shall be Operating Expenses.

## ARTICLE XVIII

### Indemnification

1. The Operator shall not in the performance of this Agreement be liable to the Owner or any other person or entity for any act or omission, negligent, tortious or otherwise, of any officer, agent or employee of Operator, except, however, for the gross negligence or willful misconduct of any such officer, agent or employee of Operator.

2. The Owner hereby agrees to indemnify and save harmless the Operator and officers, agents and employees of the Operator from and against any and all loss, damage, cost or expense (including lawyer's fees) which Operator or any of the officers, agents or employees of the Operator may sustain or incur by reason of any claim or assertion of wrong doing, error, commission, omission or negligence made by any person or entity involving or arising out of the performance by the Operator or any officer, agent or employee of the Operator of the various services contemplated by this Agreement, whether or not such claim or assertion involves any allegation based on the alleged sole negligence of two or more such entities or individuals (one or more of which may be the Operator or any of its officers, agents or employees) or any other theory, exclusive, however, of any gross negligence or willful misconduct of Operator or of any of its officers, agents or employees. Moreover, the Owner will, at the Operator's request, assume the defense of any proceeding brought by any third party to establish any such liability.

3. The provisions of this article shall survive any expiration or termination of this Agreement and shall remain enforceable by the Operator notwithstanding such expiration or termination.

## ARTICLE XIX

### Termination

1. This Agreement may at any time during the Operating Term be terminated in accordance with the following provisions:

  1.1 At the option of the Owner:

911312.4      -15-



1.1.1   By giving sixty (60) days notice in writing to the Operator in the event that, despite the fact that the Owner shall have carried adequate insurance in accordance with the provisions of Article VIII, there has been damage to and destruction of the Hotel of such magnitude that the cost of repairing, restoring, rebuilding or replacing the hotel is in excess of one hundred and twenty per cent (120%) of the proceeds of the insurance;

1.1.2   By giving 60 days notice in writing to the Operator, in the event that the Operator shall fail to observe or perform any of the provisions of this Agreement that are the Operator's responsibility to be observed or performed, including the obligation to operate the Hotel in accordance with the Standards, despite the Owner having given written notice of such default to the Operator and such default shall not have been remedied within thirty (30) days after such notice;

1.1.3   By notice in writing to the Operator, in the event of the entire or a substantial portion of the Hotel or its services being acquired, condemned, or closed in accordance with Law;

1.1.4   By notice in writing to the Operator, in the event the Operator enters into liquidation whether voluntarily or compulsorily or compounds with its creditors generally or has a receiver appointed of all or any substantial portion of its assets or takes or suffers any similar action in consequence of its debts.

1.2   At the option of the Operator:

1.2.1   By giving sixty (60) days notice in writing to the Owner, in the event that the Owner shall fail to observe or perform any of the provisions of this Agreement that are the Owner's responsibility to be observed or performed, despite the Operator having given written notice of such default to the Owner and such default shall not have been remedied within thirty (30) days after such notice;

1.2.2   By notice in writing to the Owner, in the event of the entire or a substantial portion of the Hotel or its services being acquired, condemned, or closed by Law;

1.2.3   By giving notice in writing to the Owner, in the event the Owner enters into liquidation whether voluntarily or compulsorily or by law or compounds with its creditors generally or has a receiver appointed over all or any substantial portion of its assets or takes or suffers any similar action in consequence of its debts.

911312.4                                   -16-

# ARTICLE XX

## Procedure upon Termination

1.  In the event of termination of this Agreement, whether by effluxion of time or otherwise, the following steps shall be taken, in the following order:

    1.1  If requested by Owner, the Independent Certified Accountant shall conduct a final accounting and audit of the books and records of the Hotel and shall produce and deliver to the Owner and the Operator final audited accounts to the date of the termination (otherwise, such final statements shall be prepared and delivered by Operator);

    1.2  There shall be paid from the Hotel account(s) all amounts and debts due to the Operator, and if the monies in the Hotel account(s) are insufficient for such purposes by the Owner; and

    1.3  All other amounts and the remaining assets of the Hotel shall be paid to or retained by the Owner.

    1.4  The license to the use of the "GHMarks" shall be terminated and the words "GHM", GHM Resorts and GHM Hotels shall not be used for the Hotel in its name or in any other way.

# ARTICLE XXI

## Partial Invalidity

1.  In the event that one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgement of a court of competent jurisdiction, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted in this Agreement.

911312.4                                    -17-



## ARTICLE XXII

### Force Majeure

1.   In the event that the performance by any party to this Agreement of its obligations hereunder is prevented by force majeure, including, but not limited to, acts of God, flood, hurricane, earthquake, tidal wave, landslide, fire, plague, epidemic, quarantine restriction, perils of the sea; war or serious threat of the same, civil commotion, blockade, arrest or restraint of government, rulers or people; strike, lockout, sabotage, other labor dispute; or any other causes or circumstances whatsoever beyond the party's reasonable control, then, such party shall not be liable for loss or damage, or failure or delay in performing its obligations under this Agreement.

## ARTICLE XXIII

### Damage, Destruction, Compulsory Taking

1.   If the Hotel or any portion thereof shall be damaged or destroyed at any time during the Operating Term by fire, casualty or any other case, the Owner shall, at its own expense and with due diligence, repair or replace the Hotel so that the Hotel shall be substantially the same as that prior to such damage or destruction.  If the Owner shall fail:

    1.1   To commence such work within sixty (60) days of receipt of insurance proceeds or confirmation by the insurance carrier that such proceeds will be made available to cover actual costs of repair or replacement, whichever is earlier; or

    1.2   To complete such work diligently, then the Operator may, at its option, either:

        1.2.1   Terminate this Agreement by written notice to the Owner, effective as of the date of dispatch; or

        1.2.2   Undertake or complete such work for the account of the Owner to the extent of such available insurance proceeds, in which case the Operator shall be entitled to be repaid thereof from such insurance proceeds.

2.   If the Hotel is damaged or destroyed by fire or other insurable cause to such an extent that the cost of repair or replacement as estimated by the Operator exceeds one third of the original cost of the Hotel, then the Owner may, if it determines not to repair or replace the Hotel, provisionally terminate this Agreement by notice to the Operator.

3.   If thereafter at any time within three (3) years after the termination of this Agreement pursuant to Section 2 above the Owner repairs, rebuilds or replaces the Hotel, the Operator

911312.4                                  -18-



may, within sixty (60) days of the commencement of such repair or replacement or on receipt of written notice from the Owner of its intention to repair or replace the Hotel, reinstate such services by written notice to the Owner.

4.    If the whole of the Hotel shall be taken by any expropriation, condemnation or similar proceedings, or, if a portion thereof shall be taken, any award (compensation), for such taking shall be equitably apportioned between the Owner and the Operator after recoupment by the Owner or its constituent partners of their investments in the Hotel.

5.    If only a part of the Hotel shall be so taken and the taking of such part does not make it unreasonable, in the Operator's opinion, to operate the remainder of the Hotel as a hotel of the type and class preceding such taking, so much of any award (compensation) to the Owner shall be made available as shall be reasonably necessary for making alterations or modifications to the Hotel as to make it a satisfactory architectural unit as a hotel of similar type and class a prior to the taking. The balance of the award (compensation) shall be equitably apportioned between the Owner and Operator.

## ARTICLE XXIV

### Successors and Assigns

1.    The Owner may sell, assign, transfer, lease, mortgage or otherwise alienate its interest in the Hotel, including any or all of the Units, without the prior written consent of the Operator. The Operator shall not have the right to assign or transfer to any third party any of its obligations or rights under this Agreement, save with the prior written consent or approval of the Owner; provided, however, that (a) the Operator may assign or transfer this Agreement at any time to any other member of the General Hotel Management Ltd. Group upon notice to the Owner and (b) after the earlier to occur of (i) one year after the opening of the Hotel or (ii) the sale of all the Guest Units to third parties, the Operator may assign or transfer this Agreement in connection with a sale or merger of the General Hotel Management Ltd. Group or a sale of substantially all of the assets thereof. It is understood and agreed that any consent or approval granted by the Owner to any such assignment shall not be deemed a waiver of the provisions herein contained against assignment, transfer or alienation in relation to any subsequent sale, assignment, transfer or alienation or purporting so to do.

2.    Subject to the provisions of Section 1, the provisions of this Agreement shall be binding upon and shall enure to the benefit of the successors in title and the assigns of the Owner and of the Operator.

911312.4                                -19-

ARTICLE XXV

<u>Notices</u>

1. Any notice required to be given under this Agreement shall be in writing and shall be deemed to have been effectively given (1) when personally delivered, (2) seven (7) working days after being sent by registered or certified airmail, postage prepaid and return receipt requested, or (3) when sent by facsimile, in each such case addressed as follows, or (4) to such other address as either OPERATOR or OWNER may subsequently designate by notice to the other party:

1.1 To OWNER:

Metropolitan Development Group
1411 Broadway
New York, New York 10018
Attention:    Jonathan Breene
Fax. No.:    (212) 704-0546

1.2 To OPERATOR, at <u>both</u>:

General Hotel Management Ltd.
P.O. Box 71
Craigmur Chambers, Road Town
Tortola
British Virgin Islands

<u>AND</u>

General Hotel Management Ltd.
70B Pagoda Street
Singapore 059229
Attention:    Hans R. Jenni
Fax No.:    (65) 221 1535

*With copies To:*

*Zakay Sasson*
*16495 32nd Avenue*
*Eastern Shores, Fl. 33180*

*and*

*Enrique Fefer*
*19333 Collins Avenue, apt 1708*
*Sunny Isles Beach, Fl. 33160*



ARTICLE XXVI

Applicable Law

1.    This Agreement shall be governed and interpreted in accordance with the laws of the State of Florida and the United States of America. The parties agree that in all matters relating to this Agreement, whether during its substance or after its termination, and also in all matters concerning the provisions of this Agreement where any question or dispute or difference shall be settled in mutual good faith. In case of failure by the parties to reach an amicable settlement, such difference or dispute shall be finally settled through a Board of Arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce. The venue of the arbitration shall be Dade County, Florida.

ARTICLE XXVII

Leasing and Property Management Services for
Guest Unit Owners and Residential Tower Unit Owners

1.    The Operator shall offer a "Rental Program" (i.e., rental services and property management services) to Guest Unit owners (if desired by them) on the following terms or such other terms to be reasonably agreed upon between Owner and Operator (subject to requirements of applicable laws).

      (a)    The Rental Program shall be completely voluntary;

      (b)    The Rental Program shall give Guest Unit owners the option to use their units for a maximum number of days and subject to such restrictions as Owner and Operator shall reasonably agree upon in good faith;

      (c)    The Rental Program shall contain a rotation system intended to cause similar quality units to be rented for approximately the same amount of times;

      (d)    The Rental Program will not involve any pooling of revenues;

      (e)    Operator will offer room service, maid service and turndown service to Guest Unit owners participating in the Rental Program;

      (f)    The Rental Program will provide each participating Guest Unit owner 100% of the revenue derived from the rental of the owner's unit not less frequently than quarterly, after first deducting travel agent commissions, credit card service charges, applicable taxes and Management Fees; and

911312.4                                  -21-

(g)    Participants in the Rental Program will receive activity statements from Operator not less frequently than quarterly.

Any and all revenue generated from the leasing of a Guest Unit under the Rental Program shall be deemed its Gross Revenues, and any and all costs incurred thereunder shall be deemed part of its Operating Expenses.

2.    The Operator shall offer a similar Rental Program to the Residential Tower unit owners (if desired by them) on the following terms or such other terms to be reasonably agreed upon between the Owner and the Operator:

(a)    The Rental Program shall be completely voluntary;

(b)    The Rental Program shall give Residential Tower unit owners the option to use their units for as many days of the year as they desire;

(c)    The Rental Program shall contain a rotation system intended to cause similar quality units to be rented for approximately the same amount of times;

(d)    The Rental Program will not involve any pooling of revenues;

(e)    Operator will offer room service, maid service and turndown service to Residential Tower unit owners participating in the Rental Program;

(f)    The Rental Program will provide the Residential Condominium unit owners 50% of the net revenues derived from the rental of the owner's unit, after first deducting travel agent commissions, credit card service charges and applicable taxes, with the remaining 50% paid to the Operator as a fee;

(g)    Participants in the Rental Program will receive activity statements from Operator not less frequently than quarterly; and

(h)    Each unit participating in the Rental Program shall contain Furnishings and Equipment approved by Operator.

Any and all revenue generated from the leasing of Residential Tower units under the Rental Program shall be deemed its Gross Revenues, and any and all costs incurred thereunder shall be deemed part of its Operating Expenses.

3.    Operator shall also make available to all Guest Unit and Residential Tower unit owners, whether or not they are enrolled in any Rental Program, other services (whether on an à la carte, or bulk basis, to be agreed to by Operator and Owner subsequent to the execution

911312.4

-22-



of this Operating Agreement), which shall include, without limitation, the following: room service, food and beverage charging privileges, daily maid service, routine maintenance assistance. Operator shall be entitled to its standard charges for providing any of these services.

4.      Owner and Operator agree to reasonably cooperate with each other to promptly finalize the terms of the Rental Programs and to otherwise establish reasonable rules and regulations and procedures for the operation of the Hotel.

## ARTICLE XXVIII

### Definitions

As used in this Agreement:

1.      The term "Fiscal Year" shall mean the twelve-month period commencing on January 1 and ending on December 31.

2.      The term "Annual Plan" means such statements, estimates and schedules as are mentioned in Section 2 of Article VII as amended from time to time.

3.      The term "the Country" shall mean the United States of America.

4.      The term "Building and Appurtenances" shall mean a building(s) containing about 91 guest rooms, restaurants, lobbies, bars and lounges, retail space, elevators, back-of-the-house and parking areas, recreational facilities and other related facilities.

5.      The term "Furnishings & Equipment" shall mean all furniture, furnishings, fixtures, life safety and fire equipment on or required for the management and operation of the Building and Appurtenances.

6.      The term "Gross Operating Profit" shall mean, for any particular Unit, the excess during each Fiscal Year (and proportionately, for any period less than a Fiscal Year) of Gross Revenues derived from such Unit over Operating Expenses allocated thereto during the same period, calculated in accordance with the Uniform System.

7.      The term "Gross Revenues" shall mean all income and proceeds of every kind (whether in cash or on credit) generated from Units managed by Operator, including the proceeds of business interruption insurance actually received by Operator or Owner or the owner of any such Unit (after deduction of said insurance proceeds of all necessary expenses incurred in the adjustment or collection thereof) less Turnover Taxes which have been

911312.4                                          -23-

added onto the customer's bills and actually received by the Hotel as part of the Hotel's revenue.

8.   The term "Hotel" shall have the meaning ascribed to it in the Preamble to this Agreement.

9.   The term "Independent Certified Accountant" shall mean the accountant or firm of accountants referred to in Section 2.4 of Article VII.

10.  The term "Law" shall mean all laws, acts, ordinances, rules, regulations, orders, enactment or determinations by any governmental municipal or other authority having jurisdiction.

11.  The term "Licenses" shall mean all licenses, permits, consents, approvals and authorizations (governmental, municipal or otherwise) required for the management and operation of the Hotel in accordance with this Agreement including, but not limited to: liquor licenses for the sale of alcoholic beverages at all restaurants and bars in the Hotel and to all guest rooms; restaurant and hotel licenses; all licenses, permits, consents, approvals and authorizations (governmental, municipal or otherwise) required for the procurement and import of Furnishings & Equipment, Operating Equipment and Operating Supplies, for the Hotel to operate as a world class five star international hotel meeting the Standards, and all visas and work permits for staff who require them.

12.  The term "Net Loss" shall mean any negative balance which may result after the deductions set out in Section 13 of this Article have been made to the Gross Operating Profit of the Hotel for any Fiscal Year.

13.  The term "Net Profit" shall mean, with respect to any particular Unit managed by Operator, the resulting balance after deductions from the Gross Operating Profit for such Unit for a Fiscal Year (and proportionately, for any period less than a Fiscal Year) of all or any allocable portion (as appropriate) of the following charges as they occur in accordance with the Uniform System:

13.1   Real estate and personal property taxes;

13.2   The cost and expense of any matter or thing to be done at Owner's cost and expense under this Agreement or otherwise done at the request of the Owner or of the owner of the Unit;

13.3   The 5% Base Management Fee payable to the Operator; and

13.4   Technical service fees payable for services rendered to the Hotel.



14. The term "Management Fee" shall mean, with respect to the Guest Units participating in the Rental Program, (i) a "Base Management Fee" equal to five percent (5%) of Gross Revenue, payable monthly, and (ii) an "Incentive Management Fee" equal to ten percent (10%) of the Gross Operating Profit, payable quarterly. The Management Fees payable with respect to any Commercial Unit managed by Operator shall be as set forth in the applicable Commercial Unit Operating Agreement.

15. The term "Operating Equipment" shall mean all chinaware, glassware, linens, silverware, uniforms, utensils and other items of a similar nature.

16. The term "Operating Expenses" shall mean, with respect to any particular Unit managed by Operator, all or the allocable portion (as appropriate) of the entire costs and expenses of maintaining, conducting, and supervising the operation of the Hotel (but shall not include, except as otherwise provided in this Agreement (a) principal or interest on Owner's indebtedness and any rent payable by Owner, (b) any taxes payable by the Owner, (c) the Management Fees, and (d) the costs of any other things specified in this Agreement to be done or provided at Owner's expense and not otherwise denominated as an Operating Expense) incurred by Operator directly or at its request or as otherwise provided in this Agreement, or under the applicable Commercial Unit or Guest Unit Operating Agreement, which Operating Expenses are properly attributable to the period under consideration under Operator's system of accounting, including without limitation:

16.1 The cost of all food and beverages sold or consumed and of all Operating Equipment and Operating Supplies, other than initial inventories of Operating Equipment and Operating Supplies furnished by Owner.

16.2 Salaries and wages and employee benefits of Hotel personnel, including, without limitation, pension plans, medical insurance, life insurance, travel accident insurance and bonuses, including cost of payroll taxes and employee benefits, severance or other termination benefits and accruals therefor; the cost of moving Hotel personnel (including expatriates), their families and personal belongings to the Hotel and their return, and all other expenses not specified or referred to herein which are referred to as "Administrative and General Expenses" in the Uniform System. Subject to prior consultation with the Owner and conformity with the approved Annual Plan, Operating Expenses may include the cost of visas, work permits, residence documentation, salaries, bonuses, payroll taxes and employee benefits (including family home leave airfares and allowances) for Hotel personnel from other countries. Except as herein otherwise expressly provided, the salary or wages of other employees or executives of Operator, or any member of the Operator's group of companies, shall in no event be Operating Expenses, but reasonable and customary traveling expenses incurred by them in connection with the management of the Hotel, including reasonable and customary living expenses incurred during travel, shall be Operating Expenses.

911312.4                                    -25-



Notwithstanding the foregoing, if it becomes necessary for an employee or executive of any member of the Operator's group of companies to perform temporary services at the Hotel of a nature normally performed by Hotel personnel, his salary (including payroll taxes and employee benefits) as well as his reasonable and customary traveling expenses (including living expenses) shall be Operating Expenses.

16.3   The cost of all other goods and services obtained by Operator in connection with its operation of the Hotel including, without limitation, heat and utilities, office supplies and services performed by third parties.

16.4   The cost of repair and maintenance of the Hotel.

16.5   Insurance premiums and losses incurred from any self-insured risks of the foregoing types provided that Owner and Operator have approved in advance such self-insurance or have agreed in advance to the unavailability of insurance to cover such risks.   Premiums on policies for more than one (1) year and/or not for a period within the fiscal year in question will be pro-rated over the period of insurance, and premiums under blanket policies will be fairly allocated among properties covered.

16.6   All taxes (other than income taxes and, unless otherwise included in Gross Revenues, Turnover Taxes), with respect to the operation of the Hotel, and water and sewage charges but excluding all taxes levied or imposed against the Hotel or its contents, such as real and personal property taxes.

16.7   Legal costs and fees, and fees of any Independent Certified Accountant, for services relating to the obtaining of all necessary approvals of this Management Agreement and of matters relating thereto, including any requisite registration of Operator (as a branch, an office or otherwise), and the operation of the Hotel and its facilities.

16.8   The reasonable costs and expenses (including salaries) incurred after the Hotel has opened of technical consultants and specialized operational experts for specialized services in connection with non-recurring work on operation, functional, decorating, design or construction problems and activities, including the reasonable fees of any member of the operator's group of companies in connection therewith.

16.9   All expenses for advertising the Hotel and all expenses of sales promotion and public relations activities incurred after the Hotel has opened.

911312.4                                    -26-



16.10  All out-of-pocket expenses and disbursements reasonably, properly and specifically incurred by any member of the Operator's group of companies pursuant to, in the course of or directly related to, the management and operation of the Hotel. Without limiting the generality of the foregoing, such charges may include all reasonable travel, telephone, facsimile, telex, telegram, cablegram, radiogram, air express, courier service and other incidental expenses, but except as herein otherwise expressly provided, shall not include any of the regular expenses of the offices maintained by any member of the Operator's group of companies other than offices maintained at the Hotel for the management of the Hotel.

16.11  Bad debts and allowances for uncollectible accounts receivable.

16.12  Reserve for Capital Replacements.

16.13  Those items not included above described as Operating Expenses in this Agreement and any other payments made by Owner hereunder which are to be amortized over a period of years.

17.   The term "Operating Supplies" shall mean all inventories of paper supplies, cleaning materials and similar consumable items.

18.   The term "Standards" shall mean the highest quality of facilities or operations and services generally consistent with, and expected by, guests at comparable world class five star international hotels, such as those operated under the trade names Mandarin, Four Seasons and Ritz-Carlton.

19.   The term "taxes" includes, without limitation, all present or future taxes (of any nature and howsoever termed), levies, fiscal charges, imposts, duties, fees, assessments, surcharges, or other charges of whatever nature and however arising, imposed, assessed, charged, levied or demanded by any person at any time, together with all interest thereon and penalties or similar liabilities with respect thereto but does not include any stamp, registration or documentary taxes, duties or similar charges of any kind and Turnover Taxes.

20.   The term "Turnover Taxes" shall mean sales taxes, hotel occupancy taxes, gross receipts or value added tax or similar turnover taxes and any other direct room or room sales related taxes.

21.   The term "Uniform System" shall mean the latest edition of the "Uniform System of Accounts for Hotels", as published by the Hotel Association of New York City, Inc., or any later or revised edition thereof, and as modified by the mutual agreement of the Owner and the Operator.



22. The term "Working Capital" shall mean amounts sufficient to cover anticipated Operating Expenses.

23. The term "Expert" shall mean an independent, nationally-recognized hotel consulting firm or individual qualified to resolve the issue in question and who is appointed in each instance by agreement of the parties or, failing agreement, by each party selecting one Expert and the two chosen experts selecting a third.

## ARTICLE XXIX

### Special Conditions

1. Owner and Operator agree to make such revisions to this Agreement as may be required by the Owner's mortgage lender or to better market the Guest Units, provided that such changes do not materially adversely affect the economic benefits to either party.

## ARTICLE XXX

### Miscellaneous

1. Any consent and approval required of the Owner or the Operator shall be ineffective unless in writing and signed by a duly authorized officer or agent of the respective parties.

2. No modification, alteration or amendment of this Agreement nor any waiver of any provision hereof shall be effective unless in writing and signed by the party sought to be charged therewith or by its duly authorized agent.

3. The headings of the Articles and Sections of this Agreement and all of its Appendices are inserted for convenience only and are not intended to affect the meaning of any of the provisions.

4. All Appendices to this Agreement are an integral part of this Agreement and all terms defined in this Agreement and the Appendices shall have the same meaning throughout this Agreement and its Appendices.

5. References in this Agreement to Articles, Sections, subsections and Appendices are to the Articles, Sections, subsections and the Appendices to this Agreement.  References to Articles or Sections, except where the context otherwise requires, are references to the relevant Article or Section in this Agreement or Article in which the reference appears. References to subsections are references to the relevant subsection in the Section in which the reference appears.

911312.4                                    -28-



6.  The Owner hereby represents that in entering into this Agreement the Owner has not relied on any projections of earnings, statements as to the possibility of future success or other similar matter which may have been prepared by the Operator or any member of the General Hotel Management Ltd. group of companies, and understands that no guarantee is made or implied by the Operator or any member of the General Hotel Management Ltd. group of companies as to the cost or future financial success of the Hotel.

7.  This agreement constitutes the entire agreement between the Owner and the Operator relating to the subject matter hereof, superceding all prior agreements, oral or written.

911312.4                                    -29-



IN WITNESS WHEREOF GENERAL HOTEL MANAGEMENT and OWNER have duly executed this Agreement on the date first above written.

<u>SIGNED by the OWNER</u>
DEMPSEY VANDERBILT OWNERS, LLC.

By _____ by

Metropolitan Development Group, LLC
And SKIP Properties, N.V. Members
in the presence of: _____

AND

<u>SIGNED by GENERAL HOTEL MANAGEMENT LTD.</u>



By Hans R. Jenni, its Director

in the presence of: _____

25/01 '03 SAT 10:51 FAX                                                    Ø002

# THE SETAI GROUP

Jonathan J. Breene
Partner

January 8, 2003

Hans R. Janni
General Hotel Management
No. 1 Orchard Spring Land #04-02
Tourism Court
Singapore 247729

Re:   Management Agreement, dated March 20, 2000, between General Hotel Management  Ltd.
("GHM") and Setai Owners, LLC (formerly known as Dempsey Vanderbilt Hotel) (the "Agreement)

Dear Hans:

Further to our previous conversations, this letter agreement will amend the Agreement in certain
respects and confirm certain understandings that we have agreed to.  We have agreed as follows:

1.      All capitalized terms used herein shall have the meanings given to them in the Agreement.

2.      The parties acknowledge that "Dempsey Vanderbilt Owners LLC" has changed its name to "Setai
Owners LLC" and that the proposed name of the Project has been changed from "Dempsey Vanderbilt
Hotel" to the "Setai Resort and Residences".

3.      Section 2(f) in Article XXVII of the Agreement is hereby corrected by deleting the word
"Operator" on the last line and changing it to "Owner".

4.      Article XXVII is hereby amended by adding the following provision at the end thereof:

        "5.   Notwithstanding anything herein to the contrary, the parties agree that, in
        connection with the Rental Program, Owner and Operator will endeavor to rent each
        Hotel Guest Unit in the Hotel to transient guests of the Hotel prior to offering to rent any
        of the residential units in the Residential Tower to transient guests of the Hotel."

5.      This will confirm that GHM will be entitled to a development fee equal to $964,000, (1/3 of
$2,892,000). GHM acknowledges having already received $310,000 in development fee payments
through the date hereof. The balance of $654,000 will be paid in equal monthly installments until May,
2004.

---

392 Fifth Avenue, 6ᵗʰ Floor, New York  NY 10018
Direct: 212-947 8140  Main: 212-947 7771   Fax: 212-947 8171
Cell: 917-375 2200   Email: jbreene@setai.com   Web Page: www.setai.com

25/01 '03 SAT 10:51 FAX              ☒003

THE SETAI GROUP

6.     GHM will be entitled to a brokerage commission equal to 1% of the sales price of any residential condominium units and hotel guest units; provided that GHM will not be entitled to a brokerage commission in connection with the sale of any unit with respect to which the Setai Group LLC or any entity affiliated with Setai Group LLC, Jonathan Breene or John Conroy (the "Breene/Conroy Group") does not also receive a brokerage commission (e.g., neither the Breene/Conroy Group nor GHM will be entitled to brokerage commissions in connection with the sale of units to "inside parties").  Such commissions will be payable when and to the extent such payments are made to the Breene/Conroy Group.

7.      Except as modified hereby, the Agreement remains in full force and effect and unmodified.

Please execute this letter in the lower left hand corner to confirm your agreement to the foregoing.

                         Sincerely,

                         Setai Owners LLC

                         By: Setai South Beach LLC

                         By: _____
                                 Jonathan Breene

GENERAL HOTEL MANAGEMENT LTD.

By: _____
     Hans R. Jenni